B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or to Permit Inspection in a Bankruptcy Case or Adversary Proceeding (12/13)

# UNITED STATES BANKRUPTCY COURT
## for the District of Delaware

| | |
|---|---|
| In re Physiotherapy Holdings Inc., *et al.* | Case No. ___13-12965-KG___ |
| Debtor | |
| *(Complete if issued in an adversary proceeding)* | |
| PAH Litigation Trust | Chapter ___11___ |
| *Plaintiff* | |
| v. | |
| Water Street Healthcare Partners, L.P., *et al.* | |
| *Defendant* | Adv. Proc. No. ___15-51238-KG___ |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  Mayo Foundation for Medical Education and Research
200 First Street SW
Rochester, MN 55905

*(Name of person to whom this subpoena is directed)*

☒  *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See Schedule A

| | |
|---|---|
| Place:  Quinn Emanuel Urquhart & Sullivan, LLP<br>865 South Figueroa St., 10th Floor<br>Los Angeles, CA  90017<br>c/o Johanna Ong<br>or another mutually-agreeable location | Date and Time:  April 20, 2017 at 9:00 a.m. |

☐  *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: _____ |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   April 6, 2017

*CLERK OF COURT*

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _PAH Litigation Trust_ , who issues or requests this subpoena, are: Johanna Ong, Quinn Emanuel Urquhart & Sullivan, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017; johannaong@quinnemanuel.com; 213.443.3000.

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

05773-00001/9160276.1

B257  (Form 257 - Subpoena to Produce Documents, Information, or Objects or to Permit Inspection in a Bankruptcy Case or Adversary Proceeding (12/13)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any):* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows:

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of   $_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

B257  (Form 257 - Subpoena to Produce Documents, Information, or Objects or to Permit Inspection in a Bankruptcy Case or Adversary Proceeding (12/13)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)
## (made applicably in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

05773-00001/9160276.1

**SCHEDULE A**

**DEFINITIONS**

As used herein, the following terms shall have the meanings indicated below:

1.      "Adversary Proceeding" means the adversary proceeding fashioned *PAH Litigation Trust v. Water Street Healthcare Partners, L.P. et al.* (Adv. Pro. No. 15-51238-KG) (Bankr. D. Del.).

2.      "Advisory Board" has the same definition as in Section 8.1 of the Second Amended and Restated Agreement of Limited Partnership of Wind Point Partners IV L.P. dated June 9, 2000 (WPP-PHYSIO_0041101-41205).

3.      "Answers" means  the answers filed in the Adversary Proceeding, and attached as Appendix B hereto.

4.      "Communication" means any transmittal of information, whether internal or external to You, and encompasses every medium of transmittal, including oral, written, graphic, and electronic communications.

5.      "Company" means Physiotherapy Associates Holdings, Inc. and each of its divisions, subsidiaries, and affiliates, including, but not limited to each entity identified on Appendix A hereto and their divisions, subsidiaries, and affiliates.

6.      "Complaint" means the complaint filed in the Adversary Proceeding, and attached as Appendix C hereto.

7.      "Document" is used in the broadest possible sense and means, without limitation, any written, printed, typed, photocopied, photographed, recorded or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, data, pictures, sounds or symbols, or any combination thereof. "Document" means anything which may be considered to be a document or tangible thing, and includes without limitation,

1

correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes of minutes of meetings or communications, electronic mail/messages and/or "e-mail," instant messaging, text messages, questionnaires, surveys, charts, graphs, photographs, films, tapes, disks, data cells, printouts of information stored or maintained by electronic data processing or word processing equipment, all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form), including, without limitation, electromagnetically sensitive storage media such as CDs, DVDs, memory sticks, floppy disks, hard disks and magnetic tapes and any preliminary versions, as well as drafts or revisions of any of the foregoing.

8.      "Financial Condition" means the Company's financial performance, including, but not limited to, its gross and net revenues, gross and net accounts receivable, gross and net income, adjusted and unadjusted EBITDA, profitability, assets, liabilities and solvency.

9.      "Referring or Relating to" means constituting, pertaining to, making reference to, identifying, comprising, evidencing, alluding to, responding to, connected with, commenting on, with respect to, about, regarding, resulting from, embodying, explaining, supporting, contradicting, discussing, showing, describing, reflecting, analyzing, setting forth, in respect of, having a relationship to, or in any way being factually, legally, or logically connected to, in whole or in part, the stated subject matter.

10.     "Water Street" means Water Street Healthcare Partners, L.P., WS Associate Co-Invest Partners, LLC, and Water Street Healthcare Management, L.P. and each of their

predecessors, successors, divisions, subsidiaries, affiliates, and joint ventures, as well as their present and former officers, directors, consultants, agents, representatives, employees, assigns, attorneys, and any other person or entity directly or indirectly, wholly or in part, owned by, controlled by or associated with them, and any others acting or purporting to act on their behalf.

11.    "Wind Point" means Wind Point Partners IV, L.P., Wind Point IV Executive Advisor Partners, L.P., Wind Point Associates IV, LLC, and Wind Point Investors IV, L.P., and each of their predecessors, successors, divisions, subsidiaries, affiliates, and joint ventures, as well as their present and former officers, directors, consultants, agents, representatives, employees, assigns, attorneys, and any other person or entity directly or indirectly, wholly or in part, owned by, controlled by or associated with them, and any others acting or purporting to act on their behalf.

12.    The terms "You" and "Your" as used herein shall refer to Mayo Foundation for Medical Education and Research as well as Your present and former agents, representatives and any others acting or purporting to act on Your behalf.

## **INSTRUCTIONS**

1.    Unless otherwise indicated, the documents requested to be produced herein include all documents in Your possession, custody, or control or in the possession, custody, or control of anyone acting on Your behalf or at Your direction.  If any requested document was, but no longer is, in Your possession, custody, or control, state the disposition of each such document.

2.    Responsive documents should be produced in the manner prescribed by the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, including

producing the requested documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the requests, and identifying the name of the person from whose files the documents were produced.

3.    You are to produce the original and all non-identical copies, including all drafts, of each document requested.  If You are not able to produce the original of any document, please produce the best available copy and all non-identical copies, including drafts.

4.    Electronic records and computerized information must be produced in their native format with all metadata preserved and intact.

5.    Selection of documents from the files and other sources and the numbering of such documents shall be performed in such a manner as to ensure that the source of each document may be determined, if necessary.

6.    File folders with tabs or labels or directories of files identifying documents must be produced intact with such documents.

7.    A document with handwritten, typewritten, or other recorded notes, editing marks, etc., is not and shall not be deemed identical to one without such modifications, additions, or deletions.  The term "original" includes the file copy and copies of any document if there is no actual original or ribbon copy.

8.    The singular includes the plural and vice versa, except as the context may otherwise require; any request propounded in the present tense shall also be read as if propounded in the past tense and vice versa; reference to any gender includes the other gender; the words "any" and "or" shall be construed as either conjunctive or disjunctive in such manner as will broaden as widely as possible the scope of any request for production; the word "all" means "any and all"; the word "any" means "any and all"; the word "including" means

"including but not limited to."  Any ambiguity in a discovery request shall be construed to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

9.      If any document is withheld under any claim of privilege, including without limitation, attorney-client privilege and attorney work product, You should provide the following information with respect to such document:  (a) the date of the document; (b) the title of the document; (c) the name of its author(s) or preparer(s) and an identification of the employer and title of each such person; (d) the name of each person who was sent or furnished with, received, viewed, or has custody of the document or a copy thereof together with an identification by employment and title of each such person; (e) the request to which the document relates; (f) the title and description of the document to identify it sufficiently without revealing the information for which privilege is claimed; (g) the claim of privilege under which it is withheld; and (h) a description of the subject matter of the document in sufficient detail to support Your contention that the document is privileged.

10.      If, after exercising due diligence to secure them, You cannot provide some or any of the requested documents, so state and provide all documents to the extent possible, specifying the reason for Your inability to produce the remainder of the documents, and stating whatever information or knowledge You have concerning each document not produced.

11.      If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this action or unless otherwise permitted by the Court.

12.     If an objection is made to any request, state Your objection and the ground or grounds with particularity in Your written response.  If an objection is made only to part of the request, identify that part in Your written response and state Your objection and the ground(s) therefore.

13.     This request is a continuing one.  If, after producing the requested documents, You obtain or become aware of any further documents responsive to this request, You are required to produce such additional documents.  Supplemental responses should be served within thirty (30) days after such information or documents become known to You.

14.     Unless otherwise specified, the time period covered by these requests is from February 13, 2010 (or the beginning of Your relationship with Water Street and/or Wind Point whichever is earlier) to present, and shall encompass all documents and information relating in whole or in part to such period, or to events or circumstances during such period, even though dated, prepared, generated, or received prior to or after that period.

**DOCUMENT REQUESTS**

**REQUEST FOR PRODUCTION NO. 1:**

All agreements between You and Wind Point.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Communications Referring or Relating to any funds, disbursement, transfers or benefit You received in connection with the sale of the Company, including but not limited to any distribution notices.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications Referring or Relating to any distributions or transfers made to You by Wind Point on or after August 19, 2015.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and Communications Referring or Relating to any requests to claw back or to return distributions You received, or for Your indemnification of Wind Point, in connection with this Adversary Proceeding or any other potential or actual claims relating to the sale of the Company.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show the interpretation of, and course of dealing under, any provisions in any agreement with Wind Point relating to the claw back or return of distributions received by You or relating to Your indemnification of Wind Point, including but not limited to Sections 6.10 and 7.1 of the Second Amended and Restated Agreement of Limited Partnership of Wind Point Partners IV L.P. dated June 9, 2000 (WPP-PHYSIO_0041101-41205).

**REQUEST FOR PRODUCTION NO. 6**:

All Documents and Communications Referring or Relating to any capital call notices and related documents You received from Wind Point relating to Wind Point's investment in the Company.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and Communications Referring or Relating to the Financial Condition of the Company, including but not limited to any reports, analysis, and/or other Documents provided to or created for or on behalf of the Advisory Board or any Advisory Board member.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Communications Referring or Relating to the valuation of the Company, including but not limited to any reports, analysis, and/or other Documents provided to or created for or on behalf of the Advisory Board or any Advisory Board member.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Communications Referring or Relating to the Company that was provided to or created for or on behalf of the Advisory Board or any Advisory Board member, including but not limited to minutes of the meetings of the Advisory Board, any notes or summaries of such meetings, and any reports or analysis created for or on behalf of the Advisory Board or any Advisory Board member.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and Communications Referring or Relating to any management or other fees received by Wind Point in connection with the Company.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and Communications Referring or Relating to any waivers, redirections or deferrals of Wind Point's management or other fees in connection with the Company.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and Communications Referring or Relating to any claims or demands made by Wind Point against You, or vice versa, in connection with the Company or this Adversary Proceeding.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents and Communications Referring or Relating to the valuation of portfolio companies, investments and/or other assets held by Wind Point from April 30, 2012 to the present, including but not limited to reports You received pursuant to Section 11.3 of the Second Amended and Restated Agreement of Limited Partnership of Wind Point Partners IV L.P. dated June 9, 2000 (WPP-PHYSIO_0041101-41205).

**REQUEST FOR PRODUCTION NO. 14**:

Documents sufficient to show the Identity of members of the Advisory Board from 2007-present.

**REQUEST FOR PRODUCTION NO. 15:**

All  Documents and Communications Referring or Relating to the Adversary Proceeding, including allegations in the Complaint or the claims asserted therein, or in either of the Answers.

**REQUEST FOR PRODUCTION NO. 16:**

All  Documents and Communications Referring or Relating to any inquiries, requests, or communication with or claims or investigations by the United States Securities and Exchange Commission or any other government entity or agency regarding Wind Point and Water Street's sale of the Company and/or financial or accounting irregularities or "accounting noise" at the Company, including, but not limited to, requests for Documents or Communications received from any government entity or agency, Documents or Communications exchanged with or produced to any government entity or agency, and Documents or Communications Referring or Relating to potential or actual interviews, statements, depositions, or communications with any government entity or agency concerning the foregoing.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents and Communications Referring or Relating to any claims or lawsuits involving allegations of fraud or misrepresentation by Wind Point including, but not limited to, any pleadings, depositions, declarations, documents produced or received, in the context of such claims or lawsuits.

## Appendix A

- Physiotherapy Holdings, Inc.

- Actra Rehabilitation Associates, Inc.

- Alexandria Sports, Inc.

- Benchmark Acquisition Corp.

- Benchmark Medical Management Company

- Benchmark O&P Holdings, Inc.

- Benchmark Orthotics & Prosthetics, Inc.

- Blue Hen Physical Therapy, Inc.

- Cape Prosthetics-Orthotics, Inc.

- Carrollton Physical Therapy Clinic, Inc

- Integrity Physical Therapy, Inc.

- Keystone Rehabilitation Associates of Warren

- Keystone Rehabilitation Systems, Inc.

- Keystone Rehabilitation Systems of McMurray

- Leesburg Sports, Inc.

- MATRIX Healthcare Services, LLC

- MATRIX Rehabilitation, Inc.

- MATRIX Rehabilitation-Delaware, Inc.

- MATRIX Rehabilitation-Georgia, Inc.

- MATRIX Rehabilitation-Ohio, Inc.

- MATRIX Rehabilitation-South Carolina, Inc.

- MATRIX Rehabilitation-Texas, Inc.

- Morris Area Rehabilitation Association, Inc.

- North Dallas Physical Therapy Associates, Inc.

- Northstar Health Services, Inc.

- NSHS Services, Inc.

- Orthopaedic Services of Paducah, Inc.

- PhysioLink Corporation

- Physiotherapy Associates Holdings, Inc.

- Physiotherapy Associates, Inc.

- Physiotherapy Associates-Union Rehab, LLC

- Physiotherapy Corporation

- Physiotherapy-BMHI Holdings, Inc.

- Physiotherapy-BMI, Inc.

- Potomac Rehabilitation Services, Inc.

- Professional Rehab Associates, Inc.

- Progressive Therapy Services, Inc.

- Rehab Associates, L.L.C.

- Rehab Colorado, LLC

- Rehab Missouri, LLC

- Rehab Xcel, LLC

- Rehabilitation Consultants, Inc.

- R.S. Network, Inc.

- SMR Banyan Tree, Inc.

- Swanson Orthotic & Prosthetic Center, Inc.

- The Parks Physical Therapy and Work Hardening Center, Inc.

- Theraphysics Partners of Colorado, Inc.

- Theraphysics Partners of Texas, Inc.

- Therapy Associates of Martinsville, Inc.

- Trumbull P.T. Corp.

- Wisconsin Prosthetics and Orthotics, Inc.

# APPENDIX B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*, | ) |
| | ) Case No. 13-12965 (KG) |
| Debtors. | ) (Jointly Administered) |
| PAH LITIGATION TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary No. 15-51238 (KG) |
| | ) |
| WATER STREET HEALTHCARE PARTNERS, | ) |
| L.P., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ANSWER OF THE WIND POINT DEFENDANTS

Defendants Wind Point Partners IV, L.P., Wind Point IV Executive Advisor Partners, L.P., Wind Point Associates IV, LLC, and Wind Point Investors IV, L.P. (collectively, except where otherwise specifically noted, "Defendants" or "Wind Point"),[1] by their undersigned counsel, hereby answer the Complaint filed on September 1, 2015 ("Complaint") by Plaintiff, the PAH Litigation Trust ("Plaintiff" or the "Litigation Trust"), in the above-captioned adversary proceeding as follows:

1.      Defendants deny the allegations set forth in paragraph 1 of the Complaint, except admit that Plaintiff purports to bring this action under Pennsylvania and federal fraudulent transfer laws to recover the portion of the proceeds of the April 2012 sale (the "Transaction") of Physiotherapy Associates Holdings, Inc. ("PTA" or the "Company") to affiliates of another private equity investor, Court Square Capital Partners II, L.P. ("Court Square"), that were paid to Defendants.  Defendants deny that Plaintiff is entitled to the relief requested in the Complaint.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint.

2.     Defendants deny the allegations in paragraph 2 of the Complaint, except admit and aver that: (i) Wind Point and certain of its affiliates (and, upon information and belief, that defendant Water Street Healthcare Partners, L.P. and certain of its affiliates (together, "Water Street")) are private equity investors and fund managers; (ii) in the two years preceding the Transaction, Water Street and Wind Point in the aggregate owned approximately 90 percent of the outstanding common stock of PTA; and (iii) the Company's stockholders (including, among others, Water Street, Wind Point and their investors) received cash consideration upon the closing of the Transaction, with the balance of the proceeds being used to pay certain transaction fees and repay all of PTA's existing debt (approximately $179.4 million).

3.     Defendants deny the allegations set forth in paragraph 3 of the Complaint, except admit and aver that: (i) prior to the Transaction, PTA, a privately held company headquartered in Exton, Pennsylvania, was one of the largest providers of outpatient physical therapy services in the United States, with roughly 650 clinics in 33 states as of 2012; (ii) PTA was the product of a merger of PTA with Benchmark Medical, Inc. ("Benchmark") in 2007 and subsequent acquisitions; (iii) after merging with Benchmark, PTA had four different billing systems in place, which was suboptimal; (iv) in 2010, to improve its revenue cycle management, PTA (a) transitioned to a new revenue cycle management software system, which consolidated the four legacy billing systems into a single system to drive efficiencies and improve cash flows, and (b) switched from handling its own billings and collections to using an outsourced specialist service provider, IKS, to reduce costs and consolidate collections under one system; and (v) not surprisingly, implementing these company-wide changes led to various issues that adversely affected both billings and cash collections, all of which were disclosed to, and known by, prospective purchasers of, and lenders to, the Company.

4.      Defendants deny the allegations set forth in paragraph 4 of the Complaint.

5.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Complaint.

6.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint, except deny that PTA's reported net revenue for the periods preceding the Transaction had been deliberately manipulated to inflate reported net revenue or that PTA's financial statements had been falsified.

7.      Defendants deny the allegations set forth in paragraph 7 of the Complaint.

8.      Defendants deny the allegations set forth in paragraph 8 of the Complaint.

9.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9 of the Complaint relating to Water Street holding various investment committee meetings, and deny the remaining allegations set forth in paragraph 9 of the Complaint.  By way of further response, Defendants deny Plaintiff's characterization of referenced documents (which are not attached to the Complaint), as the documents themselves constitute the best evidence of their contents.

10.     Defendants deny the allegations set forth in paragraph 10 of the Complaint.

11.     Defendants deny the allegations set forth in paragraph 11 of the Complaint, except admit that Plaintiff purports to bring this action under Pennsylvania and federal fraudulent transfer laws to recover the portion of the proceeds of the Transaction that were paid to Water Street and Wind Point.  Defendants deny that Plaintiff is entitled to the relief requested in the Complaint.

12.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first two sentences of paragraph 12 of the Complaint with

respect to the time period after the closing of the Transaction, and admit upon information and belief the remaining allegations set forth in paragraph 12 of the Complaint.

13.     Defendants (i) admit that, pursuant to the Plan, the PAH Litigation Trust was formed and certain claims were purportedly assigned to the Litigation Trust, (ii) refer the Court to the Plan and Litigation Trust Agreement for a complete and accurate statement of its terms, and (iii) state that the balance of paragraph 13 of the Complaint contains legal conclusions to which no response is required.

14.     Defendants deny the allegations set forth in paragraph 14 of the Complaint, except admit and aver upon information and belief that, following the merger of PTA and Benchmark in 2007, Water Street owned approximately 53.2 percent of PTA's common shares, and that, as of the date of the Transaction, Water Street's ownership interest was approximately 51.4 percent.

15.     Defendants admit upon information and belief the allegations set forth in paragraph 15 of the Complaint.

16.     Defendants deny the allegations set forth in paragraph 16 of the Complaint, except admit and aver that, following the merger of PTA and Benchmark in 2007, Wind Point owned approximately 38 percent of PTA's common shares, and that, as of the date of the Transaction, Wind Point's ownership interest remained at approximately 38 percent.

17.     Defendants admit upon information and belief the allegations set forth in paragraph 17 of the Complaint.

18.     The allegation set forth in paragraph 18 of the Complaint constitutes a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in paragraph 18 of the Complaint, except admit that, as of the date

of the Transaction, Water Street and Wind Point owned approximately 51.4 and 38 percent, respectively, of the common shares of PTA.

19.     Defendants deny the allegations set forth in paragraph 19 of the Complaint, except admit upon information and belief that, following the Transaction, Water Street distributed to the limited partners of the Water Street fund that was the initial recipient of the sale proceeds each limited partner's allocable share thereof, and aver that, upon information and belief, all of the so-called "subsequent transferees" that received distributions from Water Street have been dismissed from the case.

20.     Defendants deny the allegations set forth in paragraph 20 of the Complaint, except admit that, following the Transaction, Wind Point distributed to the limited partners of the Wind Point fund that was the initial recipient of the sale proceeds each limited partner's allocable share thereof, and aver that, upon information and belief, the vast majority of the so-called "subsequent transferees" that received distributions from Wind Point have been dismissed from the case.

21.     The allegations set forth in paragraph 21 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that this Court has jurisdiction to consider this matter, which is a core proceeding.  By way of further response, pursuant to Fed. R. Bankr. P. 7012(b) and Del. Bankr. L.R. 7012-1, Defendants do not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

22.     The allegation set forth in paragraph 22 of the Complaint constitutes a legal conclusion to which no response is required.  To the extent a response is required, Defendants admit the allegation set forth in paragraph 22 of the Complaint.

23.     Defendants deny the allegations set forth in paragraph 23 of the Complaint and heading A, except admit that, following the merger of PTA and Benchmark in 2007, Water Street and Wind Point owned approximately 53.2 percent and 38 percent, respectively, of PTA's common shares, and that, as of the date of the Transaction, Water Street and Wind Point owned approximately 51.4 percent and 38 percent, respectively, of PTA's common shares.

24.     Defendants deny the allegations set forth in paragraph 24 of the Complaint, except (i) admit and aver that James G. Connelly, III, Curt M. Selquist, Richard R. Kracum, Robert Womsley, Daniel J. Connors, and James W. McLane were members of PTA's Board of Directors when the sale to Court Square was approved in 2012; (ii) admit that Richard R. Kracum was a Managing Director at Wind Point at the time of the Board's approval of the Transaction, (iii) admit upon information and belief that, upon the closing of the Transaction, their Board tenures ended; (iv) deny the accuracy of the "begin date" for Richard R. Kracum; and (v) lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the beginning dates of Board service of the other identified persons.

25.     Defendants deny the allegations set forth in paragraph 25 of the Complaint, except admit upon information and belief that the individuals listed therein held the respective positions as officers of the Company at various points of time prior to (and, in certain instances, following) the closing of the Transaction, and lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the beginning and end dates for the employment of Messrs. DeVoe, Bode, Limeri, Grabaskas, Walden and Sloyer.

26.     Defendants deny the allegations set forth in paragraph 26 of the Complaint, except admit and aver that on or about June 28, 2007, Water Street Healthcare Management, L.P., Wind Point Investors IV, L.P., Physiotherapy Associates, Inc., and Benchmark Medical, Inc. entered into a management agreement (the "Management Agreement"), in which Water Street Healthcare Management, L.P. and Wind Point Investors IV, L.P. agreed, among other things, "to consult with and advise the board of directors of the Company and board of directors of Parent and the management of the Company and the Parent in such manner and on such business and financial matters as may be reasonably requested from time to time and as may be reasonably agreed to by Water Street and Wind Point, including: (i) general advisory services in relation to the Company's management and business, (ii) identification, analysis, support and negotiation of acquisitions and dispositions, (iii) analysis, support and negotiation of financing alternatives, including in connection with acquisitions, capital expenditures and refinancings of existing indebtedness, (iv) finance functions, including assistance in the preparation of financial projections and (v) strategic planning functions, including the evaluation of major strategic alternatives."  The Court is referred to the Management Agreement for a complete and accurate statement of its terms.

27.     Defendants deny the allegations set forth in paragraph 27 of the Complaint.

28.     Defendants admit the allegations set forth in paragraph 28 of the Complaint, except Defendants lack sufficient knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the final sentence of paragraph 28 of the Complaint.

29.     Defendants admit upon information and belief the allegations set forth in the first sentence of paragraph 29 of the Complaint, and lack knowledge or information sufficient to form

a belief as to the truth of the allegations set forth in the second sentence of paragraph 29 of the Complaint.

30.     Defendants admit upon information and belief the allegations set forth in paragraph 30 of the Complaint.

31.     Defendants deny the allegations set forth in paragraph 31 of the Complaint, except admit upon information and belief that the Company generally recorded revenue when the service was provided, but before payment was actually received.

32.     Defendants admit upon information and belief the allegations set forth in the second sentence of paragraph 32 of the Complaint, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 32.

33.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first two sentences of paragraph 33 of the Complaint and deny the allegations in the third sentence thereof.

34.     Defendants deny the allegations set forth in paragraph 34 of the Complaint to the extent responses are required, except admit that accounting estimates must generally be "reasonable."

35.     Defendants deny the allegations set forth in paragraph 35 of the Complaint, except admit that, from 2007 to sometime in 2010, the Company estimated its net revenue based on a "look back" method.

36.     Defendants deny the allegations set forth in paragraph 36 of the Complaint and heading C, except admit upon information and belief that in or around June 2009 PTA informed its lenders, among other things, that, through April 2009, year-to-date revenue was down versus the prior year, bad debt as a percentage of net revenue had increased since September 2007, the

Company was losing market share, its EBITDA as a percent of revenue was below the industry norm and its days sales outstanding ("DSO") was above the industry norm.

37.    Defendants deny the allegations set forth in paragraph 37 of the Complaint.

38.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38 of the Complaint, except admit and aver upon information and belief that, as a result of issues that arose beginning in 2010 during the implementation of company-wide measures to improve revenue cycle management, PTA fell significantly behind on both its billings and cash collections, resulting in a significant increase in DSO.

39.    Defendants deny the allegations set forth in paragraph 39 of the Complaint, except admit and aver that in 2010, management, with the concurrence of the Company's auditors at KPMG LLP, made efforts to improve PTA's method of estimating net revenues by switching from the "look back" method (which management concluded was no longer an effective way to estimate net revenues) to an alternative method (referred to as the "rate bridge" method).

40.    Defendants deny the allegations set forth in paragraph 40 of the Complaint, except admit and aver that, in or about 2010, the Company changed its method of estimating net revenue, with the concurrence of PTA's auditors at KPMG LLP, from a "look back" to a "rate bridge" method, and that such change was fully disclosed to all prospective purchasers of the Company.

41.    Defendants deny the allegations set forth in paragraph 41 of the Complaint, except admit and aver that, in or about 2010, the Company changed its method of estimating net revenue, with the concurrence of PTA's auditors at KPMG LLP, from a "look back" to a "rate

bridge" method, and that such change was fully disclosed to all prospective purchasers of the Company.

42.     Defendants deny the allegations set forth in paragraph 42 of the Complaint.

43.     Defendants deny the allegations set forth in paragraph 43 of the Complaint, except admit that the Board of Directors of PTA was informed of the change from the "look back" to the "rate bridge" method of estimating net revenue that occurred in 2010.

44.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44 of the Complaint.

45.     Defendants admit upon information and belief the allegations set forth in paragraph 45 of the Complaint, except aver that the solicitation and receipt of bids occurred with the involvement of Jefferies & Company, Inc. ("Jefferies"), as financial advisor to the Company, and deny the allegations in heading D.

46.     Defendants deny the allegations set forth in the first sentence of Paragraph 46 of the Complaint.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of Paragraph 46 of the Complaint.

47.     Defendants deny the allegations set forth in paragraph 47 of the Complaint.

48.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the timing, subject matter and substance of the internal PTA emails referenced in paragraph 48 of the Complaint, which are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants, and deny the remaining allegations set forth in paragraph 48 of the Complaint.  By way of further response, Defendants deny Plaintiff's characterization of

referenced documents, as the documents themselves constitute the best evidence of their contents.

49.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quote attributed to PTA's Vice President of Revenue Cycle, which is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants, and deny the remaining allegations set forth in paragraph 49 of the Complaint.  By way of further response, Defendants deny Plaintiff's characterization of the referenced document, as the document itself constitutes the best evidence of its contents.

50.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the subject matter and substance of the internal PTA emails referenced in paragraph 50 of the Complaint, which are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants, and deny the remaining allegations set forth in paragraph 50 of the Complaint.  By way of further response, Defendants deny Plaintiff's characterization of referenced documents, as the documents themselves constitute the best evidence of their contents.

51.   Defendants deny the allegations set forth in paragraph 51 of the Complaint.

52.   Defendants deny the allegations set forth in paragraph 52 of the Complaint.

53.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53 of the Complaint.

54.   Defendants deny the allegations set forth in paragraph 54 of the Complaint, except aver that the issues that arose beginning in 2010 during the implementation of company-wide measures to improve revenue cycle management, in particular in connection with its

billings and cash collections, were expressly disclosed to the Company's auditors, accounting and financial advisors and prospective bidders (and their accounting and financial advisors) in the process supervised by Jefferies.

55.    Defendants deny the allegations set forth in paragraph 55 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the existence, timing, subject matter and substance of the purported internal emails referenced therein, to which the Court is referred for a complete and accurate statement of their terms (as opposed to the undated, unattributed partial quotes selectively referenced therein that are not attached to the Complaint, have not been produced to Defendants and thus are not subject to review or confirmation by Defendants).  Defendants deny Plaintiff's characterizations of the referenced documents, as the documents themselves constitute the best evidence of their contents.

56.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the existence, subject matter and substance of the internal PTA email referenced in paragraph 56 of the Complaint, which is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants, and deny the remaining allegations set forth in paragraph 56 of the Complaint. By way of further response, Defendants deny Plaintiff's characterization of the referenced document, as the document itself constitutes the best evidence of its contents.

57.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the timing, subject matter and substance of the internal PTA emails referenced in paragraph 57 of the Complaint, to which the Court is referred for a complete and accurate statement of the contents and terms (as opposed to the undated,

unattributed partial quotes selectively referenced therein that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants) and deny the remaining allegations set forth in paragraph 57 of the Complaint. Defendants deny Plaintiff's characterizations of the referenced documents, as the documents themselves constitute the best evidence of their contents.

58.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes attributed to PTA's Vice President of Financial Planning & Accounting, and deny the remaining allegations set forth in paragraph 58 of the Complaint.

59.     Defendants deny the allegations set forth in paragraph 59 of the Complaint and in heading E.

60.     Defendants deny the allegations set forth in paragraph 60 of the Complaint, except admit that members of PTA's Board of Directors were provided information from management regarding PTA's cash collections on a monthly or periodic basis.

61.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 61 of the Complaint.

62.     Defendants deny the allegations set forth in paragraph 62 of the Complaint, except admit and aver that PTA's Board of Directors received monthly or periodic reports (including one for the month of August 2010) from PTA's Chief Financial Officer addressing, among other things, revenues, cash collections and DSO, to which the Court is referred for a complete and accurate statement of their terms.  Defendants deny Plaintiff's characterizations of the referenced document (which is not attached to the Complaint), as the document itself constitutes the best evidence of its contents.

63.     Defendants deny the allegations set forth in paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth in paragraph 64 of the Complaint, except admit that, in or around the first quarter of 2011, certain members of PTA's management made a presentation to PTA's Board of Directors entitled "Revenue Cycle Management: The Path Forward, February 2011," to which the Court is referred for a complete and accurate statement of its terms.  Defendants deny Plaintiff's characterizations of the referenced document (which is not attached to the Complaint), as the document itself constitutes the best evidence of its contents.

65.     Defendants deny the allegations set forth in paragraph 65 of the Complaint, except admit that the February 2011 presentation, to which the Court is referred for a complete and accurate statement of its terms, provided several suggested metrics for PTA's Board of Directors to measure success going forward.  Defendants deny Plaintiff's characterizations of the referenced document (which is not attached to the Complaint), as the document itself constitutes the best evidence of its contents.

66.     Defendants deny the allegations set forth in paragraph 66 of the Complaint.

67.     Defendants deny the allegations set forth in paragraph 67 of the Complaint.

68.     Defendants deny the allegations set forth in paragraph 68 of the Complaint.

69.     Defendants deny the allegations set forth in paragraph 69 of the Complaint.

70.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported email from PTA's Chairman to its CEO that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants, and deny the remaining allegations set forth in paragraph

70 of the Complaint.  Defendants deny Plaintiff's characterizations of the referenced document, as the document itself constitutes the best evidence of its contents.

71.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes attributed to PTA's consultant apparently contained in a document that is not attached to the Complaint, has not been produced to Defendants and thus is not subject to review or confirmation by Defendants, and Defendants deny the remaining allegations set forth in paragraph 71 of the Complaint.  By way of further response, Defendants deny Plaintiff's characterization of the referenced document, as the documents itself constitutes the best evidence of its contents.

72.     Defendants deny the allegations set forth in paragraph 72 of the Complaint, except admit and aver that the Company's CFO sent a one-page analysis to members of the Company's Board, to which the Court is referred for a complete and accurate statement of its terms, which noted a difference of only $200,000 after 9 months of collections on an originally estimated collectible amount of over $29 million of monthly net revenues in March 2011, reflecting the different methods temporarily used between the Company's income statement and aged trial balance to record the estimated remaining collectible amount of accounts receivable. Defendants deny Plaintiff's characterizations of the referenced document (which is not attached to the Complaint), as the document itself constitutes the best evidence of its contents.

73.     Defendants deny the allegations set forth in paragraph 73 of the Complaint.

74.     Defendants deny the allegations set forth in paragraph 74 of the Complaint and heading F, except admit and aver upon information and belief that, in or about January or February 2012, two potential bidders for PTA – Clayton Dubilier & Rice ("CD&R") and New Mountain Capital ("New Mountain") – advised Jefferies that they were not prepared to submit a

final bid to acquire PTA at that time, and they shared with PTA management and their advisors certain comments and questions that their own accounting advisors at PricewaterhouseCoopers LLP ("PwC") and Deloitte & Touche LLP ("Deloitte"), respectively, had raised during their due diligence with regard to PTA's accounting methods and financial results, which comments were summarized and rebutted by PTA's management in presentations to PTA's Board of Directors and also to the aforementioned prospective purchasers (CD&R and New Mountain) and their advisors.

75.     Defendants deny the allegations set forth in paragraph 75 of the Complaint, except admit and aver that a written summary and rebuttal of PwC's comments and questions regarding PTA's accounting methods and financial results was provided by PTA's management to PTA's Board of Directors on or about January 24, 2012, to which the Court is referred for a complete and accurate statement of its terms.

76.     Defendants deny the allegations set forth in paragraph 76 of the Complaint, except admit and aver that a written summary or copy of Deloitte's comments, and a rebuttal thereto, regarding PTA's accounting methods and financial results was provided by PTA's management to PTA's Board of Directors on or about February 3, 2012, to which the Court is referred for a complete and accurate statement of its terms.

77.     Defendants deny the allegations set forth in paragraph 77 of the Complaint and heading G.

78.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 78 of the Complaint. By way of further response, Defendants deny Plaintiff's characterization of referenced documents (which are not attached to the Complaint), as the documents themselves constitute the best evidence of their contents.

79.     Defendants deny the allegations set forth in paragraph 79 of the Complaint.

80.     Defendants deny the allegations set forth in paragraph 80 of the Complaint, except admit that Wind Point's Board designee received copies of the monthly or periodic cash collection reports and summaries of and rebuttals to the PwC and Deloitte comments that were provided to the other members of PTA's Board of Directors, refer the Court to the cash collection reports and other referenced documents for a complete and accurate statement of their terms.  By way of further response, Defendants deny Plaintiff's characterization of referenced documents (which are not attached to the Complaint), as the documents themselves constitute the best evidence of their contents.

81.     Defendants deny the allegations set forth in paragraph 81 of the Complaint and heading H.

82.     Defendants deny the allegations set forth in paragraph 82 of the Complaint, except admit and aver upon information and belief that Court Square and its underwriters prepared and circulated to prospective lenders an offering memorandum in or about April 2012, to which the Court is referred for a complete and accurate statement of its terms.  By way of further response, Defendants deny Plaintiff's characterization of the referenced document (which are not attached to the Complaint), as the document itself constitutes the best evidence of its contents.

83.     Defendants deny the allegations set forth in paragraph 83 of the Complaint.

84.     Defendants deny the allegations set forth in paragraph 84 of the Complaint.

85.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the existence and contents of the April 16, 2012 email referenced in paragraph 85 of the Complaint, which is not attached to the Complaint, has not

been produced to Defendants, and thus is not subject to review or confirmation by Defendants, and deny the remaining allegations of paragraph 85.  By way of further response, Defendants deny Plaintiff's characterization of the referenced document, as the document itself constitutes the best evidence of its contents.

86.    Defendants deny the allegations set forth in paragraph 86 of the Complaint and heading I, except admit that, on or about February 22, 2012, PTA, Physiotherapy Holdings, Inc., Physiotherapy Merger Sub, Inc. ("Merger Sub") and Water Street Healthcare Partners, L.P. entered into an Agreement and Plan of Merger ("Merger Agreement"), to which the Court is referred for a complete and accurate statement of its terms, to effectuate the sale of PTA to Court Square.  By way of further response, Defendants deny Plaintiff's characterization of the Merger Agreement, as the agreement itself constitutes the best evidence of its contents.

87.    Defendants deny the allegations set forth in paragraph 87 of the Complaint, except admit upon information and belief that the Transaction was financed by Court Square and its affiliates through (i) a Term Loan in the amount of $100 million, (ii) $210 million in Senior Notes, (iii) an equity investment by Court Square of approximately $213.3 million; (iv) a management equity rollover in the amount of approximately $3.9 million; and (v) a minority investment by General Electric Corporation of approximately $1 million.

88.    Defendants deny the allegations set forth in paragraph 88 of the Complaint, except admit upon information and belief that the Transaction was accomplished in several steps as described in the Merger Agreement and related Transaction closing documents, to which the Court is referred for a complete and accurate statement of their terms, pursuant to which, among other things: (i) Merger Sub became the initial obligor under the Term Loan and Senior Notes; (ii) following the closing, PTA assumed Merger Sub's obligations under the Term Loan and

Senior Notes; (iii) the common shares of PTA held by Water Street, Wind Point and the other selling stockholders were exchanged for cash consideration; and (iv) the balance of the sale proceeds were used to pay certain transaction fees and to repay all of PTA's preexisting debt (approximately $179.4 million).

89.     Defendants deny the allegations set forth in paragraph 89 of the Complaint.

90.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding any purported investigation that may have been conducted after the closing of the Transaction, and deny the remaining allegations set forth in paragraph 90 of the Complaint and in heading J.

91.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 91 of the Complaint.

92.     Defendants deny the allegations set forth in paragraph 92 of the Complaint and in heading K.

93.     Defendants deny the allegations set forth in paragraph 93 of the Complaint, and state that to the extent paragraph 93 contains legal contentions, no further response is required.

94.     Defendants deny the allegations set forth in paragraph 94 of the Complaint, except admit that a portion of the sale proceeds was paid to Water Street and Wind Point.

95.     Defendants deny the allegations set forth in paragraph 95 of the Complaint.

96.     Defendants deny the allegations set forth in paragraph 96 of the Complaint.

97.     Defendants deny the allegations set forth in paragraph 97 of the Complaint and in heading L.

98.     Defendants deny the allegations set forth in paragraph 98 of the Complaint.

99.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes from PTA's Chairman selectively lifted from unidentified documents that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants, and Defendants deny the remaining allegations set forth in paragraph 99 of the Complaint and heading M.    By way of further response, Defendants deny Plaintiff's characterization of referenced documents, as the documents themselves constitute the best evidence of their contents.

100.     Defendants deny the allegations set forth in paragraph 100 of the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 100 of the Complaint with respect to events that took place following the closing of the Transaction, and deny that the payment of the merger consideration to Water Street and Wind Point was a fraudulent transfer.

101.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 101 of the Complaint.

102.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 102 of the Complaint.

103.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 103 of the Complaint.

104.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 104 of the Complaint.

105.     Defendants admit upon information and belief the allegations set forth in paragraph 105 of the Complaint.

106.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding any investigation that may have been conducted after the closing of the Transaction, and deny the remaining allegations set forth in paragraph 106 of the Complaint.

107.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 107 of the Complaint and in heading N, except admit that, on or about November 12, 2013, PTA and certain affiliated debtors filed voluntary petitions under chapter 11 of the United States Bankruptcy Code.

108.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 108 of the Complaint, and aver upon information and belief that bondholders who are beneficiaries of the Litigation Trust and received equity in the reorganized debtor have now been paid in full and have suffered no legally cognizable loss or damages.

109.    Defendants admit upon information and belief the allegations set forth in paragraph 109 of the Complaint.

110.    Defendants repeat and re-allege their responses to paragraphs 1-109 above in response to paragraph 110 of the Complaint.

111.    Defendants deny the allegations set forth in paragraph 111 of the Complaint, except admit that, pursuant to the Merger Agreement, cash consideration was initially paid to Water Street, Wind Point and the other selling shareholders in exchange for their shares.

112.    Defendants deny the allegations set forth in paragraph 112 of the Complaint.

113.    Defendants deny the allegations set forth in paragraph 113 of the Complaint.

114.    Defendants deny the allegations set forth in paragraph 114 of the Complaint.

115.    Defendants admit the allegations set forth in paragraph 115 of the Complaint.

116.    The allegation set forth in paragraph 116 of the Complaint constitutes a legal conclusion to which no response is required.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation set forth in paragraph 116 of the Complaint.

117.    The allegation set forth in paragraph 117 of the Complaint constitutes a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegation set forth in paragraph 117 of the Complaint and deny that Plaintiff is entitled to the relief requested in the Complaint.

118.    Defendants deny the allegations set forth in paragraph 118 of the Complaint.

119-127.  Defendants state that no response is required to the allegations set forth in paragraphs 119-127 (Count II) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

128-132.  Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 128-132 (Count III) of the Complaint, because, upon information and belief, Plaintiff has dismissed from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the *Court's Order Approving Stipulation Regarding Service and Time to Respond to the Complaint Filed by the PAH Litigation Trust Against Alleged Subsequent Transferees dated October 2, 2015* (the "October 2015 Order").  To the extent that responses are required, Defendants deny the allegations set forth in paragraphs 128-132 of the Complaint.

133-141.  Defendants state that no response is required to the allegations set forth in paragraphs 133-141 (Count IV) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

142-150.  Defendants state that no response is required to the allegations set forth in paragraphs 142-150 (Count V) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

151-155.  Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 151-155 (Count VI) of the Complaint, because, upon information and belief, Plaintiff has dismissed from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the Court's October 2015 Order.

156.  Defendants repeat and re-allege their responses to paragraphs 1-155 above in response to paragraph 156 of the Complaint.

157.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 157 of the Complaint.

158.  Defendants deny the allegations set forth in paragraph 158 of the Complaint, except admit that, pursuant to the Merger Agreement, cash consideration was initially paid to Water Street, Wind Point and the other selling shareholders in exchange for their shares.

159.  Defendants deny the allegations set forth in paragraph 159 of the Complaint.

160.  Defendants deny the allegations set forth in paragraph 160 of the Complaint.

161.  Defendants deny the allegations set forth in paragraph 161 of the Complaint.

162.  Defendants admit the allegations set forth in paragraph 162 of the Complaint.

163.    The allegations set forth in paragraph 163 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 163 of the Complaint

164.    The allegations set forth in paragraph 164 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in paragraph 164 of the Complaint and deny that Plaintiff is entitled to the relief requested in the Complaint.

165.    Defendants deny the allegations set forth in paragraph 165 of the Complaint.

166-171.  Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 166-171 (Count VIII) of the Complaint, because, upon information and belief, Plaintiff has dismissed from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the October 2015 Order.

172.    The allegations following paragraph 171 of the Complaint are Plaintiff's prayer for relief, to which no response is required.  To the extent a response is required, Defendants deny all allegations and deny that Plaintiff is entitled to the relief sought or to any relief whatsoever.

173.    The allegations following Plaintiff's prayer for relief is Plaintiff's request for a jury trial, to which no response is required.  Defendants reserve all rights with respect to whether Plaintiff is entitled to a jury trial in this action.

**DEFENSES**

174.    Defendants hereby set forth the following defenses, without admitting that any of them technically are "affirmative defenses" and/or that Defendants bear the burden of proof or persuasion with respect to any of these defenses.  Defendants reserve the right to amend this Answer to assert additional defenses that become known to them through discovery or otherwise.

**FIRST DEFENSE**

175.    The Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

176.    The Litigation Trust lacks standing to pursue any claims on behalf of Senior Noteholders.

**THIRD DEFENSE**

177.    In or about March 2016, the reorganized debtor was sold to Select Medical Corporation  in a merger transaction for a reported value of approximately $400 million in cash, almost double the amount of prepetition debt that was owed to the holders of Senior Notes, who had received 100% of the equity of the reorganized debtor under PTA's confirmed plan of reorganization.  Under the Plan all other creditors of PTA were paid in full.  Accordingly, as a result of the sale to Select Medical Corporation (and settlements into which the Litigation Trust has entered), all creditors (including the holders of Senior Notes who assigned their claims to the Litigation Trust) have been paid in full and have no continuing loss or damage they may seek to recover under fraudulent transfer law.  Any award to Plaintiff would constitute unjust enrichment.

**FOURTH DEFENSE**

178.    The claims the Litigation Trust is now pursuing on behalf of holders of Senior Notes have been rendered moot as a result of the sale to Select Medical Corporation (and

settlements into which the Litigation Trust has entered).  Any award to Plaintiff would constitute unjust enrichment.

## FIFTH DEFENSE

179.    Neither Defendants nor the critical mass of PTA's Board of Directors who approved the Court Square Transaction did so with actual intent to hinder, delay or defraud creditors.

## SIXTH DEFENSE

180.    The holders of Senior Notes on whose behalf the Litigation Trust is purporting to sue were not in privity with, and did not receive or reasonably rely upon any representations or warranties made by Wind Point or anyone acting or purporting to act on Wind Point's behalf before deciding to provide financing to Court Square.

## SEVENTH DEFENSE

181.    All state law claims for constructive fraudulent transfer have been implicitly preempted by section 546(e) of the Bankruptcy Code, or, alternatively, should be dismissed because PTA was neither insolvent nor rendered insolvent as a result of the Transaction.

## EIGHTH DEFENSE

182.    Plaintiff's claims are barred by the doctrines of ratification, estoppel, laches, waiver and consent.

## NINTH DEFENSE

183.    Plaintiff's claims are barred as the result of a prepetition settlement and voluntary release of claims by the Debtor against Wind Point in December 2012.

### TENTH DEFENSE

184.    To the extent Debtors were solvent, Plaintiff may not avoid as constructive fraudulent transfers payments to or for the benefit of Wind Point in connection with the Transaction.

### ELEVENTH DEFENSE

185.    To the extent Defendants have filed valid proofs of claim, or are entitled to an administrative claim against the Debtors, Plaintiff may not avoid payments to Wind Point and Defendants reserve their rights to set-off any of their claims against such payments.

### TWELFTH DEFENSE

186.    The Defendants took in good faith for value.

### THIRTEENTH DEFENSE

187.    As a result of the recoveries to the only impaired class of creditors under the Plan from, *inter alia*, the sale to Select Medical Corporation and settlements into which the Litigation Trust has entered, all creditors have been paid in full and no further claims for damages can be asserted.

*[Remainder of Page Intentionally Left Blank]*

## REQUEST FOR RELIEF

WHEREFORE, Defendants respectfully request that judgment be entered in their favor and against Plaintiff, and that Defendants be awarded such other and further relief as the Court deems just and proper, including an award of attorneys' fees, costs and expenses.

Dated:   July 29, 2016                        REED SMITH LLP

                        By:     /s/ J. Cory Falgowski
                                J. Cory Falgowski (No. 4546)
                                1201 N. Market Street, Suite 1500
                                Wilmington, Delaware 19801
                                Telephone:  (302) 778-7500
                                Fax:  (302) 778-7575
                                Email:  jfalgowski@reedsmith.com

                                - and -

                                Brian D. Roche, Esquire
                                REED SMITH LLP
                                10 S. Wacker Dr.
                                Chicago, Illinois 60606-7507
                                Telephone:  (312) 207-6490
                                Email:  broche@reedsmith.com

                                *Attorneys for Wind Point Entities*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*, | ) | |
| | ) | Case No. 13-12965 (KG) |
| Debtors. | ) | (Jointly Administered) |
| PAH LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 15-51238 (KG) |
| | ) | |
| WATER STREET HEALTHCARE PARTNERS, | ) | |
| L.P., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER OF THE WATER STREET DEFENDANTS

Defendants Water Street Healthcare Partners, L.P., WS Associate Co-Invest Partners LLC, and Water Street Healthcare Management, L.P. (collectively, except where otherwise specifically noted, "<u>Defendants</u>" or "<u>Water Street</u>"),[1] by their undersigned counsel, hereby answer the Complaint filed on September 1, 2015 ("<u>Complaint</u>") by Plaintiff, the PAH Litigation Trust ("<u>Plaintiff</u>" or the "<u>Litigation Trust</u>"), in the above-captioned adversary proceeding as follows:

1.      Defendants deny the allegations set forth in paragraph 1 of the Complaint, except admit that Plaintiff purports to bring this action under Pennsylvania and federal fraudulent transfer laws to recover the portion of the proceeds of the April 2012 sale (the "<u>Transaction</u>") of Physiotherapy Associates Holdings, Inc. ("<u>PTA</u>" or the "<u>Company</u>") to affiliates of another private equity investor, Court Square Capital Partners II, L.P. ("<u>Court Square</u>"), that were paid to Defendants.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint.

RLF1 14924956v.1

2.       Defendants deny the allegations in paragraph 2 of the Complaint, except admit and aver that: (i) Water Street and certain of its affiliates (and, upon information and belief, that defendant Wind Point Partners IV, L.P. and certain of its affiliates (together, "Wind Point")) are private equity investors and fund managers; (ii) in the two years preceding the Transaction, Water Street and Wind Point in the aggregate owned approximately 90 percent of the outstanding common stock of PTA; and (iii) the Company's stockholders (including, among others, Water Street, Wind Point and their investors) received cash consideration upon the closing of the Transaction, with the balance of the proceeds being used to pay certain transaction fees and repay all of PTA's existing debt (approximately $179.4 million).

3.       Defendants deny the allegations set forth in paragraph 3 of the Complaint, except admit and aver that: (i) prior to the Transaction, PTA, a privately held company headquartered in Exton, Pennsylvania, was one of the largest providers of outpatient physical therapy services in the United States, with roughly 650 clinics in 33 states as of 2012; (ii) PTA was the product of a merger of PTA with Benchmark Medical, Inc. ("Benchmark") in 2007 and subsequent acquisitions; (iii) after merging with Benchmark, PTA had four different billing systems in place, which was suboptimal; (iv) in 2010, to improve its revenue cycle management, PTA (a) transitioned to a new revenue cycle management software system, which consolidated the four legacy billing systems into a single system to drive efficiencies and improve cash flows, and (b) switched from handling its own billings and collections to using an outsourced specialist service provider, IKS, to reduce costs and consolidate collections under one system; and (v) not surprisingly, implementing these company-wide changes led to various issues that adversely affected both billings and cash collections, all of which were disclosed to, and known by, prospective purchasers of, and lenders to, the Company.

RLF1 14924956v.1

4.        Defendants deny the allegations set forth in paragraph 4 of the Complaint.

5.        Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Complaint.

6.        Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint, except deny that PTA's reported net revenue for the periods preceding the Transaction had been deliberately manipulated to inflate reported net revenue or that its financial statements had been falsified.

7.        Defendants deny the allegations set forth in paragraph 7 of the Complaint.

8.        Defendants deny the allegations set forth in paragraph 8 of the Complaint.

9.        Defendants deny the allegations set forth in paragraph 9 of the Complaint, except admit and aver that prior to the Transaction, Defendant Water Street Healthcare Partners, L.P. held internal portfolio company review meetings, at which the potential sale of the Company was discussed, and refer the Court to the documents that were discussed at those meetings for a complete and accurate statement of their terms.

10.      Defendants deny the allegations set forth in paragraph 10 of the Complaint.

11.      Defendants deny the allegations set forth in paragraph 11 of the Complaint, except admit that Plaintiff purports to bring this action under Pennsylvania and federal fraudulent transfer laws to recover the portion of the proceeds of the Transaction that were paid to Water Street and Wind Point.

12.      Defendants admit upon information and belief the allegations set forth in paragraph 12 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first two sentences thereof with respect to the time period after the closing of the Transaction.

13.     Defendants (i) admit that pursuant to the Plan, the PAH Litigation Trust was formed, and certain claims were purportedly assigned to the Litigation Trust, (ii) refer the Court to the Plan and Litigation Trust Agreement for a complete and accurate statement of their terms, and (iii) state that the balance of paragraph 13 of the Complaint contains legal conclusions to which no response is required.

14.     Defendants deny the allegations set forth in paragraph 14 of the Complaint, except admit and aver that following the merger of PTA and Benchmark in 2007, Water Street owned approximately 53.2 percent of PTA's common shares, and that, as of the date of the Transaction, Water Street's ownership interest was approximately 51.4 percent.

15.     Defendants admit the allegations set forth in paragraph 15 of the Complaint.

16.     Defendants deny the allegations set forth in paragraph 16 of the Complaint, except admit and aver that following the merger of PTA and Benchmark in 2007, Wind Point owned approximately 38 percent of PTA's common shares, and that, as of the date of the Transaction, Wind Point's ownership interest remained at approximately 38 percent.

17.     Defendants admit upon information and belief the allegations set forth in paragraph 17 of the Complaint.

18.     The allegation set forth in paragraph 18 of the Complaint contains a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in paragraph 18 of the Complaint, except admit that as of the date of the Transaction, Water Street and Wind Point owned approximately 51.4 and 38 percent, respectively, of the common shares of PTA.

19.     Defendants deny the allegations set forth in paragraph 19 of the Complaint, except admit that following the Transaction, Water Street Healthcare Partners LLC distributed

to the limited partners of the Water Street fund that was the initial recipient of the sale proceeds each limited partner's allocable share thereof, and aver, upon information and belief, that all of the so-called "subsequent transferees" that received distributions from Water Street have been dismissed from the case.

20.     Defendants deny the allegations set forth in paragraph 20 of the Complaint, except admit upon information and belief that following the Transaction, Wind Point distributed to the limited partners of the Wind Point fund that was the initial recipient of the sale proceeds each limited partner's allocable share thereof, and aver, upon information and belief, that the vast majority of the so-called "subsequent transferees" that received distributions from Wind Point have been dismissed from the case.

21.     Defendants admit that this is a core proceeding, and state that the balance of paragraph 21 of the Complaint contains legal conclusions to which no response is required. Pursuant to Fed. R. Bankr. P. 7012(b) and Del. Bankr. L.R. 7012-1, Defendants do not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

22.     The allegations set forth in paragraph 22 of the Complaint contain a legal conclusion to which no response is required. To the extent a response is required, Defendants admit the allegations set forth in paragraph 22 of the Complaint.

23.     Defendants deny the allegations set forth in paragraph 23 of the Complaint and Heading A, except admit that following the merger of PTA and Benchmark in 2007, Water Street and Wind Point owned approximately 53.2 percent and 38 percent, respectively, of PTA's common shares, which ownership interest grew modestly thereafter, and that, as of the

date of the Transaction, Water Street and Wind Point owned approximately 51.4 percent and 38 percent, respectively, of PTA's common shares.

24.     Defendants deny the allegations set forth in paragraph 24 of the Complaint, except: (i) admit and aver that James G. Connelly III, Curt M. Selquist, Richard R. Kracum, Robert Womsley, Daniel J. Connors, and James W. McLane were members of PTA's board of directors when the sale to Court Square was approved in 2012; (ii) admit upon information and belief that, upon the closing of the Transaction, their board tenures ended; and (iii) lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the beginning dates for their service as Board members.

25.     Defendants deny the allegations set forth in paragraph 25 of the Complaint, except admit upon information and belief that the individuals listed therein held the respective positions as officers of the Company at various points of time prior to (and, in certain instances, following) the closing of the Transaction, and lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the beginning and end dates for the employment of Messrs. DeVoe, Bode, Limeri, Grabaskas, Walden, and Sloyer.

26.     Defendants deny the allegations set forth in paragraph 26 of the Complaint, except admit and aver that on or about June 28, 2007, Water Street Healthcare Management, L.P., Wind Point Investors IV, L.P., Physiotherapy Associates, Inc., and Benchmark Medical, Inc. entered into a management agreement (the "Management Agreement"), in which Water Street Healthcare Management, L.P. and Wind Point Investors IV, L.P. agreed, among other things, "to consult with and advise the board of directors of the Company and board of directors of Parent and the management of the Company and the Parent in such manner and on such business and financial matters as may be reasonably requested from time to time and as may be

reasonably agreed to by Water Street and Wind Point, including: (i) general advisory services in relation to the Company's management and business, (ii) identification, analysis, support and negotiation of acquisitions and dispositions, (iii) analysis, support and negotiation of financing alternatives, including in connection with acquisitions, capital expenditures and refinancings of existing indebtedness, (iv) finance functions, including assistance in the preparation of financial projections and (v) strategic planning functions, including the evaluation of major strategic alternatives." The Court is referred to the Management Agreement for a complete and accurate statement of its terms.

27.    Defendants deny the allegations set forth in paragraph 27 of the Complaint.

28.    Defendants admit the allegations set forth in paragraph 28 of the Complaint.

29.    Defendants admit upon information and belief the allegations set forth in the first sentence in paragraph 29 of the Complaint, and lack knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence thereof.

30.    Defendants admit upon information and belief the allegations set forth in paragraph 30 of the Complaint.

31.    Defendants deny the allegations set forth in paragraph 31 of the Complaint, except admit upon information and belief that the Company generally recorded revenue when the service was provided, but before payment was actually received.

32.    Defendants admit upon information and belief the allegations set forth in the second sentence of paragraph 32 of the Complaint, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 32.

RLF1 14924956v.1

33.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first two sentences of paragraph 33 of the Complaint, and deny the allegations in the third sentence thereof.

34.     Defendants deny the allegations set forth in paragraph 34 of the Complaint, except admit that accounting estimates must generally be "reasonable," and aver that the "look back" method was based on an analysis of historical, present, and projected future collections.

35.     Defendants deny the allegations set forth in paragraph 35 of the Complaint, except admit that, from 2007 to sometime in 2010, the Company estimated its net revenue based on a "look back" method.

36.     Defendants deny the allegations set forth in paragraph 36 of the Complaint and Heading C, except admit upon information and belief that in or around June 2009 PTA informed its lenders, among other things, that, through April 2009, year-to-date revenue was down versus the prior year, bad debt as a percentage of net revenue had increased since September 2007, the Company was losing market share, its EBITDA as a percent of revenue was below the industry norm and its days sales outstanding ("DSO") was above the industry norm.

37.     Defendants deny the allegations set forth in paragraph 37 of the Complaint.

38.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38 of the Complaint, except admit and aver upon information and belief that, as a result of issues that arose beginning in 2010 during the implementation of company-wide measures to improve revenue cycle management, PTA fell significantly behind on both its billings and cash collections, resulting in a significant increase in DSO.

39.     Defendants deny the allegations set forth in paragraph 39 of the Complaint, except admit and aver that in 2010, management, with the concurrence of the Company's auditors at KPMG LLP, made efforts to improve PTA's method of estimating net revenues by switching from the look back method (which management concluded was no longer an effective way to estimate net revenues) to an alternative method (referred to as the "rate bridge" method).

40.     Defendants deny the allegations set forth in paragraph 40 of the Complaint, except admit and aver that, in 2010, the Company changed its method of estimating net revenue, with the concurrence of PTA's auditors at KPMG LLP, from a "look back" to a "rate bridge" method, and that such change was fully disclosed to all prospective purchasers of the Company.

41.     Defendants deny the allegations set forth in paragraph 41 of the Complaint, except admit and aver that, in 2010, the Company changed its method of estimating net revenue, with the concurrence of PTA's auditors at KPMG LLP, from a "look back" to a "rate bridge" method, and that such change was fully disclosed to all prospective purchasers of the Company.

42.     Defendants deny the allegations set forth in paragraph 42 of the Complaint.

43.     Defendants deny the allegations set forth in paragraph 43 of the Complaint, except admit that the Board of Directors of PTA was informed of the change from the "look back" to the "rate bridge" method of estimating net revenue that occurred in 2010.

44.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44 of the Complaint.

45.     Defendants admit upon information and belief the allegations set forth in paragraph 45 of the Complaint, except aver that the solicitation and receipt of bids occurred with the involvement of Jefferies & Company, Inc. ("Jefferies"), as financial advisor to the Company, and deny the allegations in Heading D.

9

46.     Defendants deny the allegations set forth in Paragraph 46 of the Complaint, except admit that in late 2011 and early 2012, affiliates of Water Street were in the process of raising capital for a new fund.

47.     Defendants deny the allegations set forth in paragraph 47 of the Complaint.

48.     Defendants deny the allegations set forth in paragraph 48 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the timing, subject matter and substance of the internal PTA emails referenced therein that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants.

49.     Defendants deny the allegations set forth in paragraph 49 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quote attributed to PTA's Vice President of Revenue Cycle that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants.

50.     Defendants deny the allegations set forth in paragraph 50 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the subject matter and substance of the internal PTA emails referenced therein that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants.

51.     Defendants deny the allegations set forth in paragraph 51 of the Complaint.

52.     Defendants deny the allegations set forth in paragraph 52 of the Complaint.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53 of the Complaint.

RLF1 14924956v.1

54.      Defendants deny the allegations set forth in paragraph 54 of the Complaint, except aver that the issues that arose beginning in 2010 during the implementation of company-wide measures to improve revenue cycle management, in particular in connection with its billings and cash collections, were expressly disclosed to the Company's auditors, accounting and financial advisors and prospective bidders (and their accounting and financial advisors) in the process supervised by Jefferies.

55.      Defendants deny the allegations set forth in paragraph 55 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the timing, subject matter and substance of the purported internal emails referenced therein, to which the Court is referred for a complete and accurate statement of their terms (as opposed to the undated, unattributed partial quotes selectively referenced therein that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants).

56.      Defendants deny the allegations set forth in paragraph 56 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the subject matter and substance of the internal PTA email referenced therein that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants.

57.      Defendants deny the allegations set forth in paragraph 57 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the timing, subject matter and substance of the purported internal PTA emails referenced therein, to which the Court is referred for a complete and accurate statement of their terms (as opposed to the undated, unattributed partial quotes selectively referenced therein that

RLF1 14924956v.1

are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants).

58.     Defendants deny the allegations set forth in paragraph 58 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes attributed to PTA's Vice President of Financial Planning & Accounting.

59.     Defendants deny the allegations set forth in paragraph 59 of the Complaint and in Heading E.

60.     Defendants deny the allegations set forth in paragraph 60 of the Complaint, except admit that members of PTA's Board of Directors were provided information from management regarding PTA's cash collections on a monthly or periodic basis.

61.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 61 of the Complaint.

62.     Defendants deny the allegations set forth in paragraph 62 of the Complaint, except admit and aver that PTA's Board of Directors received monthly or periodic reports (including one for the month of August 2010) from PTA's Chief Financial Officer addressing, among other things, revenues, cash collections and DSO, to which the Court is referred for a complete and accurate statement of their terms.

63.     Defendants deny the allegations set forth in paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth in paragraph 64 of the Complaint, except admit that in or around the first quarter of 2011, certain members of PTA's management made a presentation to PTA's Board of Directors entitled "Revenue Cycle Management: The

Path Forward, February 2011," to which the Court is referred for a complete and accurate statement of its terms.

65.     Defendants deny the allegations set forth in paragraph 65 of the Complaint, except admit that the February 2011 presentation, to which the Court is referred for a complete and accurate statement of its terms, provided several suggested metrics for PTA's Board of Directors to measure success going forward.

66.     Defendants deny the allegations set forth in paragraph 66 of the Complaint.

67.     Defendants deny the allegations set forth in paragraph 67 of the Complaint.

68.     Defendants deny the allegations set forth in paragraph 68 of the Complaint.

69.     Defendants deny the allegations set forth in paragraph 69 of the Complaint.

70.     Defendants deny the allegations set forth in paragraph 70 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported email from PTA's Chairman to its CEO that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants.

71.     Defendants deny the allegations set forth in paragraph 71 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes attributed to PTA's consultant apparently contained in a document that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants.

72.     Defendants deny the allegations set forth in paragraph 72 of the Complaint, except admit and aver that the Company's CFO sent a one-page analysis to members of the Company's Board, to which the Court is referred for a complete and accurate statement of its

terms, which noted a difference of only $200,000 after 9 months of collections on an originally estimated collectible amount of over $29 million of monthly net revenues in March 2011, reflecting the different methods temporarily used between the Company's income statement and aged trial balance to record the estimated remaining collectible amount of accounts receivable.

73.     Defendants deny the allegations set forth in paragraph 73 of the Complaint.

74.     Defendants deny the allegations set forth in paragraph 74 of the Complaint and Heading F, except admit and aver, upon information and belief, that in or about January or February 2012, two potential bidders for PTA – Clayton Dubilier & Rice ("CD&R") and New Mountain Capital ("New Mountain") – advised Jefferies that they were not prepared to submit a final bid to acquire PTA at that time, and they shared with PTA management and their advisors certain comments and questions that their own accounting advisors at PricewaterhouseCoopers LLP ("PwC") and Deloitte & Touche LLP ("Deloitte"), respectively, had raised during their due diligence with regard to PTA's accounting methods and financial results, which comments were summarized and rebutted by PTA's management in presentations to PTA's Board of Directors and also to the aforementioned prospective purchasers (CD&R and New Mountain) and their advisors.

75.     Defendants deny the allegations set forth in paragraph 75 of the Complaint, except admit and aver that a written summary and rebuttal of PwC's comments and questions regarding PTA's accounting methods and financial results was provided by PTA's management to PTA's Board of Directors on or about January 24, 2012, to which the Court is referred for a complete and accurate statement of its terms.

76.     Defendants deny the allegations set forth in paragraph 76 of the Complaint, except admit and aver that a written summary or copy of Deloitte's comments, and a rebuttal

thereto, regarding PTA's accounting methods and financial results was provided by PTA's management to PTA's Board of Directors on or about February 3, 2012, to which the Court is referred for a complete and accurate statement of its terms.

77.      Defendants deny the allegations set forth in paragraph 77 of the Complaint and Heading G.

78.      Defendants deny the allegations set forth in paragraph 78 of the Complaint, except admit and aver that prior to the Transaction, Defendant Water Street Healthcare Partners, L.P. held internal portfolio company review meetings, at which a potential sale of the Company was discussed, and refer the Court to the documents that were discussed at those meetings for a complete and accurate statement of their terms.

79.      Defendants deny the allegations set forth in paragraph 79 of the Complaint.

80.      Defendants deny the allegations set forth in paragraph 80 of the Complaint, except admit that Wind Point's Board designee received copies of the monthly or periodic cash collection reports and summaries of and rebuttals to the PwC and Deloitte comments that were provided to the other members of PTA's Board of Directors, and refer the Court to the cash collection reports and other referenced documents for a complete and accurate statement of their terms.

81.      Defendants deny the allegations set forth in paragraph 81 of the Complaint and Heading H.

82.      Defendants deny the allegations set forth in paragraph 82 of the Complaint, except admit and aver upon information and belief that Court Square and its underwriters prepared and circulated to prospective lenders an offering memorandum in or about April 2012, to which the Court is referred for a complete and accurate statement of its terms.

83.        Defendants deny the allegations set forth in paragraph 83 of the Complaint.

84.        Defendants deny the allegations set forth in paragraph 84 of the Complaint.

85.        Defendants deny the allegations set forth in paragraph 85 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the existence and contents of the April 16, 2012 email referenced therein that is not attached to the Complaint, has not been produced to Defendants, and thus is not subject to review or confirmation by Defendants.

86.        Defendants deny the allegations set forth in paragraph 86 of the Complaint and Heading I, except admit that on or about February 22, 2012, PTA, Physiotherapy Holdings, Inc., Physiotherapy Merger Sub, Inc. ("Merger Sub") and Water Street Healthcare Partners, L.P. entered into an Agreement and Plan of Merger ("Merger Agreement"), to which the Court is referred for a complete and accurate statement of its terms, to effectuate the sale of PTA to Court Square.

87.        Defendants deny the allegations set forth in paragraph 87 of the Complaint, except admit upon information and belief that the Transaction was financed by Court Square and its affiliates through: (i) a Term Loan in the amount of $100 million; (ii) $210 million in Senior Notes; (iii) an equity investment by Court Square of approximately $213.3 million; (iv) a management equity rollover in the amount of approximately $3.9 million; and (v) a minority investment by General Electric Corporation of approximately $1 million.

88.        Defendants deny the allegations set forth in paragraph 88 of the Complaint, except admit upon information and belief that the Transaction was accomplished in several steps as described in the Merger Agreement and related Transaction closing documents, to which the Court is referred for a complete and accurate statement of their terms, pursuant to

which, among other things: (i) Merger Sub became the initial obligor under the Term Loan and Senior Notes; (ii) following the closing, PTA assumed Merger Sub's obligations under the Term Loan and Senior Notes; (iii) the common shares of PTA held by Water Street, Wind Point and the other selling stockholders were exchanged for cash; and (iv) the balance of the sale proceeds were used to pay certain transaction fees and to repay all of PTA's preexisting debt (approximately $179.4 million).

89.     Defendants deny the allegations set forth in paragraph 89 of the Complaint.

90.     Defendants deny the allegations set forth in paragraph 90 of the Complaint and Heading J, except lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding any purported investigation that may have been conducted after the closing of the Transaction.

91.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 91 of the Complaint.

92.     Defendants deny the allegations set forth in paragraph 92 of the Complaint and Heading K.

93.     Defendants deny the allegations set forth in paragraph 93 of the Complaint, and state that to the extent paragraph 93 contains legal contentions, no further response is required.

94.     Defendants deny the allegations set forth in paragraph 94 of the Complaint, except admit that a portion of the sale proceeds was paid to Water Street and Wind Point.

95.     Defendants deny the allegations set forth in paragraph 95 of the Complaint.

96.     Defendants deny the allegations set forth in paragraph 96 of the Complaint.

RLF1 14924956v.1

97.     Defendants deny the allegations set forth in paragraph 97 of the Complaint and Heading L.

98.     Defendants deny the allegations set forth in paragraph 98 of the Complaint.

99.     Defendants deny the allegations set forth in paragraph 99 of the Complaint and Heading M, except lack knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the purported quotes from PTA's Chairman selectively lifted from unidentified documents that are not attached to the Complaint, have not been produced to Defendants, and thus are not subject to review or confirmation by Defendants.

100.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 100 of the Complaint with respect to events that took place following the closing of the Transaction, and deny that the payment of the merger consideration to Water Street and Wind Point was a fraudulent transfer.

101.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 101 of the Complaint.

102.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 102 of the Complaint.

103.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 103 of the Complaint.

104.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 104 of the Complaint.

105.    Defendants admit upon information and belief the allegations set forth in paragraph 105 of the Complaint.

106.    Defendants deny the allegations set forth in paragraph 106 of the Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding any investigation that may have been conducted after the closing of the Transaction.

107.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 107 of the Complaint and Heading N, except admit that on or about November 12, 2013, PTA and certain affiliated debtors filed voluntary petitions under chapter 11 of the United States Bankruptcy Code.

108.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 108 of the Complaint, and aver, upon information and belief, that bondholders who are beneficiaries of the Litigation Trust and received equity in the reorganized debtor have now been paid in full and have suffered no legally cognizable loss or damages.

109.    Defendants admit upon information and belief the allegations set forth in paragraph 109 of the Complaint.

110.    Defendants repeat and re-allege their responses to paragraphs 1-109 above in response to paragraph 110 of the Complaint.

111.    Defendants deny the allegations set forth in paragraph 111 of the Complaint, except admit that pursuant to the Merger Agreement, cash consideration was initially paid to Water Street, Wind Point and the other selling shareholders in exchange for their shares.

112.    Defendants deny the allegations set forth in paragraph 112 of the Complaint.

113.    Defendants deny the allegations set forth in paragraph 113 of the Complaint.

114.    Defendants deny the allegations set forth in paragraph 114 of the Complaint.

115.    Defendants admit the allegations set forth in paragraph 115 of the Complaint.

116.     Defendants deny the allegations set forth in paragraph 116 of the Complaint.

117.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 117 of the Complaint.

118.     Defendants deny the allegations set forth in paragraph 118 of the Complaint.

119-127. Defendants state that no response is required to the allegations set forth in paragraphs 119-127 (Count II) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

128-132. Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 128-132 (Count III) of the Complaint, because, upon information and belief, Plaintiff has dismissed from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the *Court's Order Approving Stipulation Regarding Service and Time to Respond to the Complaint Filed by the PAH Litigation Trust Against Alleged Subsequent Transferees dated October 2, 2015* (the "October 2015 Order").

133-141. Defendants state that no response is required to the allegations set forth in paragraphs 133-141 (Count IV) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

142-150. Defendants state that no response is required to the allegations set forth in paragraphs 142-150 (Count V) of the Complaint, because that claim for relief was dismissed by the Court in its Opinion and Order dated June 20, 2016.

151-155. Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 151-155 (Count VI) of the Complaint,

RLF1 14924956v.1

because, upon information and belief, Plaintiff has dismissed from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the October 2015 Order.

156.     Defendants repeat and re-allege their responses to paragraphs 1-155 above in response to paragraph 156 of the Complaint.

157.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 157 of the Complaint.

158.     Defendants deny the allegations set forth in paragraph 158 of the Complaint, except admit that pursuant to the Merger Agreement, cash consideration was initially paid to Water Street, Wind Point and the other selling shareholders in exchange for their shares.

159.     Defendants deny the allegations set forth in paragraph 159 of the Complaint.

160.     Defendants deny the allegations set forth in paragraph 160 of the Complaint.

161.     Defendants deny the allegations set forth in paragraph 161 of the Complaint.

162.     Defendants admit the allegations set forth in paragraph 162 of the Complaint.

163.     Defendants deny the allegations set forth in paragraph 163 of the Complaint.

164.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 164 of the Complaint.

165.     Defendants deny the allegations set forth in paragraph 165 of the Complaint.

166-171.  Defendants state that no response is required to the allegations with respect to alleged "subsequent transferees" set forth in paragraphs 166-171 (Count VIII) of the Complaint, because, upon information and belief, Plaintiff has dismissed  from this action without prejudice all of the alleged "subsequent transferees" that received distributions from Water Street and the

RLF1 14924956v.1

vast majority of those who received distributions from Wind Point through notices of voluntary dismissal filed by the Litigation Trust pursuant to the October 2015 Order.

172.     Defendants reserve all rights with respect to whether Plaintiff is entitled to a jury trial in this action.

## DEFENSES

173.     Defendants hereby set forth the following defenses, without admitting that any of them technically are "affirmative defenses" and/or that Defendants bear the burden of proof or persuasion with respect to any of these defenses.  Defendants reserve the right to amend this Answer to assert additional defenses that become known to them through discovery or otherwise.

## FIRST DEFENSE

174.     The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

175.     The Litigation Trust lacks standing to pursue any claims on behalf of Senior Noteholders.

## THIRD DEFENSE

176.     In or about March 2016, the reorganized debtor was sold to Select Medical Corporation  in a merger transaction for a reported value of approximately $400 million in cash, almost double the amount of prepetition debt that was owed to the holders of Senior Notes, who had received 100% of the equity of the reorganized debtor under PTA's confirmed plan of reorganization.  Under the plan all other creditors of PTA were paid in full.  Accordingly, as a result of the sale to Select Medical Corporation (and settlements into which the Litigation Trust has entered), all creditors (including the holders of Senior Notes who assigned their claims to

RLF1 14924956v.1

the Litigation Trust) have been paid in full and have no continuing loss or damage they may seek to recover under fraudulent transfer law.  Any award to Plaintiff would constitute unjust enrichment.

### FOURTH DEFENSE

177.    The claims the Litigation Trust is now pursuing on behalf of holders of Senior Notes have been rendered moot as a result of the sale to Select Medical Corporation (and settlements into which the Litigation Trust has entered).    Any award to Plaintiff would constitute unjust enrichment.

### FIFTH DEFENSE

178.    Neither Defendants nor the critical mass of PTA's Board of Directors who approved the Court Square Transaction did so with actual intent to hinder, delay or defraud creditors.

### SIXTH DEFENSE

179.    The holders of Senior Notes on whose behalf the Litigation Trust is purporting to sue were not in privity with, and did not receive or reasonably rely upon any representations or warranties made by, Water Street or anyone acting or purporting to act on Water Street's behalf before deciding to provide financing to Court Square.

### SEVENTH DEFENSE

180.    All state law claims for constructive fraudulent transfer have been implicitly preempted by section 546(e) of the Bankruptcy Code, or, alternatively, should be dismissed because PTA was neither insolvent nor rendered insolvent as a result of the Transaction.

RLF1 14924956v.1

**EIGHTH DEFENSE**

181.     Plaintiff's claims are barred by the doctrines of ratification, estoppel, laches, waiver and consent.

**NINTH DEFENSE**

182.     Plaintiff's claims are barred as the result of a prepetition settlement and voluntary release of claims by the Debtor against Water Street in December 2012.

**TENTH DEFENSE**

183.     To the extent Debtors were solvent, Plaintiff may not avoid as constructive fraudulent transfers payments to or for the benefit of Water Street in connection with the Transaction.

**ELEVENTH DEFENSE**

184.     To the extent Defendants have filed valid proofs of claim, or are entitled to an administrative claim against the Debtors, Plaintiff may not avoid payments to Water Street, and Defendants reserve their rights to set-off any of their claims against such payments.

**TWELFTH DEFENSE**

185.     The Defendants took in good faith for value.

**THIRTEENTH DEFENSE**

186.     As a result of recoveries to the only impaired class of creditors under the Plan from, *inter alia*, the sale to Select Medical Corporation and settlements into which the Litigation Trust has entered, all creditors have been paid in full and no further claims for damages can be asserted.

RLF1 14924956v.1

**REQUEST FOR RELIEF**

**WHEREFORE**, Defendants respectfully request that judgment be entered in their favor and against Plaintiff, and that Defendants be awarded such other and further relief as the Court deems just and proper, including an award of attorneys' fees, costs and expenses.

Dated:   Wilmington, Delaware       */s/ Robert J. Stearn, Jr.*
         July 29, 2016               Mark D. Collins (No. 2981)
                                     Robert J. Stearn, Jr. (No. 2915)
                                     Marisa A. Terranova Fissel (No. 5396)
                                     RICHARDS, LAYTON & FINGER, P.A.
                                     One Rodney Square
                                     920 North King Street
                                     Wilmington, Delaware 19801
                                     Telephone: (302) 651-7700
                                     Facsimile: (302) 651-7701
                                     Email:  collins@rlf.com
                                             stearn@rlf.com
                                             terranova@rlf.com

                                     - and -

                                     Richard W. Reinthaler
                                     David Neier
                                     Rolf S. Woolner
                                     Kerry C. Donovan
                                     WINSTON & STRAWN LLP
                                     200 Park Avenue
                                     New York, New York 10166
                                     Telephone: (212) 294-6700
                                     Facsimile: (212) 294-4700
                                     Email: rreinthaler@winston.com
                                             dneier@winston.com
                                             rwoolner@winston.com
                                             kcdonovan@winston.com

                                     *Attorneys for Water Street Defendants*

RLF1 14924956v.1

# APPENDIX C

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>PHYSIOTHERAPY HOLDINGS, INC., *et al.*,<br><br>                               Debtors. | Chapter 11 Case<br>Case No. 13-12965 (KG)<br>(Jointly Administered) |
| PAH LITIGATION TRUST,<br><br>                               Plaintiff,<br><br>WATER STREET HEALTHCARE PARTNERS, L.P., WS ASSOCIATE CO-INVEST PARTNERS, LLC, WATER STREET HEALTHCARE MANAGEMENT, L.P., WIND POINT PARTNERS IV, L.P., WIND POINT IV EXECUTIVE ADVISOR PARTNERS, L.P., WIND POINT ASSOCIATES IV, LLC, WIND POINT INVESTORS IV, L.P., THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, JPMORGAN CHASE BANK, N.A. AS TRUSTEE FOR SBC MASTER PENSION TRUST, ALLIANZ LEBEN PRIVATE EQUITY FONDS 2001 GMBH, NEW YORK LIFE INSURANCE COMPANY, GOLDMAN SACHS PRIVATE EQUITY CONCENTRATED HEALTHCARE FUND OFFSHORE HOLDINGS, L.P., HBM BIO VENTURES CAYMAN LTD, CMFG LIFE INSURANCE SOCIETY, CROWN GLOBAL SECONDARIES II PLC, GOLDMAN SACHS PEP NEW PARTNERS - MANAGER FUND, L.P., JACKSON NATIONAL LIFE INSURANCE COMPANY, JH PARTNERSHIP HOLDINGS I, LP, JH PARTNERSHIP HOLDINGS II, LP, PACUS-UK LIMITED, PKAM GLOBAL PRIVATE EQUITY FUND, WILSHIRE US PRIVATE MARKETS FUND VI LP, ADAMS STREET PARTNERSHIP FUND - 2002 U.S. FUND, L.P., ADAMS STREET PARTNERSHIP FUND - 2005 U.S. FUND, L.P., ADAMS STREET PARTNERSHIP FUND - 2003 U.S. FUND, L.P., AT&T UNION WELFARE BENEFIT TRUST, IFM | Adversary Proceeding<br>No. _____ |

VENTURES, LLC C/O GROVE STREET
ADVISORS, LLC, ADAMS STREET
PARTNERSHIP FUND - 2004 U.S. FUND, L.P.,
GOLDMAN SACHS PRIVATE EQUITY
PARTNERS 2004 - MANAGER FUND, L.P., THE
BONY MELLON AS TRUSTEE FOR THE
HEWLETT-PACKARD COMPANY MASTER
TRUST, INVESCO U.S. LBO & CORPORATE
FINANCE PARTNERSHIP FUND IV, L.P.,
GOLDMAN SACHS PRIVATE EQUITY
PARTNERS 2004 OFFSHORE HOLDINGS, L.P.,
AZ-SGD PRIVATE EQUITY FONDS GMBH,
JPMORGAN CHASE BANK, N.A., AS DIRECTED
TRUSTEE FOR THE CORNING INCORPORATED
RETIREMENT MASTER TRUST, WILSHIRE DL
FUND CV, TIM DUGAN, JEFF HOLWAY,
CROWN PREMIUM IV
BETEILIGUNGSTREUHAND S.À R.L., NORTH
SKY LBO FUND II, LP, TENZING CFO
EQUALIZATION POOL, LP, RICHARD
CHAIFETZ, GS U.S. MIDDLE MARKET BUYOUT
FUND OFFSHORE HOLDINGS, L.P., CUMIS
INSURANCE SOCIETY, DOMINICK A. ARENA,
ESSEX HERITAGE PARTNERS LLC, K.K.
DIVERSIFIED VENTURES LLC, WILSHIRE SPF
FUND, LP, THE LAWRENCE E. FOX LIVING
TRUST, RANDOLPH PARTNERS II, GOLDMAN
SACHS PEP 2004 US-FOCUSED OFFSHORE
HOLDINGS, L.P., MULTI-STRATEGY
HOLDINGS, L.P., MARC CASPER, GOLDMAN
SACHS PRIVATE EQUITY PARTNERS 2004-
EMPLOYEE FUND, L.P., CHELTENHAM
HOLDINGS LLC, KRISHNAN-SHAH FAMILY LP,
P.K. FAMILY VENTURES LLC, RICHARD L.
THOMAS, SCOTT GARRETT, WILLIAM H.
LATIMER III, ALAN L. HELLER 1989
REVOCABLE TRUST, GOLDMAN SACHS
PRIVATE EQUITY PARTNERS 2004, L.P., KEVIN
M. SWAN, MERCHANT HOLDING, INC., PAUL J.
FINNEGAN REVOCABLE TRUST, STEVEN G.
BOOTH, WIN 8, LLC, MARK SPEERS & PAULA
NESS SPEERS, NED VILLERS, CHRIS SWEENEY,
ERIC LEV, JOHN PELLETTIERE, EDWARD L
DONNELLY, TRUSTEE OF THE EDWARD L.
DONNELLY TRUST DATED APRIL 10, 2002, THE
DAVENPORT FAMILY TRUST UTA, DATED

DEC 3, 1986, HOEBEL FAMILY TRUST,
MATTHEW F. BERGMANN, STEVEN J. GAVIN,
STANFORD J. GOLDBLATT, THOMAS A.
REYNOLDS III AND HOPE C. REYNOLDS, MIKE
BRENNAN, RYAN KELLEY, WATER STREET
HEALTHCARE PARTNERS, LLC, STATE OF
WISCONSIN INVESTMENT BOARD, STATE
TREASURER OF THE STATE OF MICHIGAN,
ROBERT L. CUMMINGS, STATE STREET BANK
AND TRUST COMPANY AS TRUSTEE OF THE
CHRYSLER GROUP LLC MASTER RETIREMENT
TRUST, SVG DIAMOND NOMINEE LIMITED,
JAMES E. FORREST, THE NORTHWESTERN
MUTUAL LIFE INSURANCE COMPANY, ASF
SUNRISE ACQUISITION, LLC, GENERAL
RETIREMENT SYSTEM OF THE CITY OF
DETROIT, MASCO CAPITAL CORPORATION,
MESIROW PARTNERSHIP FUND I. L.P., STATE
STREET BANK AND TRUST COMPANY AS
TRUSTEE OF THE INTERNATIONAL PAPER
DEFINED BENEFIT PLAN TRUST, THE BANK
OF NEW YORK MELLON, CUSTODIAN FOR
A.O. SMITH PENSION TRUST, THE POLICE AND
FIRE RETIREMENT SYSTEM OF THE CITY OF
DETROIT, WACHOVIA INVESTORS, INC.,
JAMES P. TENBROEK, WIN 5 HOLDINGS, LLC,
AETNA LIFE INSURANCE COMPANY,
LANDMARK ACQUISITION FUND, LLC,
SAMUEL CURTIS JOHNSON III, THRIVENT
FINANCIAL FOR LUTHERANS, MAYO CLINIC
MASTER RETIREMENT TRUST, AN ILLINOIS
TRUST, AMERICAN FAMILY MUTUAL
INSURANCE CO., DOW EMPLOYEES' PENSION
PLAN, GREENPARK III-W, LP, JESSIE BALL
DUPONT FUND, LEXINGTON CAPITAL
PARTNERS III, LP, MAYO CLINIC, LEXINGTON
CAPITAL PARTNERS V, LP, TCB PARTNERS,
LLC, ARBOR INVESTMENT PROPERTY TRUST,
WIND POINT VENTURES IV, LLC, NANTUCKET
PRIVATE EQUITY FUND 1999, LLC, TILC
PRIVATE EQUITY LLC, MICHAEL J. MAHONEY,
JACO IV LIMITED PARTNERSHIP, RGJ
COMPANY, LP, RWB INVESTMENTS, LLC,
THOMAS E. DARDEN, MICHAEL SOLOT,
NATHAN BROWN, NANTUCKET VENTURE
PARTNERS, LLC, STEVEN A. BERGER,

WILLIAM N. ANDERSON, B. JOSEPH MESSNER,
THOMAS R. HODGSON DECLARATION OF
TRUST UA 2/28/97, WILLIAM HALL, JOHN
JOSEPH KING, BERNARD F. SERGESKETTER
TRUST DATED APRIL 20, 1979 AND AMENDED,
CHARLES W. DENNY III REVOCABLE TRUST
DTD 7/30/1987, DAVID R. ZIMMER, DENNIS S.
BOOKSHESTER REVOCABLE TRUST 2/17/89,
EDWARD E. LUCENTE, GARY D. FORSEE, J.
GREGORY MULDOON, JDM TRUST PARTNERS,
JEAN-PIERRE ROSSO REVOCABLE TRUST U/A
DTD 11/20/2001, JOHN C. KANE, JULIUS A.
HOEFT, MICHAEL T. MONAHAN, MITCHELL F.
VERNICK, RICHARD W. KRANT, JR., ROBERT
A. PEISER, ROGER T. FRIDHOLM, TRUSTEE OF
THE ROGER T. FRIDHOLM REVOCABLE TRUST
DATED APRIL 13, 1983, AS AMENDED,
TRUSTEES OF THE WENDELL F. BUECHE
LIVING TRUST DATED JUNE 1, 1998, WARREN
L. BATTS REVOCABLE TRUST DATED
7/17/1982, WILLIAM R. HILDEBRAND, DANIEL
E. KEPLER, JENNIFER A. KEPLER, KARIN L.
SPRINGER, PETER KEPLER, SUSANNE E.
SCHNEIDER,

Defendants.

**COMPLAINT**

# INTRODUCTION

*"The numbers are so falsified if this flies I will be beside myself[.]"*
> Email from Senior Revenue Accountant to Vice President of Revenue Cycle

*"Just pull numbers out of your butt like the rest of them do . . . "*
> Email from Vice President of Revenue Cycle to Senior Revenue Accountant

*"Well it takes time to manipulate the numbers . . . if we just reported the truth it would be better!"*
> Email from Vice President of Revenue Cycle to Vice President of Financial Planning & Accounting

*"My head is exploding i[t']s so painful. The financials have been defiled for 2 years . . . it's horrific."*
> Email from Vice President of Financial Planning & Accounting to Vice President of Revenue Cycle

*"Water[ S]treet was the source of most of the deception[.]"*
> Email from Vice President of Financial Planning & Accounting to Vice President of Revenue Cycle

*"I'm tired of the leadership issues and deception [Water Street's] Dan Connors laid on us."*
> Email from Vice President of Financial Planning & Accounting to Vice President of Revenue Cycle

1.     The story in this case is simple yet troubling.  A company used false financial statements to borrow a lot more money than it was worth and then immediately gave $248.6 million of that borrowed money to its two controlling shareholders.  These two shareholders had designed this transaction—an LBO—to finance the sale of their ownership in the company to a new buyer.  But because it was premised on fraudulent financial statements, this ill-conceived LBO and $248.6 million payment rendered the company insolvent the moment the transaction closed.  It would only be a matter of time before the company was required to seek bankruptcy protection, completely eviscerating the new buyer's $213 million equity investment, and ultimately leaving the deceived creditors holding the bag with hundreds of millions of dollars in losses.  Those deceived creditors, through the PAH Litigation Trust as their assignee, now bring

this action under state and federal fraudulent transfer laws to avoid the debtor's $248.6 million transfer to the Water Street and Wind Point Defendants—the two controlling shareholders who designed the defective LBO, received the $248.6 million transfer from the debtor without providing anything of similar value in return, and who benefitted handsomely from the fraud.

2.    Defendants Water Street and Wind Point (together with their affiliates and limited partner investors) are two private equity investment funds that owned and controlled the debtor Physiotherapy Associates Holdings, Inc. ("Physiotherapy," the "Debtor," or the "Company") in the two years leading up to the defective LBO transaction underlying this case. Under their stewardship, the Debtor perpetrated a massive accounting fraud to facilitate Water Street and Wind Point's sale of their ownership interest in the Company. That sale was accomplished via the LBO transaction. As part of that transaction the Debtor transferred $248.6 million in cash to Defendants Water Street and Wind Point in return for extinguishing their stock. The Debtor received nothing of value in exchange for this payment, and the transfer left the Debtor instantaneously insolvent.

3.    The Debtor, headquartered in Exton, Pennsylvania, primarily provided physical therapy services to patients through hundreds of outpatient clinics, including many throughout Pennsylvania. It was an amalgam of several local and regional physical therapy chains and businesses that had been combined and consolidated over a period of about four years into a single enterprise, at the behest of Water Street and Wind Point. The Debtor's rapid growth by merger and acquisition created operational challenges, particularly with respect to its accounting and cash collection systems. There were delays in implementing a new single accounting system to replace the various legacy systems; there were problems keeping up with cash collections; and there were almost no internal financial reporting controls. As private equity funds with their own

investors to keep happy, Water Street and Wind Point were looking to sell their interests in the Company for a lucrative return within a rapidly closing window of time. All of these factors created fertile ground for fraud.

4.      Beginning in 2010, the Debtor began overstating the key economic metrics for a physical therapy business—its accounts receivables, net revenue and EBITDA—by using a revenue recognition methodology that was purely aspirational. The Debtor was reporting revenue without any regard for its actual collections. This approach was divorced from reality, contrary to the conventional financial reporting practice in the industry, and improper under GAAP. The opportunity to falsify reported revenue was profound. As a result, in the year leading up to the LBO, the Debtor overstated net accounts receivable, net revenue, and, most importantly, EBITDA by at least 109%.

5.      After the LBO closed in April 2012, and after Water Street and Wind Point were no longer in control of the Debtor, it became clear to the newly appointed CFO that actual cash collections were falling far short of reported and forecast income. By the spring of 2013—less than one year after the LBO—this new CFO enlisted the forensic accounting assistance of Deloitte & Touche LLP to investigate.

6.      During the investigation, the Debtor discovered numerous internal emails among the (then) current and former members of senior management and accounting personnel demonstrating that the numbers had been deliberately manipulated to inflate reported net revenue. The Debtor concluded that its reported net revenue for the periods leading up to the LBO was not supported by the actual historical collection data for those periods. The Debtor further concluded that this data—which put the lie to the falsified financials—was readily available and reasonably knowable by those in management in 2011. As a result, the Debtor concluded that it

would have to restate its YE 2011 financial statements, triggering a series of credit events and further revelations that ultimately culminated in the Debtor's request for bankruptcy protection under Chapter 11 in the fall of 2013.

7.     The size of the misstatement was staggering.  Defendants Water Street and Wind Point designed an LBO that ascribed a value of over $510 million to Physiotherapy. Unbeknownst to the unsecured creditors and new owner who helped fund the LBO, Physiotherapy was worth *less than half* of the $510 million valuation, and significantly less than its outstanding debt.

8.     All three of the Debtor's senior officers—the Chairman, the CEO, and the (previous) CFO—were fully aware of the accounting manipulations.  All three had been recruited and hired by Water Street and Wind Point to oversee the Company's day-to-day management, with a mandate to increase reported net revenue and EBITDA so that the Company could be sold at a significant profit for Water Street and Wind Point within a short period of time.

9.     Of course, the lack of integrity in the Debtor's financial reporting process was also something well known to Water Street and Wind Point.  Rather than address the problem— which they euphemistically referred to as "noise" in the quality of earnings—Water Street and Wind Point deliberately decided to sell the Company at a potentially inflated price in the LBO before the reality could catch up with them.  In the summer and fall of 2011, Water Street held various investment committee meetings on the anticipated sale.  Notes of those meetings indicate that Water Street and its board appointees knew that the "accounting noise in [Physiotherapy's] quality of earnings is high," and Physiotherapy's revenue projections had not been validated. But Water Street concluded that a sale would allow them to "sell through" the accounting

8

"challenges," and it was "better to sell the promise than wait for a potentially disappointing *reality*."

10.     In this LBO transaction designed by Water Street and Wind Point, the Debtor obtained financing from a new equity investor and bondholders, premised entirely on a foundation of widespread fraud and deceit. Defendants Water Street and Wind Point essentially hawked all of the Debtor's business assets at twice their true value, transferred the $248.6 million in borrowed cash to themselves and then disappeared from the scene, with the Debtor left in shambles and the innocent creditors left picking up the pieces.

11.     The holder of these creditors' claims and the authorized representative of the Debtor's estate—the PAH Litigation Trust—now brings this action under Pennsylvania and federal fraudulent transfer laws to avoid this $248.6 million transfer to Defendants.

## PARTIES

12.     Physiotherapy is based in Exton, Pennsylvania and employed over 3,079 employees in the period leading up to the bankruptcy. All of its senior management, accounting, finance, operations, and marketing personnel are located in Exton. On November 12, 2013, Physiotherapy Holdings Inc. ("HoldCo"), Physiotherapy Associates Holdings, Inc. and their affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On December 23, 2013, the Court entered an order confirming the Debtors' Chapter 11 plan of reorganization (the "Plan").

13.     Pursuant to the Plan, Plaintiff, the PAH Litigation Trust, was formed, and the claims of the Debtors, and consenting noteholders who purchased notes issued under the Senior Notes Indenture dated April 30, 2012 (the "Senior Notes"), were assigned to the PAH Litigation Trust. Standing to assert these claims was conferred upon the Trust pursuant to the Plan.

14.     Defendant Water Street Healthcare Partners, L.P., together with its affiliate WS Associate Co-Invest Partners, LLC (collectively, "Water Street") owned more than 45% of Physiotherapy's common shares beginning in 2007 and, by April 30, 2012, owned over 52%.

15.     Defendant Water Street Healthcare Management, L.P. is the general partner of Water Street Healthcare Partners, L.P.

16.     Defendant Wind Point Partners IV, L.P., together with its affiliates Wind Point IV Executive Advisor Partners, L.P., and Wind Point Associates IV, LLC (collectively, "Wind Point"), owned more than 35% of Physiotherapy's common shares beginning in 2007 and, by April 30, 2012, owned 38%.

17.     Defendant Wind Point Investors IV, L.P. (together with Water Street Healthcare Management, L.P., the "General Partners") is the general partner of Wind Point Partners IV, L.P. and Wind Point IV Executive Advisor Partners, L.P.

18.     Water Street and Wind Point (collectively, the "Initial Transferees") were the controlling shareholders of Physiotherapy.

19.     Each defendant listed below received a subsequent transfer of LBO proceeds (in the form of equity distributions) on or about May 3 or May 11, 2012 either directly from Water Street or from Water Street Healthcare Management, L.P.—the latter of which was a middleman that gave no value to the Initial Transferees and received no value from the Subsequent Transferees (hereinafter "Water Street Subsequent Transferees"):

| Water Street Subsequent Transferees | Amount of Subsequent Transfer |
|---|---|
| The Regents of the University of California | $13,373,528 |
| JPMorgan Chase Bank, N.A. as Trustee for SBC Master Pension Trust | $9,552,525 |
| Allianz Leben Private Equity Fonds 2001 GmbH | $7,960,311 |
| New York Life Insurance Company | $7,642,020 |
| Goldman Sachs Private Equity Concentrated Healthcare Fund Offshore Holdings, L.P. | $5,830,862 |

| | |
|---|---|
| HBM Bio Ventures Cayman LTD | $5,731,516 |
| CMFG Life Insurance Society | $4,871,788 |
| Crown Global Secondaries II plc | $4,298,636 |
| Goldman Sachs PEP New Partners - Manager Fund, L.P. | $4,248,963 |
| Jackson National Life Insurance Company | $3,821,011 |
| JH Partnership Holdings I, LP | $3,821,011 |
| JH Partnership Holdings II, LP | $3,821,011 |
| Pacus-UK Limited | $3,821,011 |
| PKAM Global Private Equity Fund | $3,821,011 |
| Wilshire US Private Markets Fund VI LP | $3,821,011 |
| Adams Street Partnership Fund - 2002 U.S. Fund, L.P. | $3,619,445 |
| Adams Street Partnership Fund - 2005 U.S. Fund, L.P. | $3,579,657 |
| Adams Street Partnership Fund - 2003 U.S. Fund, L.P. | $3,308,221 |
| AT&T Union Welfare Benefit Trust | $3,056,808 |
| IFM Ventures, LLC c/o Grove Street Advisors, LLC | $2,865,758 |
| Adams Street Partnership Fund - 2004 U.S. Fund, L.P. | $2,548,518 |
| Goldman Sachs Private Equity Partners 2004 - Manager Fund, L.P. | $2,269,680 |
| The BONY Mellon as Trustee for the Hewlett-Packard Company Master Trust | $2,228,200 |
| INVESCO U.S. LBO & CORPORATE FINANCE PARTNERSHIP FUND IV, L.P. | $2,087,963 |
| Goldman Sachs Private Equity Partners 2004 Offshore Holdings, L.P. | $1,681,245 |
| AZ-SGD Private Equity Fonds GmbH | $1,592,214 |
| JPMorgan Chase Bank, N.A., as directed Trustee for the Corning Incorporated Retirement Master Trust | $1,528,404 |
| Wilshire DL Fund CV | $1,528,404 |
| Tim Dugan | $1,467,269 |
| Jeff Holway | $1,432,879 |
| CROWN PREMIUM IV Beteiligungstreuhand S.à r.l. | $1,432,878 |
| North Sky LBO Fund II, LP | $1,146,303 |
| Tenzing CFO Equalization Pool, LP | $968,846 |
| Richard Chaifetz | $955,252 |
| GS U.S. Middle Market Buyout Fund Offshore Holdings, L.P. | $936,148 |
| Cumis Insurance Society | $859,728 |
| Dominick A. Arena | $764,201 |
| Essex Heritage Partners LLC | $764,201 |
| K.K. Diversified Ventures LLC | $764,201 |
| Wilshire SPF Fund, LP | $764,201 |
| The Lawrence E. Fox Living Trust | $687,781 |
| Randolph Partners II | $534,942 |
| Goldman Sachs PEP 2004 US-Focused Offshore Holdings, L.P. | $519,657 |
| Multi-Strategy Holdings, L.P. | $477,626 |
| Marc Casper | $458,522 |

| | |
|---|---:|
| Goldman Sachs Private Equity Partners 2004-Employee Fund, L.P. | $420,312 |
| Cheltenham Holdings LLC | $382,102 |
| Krishnan-Shah Family LP | $382,102 |
| P.K. Family Ventures LLC | $382,102 |
| Richard L. Thomas | $382,102 |
| Scott Garrett | $382,102 |
| William H. Latimer III | $382,102 |
| Alan L. Heller 1989 Revocable Trust | $286,575 |
| Goldman Sachs Private Equity Partners 2004, L.P. | $256,008 |
| Kevin M. Swan | $191,051 |
| Merchant Holding, Inc. | $191,051 |
| Paul J. Finnegan Revocable Trust | $191,051 |
| Steven G. Booth | $191,051 |
| WIN 8, LLC | $191,051 |
| Mark Speers & Paula Ness Speers | $152,841 |
| Ned Villers | $152,841 |
| Chris Sweeney | $129,914 |
| Eric Lev | $129,914 |
| John Pellettiere | $114,631 |
| Edward L Donnelly, Trustee of the Edward L. Donnelly Trust dated April 10, 2002 | $95,525 |
| The Davenport Family Trust UTA, Dated Dec 3, 1986 | $95,525 |
| Hoebel Family Trust | $76,420 |
| Matthew F. Bergmann | $76,420 |
| Steven J. Gavin | $76,420 |
| Stanford J. Goldblatt | $38,210 |
| Thomas A. Reynolds III and Hope C. Reynolds | $38,210 |
| Mike Brennan | $24,282 |
| Ryan Kelley | $24,282 |
| Water Street Healthcare Partners, LLC | $3,820 |
| **Total** | **$138,705,384** |

20.     Each defendant listed below received a subsequent transfer of LBO proceeds in the form of equity distributions on or about May 1, 2012 either directly from Wind Point or from Wind Point Investors IV, L.P.—the latter of which was a middleman that gave no value to the Initial Transferees and received no value from the Subsequent Transferees (hereinafter "Wind

Point Subsequent Transferees" and together with the Water Street Subsequent Transferees, the

"Subsequent Transferees"):

| Wind Point Subsequent Transferees | Amount of Subsequent Transfer |
|---|---|
| State of Wisconsin Investment Board | $10,521,360 |
| State Treasurer of the State of Michigan | $10,521,360 |
| Robert L. Cummings | $6,405,475 |
| State Street Bank and Trust Company as Trustee of the Chrysler Group LLC Master Retirement Trust | $5,260,679 |
| SVG Diamond Nominee Limited | $5,260,679 |
| James E. Forrest | $4,575,341 |
| The Northwestern Mutual Life Insurance Company | $4,208,543 |
| ASF Sunrise Acquisition, LLC | $3,682,475 |
| General Retirement System of the City of Detroit | $3,156,408 |
| Masco Capital Corporation | $3,156,408 |
| Mesirow Partnership Fund I. L.P. | $3,156,408 |
| State Street Bank and Trust Company as Trustee of the International Paper Defined Benefit Plan Trust | $3,156,408 |
| The Bank of New York Mellon, Custodian for A.O. Smith Pension Trust | $3,156,408 |
| The Police and Fire Retirement System of the City of Detroit | $3,156,408 |
| Wachovia Investors, Inc | $3,156,408 |
| James P. TenBroek | $2,287,670 |
| WIN 5 Holdings, LLC | $2,209,485 |
| Aetna Life Insurance Company | $2,104,272 |
| Landmark Acquisition Fund, LLC | $2,104,272 |
| Samuel Curtis Johnson III | $2,104,272 |
| Thrivent Financial for Lutherans | $1,683,417 |
| Mayo Clinic Master Retirement Trust, an Illinois Trust | $1,472,990 |
| American Family Mutual Insurance Co. | $1,052,136 |
| Dow Employees' Pension Plan | $1,052,136 |
| Greenpark III-W, LP | $1,052,136 |
| Jessie Ball duPont Fund | $1,052,136 |
| Lexington Capital Partners III, LP | $1,052,136 |
| Mayo Clinic | $1,052,136 |
| Lexington Capital Partners V, LP | $946,923 |
| TCB Partners, LLC | $736,495 |
| Arbor Investment Property Trust | $631,281 |
| Wind Point Ventures IV, LLC | $631,281 |
| Nantucket Private Equity Fund 1999, LLC | $420,854 |
| TILC Private Equity LLC | $420,854 |
| Michael J. Mahoney | $228,654 |
| Jaco IV Limited Partnership | $210,427 |
| RGJ Company, LP | $210,427 |
| RWB Investments, LLC | $210,427 |
| Thomas E. Darden | $167,602 |
| Michael Solot | $128,199 |
| Nathan Brown | $128,199 |

| | |
|---|---|
| Nantucket Venture Partners, LLC | $105,214 |
| Steven A. Berger | $105,214 |
| William N. Anderson | $76,920 |
| B. Joseph Messner | $51,280 |
| Thomas R. Hodgson Declaration of Trust UA 2/28/97 | $51,280 |
| William Hall | $51,280 |
| John Joseph King | $30,768 |
| Bernard F. Sergesketter Trust dated April 20, 1979 and amended | $25,639 |
| Charles W. Denny III Revocable Trust Dtd 7/30/1987 | $25,639 |
| David R. Zimmer | $25,639 |
| Dennis S. Bookshester Revocable Trust 2/17/89 | $25,639 |
| Edward E. Lucente | $25,639 |
| Gary D. Forsee | $25,639 |
| J. Gregory Muldoon | $25,639 |
| JDM Trust Partners | $25,639 |
| Jean-Pierre Rosso Revocable Trust U/A DTD 11/20/2001 | $25,639 |
| John C. Kane | $25,639 |
| Julius A. Hoeft | $25,639 |
| Michael T. Monahan | $25,639 |
| Mitchell F. Vernick | $25,639 |
| Richard W. Krant, Jr. | $25,639 |
| Robert A. Peiser | $25,639 |
| Roger T. Fridholm, trustee of the Roger T. Fridholm Revocable Trust dated April 13, 1983, as amended | $25,639 |
| Trustees of the Wendell F. Bueche Living Trust Dated June 1, 1998 | $25,639 |
| Warren L. Batts Revocable Trust dated 7/17/1982 | $25,639 |
| William R. Hildebrand | $25,639 |
| Wind Point Investors IV, L.P. | $5,954 |
| Daniel E. Kepler | $5,128 |
| Jennifer A. Kepler | $5,128 |
| Karin L. Springer | $5,128 |
| Peter Kepler | $5,128 |
| Susanne E. Schneider | $5,128 |
| **Total** | $98,872,276 |

## JURISDICTION AND VENUE

21.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petitions

filed by Physiotherapy under Chapter 11 of the United States Bankruptcy Code. *See In re*

*Physiotherapy Holdings, Inc.*, No. 13-12965 (Bankr. D. Del. filed Nov. 12, 2013). This is a core

proceeding pursuant to 28 U.S.C. § 157(b).

22.    Venue is proper in this Court under 28 U.S.C. § 1409(a).

## FACTS SUPPORTING COMPLAINT

**A.    Defendants Water Street and Wind Point Controlled Physiotherapy**

23.    Until the sale of the Debtor in April 2012, Water Street and Wind Point collectively owned between 80% and 90% of the common stock of, and effectively controlled, the Debtor.

24.    As controlling shareholders, Water Street and Wind Point appointed *all* of the Debtor's Board members, including all directors who voted to approve the sale (set forth below):

| BOARD MEMBER | AFFILIATION | BEGIN DATE | END DATE |
|---|---|---|---|
| James G. Connelly, III | Water Street Co-Founder | 06/28/07 | 04/30/12 |
| Curt M. Selquist | Water Street Operating Partner | 07/31/07 | 04/30/12 |
| Richard R. Kracum | Wind Point Managing Director | 03/24/08 | 04/30/12 |
| Robert Womsley | Water Street Partner | 02/03/10 | 04/30/12 |
| Daniel J. Connors | -- | 02/10/09 | 04/30/12 |

25.    Water Street and Wind Point also hand-picked senior executives to serve as CEO, CFO and COO, among other positions.  For example, they installed the following CEOs, CFOs, COO, and Controllers of the Debtor:

| EXECUTIVE | POSITION | BEGIN DATE | END DATE |
|---|---|---|---|
| Daniel J. Connors | CEO | 2/2009 | 6/2011 |
| John Andrew DeVoe | CEO/CFO | 1/2011 | 7/2013 |
| Edwin Bode | CFO | 8/2011 | 9/2012 |
| Peter Limeri | CFO | 6/2009 | 11/2010 |
| Pete Grabaskas | COO | 10/2009 | 6/2013 |
| Michael Walden | Controller | 9/2011 | 10/2012 |
| Sandy Sloyer | Controller | 3/2010 | 9/2011 |

26.    In addition, pursuant to a management agreement entered on or about June 28, 2007, the General Partners agreed to "consult with and advise" the board of directors and management of the Debtor "on [] business and financial matters . . . including (i) general

15

advisory services in relation to the Company's management and business, (ii) identification, analysis, support and negotiation of acquisitions and dispositions, (iii) analysis, support and negotiation of financing alternatives, including in connection with acquisitions, capital expenditures and refinancing of existing indebtedness, (iv) finance functions, including assistance in the preparation of financial projections, and (v) strategic planning functions, including the evaluation of major strategic alternatives."

27.     Given their controlling shareholder positions, Board appointments, hand-picked officers and the management agreement, Water Street and Wind Point exercised complete control over the Debtor and had free flowing access to information concerning the Debtor's business, operations, and financial position.

**B.     <u>Physiotherapy's Business and Historical Revenue Recognition</u>**

28.     Physiotherapy was one of the largest providers of outpatient physical therapy services in the United States.  It provided two types of services:  outpatient rehabilitation ("OR"), and orthotic and prosthetic ("O&P") services.  This case involves Physiotherapy's OR business, which represented approximately 95% of the company's total revenue for the year ending December 31, 2011.

29.     Physiotherapy performed services in rehabilitation clinics and at nursing homes and hospitals.  By December 31, 2011, Physiotherapy had 659 OR clinics and 29 O&P clinics across 33 states and the District of Columbia.

30.     The majority of Physiotherapy's revenues were received not directly from patients but from third-party payors, including healthcare insurers, managed care organizations, and Medicare and Medicaid.  Physiotherapy generally did not receive full payment when service was provided, but would bill third party payors and await payment.

31.     As is customary in the health care industry, Physiotherapy recorded revenue when the service was provided, but before payment was actually received.

32.     In the health care industry and in accordance with Generally Accepted Accounting Principles ("GAAP"), gross revenue is recorded at the health care provider's published rates.  Normally, the provider does not collect the full amount of its published rates because it negotiates contracts with third-party payors that are subject to different payment rates and adjustments or discounts, as was the case with Physiotherapy.

33.     To calculate net revenue, GAAP requires a healthcare provider to make reasonable estimates of these "contractual adjustments" – the difference between published rates and expected third-party payor payments based on the negotiated contract rates and discounts. These adjustments and discounts are then deducted from gross revenue to derive net revenue. Net revenue is used to determine "earnings" and is thus the critical component of "EBITDA" for companies like Physiotherapy.

34.     Although a "contractual adjustment" is an accounting estimate, it must be a *reasonable* estimate.  To make a reasonable estimate of the contractual adjustment amount, the industry standard was (and is) to use the "look back" method.  Under the "look back" method, a "net revenue per visit" is derived based on *actual* historical collections for claims that have already been closed and paid during the last 90 to 180 days.  This method is considered reasonable because it is based on empirical data – actual historical cash collections.

35.     Before 2010, Physiotherapy recorded net revenue based on this conventional "look back" method, which Physiotherapy understood was the "supportable" way to report revenue.

17

**C. To Position Itself for Sale, Physiotherapy Adopted an Improper Revenue Recognition Methodology that Concealed its True Financial Condition**

36.     In 2009, Physiotherapy's financial condition was grim.    In June 2009, Physiotherapy informed its lenders that, through April 2009, year-to-date revenue was down 8.9% versus the prior year and bad debt as a percentage of net revenue had more than doubled since September 2007.   According to Physiotherapy's then-CFO, the Company was "[l]osing market share," its EBITDA as a percent of revenue was 33% below the industry norm, and its days sales outstanding or "DSO" (*i.e.*, the number of days between billing and collections) was above the industry norm.

37.     In spite of this deterioration in Physiotherapy's financial performance, Defendants and their hand-picked executives conceived of a strategy to sell the Company by 2011 or 2012. To maximize the potential sales price, according to the same CFO's June 2009 "First 180 Day Plan Agenda," this strategy involved "revers[ing] the decline in revenue" by, among other things, changing Physiotherapy's accounting practice.

38.     Physiotherapy's financial condition continued to deteriorate in 2010.   A 2010 presentation to the Board indicated the Company had suffered a "significant drop" in financial performance during 2010.   As of July 2010, DSO was at 92 days, up 21 days (a 30% increase) from December 2009, and year-to-date cash collections had fallen short by 16%.   There was concern that, on the current course, Physiotherapy could face financial hardship which would lead to a "lack of cash to run the business efficiently," potential debt covenant issues, increased accounts receivable writeoffs, and a diminution in Physiotherapy's valuation.   The situation continued to worsen, with DSO climbing to 103 days—an increase of 45%—as of September 30, 2010.

39.     As part of Water Street's and Wind Point's effort to position Physiotherapy for sale (which, given Physiotherapy's continued deterioration, required concealing its true financial condition), Physiotherapy's Chairman decided to use—and the remainder of the Board approved—an improper revenue recognition method called a "rate bridge." Unlike the "look back" method, the "rate bridge" method was *not* based on actual historical cash collections, nor was it verified against cash collections.

40.     Instead, under its rate bridge method, Physiotherapy calculated a "net rate per visit" based on the prior month's net rate per visit—which itself was, at the time, based on an estimate—and adjusted it upward or downward based on supposed increases and/or decreases to published rates and assumptions about the amount Physiotherapy could charge per visit or per "unit" (i.e., services).

41.     Whereas the "look back" method was an estimate based on historical data, the rate bridge was essentially an estimate based on another estimate.

42.     More importantly, because the "rate bridge" methodology was not premised on actual historical cash collections and because there was no mechanism to verify that recorded revenue was actually collected in future periods, the rate bridge method was subject to easy manipulation.

43.     Physiotherapy's Board was informed of the use of the method and sanctioned its use in a November 2010 Board meeting, all with the knowledge of Physiotherapy's cash collection shortfalls, increasing DSO, and that the "rate bridge" method was not supported under applicable accounting standards and would enable Physiotherapy to report more net revenue than would otherwise be possible under the industry standard.

44.     Within six months of adopting the rate bridge method in April 2010, Physiotherapy began receiving reports that its net revenue was overstated. By May 2011, Physiotherapy's Chairman was notified by one of the facility managers that "our net/visit was highly inflated and [] our budgeted net revenues did not correlate."

**D.     Physiotherapy Engaged in Various Accounting Manipulations to Conceal Its True Financial Condition**

45.     In October 2011, Water Street and Wind Point began to market Physiotherapy for sale. They solicited bids from over 100 potential buyers and preliminary bids were submitted by 23 companies in November 2011. By January 2012, only three potential buyers remained.

46.     Water Street, Wind Point, and the Debtor's senior management knew that if the sale was not successful, the market would question Physiotherapy's valuation, and Physiotherapy could not be placed on the market again for another 18-24 months. During the same period, Water Street Healthcare Partners, LLC was also raising capital for a new fund, adding incentive to ensure that Physiotherapy would be seen as a successful investment by potential investors in its new fund.

47.     As potential bidders began falling away, the Debtor's senior management, under pressure from Water Street and Wind Point, manipulated the Company's net revenue and patient visit counts so that Physiotherapy could be marketed as a company that was able to grow its net revenue per visit year over year. These accounting manipulations took many forms.

48.     First, Physiotherapy characterized visits as "commercial (non-contract)," which had a high rate per visit, so that it could charge higher rates to non-contract patients, even though the visits had a contract associated with them for a lower rate. The impact of this manipulation was well understood. In one internal email, a senior Physiotherapy revenue accountant reported to Physiotherapy's Vice President of Revenue Cycle: "How about commercial – every month

they increase all of the visits that fall under that financial class to $185 even though we know a good portion are associated with a contract."

49.    Second, Physiotherapy attributed rates per visit to the "commercial" class of payors that were significantly higher than what they were actually collecting from this payor group. Again, the impact of this manipulation was obvious and well understood, as noted by its Vice President of Revenue Cycle: "*[Commercial] is a plugged number and we all know it. Commercial is coming in at $100 and it is plugged at $180 to make our net.*"

50.    Third, Physiotherapy simply inflated the overall net rate per visit. In an email chain between February 23, 2012 and March 1, 2012, Physiotherapy's Vice President of Revenue Cycle told the CEO and CFO that the net collectible rate they were reporting of $107 to $108 had her "perplexed." Based on her calculations, she noted they should be "at about $100.00 per visit for our collectible net rate . . . I can honestly tell you that $107 per visit is *not* a collectible net." Indeed, "closed claims" reports indicated the rates per visit should be even lower – at $98 per visit, prompting one employee of IKS (Physiotherapy's billing and collections vendor) to comment: "I don't get it. How can these all say around 98 and we still have everyone talking about 106??" The same Vice President later commiserated with colleagues that they needed to "dig through what is real and what is [the CEO's] and [the CFO's] *house of cards*." In another email dated April 12, 2012, she reported to the Vice President of Financial Planning & Accounting, "the Net is too high," to which the latter conceded: "net set too high and disproportionate to cash in the door."

51.    Fourth, Physiotherapy double-booked revenue related to the "contract revenue" payor class. This payor group paid a fixed fee regardless of the number of patient visits.

21

Revenues generated from this payor class were added to both the top line revenue number and used to calculate the rate per visit, which resulted in a double counting of revenues.

52.     Fifth, Physiotherapy inflated the number of patient visits per month, which in turn inflated net revenue because net revenue was calculated by multiplying the total number of visits in a given month by the net revenue per visit.  Originally, the number of visits per month was calculated based solely on completed therapist reports – therapists would be given two days after month end to "close out" their reports.  Once closed out, the data would be captured in Physiotherapy's accounting system (NextGen) as a "visit."  Later, Physiotherapy began including visits where the therapists had not yet "closed out" their reports.  This resulted in double-counting because some incomplete reports were created erroneously or were related to the same visits as completed reports.  And the same visits would be counted twice when incomplete reports were "closed out" in the following month.

53.     In an internal email, Physiotherapy's Vice President of Revenue Cycle reported to the Vice President of Financial Planning & Accounting that based on her analysis, Physiotherapy was over-accruing visits by about 2,500 a month.

54.     Sixth, Physiotherapy directed IKS to falsify accounts receivable ("AR") reports to force the AR data to match up with the company's general ledger ("GL").  Revenue numbers in Physiotherapy's GL were based on the rate bridge methodology.  Because the rate bridge was overstating revenues, Physiotherapy's GL reflected receivables that were higher than the AR data reflected in Physiotherapy's NextGen accounting system.  To conceal the revenue overstatement, therefore, Physiotherapy had to forcibly match the AR data in NextGen to the GL. To force the AR data to match the company's GL, Physiotherapy instructed IKS to use a predetermined net AR number and an arbitrary metric called "Gross Collection Ratio" (or

"GCR"), to convert gross AR into net AR. For example, if Physiotherapy's GL reflected $88 million in receivables, then Physiotherapy would direct IKS to use whatever GCR percent was necessary to convert gross AR into net AR in the NextGen system so that net AR would approximate $88 million.

   55.    Countless emails from IKS regarding the period December 2011 to April 2012—many of them to Physiotherapy's then CFO Edwin Bode—acknowledge the instructions from Physiotherapy to manipulate financial data:

- "As you are aware we do multiple versions of ATB [aged trial balance], *we change the logic (mostly the GRC %) when [the CFO] wants the ATB to reflect a specific numbers [sic]*."

- "In past two months the *ATB with the new logic was an ad hoc request* [by the CFO] to hit a pre-determined number of $84M in Sept [2011] . . . ."

- "Please let me know what rates I use to do the adjustment to the Nov 11 ATB . . . ."

- "[P]lease note that the Net AR given in Jan & Feb ATB where [sic] done using different logic as we had to tweak the GCR on Non-contracted payers *to get to a number closer to the GL*."

- "[IKS] [is] *reverse engineering the net rev to match to the GL*."

- "[the CFO] *use[d] to give me the exact net AR amount in the past*."

- "*I sent an [sic] note out to [the CFO] asking if [we] should wait to hear what the number [is] that we want to arrive [at] through the ATB* and [the CFO] confirmed that we can wait."

- "In previous months we worked on the ATB with the last logic (GCR rates) used and later we changed the logic to arrive at a number [the CFO] gave us."

56.    At one point, the manipulations of AR data to match GL became so outrageous that the ratio of net AR to net revenue exceeded the ratio of gross AR to gross revenue, a mathematical impossibility. As Physiotherapy's Controller explained it in a March 28, 2012 email to Physiotherapy's CFO: "Net AR to net revenue ratio is a higher percentage than gross AR to gross revenue ratio possibly due to *inflating the net AR ATB to decrease the delta between the net AR per the GL and the net AR per the ATB*."

57.    The various accounting manipulations by Physiotherapy became so frequent that the finance and accounting department expressed growing frustration at having to explain numbers that were simply not real:

- "[CFO] is emailing me to figure out his damn messing with the numbers."

- "I can't figure out what [CFO] did last month . . . I can't take it . . . I have had it with him[. H]e messed with the numbers last month I can't tie anything out."

- "I'm never going to be done with the #@#@#@ budget for 2012 ever. Sr. mgmt. mucked it up when the[y] confused a budget/plan with their desire to sell the business."

- "[CFO] [is] monkeying w[ith] the commercial [rate] number."

- "This [is] what happens when they don't present the truth. They made a ton of money off the sale, now that house of cards th[e]y built is starting to crumble and they need you to save it."

- "Well the entire analysis is rendered useless when we are doubling our re-imbursement for 7% of our population . . . without any proof we can collect it."

24

- "The net has been twe[a]ked so many times I have no idea what the real net is to be honest."

- "How does this not scream that we are manipulating the rate[?]"

- "See our net is a rate that is chosen by our CFO without any ability to back it up with reports."

- "The numbers are so falsified[,] if this flies[,] I will be beside myself."

- "Just pull numbers out of your butt like the rest of them do"

- "Well it takes time to manipulate the numbers . . . if we just reported the truth it would be better!"

- "My head is exploding i[t']s so painful.  The financials have been defiled for 2 years . . . it's horrific."

58.     After the LBO closed, Physiotherapy's Vice President of Financial Planning & Accounting remarked to the Vice President of Revenue Cycle that "Waterstreet was the source of most of the deception," that "Dan [Connors] [Physiotherapy's Board Chairman] definitely did some bad things himself," and that he was tired of the "deception Dan Connors laid on us."

**E.     Physiotherapy's Board Knew The Company's Reported Revenue Was Overstated**

59.     At all relevant times, Physiotherapy's Board knew, or at a minimum, was willfully blind to obvious warning signs that the "rate bridge" method was overstating net revenue.

60.     From at least mid-2010 through the sale of Physiotherapy in April 2012, Physiotherapy's Board members were focused on cash collections, understood that the "ultimate metric is cash," and received an update on Physiotherapy's cash collections every month.

61.     In a July 6, 2010 email, the CEO of IKS reported to Physiotherapy's Chairman that as of June 2010 (two months after Physiotherapy began using the rate bridge method), Physiotherapy had a year-to-date cumulative cash collection shortfall of $17.18 million (over 11%).

62.     In the August 2010 CFO report, the entire Board learned that (a) Physiotherapy's cash collection shortfall had grown to *$23.5 million*, and (b) DSO was 103 days – signaling a troubling trend. Based on cash collections as reported to the Board of Directors for each month from August 2010 to February 2012, cash collections fell short of reported revenue in all but 2 months during the entire period.

63.     On February 28, 2011, Andrew DeVoe (then Physiotherapy's CFO) informed members of the Board (Connors, Womsley, Connelly and Kracum) that based on cash collections, Physiotherapy's actual net rate per visit was $91.03, but Physiotherapy was reporting a net rate per visit of $102.86—*i.e.*, overstating it by 13%.

64.     Also in the first quarter of 2011, management made a presentation to the Board of Directors entitled "Revenue Cycle Management: The Path Forward, February 2011." The presentation indicated that (a) there was a shortfall between cash collections and "target" for *eleven of the past twelve months*; and (b) DSO days had climbed from 75 in January 2010 to 111 in December 2010—*i.e.*, almost 50% higher.

65.     The February 2011 presentation provided several metrics for the Board to measure "success" going forward, *none of which was ever achieved* in the 14 months between the February 2011 presentation and the closing of the LBO in April 2012: (a) $30 million in recovery collections from March 2011 to December 2011; and (b) DSO to decrease to 75 days by January 2012.

66.     With a $23.5 million cash shortfall as of the end of August 2010, the Board would have expected cash collections to exceed revenue at least until this shortfall was recovered.  The fact that the shortfall continued to grow provided clear evidence that Physiotherapy was overstating its net revenue.

67.     A comparison of the data the Board received against the metrics of success outlined in the February 2011 presentation to the Board showed that Physiotherapy was consistently missing budget.   From March 2011 to December 2011, Physiotherapy's cash collections were, with few exceptions, *10%-15% below projections*, even though reported revenues were within 5% of budget.

68.     By December 2011, cumulative cash collections were *$19 million below* the projection that was presented to the Board in February 2011, and were falling behind at a much greater pace than revenue (on a cumulative basis), which was only $4.5 million below budget.

69.     Based on monthly Board presentations, the Board was also aware that the amount of uncollected receivables older than 365 days continued to grow, from $8.7 million in July 2011 to $22.6 million in December 2011 (*i.e.*, by 160%), despite the retention of a consulting firm since at least May 2011 to improve collections of aged receivables, again clear evidence that Physiotherapy's reported net revenue was overstated.

70.     By September 2011, the situation was so dire, Physiotherapy's Chairman sent an email to Physiotherapy's CEO telling him: "If I saw metrics which were reassuring, I would/could worry less.  Currently all I have to look at are cash collections.  Which don't look encouraging to me."

71.     In describing the same cash collection statistics, Physiotherapy's consultant noted: "January through April [2011] were terrible months . . . Cash was so far behind pace that even the catch up months of May and June [2011] still put PTA [Physiotherapy] at an $11M deficit."

72.     The growing shortfall in cash collections took place during a time when Physiotherapy was using the "rate bridge" revenue recognition methodology.  In fact, ***only weeks before*** they approved the LBO, Board members were told by Physiotherapy's CFO that the rate bridge method had caused a disparity between cash collections and revenue.  On February 1, 2012, the CFO sent a report to members of Physiotherapy's Board, which made clear the discrepancy resulted from the company's use of the rate bridge methodology:  "The reason for the difference between $3.0[M] Cash remaining to be collected and the Dec 11 Net AR 271-300 [days outstanding] is due to the fact that the Net Revenue has been recorded for Mar 11 using a rate bridge (method used since April 2010) whereas the Net ATB is calculated from an estimated payment by payer using Gross AR resulting in unsynchronized results."

73.     Given the growing gap between (a) budgeted and actual cash collections and (b) monthly cash collections and revenue, the Board knew, or at a minimum was willfully blind to the fact, that the revenue recognition methodology used by Physiotherapy was grossly overstating its net revenue.

**F.     Physiotherapy's Board Was Presented with Hard Evidence That the Company Was Overstating its Net Revenue on the Eve of the LBO**

74.     In or about January or February 2012, two potential bidders for Physiotherapy – Clayton Dubilier & Rice ("CD&R") and New Mountain Capital ("New Mountain") – dropped out of the auction process when both their accountant advisors—Pricewaterhouse Coopers LLP ("PwC") and Deloitte & Touche LLP ("Deloitte"), respectively—concluded that Physiotherapy was overstating its net revenue and net accounts receivable.  Physiotherapy's Board (including

28

senior members of Water Street and Wind Point's management) received PwC and Deloitte's analyses only weeks before the Board approved the LBO on February 21, 2012.

75.     PwC concluded that Physiotherapy had overstated collectibility of accounts receivable by approximately *$17,542,000*—over 25%. A summary of PwC's analysis for CD&R was shared with Physiotherapy's Board and management on or about January 24, 2012.

76.     Deloitte also found a discrepancy between Physiotherapy's reported net revenue and cash collections. Deloitte's analysis for New Mountain showed that Physiotherapy had overstated its 2011 net OR revenue by *$24,167,000*—10%. Physiotherapy's Board and management received a copy of Deloitte's analysis on February 3, 2012, only weeks before the Board approved the LBO.

**G.     Water Street and Wind Point Too Were Aware of Physiotherapy's Revenue Overstatement**

77.     Unsurprisingly, Water Street and Wind Point, whose representatives sat on Physiotherapy's Board and were involved in the accounting manipulations, were fully aware of, or were at best willfully blind to, the Debtor's revenue overstatement.

78.     In the summer and fall of 2011, Water Street held various investment committee meetings on the anticipated sale of Physiotherapy. Notes of those meetings indicate that Water Street and its Board appointees knew that the "accounting noise in [Physiotherapy's] quality of earnings is high," and Physiotherapy's revenue projections had not been validated.

79.     Water Street saw a sale as a solution to its problems: A sale would allow Water Street to "sell through" the Debtor's accounting "challenges," and it was "better to sell the promise [of the revenues they were reporting under the rate bridge methodology] than wait for a potentially disappointing *reality*."

80.     Wind Point was no better.  Like Water Street, Wind Point's senior executives, including its Board appointee, received copies of the monthly cash collection reports and PwC and Deloitte's analysis, all evidencing the overstatement of the Debtor's net revenue.

**H.     The Debtor Defrauded Physiotherapy's Unsecured Creditors by Overstating the Value of the Company**

81.     With full knowledge of the revenue overstatement, the Debtor, Water Street, Wind Point marketed $210 million in unsecured notes to bondholders based on fraudulent financial statements that overstated Physiotherapy's net revenue and value.

82.     An offering memorandum was issued in April 2012 that touted Physiotherapy's operations and financial performance.  The offering memorandum falsely represented, among other things, that Physiotherapy's pre-tax net income for YE 2011 was $20.9 million and its adjusted EBITDA for 2011 year was $57.4 million.

83.     In reality, as Physiotherapy later confirmed, its net collectible revenue for YE 2011 was overstated by at least $23.4 million; in other words, instead of a pre-tax net *income* of $20.9 million, Physiotherapy actually had a pre-tax *loss* of at least $2.5 million.  In terms of absolute values, Physiotherapy's pre-tax net income had been overstated by at least *936%*.

84.     Based on Physiotherapy's actual pre-tax net income, its unadjusted EBITDA was at most $21.4 million instead of $44.8 million, an overstatement of at least *109%*.  And its 2011 adjusted EBITDA was at most $34 million, instead of $57.4 million, an overstatement of at least 69%.  The effect of these errors was magnified many times over as Physiotherapy's valuation was based on a multiple of its adjusted EBITDA.

85.     In an email dated April 16, 2012—two weeks before the LBO closed—Physiotherapy's Controller openly admitted Physiotherapy had overstated its revenue and EBITDA in the offering memorandum: "*Of course, the continued overstatement of revenues*

30

*and EBITDA may be catching up with us as evidenced by cash flows that are based on actual activity versus reported EBITDA or cash flow projections that are based upon projected or budgeted EBITDA.*"

### I.    The Sale of Physiotherapy Was Structured to Defraud Creditors

86.    On February 22, 2012, Physiotherapy, HoldCo, Physiotherapy Merger Sub, Inc. ("Merger Sub")—a wholly owned subsidiary of HoldCo—and Water Street, as representative for each of Physiotherapy's shareholders, entered into an Agreement and Plan of Merger (the "Merger Agreement") which contemplated an LBO transaction under which Physiotherapy was valued at over $510 million.

87.    The overall intent of the LBO, and of its component steps, was to enable, facilitate, and effectuate the leveraging and attendant sale of Water Street and Wind Point's interests in Physiotherapy.  Water Street, Wind Point, and the Debtor predetermined the structure of the LBO and its financing as part of a staple financing package offered to potential buyers. The LBO was financed with both equity and debt, including:  (i) a term loan to Physiotherapy in the amount of $100 million (the "Term Loan"); (ii) $210 million in Senior Notes issued by Physiotherapy; (iii) an equity investment by Court Square of approximately $213.3 million; (iv) management equity rollover in the amount of approximately $3.9 million; and (v) a minority investment by General Electric Corporation of approximately $1 million.

88.    The LBO was accomplished in several steps that Water Street, Wind Point, and the Debtor structured to occur on the same date as part of a single, integrated transaction.  On April 30, 2012, the Closing Date of the acquisition:

- Merger Sub incurred the Term Loan and Senior Notes and then merged with Physiotherapy which assumed all of Merger Sub's debt;

- Pre-merger shares of Physiotherapy were converted to Certificates that were redeemable for cash from the proceeds of the LBO payable on the same date;

31

- The proceeds of the Term Loan and Senior Notes, Court Square and General Electric's equity investments, management's equity rollover, and the balance of Physiotherapy's cash, totaled over $510 million;

- Physiotherapy, or HoldCo on Physiotherapy's behalf, transferred $248.6 million of the proceeds to Water Street and Wind Point, a portion of which was then transferred to the Subsequent Transferees.

89.     The sum of all of the foregoing was that Physiotherapy incurred a massive amount of new debt—predicated on false financials—the proceeds of which were transferred out to Physiotherapy's former owners without receiving anything of value in return.    Each transaction was a necessary and indivisible step that would not have occurred without the others, and without which the LBO could not have occurred.    The closing of each transactional step was contingent upon the closing of all other transactional steps to accomplish a single purpose.

**J.     Physiotherapy Had "Reasonably Knowable and Readily Accessible" Data That Showed Physiotherapy Was Overstating Its Net Revenue**

90.     Following the LBO, when it became clear there was something wrong with Physiotherapy's revenue recognition, Physiotherapy's new CFO conducted an investigation.

91.     After her investigation, the new CFO concluded that "[b]y the second half of 2011, NextGen [Physiotherapy's accounting system] was fully functional and transaction level detail for open and closed claims from March 2010 to December 2011 (22 months of transaction history) was available in Next Gen," and "*[a]nalysis of this reasonably knowable and readily accessible payment data in NextGen would have strongly indicated that the Net Patient Service Revenue being recorded during 2011 and the AR balance was overstated.*"

**K.     The Transfer of $248.6 Million to Water Street and Wind Point Was Rife with Fraud**

92.     The Debtor knew its true financial condition and understood the natural consequences of assuming $310 million in debt, and immediately transferring $248.6 million of the LBO proceeds to its former equity owners.    Accordingly, in addition to direct evidence of the

32

Debtor's fraudulent intent, Physiotherapy's intent can also be inferred from the following badges of fraud:

93.     <u>First</u>, the Debtor was under no obligation to enter into an LBO transaction that would result in a massive payout to its selling shareholders.  Moreover, the Debtor received nothing of value in exchange for the transfers.  As a matter of law, redemptions of shares provide nothing of value to the Company.

94.     <u>Second</u>, the transfers were made to insiders—controlling shareholders of the Debtor.

95.     <u>Third</u>, as set forth in greater detail above, the Debtor concealed its true financial condition from creditors by overstating its net revenue and EBITDA.

96.     <u>Fourth</u>, the Debtor was rendered insolvent immediately after it made the transfers to Water Street and Wind Point.  The Debtor's enterprise value, in reality, was only about $208 million or less—a number less than half of the $510 million value that Water Street and Wind Point had ascribed to the Debtor.  The incurrence of $310 million in debt, together with the $248.6 million transfer to Water Street and Wind Point, rendered Physiotherapy, with a true value of $208 million or less, instantaneously insolvent.

**L.     At a Minimum, the LBO Left the Debtor with Unreasonably Small Capital**

97.     As discussed above, Water Street and Wind Point sold the Company based on a vastly overstated EBITDA, which itself was based on overstated earnings and revenue figures in the Debtor's financial statements.  As a result, the Debtor's cash flow projections and revenue forecasts, which were based on the overstated financials, were also unreasonable.  It was obvious to the Debtor and to Water Street and Wind Point, who knew all of this, that the Debtor had no hope of surviving after the LBO.

33

98.    Water Street, Wind Point, and the Debtor knew that, without the overstatement, the Company's profit margins were below those of their peers in the industry.  They knew, when controlling for the overstatement, that the Debtor was projected *as of the date of the LBO* to be in breach of its financial covenants by year-end 2012, meaning it did not have the ability to pay its debts as they came due.  And they knew or should have known that, because the Debtor's EBITDA and enterprise value were so vastly overstated, the very structure of the LBO—saddling it with $310 million in debt and transferring $248.6 million of its capital to Water Street and Wind Point—would leave the Debtor with unreasonably small capital, and with no hope of sustaining operations or paying debts as they came due.

**M.    Physiotherapy's Financial Condition Was Deteriorating At the Time of the Fraudulent Transfers, and Declined Even Further After the Transfers**

99.    Even before the transfers to Water Street and Wind Point, Physiotherapy was consistently failing to meet its projections.   In the third quarter of 2011, Physiotherapy's Chairman was worried about the ability to perform at budgeted levels in Q1 and Q2 of 2012.  He suggested "backend[ing] the budget a little . . . so that it is easier to meet plan" and told CEO DeVoe that "[m]y fear is that we are running out of price steam . . . we are simply left with improving ebitda solely through visit growth.  Notwithstanding a .3% August, that proposition would scare me to death."   As it turned out, Physiotherapy had a "better than budgeted" visit month in January 2012 but "barely ek[ed] by on [financial] budget."  Physiotherapy's Chairman commented to the CEO that "it feels like every month is just a crapshoot and total surprise as to the result."  Not surprisingly, Physiotherapy's EBITDA missed budget by over 33% in March 2012.

100.    Following the fraudulent transfers to Water Street and Wind Point and the re-implementation of the look back method, Physiotherapy's reported financial condition declined

precipitously. Between April 30, 2012 and December 31, 2012, Physiotherapy generated $32 million of Adjusted EBITDA versus a budget of $53 million and prior year of $43.6 million. That is, Physiotherapy missed forecasts by $20 million (40%), and adjusted EBITDA had declined from prior year by $11.6 million or 26%.

101.    Between May 2012 and March 2013, pre-tax income was consistently negative except for August 2012. Pre-tax income was significantly below forecasts, and with two exceptions, was much lower when compared to pre-tax income in the prior year. Between May 2012 and March 2013, actual pre-tax income was *negative* $13,557,000, compared to a budget of $10,593,000 and prior year pre-tax income for the same period of $16,590,000. That is, net income was 228% less than budgeted and had declined by 30,147,000 – almost 182% – since the prior year.

102.    Between April 2012 and March 2013, adjusted EBITDA fell far short of both the prior year and the budget. During this time period, adjusted EBITDA was $43,054,000, compared to the prior year's $59,440,000 and the budgeted $65,196,000. This represents a decline of 28% from the prior year and a 34% shortfall against the budget.

103.    In the first quarter of 2013, Physiotherapy continued to struggle and miss projections. Its Adjusted EBITDA was $10.6 million versus budget of $12.2 million and prior year of $15.8 million.

104.    In March 2013, less than a year after the close of the LBO, Physiotherapy's auditor, KPMG LLP ("KPMG"), determined it could not issue an unqualified audit opinion with respect to the 2012 fiscal year because it was unable to reconcile the AR data with actual cash collections.

105.    On April 2, 2013, Physiotherapy defaulted on its Senior Notes Indenture by failing to deliver audited financials within the time frame required by the Indenture. On May 1, 2013, Physiotherapy missed its deadline to make its interest payments to bondholders.

106.    After Physiotherapy's new owner retained Deloitte to investigate the gap uncovered by KPMG, it was discovered that Physiotherapy's 2010 and 2011 net income had been overstated. The magnitude of the overstatement was staggering. For the fiscal year 2010, EBITDA was at most $14.6 million – *i.e.*, overstated by at least 32%. For 2011—the period immediately preceding the LBO—EBITDA was at most $21.4 million – *i.e.*, overstated by at least 109%.

### N.    Physiotherapy Was Forced to File for Bankruptcy Relief

107.    On November 12, 2013, just a few months after defaulting on the notes and completing its own internal forensic accounting analysis, Physiotherapy filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code.

108.    By the time Physiotherapy filed for bankruptcy, bondholders had lost at least 62.5% of the value of the Senior Notes.

109.    A Joint Prepackaged Chapter 11 Plan of Reorganization was confirmed on December 23, 2013 and became effective on December 31, 2013.

### COUNT I

### Avoidance and Recovery of Transfer of Stock Distributions – Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550

### (Initial Transferees)

110.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-109.

111.    In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred approximately $248.6 million to Water Street and Wind Point on account of their former ownership interests in the Debtor (the "Stock Distributions").

112.    At the time of the Stock Distributions, the Debtor had incurred in excess of $310 million in debt.

113.    The Debtor made the Stock Distributions with actual intent to hinder, delay, or defraud its creditors, as was the natural consequence of such transfers.

114.    The Debtor received no value in exchange for the Stock Distributions.

115.    The Stock Distributions (in April 2012) were made within two years of the Debtor's bankruptcy petition on November 12, 2013.

116.    Water Street Healthcare Management, L.P., as general partner, is liable for all matters chargeable to Water Street Healthcare Partners, L.P. in connection herewith.

117.    Wind Point Investors IV, L.P., as general partner, is liable for all matters chargeable to Wind Point Partners IV, L.P. and Wind Point Executive Advisor Partners, L.P. in connection herewith.

118.    Accordingly, the Stock Distributions should be avoided and recovered from the Initial Transferees, Water Street and Wind Point, and/or the General Partners in their capacities as such, for the benefit of Plaintiff.

## COUNT II

### Avoidance and Recovery of Transfer of Stock Distributions – Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550

### (Initial Transferees)

119.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-118.

120.    In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.

121.    At the time of the Stock Distributions, the Debtor had incurred in excess of $310 million in debt.

122.    The Debtor made the Stock Distributions at a time when it (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining property was unreasonably small capital, and (iii) intended to incur debts beyond its ability to repay as they matured.

123.    The Debtor received less than reasonably equivalent value in exchange for the Stock Distributions.

124.    The Stock Distributions (in April 2012) were made within two years of the Debtor's bankruptcy petition on November 12, 2013.

125.    Water Street Healthcare Management, L.P., as general partner, is liable for all matters chargeable to Water Street Healthcare Partners, L.P. in connection herewith.

126.    Wind Point Investors IV, L.P., as general partner, is liable for all matters chargeable to Wind Point Partners IV, L.P. and Wind Point Executive Advisor Partners, L.P. in connection herewith.

127.    Accordingly, the Stock Distributions should be avoided and recovered from the Initial Transferees, Water Street and Wind Point, and/or the General Partners in their capacities as such, for the benefit of Plaintiff.

## COUNT III

### Avoidance and Recovery of Transfer of Stock Distributions
### Pursuant to 11 U.S.C. §§ 548(a)(1) and 550

#### (Subsequent Transferees)

128.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-127.

129.    In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.  Thereafter, Water Street and Wind Point transferred the Stock Distributions to the Subsequent Transferees.

130.    As alleged above, the Stock Distributions are voidable under 11 U.S.C. § 548(a)(1) of the Bankruptcy Code as either actual or constructive fraudulent transfers.

131.    On information and belief, the Subsequent Transferees received the Stock Distributions for no value given that the subsequent transfers were paid to them by the Initial Transferees in the form of equity distributions.

132.    The Stock Distributions, or the value of the Stock Distributions, should be recovered from the Subsequent Transferees for whose benefit the fraudulent transfers were made.

## COUNT IV

### Avoidance and Recovery of Transfer of Stock Distributions –
### Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550 and
### 12 Pa.C.S.A. § 5104(a)(1)

#### (Initial Transferees)

133.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-132.

134.     In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.

135.     At the time of the Stock Distributions, the Debtor had incurred in excess of $310 million in debt.  The holders of the Senior Notes each held claims against the Debtor under the Senior Notes Indenture as of the time of the transfers to Defendants.

136.     The Debtor made the Stock Distributions with actual intent to hinder, delay, or defraud its creditors, as was the natural consequence of such transfers.

137.     The Debtor received no value in exchange for the Stock Distributions.

138.     The Stock Distributions (in April 2012) were made within four years of the Debtor's bankruptcy petition on November 12, 2013.

139.     Water Street Healthcare Management, L.P., as general partner, is liable for all matters chargeable to Water Street Healthcare Partners, L.P. in connection herewith.

140.     Wind Point Investors IV, L.P., as general partner, is liable for all matters chargeable to Wind Point Partners IV, L.P. and Wind Point Executive Advisor Partners, L.P. in connection herewith.

141.     Accordingly, the Stock Distributions should be avoided and recovered from the Initial Transferees, Water Street and Wind Point, and/or the General Partners in their capacities as such, for the benefit of Plaintiff.

## COUNT V

### Avoidance and Recovery of Transfer of Stock Distributions – Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550 and 12 Pa.C.S.A. §§ 5104(a)(2) and 5105

#### (Initial Transferees)

142.   Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-141.

143.   In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.

144.   At the time of the Stock Distributions, the Debtor had incurred in excess of $310 million in debt.  The holders of the Senior Notes each held claims against the Debtor under the Senior Notes Indenture as of the time of the transfers to Defendants.

145.   The Debtor made the Stock Distributions at a time when it (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

146.   The Debtor received less than reasonably equivalent value in exchange for the Stock Distributions.

147.   The Stock Distributions (in April 2012) were made within four years of the Debtor's bankruptcy petition on November 12, 2013.

148.   Water Street Healthcare Management, L.P., as general partner, is liable for all matters chargeable to Water Street Healthcare Partners, L.P. in connection herewith.

149.    Wind Point Investors IV, L.P., as general partner, is liable for all matters chargeable to Wind Point Partners IV, L.P. and Wind Point Executive Advisor Partners, L.P. in connection herewith.

150.    Accordingly, the Stock Distributions should be avoided and recovered from the Initial Transferees, Water Street and Wind Point, and/or the General Partners in their capacities as such, for the benefit of Plaintiff.

## COUNT VI

### Avoidance and Recovery of Transfer of Stock Distributions
### Recovery Pursuant to 11 U.S.C. §§ 544 and 550

### (Subsequent Transferees)

151.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-150.

152.    In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor. Thereafter, Water Street and Wind Point transferred the Stock Distributions to the Subsequent Transferees.

153.    As alleged above, the Stock Distributions are voidable under 11 U.S.C. § 544 of the Bankruptcy Code as either actual or constructive fraudulent transfers.

154.    On information and belief, the Subsequent Transferees received the Stock Distributions for no value given that the subsequent transfers were paid to them by the Initial Transferees in the form of equity distributions.

155.    The Stock Distributions, or the value of the Stock Distributions, should be recovered from the Subsequent Transferees for whose benefit the fraudulent transfers were made.

## COUNT VII

### Avoidance and Recovery of Transfer of Stock Distributions – Constructive Fraudulent Transfer Pursuant to 12 Pa.C.S.A. §§ 5104(a)(2), 5105, and 5107

#### (Initial Transferees)

156.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-155.

157.     The Assigning Noteholders each held claims against the Debtor under the Senior Notes Indenture as of the time of the transfers to Defendants.

158.     In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.

159.     At the time of the Stock Distributions, the Debtor had incurred in excess of $310 million in funded debt.

160.     The Debtor made the Stock Distributions at a time when it (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

161.     The Debtor received less than reasonably equivalent value in exchange for the Stock Distributions.

162.     This action is within four years of the Stock Distributions to Defendants.

163.     Water Street Healthcare Management, L.P., as general partner, is liable for all matters chargeable to Water Street Healthcare Partners, L.P. in connection herewith.

43

164.     Wind Point Investors IV, L.P., as general partner, is liable for all matters chargeable to Wind Point Partners IV, L.P. and Wind Point Executive Advisor Partners, L.P. in connection herewith.

165.     Accordingly, the Stock Distributions should be avoided and recovered from the Initial Transferees, Water Street and Wind Point, and/or the General Partners in their capacities as such, for the benefit of Plaintiff.

**COUNT VIII**

**Avoidance and Recovery of Transfer of Stock Distributions
Pursuant to 12 Pa.C.S.A. §§ 5104(a)(2), 5105, 5107 and 5108(b)**

**(Subsequent Transferees)**

166.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-165.

167.     The Assigning Noteholders each held claims against the Debtor under the Senior Notes Indenture as of the time of the transfers to Defendants.

168.     In April 2012, the Debtor, or HoldCo on the Debtor's behalf, transferred the Stock Distributions to Water Street and Wind Point on account of their former ownership interests in the Debtor.  Thereafter, Water Street and Wind Point transferred the Stock Distributions to the Subsequent Transferees.

169.     This action is within four years of the Stock Distributions to Defendants.

170.     As alleged above, the Stock Distributions are voidable under 12 Pa.C.S.A. §§ 5104(a)(2) and 5105 as fraudulent transfers.

171.     Accordingly, Plaintiff may recover from the Subsequent Transferees for whose benefit the fraudulent transfers were made and who, on information and belief, took for no value given that the subsequent transfers were in the form of equity distributions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief and judgment as follows:

a. Declaring that the Stock Distributions transferred to the Initial and Subsequent Transferees are avoidable pursuant to 11 U.S.C. §§ 544, 548, 550 and 12 Pa. C.S.A. §§ 5104-5105, 5107-5108.

b. Awarding Plaintiff judgment against the Initial and Subsequent Transferees and the General Partners in an amount equal to the Stock Distributions, together with pre-judgment and post-judgment interest;

c. Awarding Plaintiff attorneys' fees, costs and other expenses; and

d. Granting such other and further relief as the Court considers appropriate.

*[remainder of page intentionally left blank]*

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury of all issues so triable.  Plaintiff does not consent to the entry of final orders or judgments by the Bankruptcy Court.


Dated: September 1, 2015

> QUINN EMANUEL URQUHART
> & SULLIVAN, LLP
> Richard I. Werder, Jr.
> Susheel Kirpalani
> Benjamin Finestone
> 51 Madison Avenue, 22nd Floor
> New York, New York 10010
>
> QUINN EMANUEL URQUHART
> & SULLIVAN, LLP
> R. Brian Timmons
> Johanna Y. Ong
> Farbod S. Moridani
> 865 South Figueroa Street, 10th Floor
> Los Angeles, California 90017
>
> -and-
>
> PACHULSKI STANG ZIEHL & JONES LLP
>
> Laura Davis Jones (Bar No. 2436)
> Michael R. Seidl (Bar No. 3889)
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705 (Courier 19801)
> Telephone:  (302) 652-4100
> Facsimile:  (302) 652-4400
> Email:  ljones@pszjlaw.com
>           mseidl@pszjlaw.com
>
> *Counsel for the PAH Litigation Trust*