rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan. Any modifications to the Plan shall be subject to the Plan Support Agreement so long as such agreement shall remain effective by its terms.

69.    **Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, apply and are enforceable notwithstanding any otherwise applicable nonbankruptcy law.

70.    **Waiver of Filings.** Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule or statement with the Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule or statement not filed as of the Confirmation Date.

71.    **Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or other governmental authority with respect to the dissemination, implementation or consummation of the Plan and the Disclosure Statement, any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

K&E 28549336.14

72.    **Notices of Confirmation and Effective Date.**  The Reorganized Debtors shall serve notice of entry of this Confirmation Order, substantially in the form attached hereto as **Exhibit B** (the "Confirmation Order Notice") in accordance with Bankruptcy Rules 2002 and 3020(c) on all holders of Claims and Interests and the Core Notice Parties within 10 Business Days after the date of entry of this Confirmation Order.  As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall file notice of the Effective Date and shall serve a copy of the same on the above-referenced parties.  The notice of the Effective Date may be included in the Confirmation Order Notice.  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  The above-referenced notices are adequate under the particular circumstances of the Chapter 11 Cases and no other or further notice is necessary.

73.    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

74.    **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

75.    **References to and Omissions of Plan Provisions.**  References to articles, sections and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically

K&E 28549336.14

include or to refer to any particular article, section or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of the Court that the Plan be confirmed in its entirety and incorporated herein by this reference.

76.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

77.    **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

78.    **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

79.    **Settlement of Certain Claims and Interests.**  All components of the proposed settlement embodied in the Plan are hereby approved as of the Effective Date.

80.    **Treatment of GECC Secured Claim.**    General Electric Capital Corporation ("GECC") holds a secured claim (the "GECC Secured Claim") classified in Class 2 (Other Secured Claims) of the Plan.  As security for the obligations relating to the Letters of Credit (defined below) issued by GECC, GECC holds rights and liens in the GECC Collateral (defined below) that includes certain funds held in escrow by GECC.  GECC's claims and liens are evidenced by and described in (a) (i) Irrevocable Standby Letter of Credit Number SE445275, as amended, (ii) Irrevocable Standby Letter of Credit Number SE449674, as amended, (iii) Clean,

K&E 28549336.14

Irrevocable Standby Letter of Credit Number SM202243, as amended (collectively, "Letters of Credit"), (b) the Escrow Agreement dated as of July 31, 2013, among PAH, as borrower, and GECC, as issuing bank and escrow agent ("Escrow Agreement"), and (c) all other documents relating to the Letters of Credit and the obligations that are or may be owed to GECC in regard to the Letters of Credit (all such other documents together with the Letters of Credit, and the Escrow Agreement, are collectively referred to in this Order as the "GECC Documents"). (GECC's collateral as described in the GECC Documents is referred to in this Order as the "GECC Collateral").

(a)     The GECC Secured Claim shall be an Allowed Secured Claim as provided in the GECC Documents. The GECC Secured Claim shall not be impaired in any way or manner by the Plan as confirmed by this Order.

(b)     The Escrow Agreement and the other GECC Documents shall remain in full force and effect, fully enforceable against PAH and other applicable Reorganized Debtors (if any) according to their terms. The applicable Reorganized Debtors shall be obligated for all amounts owing under the GECC Documents, and shall pay those obligations in accordance with the terms and conditions of the GECC Documents. GECC shall retain all of its claims, rights, liens and remedies as provided in the GECC Documents. GECC's liens in the GECC Collateral shall remain in full force and effect, and shall remain first position, valid, and enforceable liens as provided in the GECC Documents.

(c)     The treatment of the GECC Secured Claim provided in this Paragraph 80 shall control over any inconsistent, additional or different provisions of the Plan (and/or any documents referenced therein) or this Confirmation Order.

K&E 28549336.14

(d)     For purposes of clarification, this Confirmation Order confirms that the existing terms of the GECC Documents remain unchanged and will not increase GECC's or the Debtors' or Reorganized Debtors' obligations thereunder.

(e)     After and only after (i) GECC has been reimbursed in full for all amounts drawn, if any, under the Letters of Credit and for all other amounts owing under the GECC Documents (other than any contingent obligations such as indemnification obligations (if any) that are not yet due and payable) including reasonable fees and costs related to the Letters of Credit to the extent required to be reimbursed by PAH under the terms of the GECC Documents, and (ii) none of the Letters of Credit is outstanding (whether by virtue of termination, replacement, cancellation, satisfaction, or expiration of the Letters of Credit or by being fully drawn), then, at Reorganized PAH's sole cost and expense, GECC shall promptly execute and deliver a customary payoff letter (which, for the avoidance of doubt, shall not be contingent upon PAH delivering any releases or taking any further action) and such other documents, instruments, and releases as Reorganized PAH may reasonably request (including UCC 3 termination statements) in order to evidence or give public notice of such lien terminations, releases, cancellations and satisfactions.

81.     Notwithstanding anything in the Plan to the contrary, any Allowed non-subordinated Claim for indemnity, reimbursement, advancement or contribution (an "Allowed Reimbursement Claim") against the Debtors in favor of any Person identified in **Exhibit C** to the Disclosure Statement, **Exhibit B** to the Litigation Trust Agreement or that is otherwise one of the Potential Defendants and Witnesses (collectively, a "Defendant") will receive the treatment of an Allowed General Unsecured Claim in Class 5. This Court shall have exclusive jurisdiction to determine whether any claim for indemnity, reimbursement, advancement or contribution by a

K&E 28549336.14

Defendant is an Allowed Reimbursement Claim against the Debtors. For the avoidance of doubt, the Plan and this Order shall not impair a Defendant's rights, if any, to assert setoff or recoupment, except and to the full extent permitted by applicable law, including without limitation sections 502, 510, and 553 of the Bankruptcy Code. The respective rights and defenses of the Defendants, the Litigation Trust, and the Debtors with respect to the foregoing are expressly preserved in all respects. If, following the commencement of any cause of action or other form of process (collectively, an "Action") against any Defendant, such Defendant believes that he, she or it holds or will hold an indemnity, reimbursement, advancement or contribution claim against the Debtors as a result of such Action that is or should be an Allowed Reimbursement Claim against the Debtors, such Defendant must promptly (but in no event more than 30 calendar days following the commencement of the Action and its service upon or delivery to such Defendant), file a proof of claim or a motion for payment with the Bankruptcy Court in respect of such indemnity, reimbursement, advancement or contribution claim, and such Defendant may thereafter settle, compromise, withdraw or litigate to judgment such proof of claim or motion. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors, the Reorganized Debtors and the Litigation Trust shall have the exclusive authority to file any objection to such proof of claim or motion for payment, settle such proof of claim or motion for payment, compromise such proof of claim or motion for payment, or litigate to judgment such proof of claim or motion for payment. Nothing herein shall impair the right of any Defendant to file a motion for payment of any timely-filed proof of claim, and the right of the Debtors and/or Litigation Trust to oppose any such motion for payment. Nothing herein shall impair the right of any Defendant to seek a stay of the Action that the Defendant asserts would give rise to an Allowed Reimbursement Claim pending a final determination of any proof of

K&E 28549336.14

claim or motion filed with the Bankruptcy Court or the right of the Debtors and/or the Litigation Trust to oppose any such request for a stay. For the purposes of this paragraph, the "Debtors" shall include the Reorganized Debtors.

82.    Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, unless the Huron Agreements (as defined below) are assumed by the Debtors or assumed and assigned to the Reorganized Debtors, any and all Allowed claims of Huron Consulting Services LLC ("Huron") arising under or related to the Master Agreement, Methodology/Software License Agreement, the Business Associate Agreement, the Project Letter, the Sustained Performance Services Agreement, the Assessment Engagement Letter and any other related agreement or document (collectively, the "Huron Agreements"), other than Class 7 Claims, shall be Class 5 Claims. This Court shall have exclusive jurisdiction to determine whether any Huron claim is an Allowed Class 7 Claim or an Allowed Class 5 Claim.

83.    Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, all of Huron's rights, title, interests, claims, defenses or the like with respect to the assumption, assumption and assignment, or rejection of the Huron Agreements are reserved and preserved, including, without limitation, any and all of Huron's rights, title or interests under the Huron Agreements, until a further order is entered providing otherwise. All of the Debtors' rights, title, interests, claims, defenses or the like with respect with respect to the assumption, assumption and assignment, or rejection of the Huron Agreements are reserved and preserved, including, without limitation, any and all of the Debtors' rights, title or interests under the Huron Agreements, until a further order is entered providing otherwise. The Debtors will file a motion to assume or reject the Huron Agreements prior to the Effective Date, and the final determination

58

of assumption or rejection shall be made within five (5) business days of the Court's ruling on

the motion to assume or reject.

84.    The Litigation Trust Agreement is hereby amended, by agreement of the parties

thereto, as follows:

(A)    The definition of "Agreement" in section 1.1 shall provide: "This PAH Litigation

Trust Agreement, as amended by agreement of the parties as provided in the Confirmation

Order."

(B)    A new Section 2.9.1 of the Litigation Trust Agreement shall be inserted following

section 2.9 of the Litigation Trust Agreement and shall provide:

> 2.9.1    Indemnification of Reorganized Debtors.  If any Person asserts,
> threatens to assert or claims he, she or it is entitled to assert a claim for indemnity,
> reimbursement, advancement or contribution against the Debtors or Reorganized
> Debtors (a "Reimbursement Claim") arising out of, deriving from or relating to a
> complaint, petition, action, cause of action, suit, demand, claim or any form of
> legal process (including discovery) commenced by the Litigation Trust (an
> "Action"), the Litigation Trust shall indemnify the Debtors or Reorganized
> Debtors with respect to such Reimbursement Claim to the extent it is required to
> be paid by the Debtors or the Reorganized Debtors (together with any legal costs
> and fees incurred by the Debtors or Reorganized Debtors, as permitted by Section
> 2.9.1(c), the "Reimbursement Claim Indemnity Obligations") on the terms and
> conditions set forth in this Section 2.9.1.  The Reimbursement Claim Indemnity
> Obligations shall be subordinate to the costs of the Litigation Trust (including any
> compensation to which the Trustees are entitled) and to attorneys' fees of the
> Litigation Trust, except as provided below, and shall not be satisfied out of the
> Initial Funding or any Additional Funding.
>
> a.    With respect to any Contributed Claim that is resolved pursuant to (1) a
> settlement with the Litigation Trust pursuant to which the applicable Defendant(s)
> are no longer able to assert a Reimbursement Claim or (2) a judgment in favor of
> the Litigation Trust against a Person who does not assert, threaten to assert, or
> claim he, she or it is entitled to assert a Reimbursement Claim, or where any such
> asserted Reimbursement Claim has been resolved in the judgment:
>
> After paying costs and expenses, including attorneys' fees, of the Litigation Trust
> attributable to such settlement or judgment, the Litigation Trustees shall satisfy
> any present Reimbursement Claim Indemnity Obligations and then shall establish
> and maintain, from the proceeds of such settlement or judgment, a reserve for the
> satisfaction of any future Reimbursement Claim Indemnity Obligations plus, in

59

accordance with Section 2.9.1(c), the estimated expenses and legal fees of the Litigation Trust, the Debtors and the Reorganized Debtors in defending against any Reimbursement Claim asserted or threatened to be asserted against the Debtors or Reorganized Debtors, which shall be funded and maintained in an amount determined by the Litigation Trustees in their reasonable discretion (the "Potential Reimbursement Claims Indemnity Reserve"). The Potential Reimbursement Claims Indemnity Reserve shall be maintained by the Litigation Trustees for the satisfaction of any Reimbursement Claim Indemnity Obligations plus, in accordance with Section 2.9.1(c), the estimated expenses and legal fees of the Litigation Trust, the Debtors and the Reorganized Debtors in defending against any Reimbursement Claim asserted or threatened to be asserted against the Debtors or Reorganized Debtors, until the Litigation Trust is dissolved pursuant to Article VII of this Agreement.

b.  With respect to any Contributed Claim that is resolved pursuant to a judgment in favor of the Litigation Trust against a Person who asserts, threatens to assert, or claims he, she or it is entitled to assert a Reimbursement Claim, where any such asserted Reimbursement Claim is not resolved in the judgment:

After paying costs and expenses, but not attorneys' fees, of the Litigation Trust attributable to such judgment (except as permitted by Section 2.9.1(c)), the Litigation Trustees shall establish and maintain, from the proceeds of such judgment, a reserve sufficient to satisfy in full any actual or threatened Reimbursement Claim plus, in accordance with Section 2.9.1(c), the estimated expenses and legal fees of the Litigation Trust, the Debtors and Reorganized Debtors in defending against any Reimbursement Claim asserted or threatened to be asserted against the Debtors or Reorganized Debtors (an "Asserted Reimbursement Claim Indemnity Reserve"). An Asserted Reimbursement Claim Indemnity Reserve shall be maintained by the Litigation Trustees for the satisfaction of any Reimbursement Claim Indemnity Obligations that result from such asserted Reimbursement Claim until the asserted Reimbursement Claim is finally adjudicated and any Reimbursement Claim Indemnity Obligations resulting from such Reimbursement Claim are satisfied, provided that the Litigation Trustees shall, before disbursing, satisfy any present Reimbursement Claim Indemnity Obligations and may, in their reasonable discretion and consistent with their obligations set forth in this Section 2.9.1, fund additional amounts to the Potential Reimbursement Claims Indemnity Reserve.

c.  The Litigation Trustees may, in their reasonable discretion, either (a) defend any Reimbursement Claims asserted or threatened against the Debtors or the Reorganized Debtors or (b) indemnify the Debtors or the Reorganized Debtors in respect of their attorneys' fees related thereto, which shall be Reimbursement Claim Indemnity Obligations.

d.  The provisions of this Section 2.9.1 shall control over any and all inconsistent provisions of the Trust Agreement.

60

(C)    Section 3.3(c) of the Litigation Trust Agreement shall be replaced with the following:

> Subject to the terms of this Agreement, the Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Trust Assets, which includes, without limitation, pursuing recovery on the Trust Causes of Action, making timely Distributions in accordance with Section 4.2 and not unduly prolonging the duration of the Litigation Trust. The Trustees, acting at the direction of a majority of the Trustees, shall have discretion to pursue or not to pursue, and settle or not settle, the Trust Causes of Action, as they determine to be in the best interests of the Beneficiaries and consistent with the purposes of the Litigation Trust without the consent of any other Person, including without limitation the Debtors or the Beneficiaries, and shall have no liability for the outcome of its decision; provided that the Trustees shall not settle any Trust Cause of Action unless the applicable Potential Defendant or Witness releases the Released Parties and the Litigation Trust in connection with the settlement; provided, further, that none of the Released Parties shall be a defendant in any action brought by the Trustees on behalf of the Litigation Trust. For the avoidance of doubt, in the exercise of their reasonable discretion, the Trustees shall not be obligated to pursue any or all of the Trust Causes of Action.

(D)    Section 7.1 shall be amended by renumbering subsection (d) as subsection (e) and adding as new subsection (d) the following:

(d)    The Litigation Trust has satisfied all actual and threatened Reimbursement Claims.

85.    **Final Order.** This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof. All interim orders entered by the Court in the Chapter 11 Cases that are in effect are deemed final by operation of this Final Order.

Dated: Dec. 23, 2013
        Wilmington, Delaware

The Honorable Kevin Gross
Chief United States Bankruptcy Judge

61

K&E 28549336.14

**EXHIBIT A**

**The Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 13-12965 (KG) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF PHYSIOTHERAPY HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:     (215) 568-6603

Jonathan S. Henes, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: December 16, 2013

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Physiotherapy Holdings; Inc. (5193); Actra Rehabilitation Associates, Inc. (7806); Alexandria Sports; Inc. (7654); Benchmark Acquisition Corp. (3850); Benchmark Medical Management Company (0335); Benchmark O & P Holdings, Inc. (6848); Benchmark Orthotics & Prosthetics, Inc. (7000); Blue Hen Physical Therapy, Inc. (7267); Cape Prosthetics-Orthotics, Inc.(7914); Carrollton Physical Therapy Clinic, Inc. (2832); Integrity Physical Therapy, Inc. (1075); Keystone Rehabilitation Associates of Warren (8341); Keystone Rehabilitation Systems, Inc. (8380); Keystone Rehabilitation Systems of McMurray (6304); Leesburg Sports, Inc. (4190); MATRIX Healthcare Services, LLC (7344); MATRIX Rehabilitation, Inc. (3147); MATRIX Rehabilitation-Delaware, Inc. (2504); MATRIX Rehabilitation-Georgia, Inc. (4073); MATRIX Rehabilitation-Ohio, Inc. (2505); MATRIX Rehabilitation-South Carolina, Inc.(5603); MATRIX Rehabilitation-Texas, Inc. (9542); Morris Area Rehabilitation Association, Inc. (2043); North Dallas Physical Therapy Associates, Inc. (5331); Northstar Health Services, Inc. (7152); NSHS Services, Inc. (6789); Orthopaedic Services of Paducah, Inc. (3143); PhysioLink Corporation (3705); Physiotherapy Associates Holdings, Inc. (3367); Physiotherapy Associates-Union Rehab, LLC (0041); Physiotherapy Associates, Inc. (7193); Physiotherapy Corporation (3816); Physiotherapy-BMHI Holdings, Inc. (3361); Physiotherapy-BMI, Inc. (4107); Potomac Rehabilitation Services, Inc. (2725); Professional Rehab Associates, Inc. (2393); Progressive Therapy Services, Inc. (8449); R.S. Network, Inc. (9104); Rehab Associates, LLC (9381); Rehab Colorado, LLC (5804); Rehab Missouri, LLC (0587); Rehab Xcel, LLC (0586); Rehabilitation Consultants, Inc. (1166); SMR Banyan Tree, Inc. (6933); Swanson Orthotic & Prosthetic Center, Inc. (2308); The Parks Physical Therapy and Work Hardening Center, Inc. (2926); Theraphysics Partners of Colorado, Inc. (2115); Theraphysics Partners of Texas, Inc. (9976); Therapy Associates of Martinsville, Inc. (1394); Trumbull P.T. Corp. (3855); and Wisconsin Prosthetics and Orthotics, Inc. (7815). The Debtors' main corporate address is 855 Springdale Drive, Suite 200, Exton, PA 19341.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
 GOVERNING LAW ..................................................................................................... 1

    A.    Defined Terms. ......................................................................................... 1
    B.    Rules of Interpretation. .......................................................................... 12
    C.    Computation of Time. ............................................................................ 13
    D.    Governing Law. ..................................................................................... 13
    E.    Reference to Monetary Figures. ............................................................ 13
    F.    Reference to the Debtors or the Reorganized Debtors. ......................... 13

ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS ...................................... 13

    A.    Administrative Claims. .......................................................................... 13
    B.    Priority Tax Claims. .............................................................................. 15
    C.    Statutory Fees. ....................................................................................... 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................................. 15

    A.    Classification of Claims and Interests. .................................................. 15
    B.    Summary of Classification. ................................................................... 15
    C.    Treatment of Claims and Interests. ....................................................... 16
    D.    Special Provision Governing Claims. .................................................... 20
    E.    Elimination of Vacant Classes. ............................................................. 20
    F.    Acceptance or Rejection of the Plan. .................................................... 20
    G.    Confirmation Pursuant to Sections 1129(a) (10) and 1129(b) of the
         Bankruptcy Code. .................................................................................. 21
    H.    Controversy Concerning Impairment. ................................................... 21
    I.    Subordinated Claims. ............................................................................ 21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................................... 21

    A.    Sources of Cash for Plan Distributions. ................................................ 21
    B.    Exit Facility. .......................................................................................... 21
    C.    Settlement of Certain Claims and Interests. .......................................... 22
    D.    Issuance and Distribution of New Common Stock. ............................... 22
    E.    New Stockholders Agreement. .............................................................. 22
    F.    Restructuring Transactions. ................................................................... 23
    G.    Corporate Existence. ............................................................................. 23
    H.    Vesting of Assets in the Reorganized Debtors. ..................................... 23
    I.    Cancellation of Existing Indebtedness and Securities. ......................... 23
    J.    Corporate Action. ................................................................................. 24
    K.    New Certificates of Incorporation and New By-Laws. ......................... 24
    L.    Directors and Officers of the Reorganized Debtors. ............................. 24
    M.    Effectuating Documents; Further Transactions. .................................... 25
    N.    Management Incentive Plan. ................................................................. 25
    O.    Senior Management and Management Employment Agreements. .......... 25
    P.    Exemption from Certain Taxes and Fees. ............................................. 25
    Q.    Legacy D&O Liability Insurance Policies. ............................................ 25
    R.    Indemnification Provisions. ................................................................... 26
    S.    Indemnification of Consenting Noteholders and Consenting Shareholders. ... 26
    T.    Assumption of Independent Director Indemnification Obligations. ....... 26

|       | U. | Preservation of Causes of Action. ........................................... | 26 |
|       | V. | Litigation Trust .......................................................................... | 27 |
|       | W. | Dissolution of Holdings ............................................................ | 29 |

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 29

|       | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases............. | 29 |
|       | B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases............. | 30 |
|       | C. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. ......... | 30 |
|       | D. | Insurance Policies. ........................................................................ | 30 |
|       | E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements........ | 31 |
|       | F. | Reservation of Rights. .................................................................. | 31 |
|       | G. | Nonoccurrence of Effective Date. ................................................ | 31 |
|       | H. | Contracts and Leases Entered Into After the Petition Date. ............... | 31 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 31

|       | A. | Timing and Calculation of Amounts to Be Distributed. ..................... | 31 |
|       | B. | Disbursing Agent. ........................................................................ | 32 |
|       | C. | Rights and Powers of Disbursing Agent. ...................................... | 32 |
|       | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........ | 32 |
|       | E. | Manner of Payment. .................................................................... | 33 |
|       | F. | Section 1145 Exemption. ............................................................ | 34 |
|       | G. | Section 3(a)(9) Exemption. .......................................................... | 34 |
|       | H. | Compliance with Tax Requirements. ............................................ | 34 |
|       | I. | Allocations. ................................................................................... | 34 |
|       | J. | Setoffs and Recoupment. ............................................................ | 34 |
|       | K. | Claims Paid or Payable by Third Parties. ...................................... | 35 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................. 35

|       | A. | Prosecution of Objections to Claims. .......................................... | 35 |
|       | B. | Claims Administration Responsibilities. ...................................... | 36 |
|       | C. | Estimation of Claims. .................................................................. | 36 |
|       | D. | Adjustment to Claims Without Objection. ...................................... | 36 |
|       | E. | Disallowance of Claims. .............................................................. | 36 |
|       | F. | No Distributions Pending Allowance. .......................................... | 36 |
|       | G. | Distributions After Allowance. ...................................................... | 37 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS........................... 37

|       | A. | Compromise and Settlement of Claims, Interests, and Controversies. ................. | 37 |
|       | B. | Discharge of Claims and Termination of Interests. ...................... | 37 |
|       | C. | Release of Liens. ........................................................................ | 37 |
|       | D. | Releases by the Debtors. ............................................................ | 38 |
|       | E. | Releases by the Releasing Parties. ............................................ | 38 |
|       | F. | Liabilities to, and Rights of, Governmental Units. ...................... | 39 |
|       | G. | Exculpation. ................................................................................. | 39 |
|       | H. | Injunction. ................................................................................... | 39 |
|       | I. | Term of Injunctions or Stays. ...................................................... | 41 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........................................ 41

    A.    Conditions Precedent to the Effective Date. ........................................ 41
    B.    Waiver of Conditions. ........................................ 41
    C.    Effect of Failure of Conditions. ........................................ 41

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................................... 42

    A.    Modification and Amendments. ........................................ 42
    B.    Effect of Confirmation on Modifications. ........................................ 42
    C.    Revocation or Withdrawal of Plan. ........................................ 42

ARTICLE XI. RETENTION OF JURISDICTION ........................................ 42

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................ 44

    A.    Immediate Binding Effect. ........................................ 44
    B.    Additional Documents. ........................................ 45
    C.    Payment of Certain Professional Fees. ........................................ 45
    D.    Statutory Committee and Cessation of Fee and Expense Payment ........................................ 45
    E.    Payment of Fees and Expenses for Counsel to the Consenting Shareholders. ........................................ 45
    F.    Reservation of Rights. ........................................ 45
    G.    Successors and Assigns. ........................................ 45
    H.    Notices. ........................................ 45
    I.    Entire Agreement. ........................................ 47
    J.    Exhibits. ........................................ 47
    K.    Severability of Plan Provisions. ........................................ 48
    L.    Votes Solicited in Good Faith. ........................................ 48
    M.    Closing of Chapter 11 Cases. ........................................ 48
    N.    Conflicts. ........................................ 48

## INTRODUCTION

Physiotherapy Holdings, Inc. ("Holdings") and its debtor affiliates, as debtors and debtors in possession propose this joint prepackaged plan of reorganization (the "Plan") for the resolution of the Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code (as such terms are defined below). Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Holders of Claims and Interests should refer to the Disclosure Statement (as such terms are defined below) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      *"2012 Transaction"* means all transactions whenever occurring, including, without limitation, borrowings, dividends, sales, and purchases of securities (whether debt or equity) or bonuses that in any way relate to the acquisition, satisfaction or issuance of debt or equity of the Debtors or any Affiliate on or about April 30, 2012.

2.      *"Accrued Professional Compensation"* means, at any given moment, all accrued, contingent, and/or unpaid fees and expenses for services rendered through and including the Effective Date by any retained Professional in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order; provided, however, that any such fees and expenses (a) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) have been applied against any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

3.      *"Ad Hoc Committee of Senior Noteholders"* means that certain committee of Holders of Senior Notes Claims.

4.      *"Administrative Claim"* means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (b) Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; and (d) all Allowed requests for compensation or expense reimbursement for making a substantial contribution to the Chapter 11 cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

5.      *"Administrative Claims Bar Date"* means the date that is 30 days after the Effective Date.

6.      *"Administrative Claims Objection Deadline"* means the date that is 60 days after the Effective Date.

7.      *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.      *"Allowed"* means as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, as applicable, or by a Final Order.

9.      *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

10.      *"Ballot"* means the form or forms distributed to certain Holders of Claims entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

11.      *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§101-1532, as may be amended from time to time.

12.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

13.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

14.      *"Bridge Loan Agent"* means U.S. Bank, National Association, in its capacities as administrative agent and collateral agent under the Bridge Loan Credit Agreement and any other capacities thereunder or related thereto, including any capacity held by any of its Affiliates.

15.      *"Bridge Loan Credit Agreement"* means that certain credit agreement, dated as of July 31, 2013 (as amended, supplemented, or modified from time to time), by and among Physiotherapy Associates Holdings, Inc., as borrower, Holdings and the Bridge Loan Credit Agreement Guarantors, as guarantors, the Bridge Loan Lenders, and U.S. Bank, National Association, in its capacities as administrative agent and collateral agent.

16.      *"Bridge Loan Credit Agreement Claims"* means any Claim derived from, based upon, relating to, or arising from the Bridge Loan Credit Agreement.

17.      *"Bridge Loan Credit Agreement Guarantors"* means Holdings, Keystone Rehabilitation Systems of McMurray, and the Senior Notes Guarantors.

18.      *"Bridge Loan Facility"* means the $140 million term loan provided under the Bridge Loan Credit Agreement.

19.      *"Bridge Loan Lenders"* means the lenders party to the Bridge Loan Credit Agreement.

20.      *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

21.      *"Cash"* means the legal tender of the United States of America.

22.      *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

2

23.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.     *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

25.     *"Claims Register"* means the official register of Claims maintained by Kurtzman Carson Consultants LLC, retained as the Debtors' notice, claims, and solicitation agent.

26.     *"Class"* means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

27.     *"Committee"* means any official committee (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

28.     *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30.     *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

31.     *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders.

32.     *"Consenting Bridge Loan Lenders"* means 100% of the Bridge Loan Lenders.

33.     *"Consenting Noteholders"* means (i) those Holders of Senior Notes Claims who have executed the Plan Support Agreement and collectively hold more than 66 $^{2/3}$% in principal amount of Senior Notes and (ii) those Holders of Senior Notes Claims who have opted-in to the settlement described in Article III.C.4 below, in accordance with the terms of the Plan and any applicable Ballot and solicitation procedures.

34.     *"Consenting Shareholders"* means the Court Square affiliates that have executed the Plan Support Agreement and that collectively hold approximately 89.98% of the outstanding shares in Holdings.

35.     *"Consummation"* means the occurrence of the Effective Date.

36.     *"Contributed Claims"* shall have the meaning set forth in Article IV.V.

37.     *"Contributing Claimants"* means the Debtors and their Estates, the Consenting Noteholders, and the Consenting Shareholders.

38.     *"Court Square"* means (i) Court Square Capital Partners II, L.P., Court Square Capital Partners II-A, L.P., Court Square Capital Partners (Executive) II, L.P., Court Square Capital Partners (Offshore) II, L.P. (in their respective capacities as equity holders, debt holders, and advisor, only) and (ii) each of their current and former Affiliates, (iii) any investment fund managed by Court Square Capital Partners II, L.P. or its Affiliates, (iv) any current or former Affiliates of any such investment fund, (v) any successor to Court Square Capital Partners II, L.P., investment management business, and (vi) current or former directors, officers, members, shareholders, partners, employees, and agents of any of the foregoing entities.

3

39.    *"Cure Claim"* means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

40.    *"Cure Notice"* means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

41.    *"Debtor"* means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

42.    *"Debtors"* means, collectively: (a) Holdings; (b) Aetra Rehabilitation Associates, Inc.; (c) Alexandria Sports; Inc.; (d) Benchmark Acquisition Corp.; (e) Benchmark Medical Management Company; (f) Benchmark O & P Holdings, Inc.; (g) Benchmark Orthotics & Prosthetics, Inc.; (h) Blue Hen Physical Therapy, Inc.; (i) Cape Prosthetics-Orthotics, Inc.; (j) Carrollton Physical Therapy Clinic, Inc.; (k) Integrity Physical Therapy, Inc.; (l) Keystone Rehabilitation Associates of Warren; (m) Keystone Rehabilitation Systems, Inc.; (n) Keystone Rehabilitation Systems of McMurray (o) Leesburg Sports, Inc.; (p) MATRIX Healthcare Services, LLC; (q) MATRIX Rehabilitation, Inc.; (r) MATRIX Rehabilitation-Delaware, Inc.; (s) MATRIX Rehabilitation-Georgia, Inc.; (t) MATRIX Rehabilitation-Ohio, Inc.; (u) MATRIX Rehabilitation-South Carolina, Inc.; (v) MATRIX Rehabilitation-Texas, Inc.; (w) Morris Area Rehabilitation Association, Inc.; (x) North Dallas Physical Therapy Associates, Inc.; (y) Northstar Health Services, Inc.; (z) NSHS Services, Inc.; (aa) Orthopaedic Services of Paducah, Inc.; (bb) PhysioLink Corporation; (cc) PAH; (dd) Physiotherapy Associates-Union Rehab, LLC; (ee) Physiotherapy Associates, Inc.; (ff) Physiotherapy Corporation; (gg) Physiotherapy-BMHI Holdings, Inc.; (hh) Physiotherapy-BMI, Inc.; (ii) Potomac Rehabilitation Services, Inc.; (jj) Professional Rehab Associates, Inc.; (kk) Progressive Therapy Services, Inc.; (ll) R.S. Network, Inc.; (mm) Rehab Associates, LLC; (nn) Rehab Colorado, LLC; (oo) Rehab Missouri, LLC; (pp) Rehab Xcel, LLC; (qq) Rehabilitation Consultants, Inc.; (rr) SMR Banyan Tree, Inc.; (ss) Swanson Orthotic & Prosthetic Center, Inc.; (tt) The Parks Physical Therapy and Work Hardening Center, Inc.; (uu) Theraphysics Partners of Colorado, Inc.; (vv) Theraphysics Partners of Texas, Inc.; (ww) Therapy Associates of Martinsville, Inc.; (xx) Trumbull P.T. Corp.; and (yy) Wisconsin Prosthetics and Orthotics, Inc.

43.    *"Description of Transaction Steps"* means the description of the Restructuring Transactions as set forth in the Plan Supplement.

44.    *"Disbursing Agent"* means the Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

45.    *"Disclosure Statement"* means the Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated October 10, 2013, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, and is in form and substance reasonably acceptable in all respects to the Consenting Shareholders and the Ad Hoc Committee of Senior Noteholders.

46.    *"Disputed"* means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

47.    *"Distribution Record Date"* means the Effective Date.

48.    *"Effective Date"* means the date selected by the Debtors, the Ad Hoc Committee of Senior Noteholders, the Consenting Bridge Loan Lenders, and the Consenting Shareholders that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B and (b) no stay of the Confirmation Order is in effect.

4

49.      *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

50.      *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

51.      *"Exculpated Claim"* means any Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the Restructuring Transactions, (c) the issuance of the New Common Stock, and (d) the distribution of property under the Plan or any other agreement, provided, however, that any Contributed Claim shall not be an Exculpated Claim.

52.      *"Exculpated Party"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Bridge Loan Agent; (d) the Bridge Loan Lenders; (e) the Ad Hoc Committee of Senior Noteholders; (f) the Holders of Senior Notes Claims who executed the Plan Support Agreement; (g) the Senior Notes Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Lenders; (j) the Consenting Shareholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees. Notwithstanding the foregoing, under no circumstances shall any of the Potential Defendants and Witnesses constitute an Exculpated Party.

53.      *"Executory Contract"* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

54.      *"Exit Facility"* means (a) a term loan credit facility of $144.162 million, of which $140 million shall be used to refinance the existing Bridge Loan Facility and (b) incremental credit facilities, each to be issued and accessed in accordance with the Exit Facility Credit Agreement and each secured by a first-priority lien on and security interests in substantially all the Reorganized Debtors' assets, which facilities shall be consistent in all material respects with the Exit Facility Commitment Letter and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, to be executed and delivered by the parties thereto on or about, and as a condition to, the Effective Date.

55.      *"Exit Facility Agent"* means U.S. Bank National Association or such other financial institution in its capacity as administrative agent, collateral agent, and issuing bank under the Exit Facility Credit Agreement.

56.      *"Exit Facility Commitment Letter"* means the commitment letter, which is attached as Exhibit B to the Disclosure Statement, setting forth the material terms of the Exit Facility Credit Agreement.

57.      *"Exit Facility Credit Agreement"* means that certain agreement governing the Exit Facility, dated on or about the Effective Date by and among the Reorganized Debtors, the lenders party thereto, and the Exit Facility Agent, in its capacities as administrative agent, collateral agent, and issuing bank (as amended, restated, supplemented, or otherwise modified from time to time).

58.      *"Exit Lenders"* means those "Lenders" under (and as defined in) the Exit Facility Credit Agreement.

KE 28889748
PHIL1 3340378v.1

59.    *"Federal Judgment Rate"* means the federal judgment rate in effect as of the Petition Date.

60.    *"Fee Claim"* means a Claim for Accrued Professional Compensation.

61.    *"File," "Filed,"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

62.    *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

63.    *"General Unsecured Claim"* means any Unsecured Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) a Senior Notes Claim, (e) a Subordinated Claim, (f) a Non-Subordinated Contribution and Reimbursement Claim, (g) a Fee Claim, or (h) an Intercompany Claim.

64.    *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

65.    *"Holder"* means an Entity holding a Claim or an Interest.

66.    *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

67.    *"Independent Director Indemnification Obligations"* means the Debtors' obligation to indemnify Matthew Cantor, a current independent director of Holdings and PAH, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of Holdings or PAH, pursuant to and to the maximum extent provided by (a) that certain Director Agreement by and between Holdings, PAH, and Matthew Cantor, dated as of May 1, 2013, (b) the (i) articles of incorporation, (ii) certificates of formation, (iii) bylaws, and (iv) similar corporate documents (including under an Executory Contract or otherwise) of Holdings and/or PAH, and (c) applicable law, as in effect as of the Petition Date.

68.    *"Initial Litigation Trust Funding"* shall have the meaning set forth in Article IV.V.

69.    *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

70.    *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

71.    *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

72.    *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

73.    *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

KE 28889748
PHIL1 3340378v.1

74.     *"Legacy D&O Liability Insurance Policies"* means Policy Nos. 0306-3479 and 0307-4999 issued by Darwin National Assurance Company, including all endorsements, riders, and amendments thereto.

75.     *"Lien" means* a lien as defined in section 101(37) of the Bankruptcy Code.

76.     *"Litigation Trust"* means that certain trust established pursuant to the Plan and the Confirmation Order on the Effective Date.

77.     *"Litigation Trust Agreement"* means that certain agreement, in form and substance mutually acceptable to the Ad Hoc Committee of Senior Noteholders and the Consenting Shareholders, setting forth the terms and conditions governing the Litigation Trust, the form of which is attached as Exhibit F to the Disclosure Statement and will be included in the Plan Supplement.

78.     *"Litigation Trust Beneficiaries"* means, collectively, the Consenting Shareholders and Holders of Allowed Senior Notes Claims, each in their capacity as beneficiaries of the Litigation Trust, and their permitted assignees and transferees in accordance with the Litigation Trust Agreement.

79.     *"Litigation Trust Funding"* shall have the meaning set forth in Article IV.V.

80.     *"Litigation Trust Units"* means the 10,000 trust units initially allocated to the Litigation Trust Beneficiaries on the Effective Date, and any additional trust units allocated in accordance with the Litigation Trust Agreement.

81.     *"Litigation Trustees"* means those three (3) original trustees and any successors to the original trustees. As set forth in the Litigation Trust Agreement, one of the trustees shall be appointed by (and may be replaced by) the Consenting Noteholders, one of the trustees shall be appointed by (and may be replaced by) the Consenting Shareholders, and one of the trustees shall be an independent member appointed (or replaced) by mutual agreement of the Consenting Noteholders and Consenting Shareholders. The trustees shall govern the Litigation Trust in accordance with the Litigation Trust Agreement.

82.     *"Management Employment Agreements"* means those management employment agreements by and between the Debtors and the Debtors' current (as of September 1, 2013) senior management team.

83.     *"Management Incentive Plan"* means that certain post-Effective Date equity incentive program, which shall provide for up to 10% of the New Common Stock, on a fully diluted basis. The terms, form of equity, and allocation of the Management Incentive Plan shall be determined by the New PAH Board.

84.     *"New Boards"* means, collectively, the New PAH Board and the New Subsidiary Boards, as initially comprised in accordance with the terms of the applicable New Corporate Governance Documents.

85.     *"New By-Laws"* means the form of the by-laws of each of the Reorganized Debtors.

86.     *"New Certificates of Incorporation"* means the form of the certificates of incorporation of the Reorganized Debtors.

87.     *"New Common Stock"* means a certain number of common shares in the capital of Reorganized PAH authorized pursuant to the Plan, of which up to approximately 2.1 million shares shall be initially issued and outstanding as of the Effective Date.

88.     *"New Corporate Governance Documents"* means, as applicable, (a) the New Certificates of Incorporation, (b) the New By-Laws, and (c) the New Stockholders Agreement.

89.     *"New PAH Board"* means the initial board of directors of Reorganized PAH.

7

90.    *"New Stockholders Agreement"* means the stockholders agreement for Reorganized PAH, the form of which is attached as Exhibit E to the Disclosure Statement and will be included in the Plan Supplement.

91.    *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized PAH, the initial board of directors or member, as the case may be, of each such Reorganized Debtor.

92.    *"Non-Subordinated Contribution and Reimbursement Claims"* means Claims against the Debtors for contribution, indemnification, or reimbursement that are not Subordinated Claims and are brought: (a) by any Person or Entity arising out of or resulting from the pursuit of litigation by the Litigation Trust; (b) by a Released Party other than a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (i)-(iv) above, (vi) all claims and Causes of Action for breach of fiduciary duty (including but not limited to breaches of the duties of care, good faith, and loyalty), and (vii) any and all claims and Causes of Action arising from actions taken or not taken in connection with the Restructuring and the Chapter 11 Cases; or (c) by a Released Party that is a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, and (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (i)-(iv) above. For the avoidance of doubt, Independent Director Indemnification Obligations do not constitute Non-Subordinated Contribution and Reimbursement Claims or Subordinated Claims, and shall be assumed by the Reorganized Debtors.

93.    *"Other Secured Claim"* means any Secured Claim that is not a Bridge Loan Credit Agreement Claim.

94.    *"PAH"* means Physiotherapy Associates Holdings, Inc.

95.    *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

96.    *"Petition Date"* means the date on which each of the Debtors commenced the Chapter 11 Cases.

8

97.    *"Plan"* means this Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement (as modified, amended, or supplemented from time to time), which is incorporated herein by reference.

98.    *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each in form and substance reasonably acceptable to the Consenting Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders,, and Consenting Shareholders, to be Filed by the Debtors no later than five days before the Confirmation Hearing or as soon as reasonably practicable thereafter, and as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including the following: (a) the New Corporate Governance Documents for Reorganized PAH; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List; (d) a list of retained Causes of Action; (e) the Litigation Trust Agreement; (f) the Exit Facility Credit Agreement; (g) the members of the New Boards, to the extent known; (h) the Description of Transaction Steps; and (i) the Management Employment Agreements. Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (i). The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with Article X.A hereof, and the Reorganized Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with applicable law.

99.    *"Plan Support Agreement"* means that certain plan support agreement, dated as of October 10, 2013, by and among the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders party thereto, and the Consenting Shareholders, a copy of which is attached as Exhibit H to the Disclosure Statement

100.    *"Potential Defendants and Witnesses"* means those Persons and/or Entities set forth on Exhibit C to the Disclosure Statement, as such exhibit may be amended prior to the Effective Date with the consent of the Contributing Claimants, or on or after the Effective Date in accordance with the Litigation Trust Agreement.

101.    *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.    *"Priority Tax Claims"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103.    *"Professional"* means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

104.    *"Professional Fee Escrow Account"* means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

105.    *"Professional Fee Reserve Amount"* means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.A.2(c) hereof.

106.    *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

107.    *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

108.    *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

9

109.    *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

110.    *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

111.    *"Released Claims"* means (i) any and all claims and Causes of Action relating to any Debtor arising at any time prior to the Effective Date, including without limitation (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, and (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (a)-(d) above; and (ii) any and all claims and Causes of Action arising from actions taken or not taken in connection with the Restructuring and the Chapter 11 Cases; *provided, however,* that with respect to any Released Party, Released Claims shall not include any claims, Causes of Action or liabilities arising out of or relating to any act or omission of such Released Party that constitutes gross negligence, willful misconduct, or fraud.

112.    *"Released Party"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Bridge Loan Agent; (d) the Bridge Loan Lenders; (e) the Consenting Noteholders; (f) the Ad Hoc Committee of Senior Noteholders; (g) the Senior Notes Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Lenders; (j) the Consenting Shareholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (k), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents (other than third-party vendors performing services for the Debtors), financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees. Notwithstanding the foregoing, under no circumstances shall any of the Potential Defendants and Witnesses constitute a Released Party.

113.    *"Releasing Parties"* means each of: (a) the Debtors; (b) the Bridge Loan Agent; (c) the Bridge Loan Lenders; (d) the Consenting Noteholders; (e) the Senior Notes Indenture Trustee; (f) the Consenting Shareholders; and (g) without limiting the foregoing clauses (a), (b), (c), (d), (e), and (f), and notwithstanding anything contained herein to the contrary, the Holders of Claims against and Interests in the Debtors and the Reorganized Debtors who (i) vote to accept the Plan and (ii) for Holders of Senior Notes Claims, have opted-in to the settlement described in Article III.C.4 below.

114.    *"Reorganized Debtors"* means the Debtors (other than Holdings, which shall be dissolved on the Effective Date), or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

115.    *"Reorganized PAH"* means PAH, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized PAH shall be a corporation organized under the laws of the state of Delaware.

116.    *"Restructuring Transactions"* means one or more transactions pursuant to section 1123 of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be

10

necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the execution and delivery of all documents in connection with the creation and funding of the Litigation Trust; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

117.    *"Secured"* means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

118.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. 77a-77aa, together with the rules and regulations promulgated thereunder.

119.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

120.    *"Senior Notes"* means those certain 11.875% Senior Notes due 2019 issued pursuant to the Senior Notes Indenture.

121.    *"Senior Notes Claim"* means any Claim derived from, based upon, relating to, or arising from the Senior Notes Indenture.

122.    *"Senior Notes Guarantors"* means, collectively: (a) Actra Rehabilitation Associates, Inc.; (b) Alexandria Sports; Inc.; (c) Benchmark Acquisition Corp.; (d) Benchmark Medical Management Company; (e) Benchmark O & P Holdings, Inc.; (f) Benchmark Orthotics & Prosthetics, Inc.; (g) Blue Hen Physical Therapy, Inc.; (h) Cape Prosthetics-Orthotics, Inc.; (i) Carrollton Physical Therapy Clinic, Inc.; (j) Integrity Physical Therapy, Inc.; (k) Keystone Rehabilitation Associates of Warren; (l) Keystone Rehabilitation Systems, Inc.; (m) Leesburg Sports, Inc.; (n) MATRIX Healthcare Services, LLC; (o) MATRIX Rehabilitation, Inc.; (p) MATRIX Rehabilitation-Delaware, Inc.; (q) MATRIX Rehabilitation-Georgia, Inc.; (r) MATRIX Rehabilitation-Ohio, Inc.; (s) MATRIX Rehabilitation-South Carolina, Inc.; (t) MATRIX Rehabilitation-Texas, Inc.; (u) Morris Area Rehabilitation Association, Inc.; (v) North Dallas Physical Therapy Associates, Inc.; (w) Northstar Health Services, Inc.; (x) NSHS Services, Inc.; (y) Orthopaedic Services of Paducah, Inc.; (z) PhysioLink Corporation; (aa) PAH; (bb) Physiotherapy Associates-Union Rehab, LLC; (cc) Physiotherapy Associates, Inc.; (dd) Physiotherapy Corporation; (ee) Physiotherapy-BMHI Holdings, Inc.; (ff) Physiotherapy-BMI, Inc.; (gg) Potomac Rehabilitation Services, Inc.; (hh) Professional Rehab Associates, Inc.; (ii) Progressive Therapy Services, Inc.; (jj) R.S. Network, Inc.; (kk) Rehab Associates, LLC; (ll) Rehab Colorado, LLC; (mm) Rehab Missouri, LLC; (nn) Rehab Xcel, LLC; (oo) Rehabilitation Consultants, Inc.; (pp) SMR Banyan Tree, Inc.; (qq) Swanson Orthotic & Prosthetic Center, Inc.; (rr) The Parks Physical Therapy and Work Hardening Center, Inc.; (ss) Theraphysics Partners of Colorado, Inc.; (tt) Theraphysics Partners of Texas, Inc.; (uu) Therapy Associates of Martinsville, Inc.; (vv) Trumbull P.T. Corp.; and (ww) Wisconsin Prosthetics and Orthotics, Inc.

123.    *"Senior Notes Indenture"* means that certain indenture, dated as of April 30, 2012, as amended by the Supplemental Indenture (and as may be further amended, supplemented, or modified from time to time), for an issuance of $210,000,000 of Senior Notes at 11.875% interest, by and among PAH (successor by merger to Physiotherapy Merger Sub, Inc.), the Senior Notes Guarantors, and the Senior Notes Indenture Trustee.

124.    *"Senior Notes Indenture Trustee"* means The Bank of New York Mellon Trust Company N. A., in its capacities as trustee, registrar, paying agent and custodian under the Senior Notes Indenture.

11

KE 28889748
PHIL1 3340378v.1

125.   *"Senior Notes Indenture Trustee Charging Lien"* means any Lien or other priority in payment to which the Senior Notes Indenture Trustee is entitled, pursuant to the Senior Notes Indenture, against distributions to be made to holders of Allowed Senior Notes Claims, for payment of any Senior Notes Indenture Trustee Fees.

126.   *"Senior Notes Indenture Trustee Fees"* means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Senior Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan, to the extent provided for under the Senior Notes Indenture.

127.   *"Senior Notes Litigation Trust Recovery"* means the 5,000 Litigation Trust Units allocated to Holders of Senior Notes on the Effective Date pursuant to the Plan.

128.   *"Subordinated Claims"* means Claims that are subordinated by section 510 of the Bankruptcy Code or otherwise applicable law.

129.   *"Supplemental Indenture"* means that certain supplemental indenture, dated as of June 18, 2013, by and among PAH (successor by merger to Physiotherapy Merger Sub, Inc.) and the Senior Notes Indenture Trustee

130.   *"Treasury Regulations"* means regulations (including temporary and proposed) promulgated under the Internal Revenue Code.

131.   *"Trust Indemnification Claims"* shall have the meaning set forth in Article IV.S.

132.   *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.   *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

134.   *"Unsecured Claim"* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

135.   *"U.S. Trustee"* means the United States Trustee for the District of Delaware.

136.   *"Voting Deadline"* means 11:59 p.m. (prevailing Eastern Time) on November 8, 2013.

*B.      Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the

12

applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order; and (14) any undefined term used herein that is defined in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims.*

1.      Administrative Claims.

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided,

KE 28889748
PHIL1 3340378v.1

however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

      2.     Professional Compensation.

      (a)     Fee Claims.

Professionals asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 40 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. Notwithstanding anything contrary to the foregoing contained in the Plan, in no event shall the Debtors' payments for professional fees and expenses for the period September 9, 2013 through the Effective Date relating to the investigation of the 2012 Transaction and the preparation for litigation of the Contributed Claims exceed $250,000, unless otherwise agreed to by the Ad Hoc Committee of Senior Noteholders in their sole and absolute discretion.

      (b)     Professional Fee Escrow Account.

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Litigation Trust, property of the Debtors' Estates, or property of the Reorganized Debtors. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. Allowed Accrued Professional Compensation Claims shall be paid first from amounts in the Professional Fee Escrow Account and then by the Reorganized Debtors. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

      (c)     Professional Fee Reserve Amount.

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such estimate to the Debtors no later than five days prior to the anticipated Confirmation Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

14

     (d)       Post-Effective Date Fees and Expenses.

       Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors or Litigation Trust, as applicable, following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with section 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and the Reorganized Debtors or Litigation Trust, as applicable, may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

**B.**     *Priority Tax Claims.*

       Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors or Reorganized Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on the or as soon as practicable following the Effective Date; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

**C.**     *Statutory Fees.*

       Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. The Reorganized Debtors shall pay all U.S. Trustee fees due and owing under 28 U.S.C. § 1930 until such time as the Reorganized Debtors move for entry of a final decree and the Bankruptcy Court enters such a decree; provided, however, that if the Litigation Trust opposes such motion, the Litigation Trust shall thereafter bear the cost of all U.S. Trustee fees until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.**     *Classification of Claims and Interests.*

       Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

**B.**     *Summary of Classification.*

       The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors

KE 28889748
PHIL1 3340378v.1

are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.E hereof.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Bridge Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Non-Subordinated Contribution and Reimbursement Claims | Unimpaired | Deemed to Accept |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Interests (other than Class 9 Interests) | Impaired | Deemed to Reject |

C.    *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    Class 1 - Priority Non-Tax Claims.

(a)    *Classification:* Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim, (iii) such other date as may be ordered by the Bankruptcy Court, or (iv) when due and payable in the ordinary course of business.

(c)    *Voting:* Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 - Other Secured Claims.

(a)    *Classification:* Class 2 consists of Other Secured Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor or Reorganized Debtor: (i) the Debtors or the Reorganized Debtors shall pay such

16

Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired.

(c)    *Voting:* Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Bridge Loan Credit Agreement Claims

(a)    *Classification:* Class 3 consists of all Bridge Loan Credit Agreement Claims.

(b)    *Allowance:* The Bridge Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $140,000,000, plus interest on such Claim, and any reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement.

(c)    *Treatment:* Except to the extent that a Holder of an Allowed Bridge Loan Credit Agreement Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Bridge Loan Credit Agreement Claims, each Holder of an Allowed Bridge Loan Credit Agreement Claim shall (i) receive its Pro Rata share of the Exit Facility or (ii) be paid in full in Cash.

(d)    *Voting:* Class 3 is Impaired.  Therefore, Holders of Class 3 Bridge Loan Credit Agreement Claims are provisionally entitled to vote to accept or reject the Plan.

4.    Class 4 - Senior Notes Claims

(a)    *Classification:* Class 4 consists of all Senior Notes Claims.

(b)    *Allowance:*  The Senior Notes Claims shall be Allowed in the aggregate principal amount of $210,000,000.

(c)    *Treatment:* Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Senior Notes Claims, each Holder of an Allowed Senior Notes Claim shall receive (i) subject to the final two sentences of this paragraph, its Pro Rata share of 100% of the New Common Stock (subject to dilution by the Management Incentive Plan) based on the principal amount of Senior Notes held by such Holder on the Distribution Record Date (calculated by issuing ten (10) shares of New Common Stock for every $1,000 in principal amount of Senior Notes held by such Holder on the Distribution Record Date) and (ii) a share of the Senior Notes Litigation Trust Recovery.  The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be determined in accordance with Article IV.V and will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C.  To opt-in to the settlement, a Holder of an Allowed Senior Notes Claim must agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust.  By electing to opt-in to the settlement on its Ballot, the Holder of an Allowed

17

Senior Notes Claim agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Trust, it will be deemed, without further action, (i) to have assigned its Contributed Claims to the Litigation Trust and (ii) to have agreed to execute any documents reasonably requested to effectuate the foregoing. The Litigation Trust Agreement will be binding on all Holders of Senior Notes Claims and all Holders of Senior Notes Claims shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date. All distributions made in respect of Allowed Senior Note Claims shall be made on account of the principal amount of such Claims and not on account of any prepetition or postpetition interest that may be owed in respect of such Claims. The Holders of Claims in Class 4 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan. If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery).

(d)   *Voting:* Class 4 is Impaired. Therefore, Holders of Class 4 Senior Notes Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 - General Unsecured Claims.

(a)   *Classification:* Class 5 consists of General Unsecured Claims.

(b)   *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor or Reorganized Debtor: (i) the Debtors or the Reorganized Debtors shall pay such Allowed General Unsecured Claim in the ordinary course of business or (ii) the Debtors or the Reorganized Debtors shall pay such Allowed General Unsecured Claim in full in Cash, including interest at the contractual rate, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claims, (C) or such other date as may be ordered by the Bankruptcy Court.

(c)   *Voting:* Class 5 is Unimpaired by the Plan, and each Holder of a Class 5 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.   Class 6 - Intercompany Claims.

(a)   *Classification:* Class 6 consists of Intercompany Claims.

(b)   *Treatment:* No distribution shall be made on account of Allowed Intercompany Claims. To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Claims shall be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors; provided that Intercompany Claims held by Holdings shall not receive any distribution under the Plan and shall be canceled and discharged on the Effective Date. The Debtors and the Reorganized Debtors will be entitled to transfer funds between

18

and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors historical intercompany account settlement practices.

(c)  *Voting:* Class 6 is Unimpaired by the Plan, and each Holder of a Class 6 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.  Class 7 - Subordinated Claims.

(a)  *Classification:* Class 7 consists of Subordinated Claims.

(b)  *Treatment:* Holders of Allowed Subordinated Claims shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, Allowed Subordinated Claims shall be discharged, canceled, released, and extinguished.

(c)  *Voting:* Class 7 is Impaired and Holders of Class 7 Subordinated Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Subordinated Claims are not entitled to vote to accept or reject the Plan.

8.  Class 8 - Non-Subordinated Contribution and Reimbursement Claims

(a)  *Classification:* Class 8 consists of Non-Subordinated Contribution and Reimbursement Claims.

(b)  *Treatment:* On the Effective Date, all of the Debtors' obligations with respect to Allowed Non-Subordinated Contribution and Reimbursement Claims shall be assumed by the Litigation Trust and, to the extent not satisfied by any available insurance coverage, satisfied solely by way of setoff or recoupment, to the extent applicable, or payment by the Litigation Trust, which shall be paid after the payment of costs and expenses, including legal fees, of the Litigation Trust, but prior to any further distributions to Litigation Trust Beneficiaries and shall not be paid from the Litigation Trust Funding. Any Allowed Non-Subordinated Contribution and Reimbursement Claims shall only be satisfied from the proceeds of the Contributed Claims after the payment of attorneys' fees and expenses, and there shall be no clawback against previous distributions to Litigation Trust Beneficiaries in order to satisfy any such claims.

(c)  *Voting:* Class 8 is Unimpaired by the Plan, and each Holder of a Class 8 Non-Subordinated Contribution and Reimbursement Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 8 Non-Subordinated Contribution and Reimbursement Claims are not entitled to vote to accept or reject the Plan.

9.  Class 9 - Intercompany Interests.

(a)  *Classification:* Class 9 consists of Intercompany Interests.

(b)  *Treatment:* No distribution shall be made on account of Allowed Intercompany Interests. To preserve the Debtors' corporate structure, on the Effective Date, or

19

as soon thereafter as practicable, all Allowed Intercompany Interests shall be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. Notwithstanding the foregoing, on the Effective Date, Holdings' Interests in PAH shall be cancelled and discharged.

(c)     *Voting:* Class 9 is Unimpaired by the Plan, and each Holder of a Class 9 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.    Class 10 - Interests (other than Class 9 Interests).

(a)     *Classification:* Class 10 consists of Interests (other than Class 9 Interests).

(b)     *Treatment:* Holders of Interests (other than Class 9 Interests) shall not receive any distribution on account of such Interests. On the Effective Date, Class 10 Interests shall be cancelled and discharged.

(c)     *Voting:* Class 10 is Impaired and Holders of Class 10 Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

D.    *Special Provision Governing Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Litigation Trust's rights in respect of any Claims, including legal and equitable defenses to or setoffs or recoupments against any such Claims.

E.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Acceptance or Rejection of the Plan.*

1.    Voting Classes.

Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.    Failure to Vote.

If Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

3.    Presumed Acceptance of the Plan.

Classes 1, 2, 5, 6, 8, and 9 are Unimpaired under the Plan, and the Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

20

    4.       Presumed Rejection of Plan.

Classes 7 and 10 are Impaired and shall receive no distribution under the Plan. The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Cash for Plan Distributions.*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Facility, or other Cash from the Debtors, including Cash from business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

B.      *Exit Facility.*

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to satisfy the conditions to effectiveness of the Exit Facility, the terms, conditions, and covenants of each of which shall be consistent with the Exit Facility Commitment Letter, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

Pursuant to the terms of the Exit Facility Credit Agreement, the Exit Facility will provide the Debtors with (a) a term loan credit facility of $144.162 million, of which $140 million shall be used to refinance the existing Bridge Loan Facility and (b) incremental credit facilities, each to be issued and accessed in accordance with the Exit Facility Credit Agreement. The Exit Facility and the Reorganized Debtors' Cash on hand will provide sufficient available funds as of the Effective Date to: (i) permit repayment in full of all Allowed Bridge Loan Credit Agreement Claims (including principal, interest, and reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement) of Holders of Allowed Bridge Loan Agreement Claims who elect to be

21

paid in full in Cash on the Effective Date; (ii) make the other required Effective Date payments under the Plan; and (iii) provide the Reorganized Debtors with working capital necessary to run their businesses and to fund certain capital expenditures (in accordance with the Exit Facility). Any letters of credit issued under the Bridge Loan Facility shall be deemed to be issued under the Exit Facility or cash collateralized.

C.       *Settlement of Certain Claims and Interests.*

To consensually resolve all outstanding disputes among the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders, and the Consenting Shareholders, the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders, and the Consenting Shareholders have agreed to the settlement embodied in the Plan, including the creation of the Litigation Trust to most effectively and efficiently pursue the Contributed Claims, which shall be effective as of the Effective Date. The settlement was extensively negotiated in good faith and is an integral component of the Debtors' overall restructuring and the transactions contemplated herein.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the proposed settlement. Entry of the Confirmation Order shall confirm (i) the Bankruptcy Court's approval, as of the Effective Date, of the Plan and all components of the proposed settlement and (ii) the Bankruptcy Court's finding that the proposed settlement is (a) in the best interests of the Debtors, their respective Estates and the holders of Claims and Interests and (b) fair, equitable and reasonable.

Any Holder of an Allowed Senior Notes Claim shall be permitted to opt-in to the aforementioned settlement between the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders and the Consenting Shareholders as set forth in Article III.C.4 of the Plan; provided, however, that none of the Potential Defendants and Witnesses shall receive the releases or indemnification provided under the settlement or be a "Released Party" under the Plan.

D.       *Issuance and Distribution of New Common Stock.*

The issuance of the New Common Stock by Reorganized PAH, including options, stock appreciation rights, or other equity awards, if any, in connection with the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, an initial number of up to approximately 2.1 million shares of New Common Stock shall be issued and, as soon as reasonably practicable thereafter, distributed to Holders of Claims in Class 4, subject to dilution with respect to any shares issued pursuant to the Management Incentive Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.       *New Stockholders Agreement.*

Upon the Effective Date, Reorganized PAH shall be a private company governed by the New Stockholders Agreement. The New Stockholders Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby. The Holders of Claims in Class 4 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan. If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery).

KE 28889748
PHIL1 3340378v.1

F.      *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor (other than Holdings) shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law). As set forth in Article IV.W below, on the Effective Date, Holdings shall be dissolved.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (i) all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, except for the assets contributed to the Litigation Trust, including any Contributed Claims of the Debtors and their Estates, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, except for Liens securing the Exit Facility and (ii) all property of the Debtors and their Estates contributed to the Litigation Trust, including any Contributed Claims of the Debtors and their Estates, will be transferred to and vest in the Litigation Trust, free and clear of all Liens, claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Cancellation of Existing Indebtedness and Securities.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document

Holders of Senior Note Claims for payment of any unpaid Senior Notes Indenture Trustee Fees; provided, further, however, that the preceding proviso shall not affect (i) the Senior Notes Indenture Trustee Charging Lien or (ii) the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan. On and after the Effective Date, all duties and responsibilities of the Bridge Loan Agent and the Senior Notes Indenture Trustee, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

J.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (i) execution and entry into the Exit Facility; (ii) entry into the New Corporate Governance Documents; (iii) establishment and funding of the Litigation Trust; (iv) the distribution of the New Common Stock; (v) selection of the directors and officers for the Reorganized Debtors; (vi) implementation of the Restructuring Transactions contemplated by this Plan; (vii) adoption of the Management Incentive Plan; (viii) adoption or assumption, as applicable, of the agreements with existing management; and (ix) all other actions contemplated by the Plan (whether to occur before on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the Exit Facility Credit Agreement, the Litigation Trust Agreement, and any and all related and ancillary agreements, documents, and filings, New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law. The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

K.      *New Certificates of Incorporation and New By-Laws.*

On or promptly after the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states or countries of incorporation in accordance with the corporate laws of the respective states, or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

L.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of PAH shall expire, and the initial boards of directors, including the New PAH Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New PAH Board shall consist of three (3) to seven (7) directors, one (1) of whom shall be the chief executive officer of PAH and the remainder of whom shall be initially chosen by the Ad Hoc Committee of Senior Noteholders. The New PAH Board shall elect members of the New Subsidiary Boards.

24

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New PAH Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

M.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the New Corporate Governance Documents, the Exit Facility Agreement, the Litigation Trust Agreement, and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

N.    *Management Incentive Plan.*

Following the Effective Date the Reorganized Debtors will implement a Management Incentive Plan, which shall reserve up to 10% of the fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for distribution to officers, directors and employees of the Reorganized Debtors, on terms to be determined by the New PAH Board. The terms, form of equity (*e.g.*, options and/or restricted stock units), and allocation of the Management Incentive Plan shall be determined by the New PAH Board.

O.    *Senior Management and Management Employment Agreements*

The Debtors' existing senior management team (other than the Debtors' interim chief executive officer) shall remain in their current capacities as officers of the Reorganized Debtors, and the Management Employment Agreements shall be assumed (as may be amended) and filed as part of the Plan Supplement. If no new chief executive officer is chosen as of the Effective Date, Martin McGahan of Alvarez & Marsal Healthcare Industry Group will continue in his capacity as interim chief executive officer until a new chief executive officer is selected by the New PAH Board.

P.    *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation of any mortgage, deed of trust, lien, or other security interest, (ii) the making or assignment of any lease or sublease, (iii) any restructuring transaction authorized by the Plan, or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

Q.    *Legacy D&O Liability Insurance Policies.*

The Legacy D&O Liability Insurance Policies are not executory contracts and, therefore, will not be assumed or rejected by the Debtors. If the Bankruptcy Court determines that a Legacy D&O Liability Insurance Policy is an executory contract and must be assumed, or assumed and assigned, to maintain coverage, the applicable

25

Legacy D&O Liability Insurance Policy shall be assumed and, if necessary, assigned to the applicable Reorganized Debtor.

R.    *Indemnification Provisions.*

As of the Effective Date, each Reorganized Debtor's certificate of incorporation and/or bylaws (or other formation documents) shall provide, to the extent not satisfied by any available insurance coverage, for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current (as of September 1, 2013) directors, officers or employees who were employed as directors, officers or employees of such Debtor, on or after September 1, 2013 at least to the same extent as the bylaws (or other formation documents) of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws (or other formation documents) before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers' or employees' rights; provided, however, that there shall be no indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses by the Reorganized Debtors with respect to Subordinated Claims or Non-Subordinated Contribution and Reimbursement Claims (with such claims treated as set forth in Article III.C.7 and Article III.C.8, respectively, of the Plan); provided, further, that nothing in the Plan, Plan Supplement, or any documentation related thereto shall in any way provide for any release, indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses of any of the Potential Defendants and Witnesses.

S.    *Indemnification of Consenting Noteholders and Consenting Shareholders.*

The Litigation Trust shall, to the extent not satisfied by any available insurance coverage, indemnify and hold harmless each of the following Persons and Entities, solely to the extent such Person or Entity is not one of the Potential Defendants and Witnesses, for any and all Released Claims brought by any Person or Entity: (i) Consenting Noteholders; (ii) Consenting Shareholders; (iii) the Consenting Noteholders' and Consenting Shareholders' respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals; and (iv) the respective heirs, executors, estates, servants, and nominees of the Persons and Entities set forth in (i)-(iii) above (the "Trust Indemnification Claims").

T.    *Assumption of Independent Director Indemnification Obligations.*

On the Effective Date, the Debtors and the Reorganized Debtors shall assume the Independent Director Indemnification Obligations pursuant to sections 365 and 1123 of the Bankruptcy Code. The Independent Director Indemnification Obligations that are assumed, deemed assumed, honored, or reaffirmed by the Debtors hereunder shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

U.    *Preservation of Causes of Action.*

1.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof and excluding the Contributed Claims of the Debtors, which are contributed to the Litigation Trust, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (i) right to object

26