to Administrative Claims, (ii) right to object to other Claims, and (iii) right to subordinate Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*V.    Litigation Trust*

The Litigation Trust shall be established pursuant to this Plan and become effective for the benefit of the Litigation Trust Beneficiaries on the Effective Date. The Plan and the Litigation Trust Agreement shall govern the management and administration of the Litigation Trust and the respective rights, powers, and obligations of the Litigation Trustees and the Litigation Trust Beneficiaries. The Litigation Trust Agreement will be binding on all Litigation Trust Beneficiaries who shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

On the Effective Date, all actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, held by any of the Contributing Claimants against the Potential Defendants and Witnesses related in any way to the Debtors, their predecessors, their respective affiliates and/or (a) through (e) below (the "Contributed Claims"), shall be absolutely transferred and assigned to the Litigation Trust, including without limitation (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of the Debtors, (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (a)-(d) above and (f) any other potential claims, Causes of Action, charges, suits or rights of recovery under state, federal, or other applicable law. The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment. For the avoidance of doubt, (a) the Contributed Claims shall not include the rights of any of the Contributing Claimants or Released Parties to receive the distributions, if any, to which they are entitled under this Plan and the Confirmation Order and (b) the Contributed Claims shall not include any actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment,

27

liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties. For the avoidance of doubt, in the exercise of their reasonable discretion and in accordance with the Litigation Trust Agreement, the Trustees shall not be obligated to pursue all Contributed Claims.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, with respect to the Contributed Claims of the Debtors and their Estates, which are assigned and contributed to the Litigation Trust under this Plan, and Non-Subordinated Contribution and Reimbursement Claims, if any, which, to the extent they are Allowed, are assumed by the Litigation Trust, the Litigation Trust shall retain and may enforce all of the Debtors' rights to commence and pursue, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, including any such actions specifically enumerated in the Disclosure Statement or the Plan Supplement, and the Litigation Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Litigation Trust may pursue such Causes of Action, as appropriate, in accordance with the Litigation Trust Agreement. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them. The Litigation Trust expressly reserves all rights to prosecute any and all such Causes of Action against any Entity, except as otherwise expressly provided in the Plan. For the avoidance of doubt, the preservation of the Causes of Action described in this paragraph includes, but is not limited to, the Litigation Trust's right to object to Non-Subordinated Contribution and Reimbursement Claims, if any.

Notwithstanding anything to the contrary set forth in the Confirmation Order, the Plan, or the Disclosure Statement, (a) all claims and Causes of Action (whether or not described in the Plan or Disclosure Statement) held by the Consenting Noteholders and Consenting Shareholders are specifically preserved as against all Persons and Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties, and (b) the Litigation Trust may, but is not required to, pursue any and all such claims and/or Causes of Action that are contributed to the Litigation Trust (whether or not described in the Plan or Disclosure Statement) as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties.

Net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims) shall be distributed as follows: (1) 50% to the Consenting Shareholders and (2) 50% to the Holders of Senior Notes as of the Distribution Record Date, as set forth below. Upon the Effective Date, there shall be 10,000 units allocated to the beneficiaries of the Litigation Trust and shall be distributed as follows:

(i) 5,000 units to the Consenting Shareholders with each Consenting Shareholder's respective share of the 5,000 units being determined by dividing the number of shares held by such Consenting Shareholder by the total number of shares held by all Consenting Shareholders, i.e., if the Consenting Shareholders collectively hold 250 shares and a particular Consenting Shareholder holds 50 shares, that Consenting Shareholder would receive 50/250 x 5,000 = 1,000 units; and

(ii) 5,000 units to the holders of Senior Notes as of the Distribution Record Date with each holder's respective share of the 5,000 units being determined as follows:

(A) The denominator of the fraction applied to each holder of Senior Notes will be equal to the sum of (x) total outstanding principal of Senior Notes, i.e., $210,000,000, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred to the Litigation Trust;

(B) The numerator of the fraction applied to each holder of Senior Notes will be equal to the sum of (x) the principal amount of Senior Notes held by such holder, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred by such holder to the Litigation Trust.

28

(C) The fraction thus derived will be multiplied by 5,000 units.

To illustrate, if holders of $150,000,000 in principal amount of the Senior Notes contribute Contributed Claims to the Litigation Trust, the preceding denominator would be 360,000,000. If an individual holder had $6,000,000 principal amount of Senior Notes and contributed its Contributed Claims to the Litigation Trust, the relevant numerator would be $12,000,000 and such holder would receive 12/360 x 5,000 = 166.7 units in the Litigation Trust.

Subsequent to the Effective Date, units in the Litigation Trust may be further adjusted as specifically set forth in the Litigation Trust Agreement.

The Litigation Trust shall initially be funded with $4,500,000, subject to adjustment and credits as set forth below, on and as a condition precedent to the Effective Date, as follows: (i) $2,250,000 from the Reorganized Debtors, minus amounts actually paid by the Debtors or Reorganized Debtors on or prior to the Effective Date to proposed counsel to the Litigation Trust for fees and expenses incurred on or after September 9, 2013, in an amount of up to $250,000, plus any further amounts approved by the Consenting Noteholders in their sole and absolute discretion and (ii) $2,250,000 from the Consenting Shareholders (the "Initial Litigation Trust Funding"). For the avoidance of doubt, the $2,250,000 to be funded by the Consenting Shareholders to the Litigation Trust shall not be paid or reimbursed by the Debtors or the Reorganized Debtors on the Effective Date or otherwise. Additional funding to the Litigation Trust shall be governed by the procedures set forth in the Litigation Trust Agreement (such additional funding, together with the Initial Litigation Trust Funding, the "Litigation Trust Funding").

*W.*     *Dissolution of Holdings*

On the Effective Date or as soon as practicable thereafter, Holdings shall be dissolved in accordance with the Description of Transaction Steps.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*     *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases, including those listed on the Assumed Executory Contract and Unexpired Lease List, shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected prior to the Effective Date by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; (iv) is identified as an Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Lease List, or (v) is the subject of a dispute regarding the Cure Claim.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Leases List, or the Assumed Executory Contract and Unexpired Leases List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

29

*B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after notice of such rejection is served on the applicable claimant. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, the Litigation Trust, and their respective property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

*C.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contract and Unexpired Leases List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the amount of the Cure Claim, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between Debtors and the applicable counterparty. At least 10 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least two days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount; provided, however, the Debtors, with the consent of the Ad Hoc Committee of Senior Noteholders, shall have the right to alter, amend, modify or supplement the Assumed Executory Contracts and Unexpired Lease List or Rejected Executory Contracts and Unexpired Lease List, as applicable, as identified in the Plan Supplement, through and including the Effective Date. To the extent that the Debtors, with the consent of the Ad Hoc Committee of Senior Noteholders, alter, amend, modify or supplement the lists of Executory Contracts and Unexpired Lease included in the Plan Supplement, the Debtors will provide notice to each counterparty to an affected Executory Contract or Unexpired Lease within five days of such decision.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

*D.     Insurance Policies.*

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto. With respect to AIG National Union Fire Insurance Company of Pittsburgh, Pa policy number 01-351-13-73, on the

30

Effective Date, the Debtors will pay the Additional Premium Amount (as defined in such policy) for a six-year Discovery Period (as defined in such policy), provided that the Additional Premium Amount does not exceed $200,000. Notwithstanding the foregoing, as set forth above, the Legacy D&O Liability Insurance Policies are not executory contracts and, therefore, are not assumed or rejected hereunder.

E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor or the Litigation Trust has any liability thereunder. If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Litigation Trust, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class (except those distributions to Litigation Trust Beneficiaries, which distributions will be made by the Litigation Trust in accordance with the Litigation Trust Agreement). In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the

31

extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. Distributions to Holders of Claims or Interests related to public securities shall be made to such Holders in exchange for such securities, which shall be deemed cancelled as of the Effective Date.

B.      *Disbursing Agent.*

        Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date (except those distributions to Litigation Trust Beneficiaries, which distributions will be made by the Litigation Trust in accordance with the Litigation Trust Agreement). To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of Disbursing Agent.*

        1.      Powers of the Disbursing Agent.

        The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        2.      Expenses Incurred On or After the Effective Date.

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

        1.      Delivery of Distributions.

                (a)      Delivery of Distributions to Holders of Bridge Loan Credit Agreement Claims.

        Except as otherwise provided in the Plan, all distributions to Holders of Bridge Loan Credit Agreement Claims shall be governed by the Bridge Loan Credit Agreement. The Disbursing Agent shall make such distributions directly to the Holders of Allowed Bridge Loan Credit Agreement Claims.

                (b)      Delivery of Distributions to Senior Notes Indenture Trustee.

        Except as otherwise provided in the Plan, all distributions on account of Allowed Senior Notes Claims shall be made by the Disbursing Agent at the direction and with the consent of the Senior Notes Indenture Trustee. The Senior Notes Indenture Trustee shall direct the Disbursing Agent to hold or deliver such distributions to the beneficial owners of Allowed Senior Notes Claims in accordance with the provisions of this Plan and the terms of the Senior Notes Indenture. Any distributions held by the Disbursing Agent shall remain subject to the right of the Senior Notes Indenture Trustee to assert its Senior Notes Indenture Trustee Charging Lien against such distributions.

                        i.      Senior Notes Indenture Trustee Fees. In order not to reduce the amount of distributions to Holders of Allowed Senior Notes Claims, and in light of the unimpairment of General Unsecured Claims under the Plan, the Reorganized Debtors shall pay on the Effective Date all Senior Notes Indenture Trustee

32

Fees in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the Holders of the Senior Notes.

  ii.  Additional Trustee's Fees and Expenses. In the event that the Senior Notes Indenture Trustee provides services related to distributions pursuant to the Plan, the Senior Notes Indenture Trustee will receive from the Reorganized Debtors, upon presentation of invoices in customary form and without further court approval, reasonable compensation for such services and reimbursement of reasonable expenses (including attorneys' and agents' fees) incurred in connection with such services.

  (c)  Delivery of Distributions in General.

  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the Disbursing Agent, and the Litigation Trust, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

  2.  Minimum Distributions.

  No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.

  3.  Undeliverable Distributions and Unclaimed Property.

  In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the Litigation Trustees, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the later of (i) the Effective Date and (ii) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the Litigation Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

*E.*  *Manner of Payment.*

  1.  All distributions of New Common Stock under the Plan shall be made by the Disbursing Agent on behalf of Reorganized PAH.

  2.  All distributions with respect to, or effected with, the proceeds of the Exit Facility shall be deemed made as of the Effective Date.

  3.  All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors), other than distributions made by the Litigation Trust which shall be made in accordance with the Litigation Trust Agreement.

  4.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

KE 28889748
PHIL1 3340378v.1

*F.*      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock as contemplated by Article IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Corporate Governance Documents, including the New Stockholders Agreement and Reorganized PAH's New Certificate of Incorporation.

*G.*      *Section 3(a)(9) Exemption.*

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, section 3(a)(9) thereof, to exempt the offer and sale of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 3(a)(9) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer the Holders of Senior Notes to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

*H.*      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

*I.*      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*J.*      *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim. Unless otherwise provided under the Plan, nothing herein shall impact the setoff or recoupment rights of Holders of Allowed General Unsecured Claims to the extent valid and applicable.

34

K.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors or Litigation Trust, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trust, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trust, as applicable, on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or Litigation Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or Litigation Trust, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, the Litigation Trust, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Prosecution of Objections to Claims.*

The Debtors, the Reorganized Debtors, or the Litigation Trust, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims, other than (1) Fee Claims, as permitted under the Plan (which Fee Claims shall be subject to objection by any Person with standing to object), and (2) Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims, where the Litigation Trust will have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment such Claims; provided, however, for the avoidance of doubt, the U.S. Trustee shall have standing to object to Fee Claims. From and after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, may settle or compromise any Disputed Claim without notice to or action, order or approval of the Bankruptcy Court. The Debtors, the Reorganized Debtors, and the Litigation Trust reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

KE 28889748
PHIL1 3340378v.1

B.    *Claims Administration Responsibilities.*

Except as otherwise provided herein (including, without limitation, by Article V.B), Holders of Claims shall not be required to File a Proof of Claim, and no parties should File a Proof of Claim; provided that the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, reserve all rights to object to any Claim for which a Proof of Claim is Filed.

The Debtors, the Reorganized Debtors, or the Litigation Trust, as applicable, may, in their discretion, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto, and the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, shall have the right to compromise, settle, withdraw or litigate to judgment any objections to Claims for which a Proof of Claim is Filed.

C.    *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors or the Litigation Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or the Litigation Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    *Adjustment to Claims Without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may, in accordance with the Bankruptcy Code and Bankruptcy Rules, be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the Litigation Trust, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

F.    *No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

36

G.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, may compromise and settle claims against them and Causes of Action held by them against other Entities.

B.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and

37

interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors. In addition, the Bridge Loan Agent, at the request and expense of the Reorganized Debtors, shall execute and deliver all documents reasonably required to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.      *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, by statute or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or each of their respective Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each Released Party, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Debtors as of the Petition Date that constitutes gross negligence, willful misconduct, or fraud, in each case as determined by Final Order of a court of competent jurisdiction; *provided, however*, that notwithstanding anything herein to the contrary, none of the Potential Defendants and Witnesses shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.

E.      *Releases by the Releasing Parties.*

As of the Effective Date of the Plan, to the fullest extent permitted by applicable law, each of the Releasing Parties shall be deemed to have expressly, unconditionally, irrevocably, generally, and individually and collectively, released, acquitted, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, by statute or otherwise, that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each party released herein, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Releasing Party as of the Petition Date that constitutes gross negligence, willful misconduct, or fraud, in each case, as determined by Final Order of a court of competent jurisdiction; *provided, however*, that notwithstanding anything herein to the contrary, none of the

38

Potential Defendants and Witnesses shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.

F.     *Liabilities to, and Rights of, Governmental Units.*

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (iv) any valid right of setoff or recoupment by a Governmental Unit; or (v) any criminal liability. Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.     *Exculpation.*

**Except as otherwise specifically provided in the Plan or Plan Supplement, to the fullest extent permitted by law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Claim and (ii) any obligation, Cause of Action, or liability for any Exculpated Claim, except for those that result from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date.**

H.     *Injunction.*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (ii) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iii) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (iv) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

39

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, OR THE ASSETS AND TRUSTEES OF THE LITIGATION TRUST (EXCEPT AS SPECIFICALLY PROVIDED IN THE LITIGATION TRUST AGREEMENT), EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AGAINST THE POTENTIAL DEFENDANTS AND WITNESSES, SET FORTH ON EXHIBIT C TO THE DISCLOSURE STATEMENT, INCLUDING WITHOUT LIMITATION THE CONTRIBUTED CLAIMS AND CLAIMS ARISING FROM THE FACTS AND CIRCUMSTANCES SET FORTH IN EXHIBIT G TO THE DISCLOSURE STATEMENT, WILL NOT BE RELEASED OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER, BUT WILL BE PRESERVED IN ACCORDANCE WITH THE PLAN AND MAY BE PURSUED AND LITIGATED BY THE LITIGATION TRUST. NO PERSON OR ENTITY MAY RELY ON THE ABSENCE OF A SPECIFIC REFERENCE IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THIS DISCLOSURE STATEMENT TO ANY CONTRIBUTED CLAIMS AGAINST SUCH PERSON OR ENTITY AS ANY INDICATION THAT THE LITIGATION TRUST WILL NOT PURSUE ANY AND ALL AVAILABLE CONTRIBUTED CLAIMS AGAINST SUCH PERSON OR ENTITY. UNLESS ANY CONTRIBUTED CLAIMS AGAINST A PERSON OR ENTITY ARE EXPRESSLY WAIVED, RELINQUISHED, EXCULPATED, RELEASED, COMPROMISED, OR SETTLED IN THE PLAN, THE CONFIRMATION ORDER OR A BANKRUPTCY COURT ORDER, ALL CONTRIBUTED CLAIMS ARE EXPRESSLY RESERVED BY AND FOR THE LITIGATION TRUST, FOR LATER ADJUDICATION, AND, THEREFORE, NO PRECLUSION DOCTRINE, INCLUDING THE DOCTRINES OF RES JUDICATA, COLLATERAL ESTOPPEL, ISSUE PRECLUSION, CLAIM PRECLUSION, ESTOPPEL (JUDICIAL, EQUITABLE, OR OTHERWISE) OR LACHES WILL APPLY TO SUCH CONTRIBUTED CLAIMS UPON, AFTER, OR AS A CONSEQUENCE OF THE CONFIRMATION ORDER. THE OBJECTION TO THE ALLOWANCE OF ANY CLAIMS FILED WITH THE BANKRUPTCY COURT WITH RESPECT TO WHICH THEY DISPUTE LIABILITY, PRIORITY, AND/OR AMOUNT (OR ANY OBJECTIONS, AFFIRMATIVE DEFENSES AND/OR COUNTERCLAIMS, WHETHER OR NOT LITIGATED TO FINAL ORDER) SHALL NOT IN ANY WAY LIMIT THE ABILITY OR THE RIGHT OF THE LITIGATION TRUST TO ASSERT, COMMENCE OR PROSECUTE ANY CONTRIBUTED CLAIMS. NOTHING CONTAINED IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THE DISCLOSURE STATEMENT WILL BE DEEMED TO BE A WAIVER, RELEASE, OR RELINQUISHMENT OF ANY CONTRIBUTED CLAIMS WHICH THE CONTRIBUTING CLAIMANTS HAD IMMEDIATELY PRIOR TO THE EFFECTIVE DATE. THE LITIGATION TRUST SHALL HAVE, RETAIN, RESERVE, AND BE ENTITLED TO ASSERT ALL CONTRIBUTED CLAIMS FULLY AS IF THE CONTRIBUTED CLAIMS HAD NOT BEEN TRANSFERRED TO THE LITIGATION TRUST IN ACCORDANCE WITH THE PLAN, THE CONFIRMATION ORDER AND THE LITIGATION TRUST AGREEMENT.

KE 28889748
PHIL1 3340378v.1

*I.*     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

*A.*     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article VIII.B hereof:

1.     The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Consenting Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders, and the Consenting Shareholders.

2.     Any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to: (a) the Debtors, (b) the Consenting Bridge Loan Lenders, (c) the Ad Hoc Committee of Senior Noteholders, and (d) the Consenting Shareholders.

3.     All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

4.     The Debtors shall enter into the Exit Facility and the conditions precedent to funding under the Exit Facility shall have been satisfied or waived.

5.     Reorganized PAH shall have executed the New Stockholders Agreement.

6.     The Litigation Trustees shall have been appointed and the Reorganized Debtors, the Debtors, the Consenting Noteholders who have executed the Plan Support Agreement, the Consenting Shareholders, and the Litigation Trustees shall have executed and delivered the Litigation Trust Agreement.

7.     The Litigation Trust shall have been established and the Initial Litigation Trust Funding shall have been funded to the Litigation Trust.

8.     The Professional Fee Escrow Account shall have been established and funded.

*B.*     *Waiver of Conditions.*

The conditions to Consummation set forth in Article IX may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

*C.*     *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims or Causes of Action by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

41

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A.      Modification and Amendments.*

Subject to the Plan Support Agreement, and except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to the Plan Support Agreement and certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.      Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

*C.      Revocation or Withdrawal of Plan.*

Subject to the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the determination of a whether a Claim shall be deemed a Subordinated Claim or Non-Subordinated Contribution and Reimbursement Claim in connection with the Plan;

3.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

42

4.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

5.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      adjudicate, decide, or resolve any and all matters that may arise in connection with or relate to the Litigation Trust Agreement;

9.      adjudicate, decide, or resolve any and all matters related to the Litigation Trust Units;

10.     adjudicate, decide, and resolve any and all Causes of Action arising under the Bankruptcy Code, including without limitation sections 502(d), 510, 542-551 and 553 commenced by the Litigation Trust;

11.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Litigation Trust Agreement;

12.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including obligations of the Litigation Trust and the Litigation Trustees;

14.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

15.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

16.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

17.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.     determine any other matters that may arise in connection with or relate to the Plan, the New Corporate Governance Documents, the Disclosure Statement, the Confirmation Order, or any contract,

43

KE 28889748
PHIL1 3340378v.1

instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

19.    enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

20.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

21.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

22.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

23.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan or the Litigation Trust Agreement;

24.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

25.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

26.    enforce all orders previously entered by the Bankruptcy Court, resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan; and

27.    hear any other matter not inconsistent with the Bankruptcy Code.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction over any Causes of Action arising under state or other federal law (other than Causes of Action arising under the Bankruptcy Code) brought by the Litigation Trust in a state or other federal court of competent jurisdiction; provided, however, that nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Litigation Trust Agreement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*    *Immediate Binding Effect.*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Litigation Trust, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

KE 28889748
PHIL1 3340378v.1

*B.      Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*C.      Payment of Certain Professional Fees.*

On the Effective Date, the Debtors shall pay the reasonable and documented fees and expenses of (i) Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Ad Hoc Committee of Senior Noteholders; (ii) local co-counsel to the Ad Hoc Committee of Senior Noteholders; (iii) Houlihan Lokey Capital, Inc., the financial advisor to the Ad Hoc Committee of Senior Noteholders; and (iv) the Bridge Loan Agent.

*D.      Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

*E.      Payment of Fees and Expenses for Counsel to the Consenting Shareholders.*

As partial consideration for contributing their Contributed Claims to the Litigation Trust, on the Effective Date, the Debtors shall pay in full in Cash the legal fees and expenses of the Consenting Shareholders relating to the Plan and the Chapter 11 Cases through the Effective Date; provided, that in no event shall such fees and expenses exceed $250,000 in the aggregate.

*F.      Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

*G.      Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*H.      Notices.*

To be effective, all notices, requests, and demands to or upon the Debtors, the Ad Hoc Committee of Senior Noteholders, the Bridge Loan Agent, the Senior Notes Indenture Trustee, and the Consenting Shareholders shall be in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

KE 28889748
PHIL1 3340378v.1

**If to the Debtors:**

Physiotherapy Holdings, Inc.
Whiteland Business Park
855 Springdale Drive, Suite 200
Exton, Pennsylvania 19341
Attention: General Counsel
Facsimile No: (610) 644-3262

**With copies to:**

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Attention: Michael W. Yurkewicz and Domenic E. Pacitti
Facsimile No: (302) 426-9193
E-mail address: myurkewicz@klehr.com and dpacitti@klehr.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Jonathan S. Henes, P.C., Nicole L. Greenblatt, and David S. Meyer
Facsimile No: (212) 446-4900
E-mail address: jonathan.henes@kirkland.com, nicole.greenblatt@kirkland.com, and
david.meyer@kirkland.com

**If to the Ad Hoc Committee of Senior Noteholders:**

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Attention: Michael L. Tuchin and David A. Fidler
Facsimile No: (310) 407-9090
E-mail address: mtuchin@ktbslaw.com, dfidler@ktbslaw.com

**If to the Bridge Loan Agent:**

U.S. Bank, National Association
214 N. Tryon Street, 26th Floor
Charlotte, NC 28202
Attention: CDO Trust Services/James Hanley
Facsimile No: (704) 335-4678

**With copies to:**

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Attention: Stacey Rosenberg
Facsimile No: (213) 891-8763

**If to the Senior Notes Indenture Trustee:**

The Bank of New York Mellon Trust Company, N.A.

46

KE 28889748
PHIL1 3340378v.1

601 Travis, 16th Floor
Houston, TX 77002
Facsimile: (713) 483-6979
Attention: Dennis J. Roemlein CCTS
E-mail address: dennis.roemlein@bnymellon.com

**With copies to:**

Reed Smith
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Facsimile: (412) 288-3063
Attention: Eric A. Schaffer
E-mail Address: eschaffer@reedsmith.com

**If to the Consenting Shareholders:**

Court Square
Park Avenue Plaza
55 East 52nd Street, 34th Floor
New York, NY 10055
Attention: John Weber and Thomas McWilliams
Facsimile: (212) 752-6397

**With copies to:**

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attention: Michael J. Sage, Matthew L. Larrabee and Nicole B. Herther-Spiro
Facsimile No: (212) 698-3599

After the Effective Date, the Reorganized Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at Kurtzman Carson Consultants, LLC or the Bankruptcy Court's website at http://www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

47

K.      *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the New Corporate Governance Documents, the Litigation Trust Agreement, and the Exit Facility Credit Agreement, as any of such documents may have been altered or interpreted in accordance with the foregoing, are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (iii) non-severable and mutually dependent.   The Litigation Trust Agreement shall be binding on all Litigation Trust Beneficiaries who shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e), 1125(g), and 1126(b) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

N.      *Conflicts.*

To the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other document referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control. Moreover, to the extent that any provision of the Plan Support Agreement conflicts with or is in any way inconsistent with the Plan, the Plan shall govern and control in all respects.

*[Remainder of page intentionally left blank]*

KE 28889748
PHIL1 3340378v.1

Dated:    December 16, 2013
          Wilmington, Delaware

                               PHYSIOTHERAPY HOLDINGS, INC., on behalf of itself
                               and each of the other Debtors

                               By:  */s/ Martin McGahan*

                               Name: Martin McGahan
                               Title:   Chief Restructuring Officer and Interim Chief
                               Executive Officer

COUNSEL:

*/s/ Jonathan S. Henes, P.C.*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

-and-

Morton R. Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (856) 586-6603

- and -

Jonathan S. Henes, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

KE 28889748
PHIL1 3340378v.1

**EXHIBIT B**

**Proposed Confirmation Order Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 13-12965 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**NOTICE OF (I) ENTRY OF ORDER APPROVING DISCLOSURE
STATEMENT FOR AND CONFIRMING DEBTORS' JOINT PREPACKAGED
CHAPTER 11 PLAN, (II) OCCURRENCE OF EFFECTIVE DATE AND
(III) DEADLINES FOR FILING VARIOUS CLAIMS RELATED TO THE PLAN**

**TO ALL CREDITORS, INTEREST HOLDERS AND OTHER PARTIES IN INTEREST:**

1.     **Confirmation of the Plan.** On [___], 2013, the Honorable Kevin Gross, Chief United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), entered the *Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. [___]]

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Physiotherapy Holdings, Inc. (5193); Actra Rehabilitation Associates, Inc. (7806); Alexandria Sports, Inc. (7654); Benchmark Acquisition Corp. (3850); Benchmark Medical Management Company (0335); Benchmark O&P Holdings, Inc. (6848); Benchmark Orthotics & Prosthetics, Inc. (7000); Blue Hen Physical Therapy, Inc. (7267); Cape Prosthetics-Orthotics, Inc. (7914); Carrollton Physical Therapy Clinic, Inc. (2832); Integrity Physical Therapy, Inc. (1075); Keystone Rehabilitation Associates of Warren (8341); Keystone Rehabilitation Systems, Inc. (8380); Keystone Rehabilitation Systems of McMurray (6304); Leesburg Sports, Inc. (4190); MATRIX Healthcare Services, LLC (7344); MATRIX Rehabilitation, Inc. (3147); MATRIX Rehabilitation-Delaware, Inc. (2504); MATRIX Rehabilitation-Georgia, Inc. (4073); MATRIX Rehabilitation-Ohio, Inc. (2505); MATRIX Rehabilitation-South Carolina, Inc. (5603); MATRIX Rehabilitation-Texas, Inc. (9542); Morris Area Rehabilitation Association, Inc. (2043); North Dallas Physical Therapy Associates, Inc. (5331); Northstar Health Services, Inc. (7152); NSHS Services, Inc. (6789); Orthopaedic Services of Paducah, Inc. (3143); PhysioLink Corporation (3705); Physiotherapy Associates Holdings, Inc. (3367); Physiotherapy Associates, Inc. (7193); Physiotherapy Associates-Union Rehab, LLC (0041); Physiotherapy Corporation (3816); Physiotherapy-BMHI Holdings, Inc. (3361); Physiotherapy-BMI, Inc. (4107); Potomac Rehabilitation Services, Inc. (2725); Professional Rehab Associates, Inc. (2393); Progressive Therapy Services, Inc. (8449); Rehab Associates, L.L.C. (9381); Rehab Colorado, LLC (5804); Rehab Missouri, LLC (0587); Rehab Xcel, LLC (0586); Rehabilitation Consultants, Inc. (1166); R.S. Network, Inc. (9104); SMR Banyan Tree, Inc. (6933); Swanson Orthotic & Prosthetic Center, Inc. (2308); The Parks Physical Therapy and Work Hardening Center, Inc. (2926); Theraphysics Partners of Colorado, Inc. (2115); Theraphysics Partners of Texas, Inc. (9976); Therapy Associates of Martinsville, Inc. (1394); Trumbull P.T. Corp. (3855); Wisconsin Prosthetics and Orthotics, Inc. (7815). The Debtors' main corporate address is 855 Springdale Drive, Suite 200, Exton, PA 19341.

(the "Confirmation Order") approving the Disclosure Statement[2] [Docket No. 19] and confirming the Plan of the above-captioned debtors in possession (the "Debtors").

2.      **Effective Date.** The Effective Date of the Plan occurred on [_____], **2013**.

3.      **Discharge of Debtors.** The Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim against, or Interest in, the Debtors and such Holders' respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder or Entity voted to accept the Plan. Except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all debts (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Confirmation Date, any debts of any kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not: (1) a Proof of Claim based on such debt or Interest is filed; (2) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.

4.      **Executory Contracts.** Except as otherwise provided in the Plan, the Confirmation Order or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, as of the Effective Date, Executory Contracts and Unexpired Leases, including those listed on the Assumed Executory Contract and Unexpired Lease List, shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected prior to the Effective Date by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; (iv) is identified as an Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Lease List, or (v) is the subject of a dispute regarding the Cure Claim.

On November 27, 2013, the Debtors filed the Assumption Schedule identifying those Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan and the respective Cure Costs associated therewith (as supplemented, modified and amended)[3] On

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Debtors' Joint Prepackaged Chapter 11 Plan* [Docket Nos. 18] (as modified, amended, and including all supplements, the "Plan") and the Confirmation Order. The summary of the Plan and the Confirmation Order set forth herein are for informational purposes only. In the event of any inconsistency between this Notice and the Plan and/or Confirmation Order, the Plan or Confirmation Order (as applicable) shall control in all respects.

[3]    *See Notice of (A) Proposed Assumption of Executory Contract or Unexpired Lease, (B) Proposed Cure Amounts to be Paid in Connection Therewith and (C) Procedures for Objecting to the Assumption or Proposed Cure Amount with Respect to Such Executory Contract or Unexpired Lease* [Docket No. 73]; *Notice of First Supplement to Notice of (A) Proposed Assumption of Executory Contract or Unexpired Lease, (B) Proposed Cure Amounts to be Paid in Connection Therewith and (C) Procedures for Objecting to the Assumption or Proposed Cure Amount with Respect to Such Executory Contract or Unexpired Lease* [Docket No. 136].

the same day, the Debtors filed the Rejection Schedule identifying those Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan effective as of the Effective Date.[4] On December 12, 2013, the Debtors filed the Assumption Schedule and the Rejection Schedule as exhibits to the Plan Supplement.[5]

Pursuant to the Plan and the Confirmation Order, any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contract and Unexpired Leases List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to certain limitations provided in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court within 30 days after the claimant receives notice of rejection.

ANY CLAIMS ARISING FROM AN EXECUTORY CONTRACT OR UNEXPIRED LEASE NOT FILED WITHIN SUCH TIME WILL BE AUTOMATICALLY DISALLOWED, FOREVER BARRED FROM ASSERTION AND SHALL NOT BE ENFORCEABLE AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, THEIR ESTATES OR THEIR PROPERTY WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTORS OR FURTHER NOTICE TO, OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.

5.    **Bar Dates for Administrative Claims.**  Unless otherwise provided by the Plan, the Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the Holder of an Allowed Administrative Claim and the Debtors, all requests for Payment of Administrative Claims must be filed and served on the Debtors **no later than January [__], 2014** (the "Administrative Claims Bar Date").  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

6.    **Deadline for Professional Claims.**  Professionals asserting a Fee Claim for services rendered before the Effective Date must file and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later

---

[4]    *See Notice of Proposed Rejection of Certain Executory Contract or Unexpired Lease* [Docket No. 72]; *Notice of First Supplement to Notice of Proposed Rejection of Executory Contract or Unexpired Lease* [Docket No. 137].

[5]    *See Supplement to the Joint Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 135].

K&E 28549336.14

than 20 days after the Effective Date, or **no later than January [     ], 2014**. In no event shall the Debtors' payments for professional fees and expenses for the period September 9, 2013 through the Effective Date relating to the investigation of the 2012 Transaction and the preparation for litigation of the Contributed Claims exceed $250,000, unless otherwise agreed to by the Ad Hoc Committee of Senior Noteholders in their sole and absolute discretion.

7.    **The Litigation Trust.**    On the Effective Date, the Litigation Trust was funded and established for the benefit of the Litigation Trust Beneficiaries, and all Contributed Claims were transferred and assigned to the Litigation Trust, all pursuant to Article IV.V of the Plan.

8.    **Access to Court Documents.**    The Confirmation Order, the Disclosure Statement and the Plan are available for inspection.    If you would like to obtain a copy of the Confirmation Order, the Disclosure Statement or the Plan, you may contact Kurtzman Carson Consultants, the notice, claims and solicitations agent retained by the Debtors in the Chapter 11 Cases, by: (a) calling the Debtors' restructuring hotline at 877-725-7537; (b) visiting the Debtors' restructuring website at:  www.kccllc.net/physiocorp; or (c) writing to Physiotherapy Holdings, Inc. Corporation Claims Processing Center, c/o Kurtzman Carson Consultants, 599 Lexington Avenue, New York, New York 10011.    You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: www.deb.uscourts.gov.

9.    Please take further notice that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction and related provisions in Article VIII of the Plan.

10.    Please take further notice that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Disbursing Agent, and any holder of a Claim or an Interest and such holder's respective successors and assigns, whether or not the Claim or the Interest of such holder is Impaired under the Plan, and whether or not such holder or Entity voted to accept the Plan.

11.    Please take further notice that the Plan and the Confirmation Order contain other provisions that may affect your rights.    You are encouraged to review the Plan and the Confirmation Order in their entirety.

*[The remainder of this page is intentionally left blank.]*

67

12.    Please take further notice that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction and related provisions in Article VIII of the Plan.

13.    Please take further notice that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Disbursing Agent, and any holder of a Claim or an Interest and such holder's respective successors and assigns, whether or not the Claim or the Interest of such holder is Impaired under the Plan, and whether or not such holder or Entity voted to accept the Plan.

14.    Please take further notice that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

Dated:  [ _____ ]
        Wilmington, Delaware

/s/ _____
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-2700
Facsimile:    (215) 568-6603

- and -

Jonathan S. Henes, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

K&E 28549336.14

## EXHIBIT B

## BLACKLINED PROPOSED CONFIRMATION ORDER

# EXHIBIT 6

INVESTMENT ADVISER BROCHURE
PART 2A OF FORM ADV

# WIND POINT ADVISORS LLC DBA WIND POINT PARTNERS

**Wind Point Advisors LLC**
**676 N. Michigan Avenue, Suite 3700**
**Chicago, IL 60611**
**(312) 255-4800**
**http://www.wppartners.com**

**March 29, 2016**

**This Investment Adviser Brochure ("Brochure") provides information about the qualifications and business practices of Wind Point Advisors LLC ("Wind Point Advisors"). If you have any questions about the contents of this Brochure, please contact us at (312) 255-4800. The information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission (the "SEC") or by any state securities authority.**

Wind Point Advisors is an investment adviser registered with the SEC under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"). However, such registration does not imply a certain level of skill or training.

Additional information regarding Wind Point Advisors is also available on the SEC's website at www.adviserinfo.sec.gov.

## MATERIAL CHANGES

This Brochure updates the previous Wind Point Advisors' Brochure dated March 30, 2015. There have been no material changes since the filing of the previous Brochure and this Brochure contains disclosures related to new private fund clients and enhanced disclosures with respect to types of expenses charged to portfolio companies.

In addition, this Brochure contains typical annual amendment changes such as updating Wind Point Advisors' total Assets Under Management to $1,934,407,873 as of the date of this filing.

## TABLE OF CONTENTS

**Page**

**Brochure**

**Wind Point Advisors LLC Brochure** .................................................................................1
    Section 1.    Advisory Business .................................................................................1
    Section 2.    Fees and Compensation .......................................................................3
    Section 3.    Performance-Based Fees and Side-By-Side Management ......................6
    Section 4.    Types of Clients .................................................................................6
    Section 5.    Methods of Analysis, Investment Strategies and Risk of Loss..................7
    Section 6.    Disciplinary Information.....................................................................15
    Section 7.    Other Financial Industry Activities and Affiliations ..............................16
    Section 8.    Code of Ethics, Participation or Interest in Client Transactions and
                Personal Trading ...............................................................................16
    Section 9.    Brokerage Practices ...........................................................................19
    Section 10.   Review of Accounts............................................................................20
    Section 11.   Client Referrals and Other Compensation ............................................20
    Section 12.   Custody ...........................................................................................21
    Section 13.   Investment Discretion ........................................................................21
    Section 14.   Voting Client Securities......................................................................21
    Section 15.   Financial Information..........................................................................22

CH\2277261.4

**Wind Point Advisors LLC Brochure**

**Section 1.    Advisory Business**

Wind Point Advisors, the registered investment adviser, is a Delaware limited liability company. Wind Point Advisors and its affiliated investment advisers provide "investment supervisory services" to their clients, which consist of private investment-related funds. Wind Point Advisors was organized in May 1999.  Wind Point Advisors is controlled by its managing directors, who are Nathan Brown, Mark Burgett, Robert Cummings, Richard Kracum, Paul Peterson and Alex Washington, and is principally owned by Robert Cummings and Richard Kracum.

The following are certain of the affiliated advisers of Wind Point Advisors (the "**General Partners**," and together with Wind Point Advisors, the "**Managers**"):

- Wind Point Investors, L.L.C. ("**Wind Point Investors**")

- Wind Point Investors IV, L.P. ("**Wind Point IV GP**")

- Wind Point Investors V, L.P. ("**Wind Point V GP**")

- Wind Point Investors VI, L.P. ("**Wind Point VI GP**")

- Wind Point Investors VII, L.P. ("**Wind Point VII GP**")

- Wind Point Investors VIII, L.P. ("**Wind Point VIII GP**")

Each General Partner listed above is registered under the Advisers Act pursuant to Wind Point Advisors' registration in accordance with SEC guidance.  This Brochure also describes the business practices of each General Partner, which operate as a single advisory business together with Wind Point Advisors.

The Managers' clients include the following (collectively the "**Partnerships**" or the "**Funds**," and together with any future private investment fund to which Wind Point Advisors or its affiliates provide investment advisory services, "**Private Investment Funds**"):

- Wind Point Partners III, L.P.

- Wind Point III Executive Advisor Partners, L.P.

- Wind Point Partners IV, L.P.

- Wind Point IV Executive Advisor Partners, L.P.

- Wind Point Associates IV, LLC

- Wind Point Partners V, L.P.

1

- Wind Point V Executive Advisor Partners, L.P.

- Wind Point Partners VI, L.P.

- Wind Point VI Executive Advisor Partners, L.P.

- Wind Point Partners VII-A, L.P.

- Wind Point Partners VII-B, L.P.

- Wind Point VII Affiliates, L.P.

- Wind Point Partners VIII-A, L.P.

- Wind Point Partners VIII-B, L.P.

The General Partners listed above each serve as general partner to one or more Funds and have the authority to make the investment decisions for the Funds to which they provide advisory services

The Funds and any other Private Investment Funds that may be formed by a General Partner (or its affiliates) at a later date or that may otherwise become clients of a General Partner are expected to invest through negotiated transactions in operating entities. The Managers' investment advisory services to the Funds consist of identifying and evaluating investment opportunities, negotiating investments, managing and monitoring investments and achieving dispositions for such investments. Investments are made predominantly in non-public companies, although investments in public companies are permitted. From time to time, the senior principals or other personnel of the Managers or their affiliates may serve on a portfolio company's board of directors or otherwise act to influence control or management of portfolio companies held by the Funds.

Certain of the Funds managed by the Managers are co-invest vehicles (each a "Co-Invest Fund") that invest in certain portfolio companies alongside one of the Managers' primary Funds. Such Co-Invest Funds typically are formed to invest alongside a primary Fund and dispose of their investments in the applicable portfolio company at the same time and on the same terms as the primary Fund making the investment.

The Managers' advisory services for Private Investment Funds are further described in the applicable private placement memoranda and limited partnership agreements (each, a "**Partnership Agreement**"), as well as below under "Methods of Analysis, Investment Strategies and Risk of Loss" and "Investment Discretion." Investors in Private Investment Funds participate in the overall investment program for the applicable Fund, but may be excused from a particular investment due to legal, regulatory or other applicable constraints or for other agreed upon reasons. The Managers have, and expect to in the future, enter into side letters or other similar agreements with certain investors that have the effect of establishing rights under, altering or supplementing a Fund's Partnership Agreement or an investor's subscription agreement. Such rights or alterations could be regarding economic terms, fee structures, excuse rights, information rights, co-investment rights, or transfer rights. Furthermore, pursuant to a

2

Fund's Partnership Agreement, some of such rights, terms or conditions may be elected by certain sizeable investors with "most favored nations" rights.

As of the date of this filing, Wind Point Advisors managed approximately $1,934,407,873 in client assets on a discretionary basis.

### Section 2.    Fees and Compensation

The following is a general description of fees, compensation, and expenses of the Funds. Differences exist from Fund to Fund, and certain Funds do not charge certain fees, compensation, or expenses that other Funds charge. The Partnership Agreements of the Funds describe fees, compensation and expenses in greater detail.

With respect to the Funds, each Fund's General Partner generally receives an annual management fee (the "**Management Fee**") and a carried interest in connection with advisory services, although certain Funds may not charge a Management Fee and/or carried interest. The General Partners or their affiliates may receive additional compensation in connection with management and other services performed for certain portfolio companies of Private Investment Funds and such additional compensation may offset in whole or in part the Management Fees otherwise payable to the applicable General Partner.  Investors in the Funds also bear certain fund expenses.

Each Fund generally pays a Management Fee equal to 2.00% of investor capital commitments to the Fund ("**Commitments**") during the commitment period (generally, five or six years from the Fund's effective date), and 2.00% (1.75% in the case of Wind Point Partners VI, L.P., Wind Point Partners VII-A, L.P. and Wind Point Partners VII-B, L.P.) of net invested capital beginning when the commitment period ends or a successor Fund begins operations. The Management Fee generally will be payable by a Fund until the earliest of the date all portfolio investments are distributed, the tenth anniversary of a Fund's effective date and the date a General Partner's relationship with the applicable Fund is terminated for other reasons (as described in the Partnership Agreement).

The Management Fee is typically payable by a Fund to the applicable General Partner either quarterly in advance or semi-annually, partially in advance and partially in arrears.   Installments of the Management Fee payable for any period other than a full management fee period are adjusted on a pro rata basis according to the actual number of days in such period.

The Management Fee otherwise payable by certain Funds is generally reduced by such Funds' pro rata share of a specified percentage of any: (i) directors' fees, monitoring fees, financial consulting fees or advisory fees earned by the applicable General Partner with respect to any Fund investment; (ii) transaction fees paid to the applicable General Partner with respect to any Fund investment; and (iii) break-up fees with respect to Fund transactions not completed that are paid to the applicable General Partner.  Payments received for services provided to a portfolio company in the ordinary course of its business or as compensation for serving as an employee or in a similar capacity for a portfolio company, whether received by Wind Point Advisors' personnel or third parties, are not subject to offset.  The remaining amount of the aforementioned

3

fees that are received by the applicable General Partner without offset against the Management Fee are hereinafter referred to as "**Supplemental Fees.**"

As described in the Partnership Agreement of certain Funds, the applicable General Partner may waive all or a portion of a Management Fee payment for a corresponding interest in such Fund's profits, and any waived portion of such Management Fee may be used to reduce the amount of capital contributions the General Partner would otherwise be required to contribute to the Fund. The partners of a Fund may be required to make a pro rata contribution according to how they would have funded the waived Management Fee to fund a contribution that would otherwise be required of the General Partner in connection with any such waiver, which will be treated as a deemed capital contribution by the General Partner in respect of the General Partner's Commitment. Reductions to Management Fees due to waivers are taken into account before applying the offsets described above.

The following Funds do not pay or no longer pay a Management Fee: Wind Point Partners III, L.P., Wind Point III Executive Advisor Partners, L.P., Wind Point Partners IV, L.P., Wind Point IV Executive Advisor Partners, L.P., Wind Point Associates IV, LLC, Wind Point Partners V, L.P. and Wind Point V Executive Advisor Partners, L.P. As a result, these Funds do not, or no longer, receive the benefit of any Management Fee offsets.

In addition to the Management Fee, each Fund's General Partner generally receives a carried interest from investors in the Fund of 20% of all realized profits, subject to an 8% compounded annual preferred return and a related General Partner catch-up (as more fully described in each Fund's Partnership Agreement). The carried interest distributed to a General Partner typically is subject to a potential giveback at the end of the life of the applicable Fund and, for certain funds, on an interim basis, if the General Partner has received excess cumulative distributions.

For certain Funds, the General Partners and/or their affiliates generally may exempt certain persons from payment of all or a portion of Management Fees and/or carried interest, including the General Partner and any other person designated by the General Partner. Any such exemption from Management Fees and/or carried interest may be made by a direct exemption, through a Co-Invest Fund or through another co-invest arrangement.

It is expected that any similar future Private Investment Funds will have a similar fee structure.

The Funds generally invest on a long-term basis. Accordingly, investment advisory and other fees are expected to be paid, except as otherwise described in the Partnership Agreement, over the term of the applicable Fund, and investors generally are not permitted to withdraw or redeem interests in the Fund.

Managing Directors and other employees of Wind Point Advisors may receive a portion of the Management Fee, carried interest or other compensation received by Wind Point Advisors or its affiliates.

As described in each Fund's Partnership Agreement, a Fund will typically reimburse the applicable General Partner for certain organizational and start-up expenses of the Fund, its General Partner, any ultimate general partner, and affiliated management company up to a specified amount, including legal, travel, accounting, filing, printing, capital raising, regulatory

compliance (including the initial compliance contemplated by the Alternative Investment Fund Managers Directive or any similar law, rule or regulation), any administrative or other filings, and the preparation of, and negotiations with respect to, the Partnership Agreement and any side letters or similar agreements. A Fund generally does not ultimately bear any placement fees incurred in connection with the organization of the Fund, even if it pays such fees initially, as such fees generally reduce the amount of the Management Fee otherwise payable to the applicable General Partner, as described above.

In addition to such organizational costs, the Management Fee and carried interest payable to the applicable General Partner, a Fund will typically bear all other fees, costs, expenses, liabilities and obligations relating to the Fund's and/or its subsidiaries' activities, investments and business (to the extent not borne or reimbursed by a portfolio company or any subsidiary thereof), including (i) all fees, costs, expenses, liabilities and obligations attributable to structuring, organizing, acquiring, managing, operating, holding, valuing, winding up, liquidating, dissolving and disposing of the Fund's investments (including interest and fees on money borrowed by the Fund or by the Managers or their affiliates on behalf of the Fund, registration expenses and brokerage, finders', custodial and other fees), (ii) legal, accounting, auditing, administration, custodian, depositary, insurance (including directors and officers and errors and omissions liability insurance), travel, litigation and indemnification costs and expenses, judgments and settlements, consulting, finders', financing, appraisal, filing and other fees and expenses (including fees, costs and expenses associated with the preparation or distribution of the Fund's financial statements, tax returns and Schedule K-1s or any other administrative, regulatory or other Fund-related reporting or filing and all fees, costs and expenses associated with establishing, operating and maintaining any online portal), (iii) costs and expenses of the limited partner advisory board incurred in accordance with the Partnership Agreement, (iv) all out-of-pocket fees, costs, expenses, liabilities and obligations incurred by the Fund, the Managers or any of their affiliates relating to investment and disposition opportunities for the Fund not consummated (including legal, accounting, auditing, insurance, travel, consulting, finders', financing, appraisal, filing, printing, real estate title, survey and other fees and expenses), (v) all out-of-pocket fees, costs and expenses incurred by the Fund, the Managers or any of their affiliates in connection with the annual meetings of the Fund's limited partners and any other conference or meeting of with any limited partners(s), (vi) any taxes, fees and other governmental charges levied against the Fund (except to the extent that the Fund is reimbursed therefor by a limited partner or such tax, fee or charge is treated as having been distributed to the Fund's partners pursuant to the Partnership Agreement, (vii) Placement Fees, (viii) costs and expenses that are classified as extraordinary expenses under GAAP, (ix) all fees, costs and expenses incurred in connection with the organization, management, operation and dissolution, liquidation and final winding-up of any alternative investment vehicles, (x) any organizational expenses and (xi) unreimbursed costs and expenses incurred in connection with any transfer of limited partnership. The Funds also may bear expenses indirectly from the payment by portfolio companies of similar expenses, including late night meal and taxi costs incurred generally by junior investment professionals while completing specific portfolio company business, and other travel related costs. On an infrequent basis, a portfolio company may bear the cost of a private plane used to transport portfolio company board members, management and/or members of the General Partner for specific portfolio company business travel.

5

Generally, with respect to investment-related expenses, if more than one Fund participates, or is expected to participate, in an investment, then the Managers allocate expenses related to such investment (whether consummated or not) on a pro rata basis based on expected or actual commitments.    Subject to any restrictions in any applicable Partnership Agreement, the Managers allocate non-investment related expenses that were not incurred solely by or on behalf of one Fund among the applicable Funds or the Fund(s) and other parties (e.g., the Managers) on a basis deemed fair and reasonable by the Managers.

Subject to a Fund's Partnership Agreement, the applicable General Partner will generally bear all ordinary administrative and overhead expenses incurred in connection with maintaining their offices, including employees' salaries, rent, utilities, and equipment expenses (although, as noted above, compensation for services provided in the ordinary course to or for serving as an employee or in a similar capacity for a portfolio company are not part of the Managers' overhead expenses).

The Managers utilize Executive Advisor Partners ("EAPs") to assist with a variety of activities, including portfolio company CEO identification, market research, new investment identification, pre-investment business diligence and post investment consulting and services.    EAPs are not employees of the Managers, they are third party consultants utilized by the Managers on a periodic basis.    EAPs may receive direct compensation from a portfolio company under terms agreed to by the portfolio company and the EAP and this compensation will not offset management fees. Any compensation received by EAPs at the portfolio company level will be indirectly borne by the Fund by virtue of the Fund's investment in a portfolio company.

Brokerage fees may be incurred by the applicable Fund in accordance with the practices set forth in Section 9 below.

### Section 3.    Performance-Based Fees and Side-By-Side Management

As discussed under Section 2 ("Fees and Compensation") above, the General Partners receive a carried interest allocation on certain realized profits in certain of the Funds.    A performance-based allocation is an allocation representing an asset manager's compensation based on a percentage of net profits of the fund being managed.    Certain of the General Partners manage Funds that are not charged a performance-based fee.    This practice could present a conflict of interest because the applicable General Partner has an incentive to favor accounts for which it receives a performance-based fee.    The Funds that are not charged a performance-based fee were formed to invest alongside the Managers' primary Funds and invest in each portfolio company in which the applicable primary Fund invests.    Such investments are made on substantially the same terms and are generally made on a pro rata basis based on aggregate available Commitments.    See Section 5, "Methods of Analysis, Investment Strategies and Risk of Loss," for further discussion of conflicts of interest.

### Section 4.    Types of Clients

The Managers provide investment advice to Private Investment Funds, including the Funds. Private Investment Funds are investment partnerships or other investment entities formed under domestic or foreign laws and operated as exempt investment pools under the Investment

6

Company Act of 1940, as amended (the "**Investment Company Act**"). The investors participating in Private Investment Funds may include individuals, banks or thrift institutions, other investment entities, pension and profit-sharing plans, trusts, estates or charitable organizations or other corporations or business entities and may include, directly or indirectly, principals or other employees of Wind Point Advisors and its affiliates.

The Funds generally have a minimum investment of $5 million for third-party investors, although individual Commitments of lesser amounts may be accepted at the discretion of the applicable General Partner. Generally, investors must be "accredited investors" as defined under Regulation D of the Securities Act of 1933, as amended, and may also be required to be either "qualified purchasers" or "knowledgeable employees" as defined under the Investment Company Act of 1940, as amended.

**Section 5.**     **Methods of Analysis, Investment Strategies and Risk of Loss**

**General**

The principal investment strategy of the Managers generally is to acquire under-managed middle market companies where the Managers are able to establish a clear path to value creation. The Managers invest in companies across many industry categories.

*The following is a summary of the investment strategies and methods of analysis generally employed by the Managers on behalf of the Funds and a summary of certain risks involved with the Managers' investment strategy and an investment in the Funds. More detailed descriptions of the Funds' investment strategies and methods of analysis and risks are included in the applicable private placement memorandum for each Fund. There can be no assurance that the Managers will achieve the investment objectives of the Funds, and a loss of investment may be possible.*

**Investment and Operating Strategy**

To execute their strategy, the Managers focus on bringing together the following three key elements in each transaction:

1) Top Caliber CEO. The Managers recruit CEOs who will be their partners in selecting and acquiring a portfolio company where the CEO will be responsible for developing and leading the value creation plan. The CEO partners should also be willing to invest a meaningful portion of their liquid net worth in the company alongside the applicable Fund.

2) Under-managed Middle Market Company. The Managers typically seek to acquire well-positioned but undermanaged businesses with an enterprise value of $100 million to $500 million that are a good match with a CEO partner's skill set and industry experience.

3) Clear Path to Value Creation. The Managers seek to pursue opportunities where a CEO partner can develop a value creation plan that is designed to produce greater growth

7
