and profitability than might otherwise be anticipated from the incumbent management team. This value creation plan is formulated during the several months of due diligence that the applicable General Partner and the CEO partner dedicate prior to acquiring a company.

## Types of Investments

The Funds will hold a substantial portion of their assets in restricted securities, but generally will seek registration rights or other liquidity features in connection with investments to enable them to exit the investment at an appropriate point under the individual circumstances of each investment. The Funds may use leverage in connection with their investments.

## Risks of Investment

A Fund and its investors bear the risk of loss that the applicable General Partner's investment strategy entails. The risks involved with the General Partner's investment strategy and an investment in each Fund include, but are not limited to:

1. *Business Risks*. The Fund's investment portfolio may consist primarily of securities issued by privately held companies, and operating results in a specified period will be difficult to predict. Such investments involve a high degree of business and financial risk that can result in substantial losses.

2. *Investment in Junior Securities*. The securities in which the Fund will invest may be among the most junior in a portfolio company's capital structure and, thus, subject to the greatest risk of loss. Generally, there will be no collateral to protect an investment once made.

3. *Concentration of Investments*. The Fund will participate in a limited number of investments and may seek to make several investments in one industry or one industry segment. As a result, the Fund's investment portfolio could become highly concentrated, and the performance of a few holdings may substantially affect its aggregate return. Furthermore, to the extent that the capital raised is less than the targeted amount, the Fund may invest in fewer portfolio companies and thus be less diversified.

4. *Lack of Sufficient Investment Opportunities*. The business of identifying, structuring and completing private equity transactions is highly competitive and involves a high degree of uncertainty. It is possible that the Fund will never be fully invested if enough sufficiently attractive investments are not identified. However, limited partners will be required to bear Management Fees through the Fund during its investment period based on the entire amount of the limited partners' commitments and other expenses as set forth in the Partnership Agreement.

5. *Illiquidity; Lack of Current Distributions.* An investment in the Fund should be viewed as an illiquid investment. It is uncertain as to when profits, if any, will be realized. Losses on unsuccessful investments may be realized before gains on successful investments are realized. The return of capital and the realization of gains, if any,

8

generally will occur only upon the partial or complete disposition of an investment. While an investment may be sold at any time, it is generally expected that this will not occur for a number of years after the initial investment. Before such time, there may be no current return on the investment. Furthermore, the expenses of operating the Fund (including the Management Fee payable to the General Partner) may exceed its income, thereby requiring that the difference be paid from the Fund's capital, including unfunded commitments.

6.    *Leveraged Investments*. The Fund may make use of leverage by incurring or having a portfolio company incur debt to finance a portion of its investment in a given portfolio company, including in companies not rated by credit agencies. Leverage generally magnifies both the Fund's opportunities for gain and its risk of loss from a particular investment. The cost and availability of leverage is highly dependent on the state of the broader credit markets (and such credit markets may be impacted by regulatory restrictions and guidelines), which state is difficult to accurately forecast, and at times, it may be difficult to obtain or maintain the desired degree of leverage. The use of leverage will also result in interest expense and other costs to the Fund that may not be covered by distributions made to the Fund or appreciation of its investments.

The use of leverage often imposes restrictive financial and operating covenants on a company, in addition to the burden of debt service, and may impair its ability to operate its business as desired and/or finance future operations and capital needs. The leveraged capital structure of portfolio companies will increase the exposure of the Fund's investments to any deterioration in a company's condition or industry, competitive pressures, an adverse economic environment or rising interest rates and could accelerate and magnify declines in the value of the Fund's investments in the leveraged portfolio companies in a down market. In the event any portfolio company cannot generate adequate cash flow to meet its debt service, the Fund may suffer a partial or total loss of capital invested in the portfolio company, which could adversely affect the returns of the Fund. Furthermore, should the credit markets be limited or costly at the time the Fund determines that it is desirable to sell all or a part of a portfolio company, the Fund may not achieve an exit multiple or enterprise valuation consistent with its forecasts. Moreover, the companies in which the Fund will invest generally will not be rated by a credit rating agency. The Fund may also borrow money or guaranty indebtedness (such as a guaranty of a portfolio company's debt). The use of leverage by the Fund also will result in interest expense and other costs to the Fund that may not be covered by distributions made to the Fund or appreciation of its investments. The Fund may incur leverage on a joint and several basis with one or more other investment funds and entities managed by the General Partner or any of its affiliates and may have a right of contribution, subrogation or reimbursement from or against such entities. In addition, to the extent the Fund incurs leverage (or provides such guaranties), such amounts may be secured by capital commitments made by the Fund's investors and such investors' contributions may be required to be made directly to the lenders instead of the Fund.

7.    *Limited Transferability of Fund Interests.* There will be no public market for the Fund interests, and none is expected to develop. There are substantial restrictions upon the

9

transferability of Fund interests under the Partnership Agreement and applicable securities laws. In general, withdrawals of Fund interests are not permitted. In addition, Fund interests are not redeemable.

8.  *Restricted Nature of Investment Positions*. Generally, there will be no readily available market for a substantial number of the Fund's investments, and hence, most of the Fund's investments will be difficult to value. Certain investments may be distributed in kind to the partners and it may be difficult to liquidate the securities received at a price or within a time period that is determined to be ideal by such partners. After a distribution of securities is made to the partners, many partners may decide to liquidate such securities within a short period of time, which could have an adverse impact on the price of such securities. The price at which such securities may be sold by such partners may be lower than the value of such securities determined pursuant to the Partnership Agreement, including the value used to determine the amount of carried interest available to the General Partner with respect to such investment.

9.  *Reliance on Portfolio Company Management*. Although the General Partner will monitor the performance of each Fund investment, it will primarily be the responsibility of each portfolio company's management team to operate the portfolio company on a day-to-day basis.

10. *Projections*. Projected operating results of a company in which the Fund invests normally will be based primarily on financial projections prepared by such company's management, with adjustments to projections made by the General Partner in its discretion. In all cases, projections are only estimates of future results that are based upon information received from the company and assumptions made at the time the projections are developed. There can be no assurance that the results set forth in the projections will be attained, and actual results may be significantly different from the projections. Also, general economic factors, which are not predictable, can have a material effect on the reliability of projections.

11. *Conflicting Investor Interests.* Limited partners may have conflicting investment, tax, and other interests with respect to their investments in the Fund, including conflicts relating to the structuring of investment acquisitions and dispositions. Conflicts may arise in connection with decisions made by the General Partner regarding an investment that may be more beneficial to one limited partner than another, especially with respect to tax matters. In structuring, acquiring and disposing of investments, the General Partner generally will consider the investment and tax objectives of the Fund and its partners as a whole, not the investment, tax, or other objectives of any limited partner individually.

12. *Enhanced Scrutiny and Certain Effects of Potential Regulatory Changes*. There continue to be discussions regarding enhanced governmental scrutiny and/or increased regulation of the private equity industry. There can be no assurance that any such scrutiny or regulation will not have an adverse impact on the Fund's activities, including the ability of the Fund to effectively and timely address such regulations, implement operating

improvements or otherwise execute its investment strategy or achieve its investment objectives.

Additionally, Congress has considered proposed legislation that would treat certain income allocations to service providers by partnerships such as the Fund (including any carried interest) as ordinary income for U.S. federal income tax purposes that under current law is treated as an allocation of the partnership's income, which may be taxed at lower rates than ordinary income. Enactment of any such legislation, whether during or after the initial closing of the Fund, could adversely affect the ability of the Principals, employees or other individuals associated with the Fund or the General Partner who were or may in the future be granted direct or indirect interests in the General Partner, to benefit from carried interest taxed at lower rates. This may reduce such persons' after-tax returns from the Fund and the General Partner, which could make it more difficult for the General Partner and its affiliates to incentivize, attract and retain individuals to perform services for the Fund. These same issues may also apply to officers, directors and employees of the Fund's portfolio companies if such persons receive a profits interest in such companies.

13. *Alternative Investment Fund Managers Directive.* The EU Alternative Investment Fund Managers Directive (the "AIFMD") regulates the activities of certain private fund managers undertaking fund management activities or marketing fund interests to investors within the European Economic Area ("EEA"). If the Fund is actively marketed to investors domiciled or having their registered office in the EEA in circumstances where no transitional relief is available: (i) the Fund may be subject to certain reporting, disclosure and other compliance obligations under the AIFMD, which may result in the Fund incurring additional costs and expenses; (ii) the Fund and/or the General Partner may become subject to additional regulatory or compliance obligations arising under national law in certain EEA jurisdictions, which may result in the Partnership incurring additional costs and expenses or otherwise affect the management and operation of the Fund; (iii) the General Partner may be required to make detailed information relating to the Fund and its investments available to regulators and third parties; and (iv) the AIFMD may also restrict certain activities of the Fund in relation to EEA portfolio companies including, in some circumstances, the Fund's ability to recapitalize, refinance or potentially restructure an EEA portfolio company within the first two years of ownership. In addition, it is possible that some EEA jurisdictions will elect to restrict or prohibit the marketing of non-EEA funds to investors based in those jurisdictions, which may make it more difficult for the Fund to raise its targeted amount of commitments.

14. *Need for Follow-On Investments.* Following its initial investment in a given portfolio company, the Fund may decide to provide additional funds to such portfolio company or may have the opportunity to increase its investment in a successful portfolio company whether for opportunistic reasons, to fund the needs of the business, as an equity cure under applicable debt documents or for other reasons). There is no assurance that the Fund will make follow-on investments or that the Fund will have sufficient funds to make all or any of such investments.

Any decision by the Fund not to make follow on investments or its inability to make such investments may have a substantial negative effect on a portfolio company in need of such an investment (including an event of default under applicable debt documents in the event an equity cure cannot be made).    Additionally, such failure to make such investments may result in a lost opportunity for the Fund to increase its participation in a successful portfolio company or the dilution of the Fund's ownership in a portfolio company if a third party invests in such portfolio company.

15.    *Non-U.S. Investments*. The Fund may invest in portfolio companies that are organized or have substantial sales or operations outside of the United States, its territories, and possessions. Such investments may be subject to certain additional risks due to, among other things, potentially unsettled points of applicable governing law, the risks associated with fluctuating currency exchange rates, capital repatriation regulations (as such regulations may be given effect during the term of the Fund), the application of complex U.S. and non-U.S. tax rules to cross-border investments, possible imposition of non-U.S. taxes on the Fund and/or the partners with respect to the Fund's income, and possible non-U.S. tax return filing requirements for the Fund and/or the partners.

Additional risks of non-U.S. investments include: (a) economic dislocations in the host country; (b) less publicly available information; (c) less well-developed and/or more restrictive laws, regulations, regulatory institutions and judicial systems; (d) greater difficulty of enforcing legal rights in a non-U.S. jurisdiction; (e) civil disturbances; (f) government instability; and (g) nationalization and expropriation of private assets. Moreover, non-U.S. companies may not be subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those that apply to U.S. companies.

16.    *Hedging Arrangements*. The General Partner may (but is not obligated to) endeavor to manage the Fund's or any portfolio company's currency exposures, interest rate exposures or other exposures, using hedging techniques where available and appropriate. The Fund may incur costs related to such hedging arrangements, which may be undertaken in exchange-traded or over-the-counter ("OTC") contexts, including futures, forwards, swaps, options and other instruments. There can be no assurance that adequate hedging arrangements will be available on an economically viable basis or that such hedging arrangements will achieve the desired effect, and in some cases hedging arrangements may result in losses greater than if hedging had not been used. In some cases, particularly in OTC contexts, hedging arrangements will subject the Fund to the risk of a counterparty's inability or refusal to perform under a hedging contract, or the potential loss of assets held by a counterparty, custodian or intermediary in connection with such hedging. OTC contracts may expose the Fund to additional liquidity risks if such contracts cannot be adequately settled. Certain hedging arrangements may create for the General Partner and/or one of its affiliates an obligation to register with the U.S. Commodity Futures Trading Commission or other regulator or comply with an applicable exemption.

17.    *Director Liability*.  The Fund will often obtain the right to appoint one or more representatives to the board of directors (or similar governing body) of the companies in which it invests. Serving on the board of directors (or similar governing body) of a portfolio company exposes the Fund's representatives, and ultimately the Fund, to potential liability. Not all portfolio companies may obtain insurance with respect to such liability, and the insurance that portfolio companies do obtain may be insufficient to adequately protect officers and directors from such liability. In addition, involvement in litigation can be time consuming for such persons and can divert the attention of such persons from the Fund's investment activities.

18.    *Advisory Board.*  The General Partner will appoint one or more limited partner representatives to the Fund's advisory board.  The Partnership Agreement may provide that to the fullest extent permitted by applicable law, none of the advisory board members shall owe any fiduciary duties to the Fund or any other partner.   In addition, representatives of the advisory board may have various business and other relationships with Wind Point Advisors and its partners, employees and affiliates. These relationships may influence their decisions as members of the advisory board.

19.    *Uncertain Economic and Political Environment*. Consumer, corporate and financial confidence may be adversely affected by current or future tensions around the world, fear of terrorist activity and/or military conflicts, localized or global financial crises or other sources of political, social or economic unrest.  Such erosion of confidence may lead to or extend a localized or global economic downturn.  A climate of uncertainty may reduce the availability of potential investment opportunities, and increases the difficulty of modeling market conditions, potentially reducing the accuracy of financial projections. In addition, limited availability of credit for consumers, homeowners and businesses, including credit used to acquire businesses, in an uncertain environment or economic downturn may have an adverse effect on the economy generally and on the ability of the Fund and its portfolio companies to execute their respective strategies and to receive an attractive multiple of earnings on the disposition of businesses. This may slow the rate of future investments by the Fund and result in longer holding periods for investments. Furthermore, such uncertainty or general economic downturn may have an adverse effect upon the Fund's portfolio companies.

20.    *Market Conditions.*  The capital markets have experienced great volatility and financial turmoil.   Moreover, governmental measures undertaken in response to such turmoil (whether regulatory or financial in nature) may have a negative effect on market conditions.   General fluctuations in the market prices of securities and economic conditions generally may reduce the availability of attractive investment opportunities for the Fund and may affect the Fund's ability to make investments.  Instability in the securities markets and economic conditions generally (including a slow-down in economic growth and/or changes in interest rates or foreign exchange rates) may also increase the risks inherent in the Fund's investments and could have a negative impact on the performance and/or valuation of the portfolio companies.  The Fund's performance can be affected by deterioration in the capital markets and by market events, such as the onset of the credit crisis in the summer of 2007 or the downgrading of the credit rating of

the United States in 2011, which, among other things, can impact the public market comparable earnings multiples used to value privately held portfolio companies and investors' risk-free rate of return. Movements in foreign exchange rates may adversely affect the value of investments in portfolio companies and the Fund's performance. Volatility and illiquidity in the financial sector may have an adverse effect on the ability of the Fund to sell and/or partially dispose of its portfolio company investments. Such adverse effects may include the requirement of the Fund to pay break-up, termination or other fees and expenses in the event the Fund is not able to close a transaction (whether due to the lenders' unwillingness to provide previously committed financing or otherwise) and/or the inability of the Fund to dispose of investments at prices that the General Partner believes reflect the fair value of such investments. The impact of market and other economic events may also affect the Fund's ability to raise funding to support its investment objective.

## Conflicts of Interest

The Managers currently manage a number of Funds that are similar to each other, and each of the Funds have made investments that are similar to investments made by other Funds. The Managers' investment staff will continue to manage and monitor such Funds and investments. This practice could create a conflict of interest. However, during the investment period of a Fund, the principals of the applicable General Partner (the "**Principals**") pursue all appropriate investment opportunities exclusively through such Fund, subject to certain exceptions as described in the applicable Partnership Agreement. In addition, the significant investment of the Principals in such Fund, as well as the Principals' interest in the carried interest of such Fund, operate to align, to some extent, the interest of the Principals with the interest of the limited partners in such Fund, although the Principals have economic interests in such other Funds and investments as well and receive Management Fees and carried interests relating to such interests. Such other Funds and investments that the Principals may control may compete with a Fund or companies acquired by a Fund. Following the investment period of a Fund, the Principals may, and likely will, focus their investment activities on other opportunities and areas unrelated to such Fund's investments.

From time to time, the Principals will be presented with investment opportunities that would be suitable for more than one Fund. In determining which investment vehicles should participate in such investment opportunities, the Managers and their affiliates are subject to conflicts of interest among the investors in such investment vehicles. The Managers attempt to resolve such conflicts of interest in light of their obligations to investors in each Fund, and attempt to allocate investment opportunities among the Funds in a fair and equitable manner and consistent with the applicable Partnership Agreements. Where necessary, the Managers consult and receive consent to conflicts from an advisory committee consisting of limited partners of the applicable Fund.

Because a General Partner's carried interest is based on a percentage of realized profits of the respective Fund, it may create an incentive for the General Partner to cause the applicable Fund to make riskier or more speculative investments than would otherwise be the case. However, the Managers believe that the carried interest does not create a conflict of interest with respect to the Funds and instead operates to align the interests of the Managers with that of the Funds.

14

Since a General Partner is permitted to retain certain Supplemental Fees (as described under "Fees and Compensation") in connection with Fund investments, it could have a conflict of interest in connection with approving transactions. This conflict may be mitigated to an extent by offsetting the Management Fee by a specified percentage of such Supplemental Fees and a General Partner's interest in the carried interest of a Fund.

The limited partners may have conflicting investment, tax and other interests with respect to their investments in a Fund. The conflicting interests of individual limited partners may relate to or arise from, among other things, the nature of investments made by the Fund, the structuring or the acquisition of investments and the timing of disposition of investments. Conflicts of interest may arise in connection with decisions made by the Managers, including with respect to the nature or structuring of investments, that may be more beneficial for one limited partner than for another limited partner, especially with respect to limited partners' individual tax situations. Also, Fund investments may have a negative impact on related investments made by the limited partners in separate transactions. In selecting, structuring and managing investments appropriate for a Fund, the General Partner will consider the investment and tax objectives of the Fund and its partners as a whole, not the investment, tax or other objectives of any limited partner individually.

A Fund's advisory board may not have the same interests as all limited partners. Each member of the advisory board will have no duty to any limited partner other than the limited partner appointing such member. Furthermore, the Fund's advisory board members cannot be expected to be expert in investing, and certain of its determinations may, in fact, adversely affect the performance of the Fund. A Fund will also indemnify members of its advisory board for any losses or damages incurred in connection with serving on the advisory board so long as such losses or damages did not result from such member's fraud.

A Fund or its General Partner, on behalf of the Fund, may from time to time enter into side letters or similar agreements with one or more limited partners, which provide such Limited Partners with additional or different rights (including with respect to access to information and liquidity terms) than such limited partners have pursuant to the applicable Partnership Agreements. As a result, certain limited partners may receive additional benefits that other limited partners will not receive. A Fund and its General Partner, on behalf of the Fund, will not be required to notify any or all of the other limited partners of any such arrangements or any of the rights or terms or provisions thereof, or offer such additional or different rights or terms to any or all of the other limited partners. The other limited partners will have no recourse against the Fund, the General Partner or any of their affiliates in the event that certain limited partners receive additional or different rights or terms as a result of such arrangements.

**Section 6.**    **Disciplinary Information**

Wind Point Advisors and its management persons have not been subject to any material legal or disciplinary events required to be discussed in this Brochure.

**Section 7.      Other Financial Industry Activities and Affiliations**

Wind Point Advisors is affiliated with other Wind Point investment advisers registered with the SEC under the Advisers Act pursuant to Wind Point Advisors' registration in accordance with SEC guidance. These advisers are Wind Point Investors, Wind Point IV GP, Wind Point V GP, Wind Point VI GP, Wind Point VII GP and Wind Point VIII GP. These affiliated investment advisers operate as a single advisory business together with Wind Point Advisors and serve as General Partners of the Partnerships and may share common owners, officers, partners, consultants or persons occupying similar positions. See Section 5, "Methods of Analysis, Investment Strategies and Risk of Loss," for a discussion of conflicts of interest.

In addition, Alex Washington was elected to serve as a director of Wintrust Bank. From time to time, the portfolio companies have entered, and expect in the future to enter, into transactions with Wintrust and/or its affiliates. Wind Point Advisors does not expect Mr. Washington's directorship to create a material conflict of interest because transactions with Wintrust and/or its affiliates are generally negotiated on an arms' length basis, and Mr. Washington will not receive any compensation from Wintrust in connection with transactions any portfolio company enters into with Wintrust and/or its affiliates.

**Section 8.      Code of Ethics, Participation or Interest in Client Transactions and Personal Trading**

The Managers have adopted the Wind Point Partners Code of Ethics and Securities Trading Policy and Procedures (the "**Code**"), which sets forth standards of conduct that are expected of the Managers' Principals and employees and addresses conflicts that arise from personal trading. The Code requires the Managers' personnel to report their personal securities transactions and prohibits the Managers' personnel's direct or indirect acquisition of beneficial ownership of securities in an initial public offering or in a limited offering, in each case, without first obtaining approval from the Managers' Chief Compliance Officer. In addition, the Code requires the Managers' Principals and employees to comply with policies and procedures reasonably designed to prevent the misuse of, or trading upon, material non-public information. A copy of the Code will be provided to any client or prospective client upon request to LeAnn Kilarski at (312) 255-4800 or LKK@wppartners.com. Personal securities transactions by employees who manage client accounts are required to be conducted in a manner that prioritizes the client's interests in client-eligible investments.

The Managers and their affiliated persons may come into possession from time to time of material nonpublic or other confidential information about public companies which, if disclosed, might affect an investor's decision to buy, sell or hold a security. Under applicable law, the Managers and their affiliated persons would be prohibited from improperly disclosing or using such information for their personal benefit or for the benefit of any person, regardless of whether such person is a client of the Managers. Accordingly, should the Managers or any of their affiliated persons come into possession of material nonpublic or other confidential information with respect to any public company, the Managers would be prohibited from communicating such information to clients, and the Managers will have no responsibility or liability for failing to disclose such information to clients as a result of following their policies and procedures designed to comply with applicable law. Similar restrictions may be applicable as a result of

16

Wind Point personnel serving as directors of public companies and may restrict trading on behalf of clients, including the Funds. Due to these restrictions, the Managers will not be free to act upon any such information and may not be able to initiate a transaction that they otherwise might have initiated and may not be able to sell an investment that they otherwise might have sold.

Principals and employees of the Managers and their affiliates may directly or indirectly own an interest in Private Investment Funds, including the primary Funds or Co-Invest Funds. The Managers believe that such interests do not create a conflict of interest and instead operate to align the interests of Principals and employees of the Managers with the Private Investment Funds. The Funds and other Private Investment Funds may invest together in the manner set forth in the applicable Partnership Agreement. The Managers will determine allocation of investment opportunities in a manner that they believe is fair and equitable to their clients consistent with the Managers' fiduciary obligations and consistent with the applicable Private Investment Funds' underlying documents.

The Managers serve as investment managers to the Co-Invest Funds that invest alongside the primary Funds in certain portfolio companies. Certain affiliates and personnel of the Managers, third party investors and other persons may be permitted to participate in the Co-Invest Funds or in some cases co-invest directly in a particular portfolio company. Conflicts of interest may arise in the allocation of such co-investment opportunities. The allocation of co-investment opportunities, which may be made to one or more persons for any number of reasons as determined by a General Partner in its sole discretion, may not be in the best interests of the applicable Fund or any individual limited partner. In exercising its sole discretion in connection with such co-investment opportunities, the applicable General Partner may consider some or all of a wide range of factors, which may include the likelihood that an investor may invest in a future fund sponsored by such General Partner or its affiliates.

The Funds may co-invest with third parties through partnerships, joint ventures or other entities or arrangements. Such investments may involve risks not present in investments where a third-party is not involved, including the possibility that a third-party co-venturer or partner may at any time have economic or business interests or goals that are inconsistent with those of the applicable Fund, or may be in a position to take action contrary to the investment objectives of such Fund. In addition, the Fund may in certain circumstances be liable for actions of its third-party co-venturer or partner. Furthermore, co-invest participants may be in a position to obtain additional information regarding a particular portfolio company that may not generally be available to investors in the Funds. Any Co-Invest Fund formed for the purpose of pursuing a particular transaction lack the potential benefit of diversification and will be particularly exposed to the legal and financial risks associated with that transaction, including the risk of loss.

From time to time for strategic or other reasons, a Co-Invest Fund or other co-investor may purchase a portion of an investment from a primary Fund. The co-invest buy-down generally occurs shortly after the primary Fund's completion of the investment to avoid any changes in the valuation of the investment. The Co-Invest Fund or other co-investor generally will be charged interest on its buy-downs to compensate the primary Fund for the holding period.

The Managers and their affiliates, Principals and employees may carry on investment activities for their own accounts and for family members, friends or others who do not invest in the Funds,

17

and may give advice and recommend securities to other accounts or certain Funds or vehicles that may differ from advice given to, or securities recommended or bought for, other Funds or vehicles, even though their investment objectives may be the same or similar. The operative documents and investment programs of certain vehicles sponsored by Wind Point Advisors (the "**Referenced Funds**") may restrict, limit or prohibit, in whole or subject to certain procedural requirements, investments of certain other vehicles in issuers held by such Referenced Funds or may give priority with respect to investments to such Referenced Funds. Some of these restrictions could be waived by investors (or their representatives on advisory boards) in such Referenced Funds. However, the Managers may or may not, in their sole discretion, seek any such waiver and, in any event, there can be no assurance that any waiver sought would be obtained.

The Managers may recommend the purchase or sale of securities for Funds in which one or more of their partners, members, officers, directors, employees (and members of their families) or affiliates ("**affiliated persons**"), directly or indirectly, have a position or interest, or which an affiliated person buys or sells for himself or herself. Such transactions also may include trading in securities in a manner that differs from or is inconsistent with the advice given to the Funds. Certain of these transactions may require the consent of the applicable Funds.

See Section 5, "*Methods of Analysis, Investment Strategies and Risk of Loss*," for a discussion of conflicts of interest.

As noted in Section 2, "*Fees and Compensation*," the Managers and their affiliates may be entitled to receive cash and non-cash director's, consulting, advisory, transaction, break-up, monitoring, and other similar fees in connection with the purchase, monitoring or disposition of investments or from unconsummated transactions including warrants, options, derivatives and other rights in respect of portfolio companies of the Fund. Limited partners will receive the benefit from certain such fees only to the extent of any applicable offsets to the Management Fee, as described herein.

In addition, as a result of the Funds' interests in portfolio companies, the Managers and their affiliates may have the right to appoint, or influence the appointment of, board members to such portfolio companies and to determine, or influence a determination of, board member compensation and/or other amounts payable to the Managers or their affiliates. Furthermore (as described under Section 2, "*Fees and Compensation*"), a portfolio company (or a Fund in anticipation of a portfolio company investment) typically will pay, or reimburse the Manager, for certain fees and expenses (including travel expenses) of the Manager's personnel, the EAPs or other service providers retained at the Managers' discretion. The Managers may determine or influence the amount of these payments and reimbursements.

The Managers and their affiliates may also, from time to time, employ personnel with pre-existing ownership interests in portfolio companies owned by the Funds. Additionally, the Managers, their affiliates and/or personnel maintain relationships with (or may invest in) financial institutions or other service providers, some of which will invest (or will be affiliated with an investor) in, engage in transactions with and/or provide services (including services at reduced rates) to, the Managers and/or their affiliates, and/or the Funds or other investment

18

vehicles they advise. Any of these situations subjects the Managers and/or their affiliates to potential conflicts of interest.

Principals and employees of the Managers may serve as directors and officers of certain portfolio companies and, in that capacity, will be required to make decisions that they consider to be in the best interests of such portfolio company and their respective shareholders. In certain circumstances (for example in situations involving bankruptcy or near-insolvency of a portfolio company), actions that may be in the best interests of the portfolio company may not be in the best interests of the Funds, and vice versa. Accordingly, in these situations, there may be conflicts of interests between an individual's duties as an employee of the Managers and an individual's duties as a director of such portfolio company.

### Section 9.    Brokerage Practices

The Managers focus on securities transactions of private companies and generally purchase and sell such companies through privately negotiated transactions in which the services of a broker-dealer may be retained. However, the Managers may also distribute securities to investors in the Funds or sell such securities, including through using a broker-dealer, if a public trading market exists. Although the Managers do not intend to regularly engage in public securities transactions, to the extent they do so, they follow the brokerage practices described below.

If the Managers sell publicly traded securities for the Funds, they are responsible for directing orders to broker-dealers to effect securities transactions for accounts managed by the Managers. In such event, the Managers will seek to select brokers on the basis of best price and execution capability. In selecting a broker to execute client transactions, the Managers may consider a variety of factors, including: (i) execution capabilities with respect to the relevant type of order; (ii) commissions charged; (iii) the reputation of the firm being considered; and (iv) responsiveness to requests for trade data and other financial information.

The Managers have no duty or obligation to seek in advance competitive bidding for the most favorable commission rate applicable to any particular client transaction or to select any broker on the basis of its purported or "posted" commission rate, but will endeavor to be aware of the current level of the charges of eligible brokers and to reduce the expenses incurred for effecting client transactions to the extent consistent with the interests of such clients. Although the Managers generally seek competitive commission rates, they may not necessarily pay the lowest commission or commission equivalent. Transactions may involve specialized services on the part of the broker involved and thereby entail higher commissions or their equivalents than would be the case with other transactions requiring more routine services.

Consistent with the Managers seeking to obtain best execution, brokerage commissions on client transactions may be directed to brokers in recognition of research furnished by them, although the Managers generally do not make use of such services at the current time. Such research services could include economic research, market strategy research, industry research, company research, fixed income data services, computer-based quotation equipment and research services and portfolio performance analysis. As a general matter, research provided by these brokers would be used to service all of the Managers' Private Investment Funds. However, each and every research service may not be used for the benefit of each and every Private Investment Fund

managed by the Managers, and brokerage commissions paid by one Private Investment Fund may apply towards payment for research services that might not be used in the service of such Private Investment Fund.

To the extent that the Managers allocate brokerage business on the basis of research services, they may have an incentive to select or recommend broker-dealers based on the interest in receiving such research or other products or services, rather than based on their Private Investment Funds' interest in receiving most favorable execution.

The Managers do not anticipate engaging in significant public securities transactions; however, to the extent that the Managers engage in any such transactions, orders for purchase or sale of securities placed first will be executed first, and within a reasonable amount of time of order receipt. To the extent that orders for Private Investment Funds are completed independently, the Managers may also purchase or sell the same securities or instruments for several Private Investment Funds simultaneously. From time to time, the Managers may, but are not obligated to, purchase or sell securities for several client accounts at approximately the same time. Such orders may be combined or "batched" to facilitate obtaining best execution and/or to reduce brokerage commissions or other costs. Batched transactions are executed in a manner intended to ensure that no participating Private Investment Fund of the Managers is favored over any other Private Investment Fund.

###### Section 10.    Review of Accounts

The investments made by the Private Investment Funds are generally private, illiquid and long-term in nature. Accordingly, the review process is not directed toward a short-term decision to dispose of securities. However, the Managers closely monitor companies in which the Private Investment Funds invest, and the Managers' Chief Compliance Officer periodically checks to confirm that each Private Investment Fund is managed in accordance with its stated objectives.

The Funds generally provide to their limited partners (i) audited financial statements annually, (ii) unaudited financial statements for the first three quarters of each fiscal year, (iii) annual tax information necessary for each limited partner's U.S. tax returns, and (iv) descriptive investment information for each portfolio company periodically. In addition to the information provided to all investors, the Managers may provide certain investors with additional information or more frequent reports that other investors will not receive.

###### Section 11.    Client Referrals and Other Compensation

As discussed in the "Fees and Compensation" section, the Managers and/or their affiliates may receive certain fees from a Fund's portfolio companies. As described in the applicable Fund's Partnership Agreement, a portion of this compensation may, in certain circumstances, offset a portion of the Management Fees otherwise payable by the Funds, but certain compensation, such as compensation for services provided to portfolio companies in the ordinary course or for serving as an employee of a portfolio company, are not included in the offset amounts.

From time to time, Wind Point Advisors may enter into solicitation arrangements pursuant to which it compensates third parties for referrals that result in a potential investor becoming a limited partner in a Fund or other Private Investment Fund. Any fees and expenses payable to

any such third parties will be borne by Wind Point Advisors directly or indirectly through an offset against the Management Fee.

### Section 12.    Custody

As required by the Advisers Act, the Managers have established accounts with the following qualified custodians to hold funds and securities on behalf of the Funds:  Merrill Lynch, Pierce, Fenner & Smith Incorporated, JP Morgan Chase Bank, N.A., and Wells Fargo Bank, N.A. Although the Managers are deemed to have custody of underlying assets of many of the Funds, the Managers rely on the "pooled investment vehicles" exemption from the reporting and surprise audit obligations imposed by the SEC's custody rule.  Accordingly, the Funds are generally subject to a year-end audit by a major accounting firm that is a member of, and subject to regular inspection by, the Public Company Accounting Oversight Board.  Each Fund's audited financial statements are then provided to underlying investors of such Fund within 120 days of the Fund's fiscal year end.

### Section 13.    Investment Discretion

Each Manager has discretionary authority to manage investments on behalf of the applicable Fund. As a general policy, the Managers do not allow clients to place limitations on this authority, provided that the Partnership Agreement of a Fund may impose certain restrictions on investing in certain types of securities.  Pursuant to the terms of the applicable Partnership Agreement, however, a Manager may enter into side letter or similar arrangements with certain limited partners whereby the terms applicable to such limited partner's investment in the Fund may be altered or varied, including, in some cases, the right to opt-out of certain investments for legal, tax, regulatory or other similar reasons or for other agreed upon reasons.  The applicable Manager assumes this discretionary authority pursuant to the terms of the Partnership Agreement.

### Section 14.    Voting Client Securities

In accordance with SEC requirements, the Managers have adopted Proxy Voting Policies and Procedures (the "**Policy**") to address how any Manager will vote proxies, as applicable, for the Funds' portfolio investments.  The Policy seeks to ensure that the applicable Manager votes proxies (or similar instruments) in the best interest of the Funds, including when there may be material conflicts of interest in voting proxies.  The Managers generally believe their interests are aligned with the Funds' investors through the Managers' Principals' beneficial ownership interests in the Funds and therefore generally do not expect to seek investor approval or direction when voting proxies.  In the event, however, there is or may be a conflict of interest between the applicable Manager and the Funds in voting proxies, the Policy outlines several alternative approaches that the Manager may take to address the conflict.  The Managers do not consider service on portfolio company boards by Manager personnel or Principals or the Managers' receipt of management or other fees from portfolio companies to create a material conflict of interest in voting proxies with respect to such companies.  In addition, the Policy sets forth certain specific proxy voting guidelines the Managers follow when voting proxies on behalf of the Funds.  A copy of the Policy or information regarding how the Managers voted proxies for

particular portfolio companies will be provided to clients or prospective clients at no charge upon request to LeAnn Kilarski at (312) 255-4800 or LKK@wppartners.com.


**Section 15.**    <u>**Financial Information**</u>

Wind Point Advisors does not require or solicit prepayment of management fees more than six months in advance and does not have any other events requiring disclosure under this item of the Brochure.

# EXHIBIT 7

# WATER STREET HEALTHCARE PARTNERS, LLC

**Water Street Healthcare Partners, LLC**
**444 West Lake Street**
**Suite 1800**
**Chicago, IL 60606**
**http://www.waterstreet.com**

**March 31, 2017**

**This Investment Adviser Brochure ("Brochure") provides information about the qualifications and business practices of Water Street Healthcare Partners, LLC (the "Management Company"). If you have any questions about the contents of this Brochure, please contact us at (312) 506-2900. The information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission (the "SEC") or by any state authority.**

The Management Company is an investment adviser registered with the SEC under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"). However, such registration does not imply a certain level of skill or training.

Additional information regarding the Management Company is also available on the SEC's website at www.adviserinfo.sec.gov.

## MATERIAL CHANGES

Water Street Healthcare Partners, LLC filed its most recent Form ADV Part 2 on July 8, 2016. This annual amendment updates the description of certain of the business practices of Water Street Healthcare Partners, LLC and its affiliates.

# TABLE OF CONTENTS

Page

**Brochure**

Material Changes ................................................................................................................. i

Advisory Business ............................................................................................................... 2

Fees and Compensation ...................................................................................................... 3

Performance-Based Fees and Side-By-Side Management ................................................. 8

Types of Clients .................................................................................................................. 9

Methods of Analysis, Investment Strategies and Risk of Loss ........................................ 9

Disciplinary Information ................................................................................................... 24

Other Financial Industry Activities and Affiliations ...................................................... 24

Code of Ethics, Participation or Interest in Client Transactions and Personal
    Trading......................................................................................................................... 24

Brokerage Practices .......................................................................................................... 26

Review of Accounts .......................................................................................................... 27

Client Referrals and Other Compensation ....................................................................... 28

Custody ............................................................................................................................. 28

Investment Discretion ....................................................................................................... 28

Voting Client Securities ................................................................................................... 28

Financial Information ........................................................................................................ 29

### ADVISORY BUSINESS

Water Street (as defined below) is a private investment management firm, including several registered investment advisory entities and other organizations affiliated with the Management Company (collectively, "**Water Street**").

The Management Company, a Delaware limited liability company and a registered investment adviser, provides investment advisory services to private investment funds. The Management Company commenced operations in January 2005.

The following are the affiliated advisers of the Management Company (collectively with the Management Company, the "**Advisers**"):

- Water Street Healthcare Management, L.P. ("**GP I**");

- Water Street Healthcare Management II, L.P. ("**GP II**");

- WSHM II AIV, L.P. ("**GP II AIV**"); and

- Water Street Healthcare Management III, L.P. ("**GP III**" and collectively with GP I, GP II and GP II AIV, the "**General Partners**")

The Advisers' clients include the following (each, a "**Partnership**," and together with any future private investment fund(s) to which Water Street or its affiliates provide investment advisory services, the "**Private Investment Funds**"):

- Water Street Healthcare Partners, L.P. ("**Fund I**");

- Water Street Healthcare Partners II, L.P. ("**Fund II**");

- WSHP II AIV, L.P. ("**Fund II AIV**"); and

- Water Street Healthcare Partners III, L.P. ("**Fund III**")

The General Partners each serve as general partner to one or more Partnerships and have the authority to make the investment decisions for the Partnerships to which they provide advisory services. The Management Company provides certain advisory services to the General Partners. Each General Partner is subject to the Advisers Act pursuant to the Management Company's registration in accordance with SEC guidance. This Brochure also describes the business practices of the General Partners, which operate as a single advisory business together with the Management Company.

The Partnerships and any other Private Investment Funds that may be formed by a General Partner (or its affiliates) at a later date or that may otherwise become clients of a General Partner are expected to invest through negotiated transactions in operating entities, generally referred to herein as "**portfolio companies**." The Advisers' investment advisory services to the Partnerships consist of identifying and evaluating investment opportunities, negotiating the terms of investments, managing and monitoring investments and achieving dispositions for such

investments.    Investments are made predominantly in non-public companies, although investments in public companies are permitted.  From time to time, where such investments consist of portfolio companies, the senior principals or other personnel of the Advisers or their affiliates generally serve on such portfolio companies' respective boards of directors or otherwise act to influence control over management of portfolio companies in which the Partnerships have invested.

The Advisers' advisory services for Private Investment Funds are detailed in the applicable private placement memoranda or other offering documents (each, a "**Memorandum**") and limited partnership or other operating agreements (each, a "**Partnership Agreement**"), and are further described below under "Methods of Analysis, Investment Strategies and Risk of Loss."  Investors in Private Investment Funds participate in the overall investment program for the applicable Partnership, but may be excused from a particular investment due to legal, regulatory or other applicable constraints or agreed upon circumstances pursuant to the relevant Partnership Agreement.  The Partnerships or the General Partners generally have entered into side letters or other similar agreements with certain investors that have the effect of establishing rights (including economic or other terms) under, or altering or supplementing the terms of, the relevant Partnership Agreement with respect to such investors.

Additionally, from time to time, the Advisers expect to provide (or agree to provide) certain investors or other persons, including Water Street personnel and/or certain other persons associated with Water Street and/or its affiliates (to the extent not prohibited by the applicable Partnership Agreement), co-investment opportunities (including the opportunity to participate in co-invest vehicles) that will invest in certain portfolio companies alongside a Private Investment Fund.  Such co-investments typically involve investment and disposal of interests in the applicable portfolio company at the same time and on the same terms as the Private Investment Fund making the investment.  However, from time to time, for strategic and other reasons, a co-investor or co-invest vehicle may purchase a portion of an investment from one or more Private Investment Funds after such Funds have consummated their investment in the portfolio company (also known as a post-closing sell down or transfer).  Any such purchase from a Private Investment Fund by a co-investor or co-invest vehicle generally occurs shortly after the Private Investment Fund's completion of the investment to avoid any changes in valuation of the investment.  Where appropriate, and in the Adviser's sole discretion, the Adviser is authorized to charge interest on the purchase to the co-investor or co-invest vehicle, and to seek reimbursement to the relevant Private Investment Fund for related costs. However, to the extent such amounts are not so charged or reimbursed, they generally will be borne by the relevant Private Investment Fund.

As of December 31, 2016, the Management Company managed approximately $1,282,290,244 billion in client assets on a discretionary basis.  The only person with a 25% or more ownership interest in the Management Company is Timothy A. Dugan.

### FEES AND COMPENSATION

In general, the General Partners receive a Management Fee (as defined below) and a carried interest in connection with advisory services.  The General Partners, the Management Company or other Water Street entities or affiliates receive additional compensation in

connection with management and other services performed for portfolio companies of Partnerships and such additional compensation will offset in whole or in part the management fees otherwise payable to the applicable General Partner. Investors in the Partnerships also bear certain Partnership expenses. The following is a general description of the fees, compensation and expenses of the Partnerships. Differences exist from Partnership to Partnership, and certain Partnerships may not charge certain fees, compensation or expenses that other Partnerships charge. The Partnership Agreements of the Partnerships describe fees, compensation and expenses in greater detail.

**Management Fee**

Each Partnership will pay the applicable General Partner a management fee (the "**Management Fee**"), partially in advance and partially in arrears, equal to 2.0% on an annual basis of aggregate Partnership investor capital commitments ("**Commitments**"), subject to reductions at the end of the investment period and in certain other circumstances, in each case, as specified in the applicable Partnership Agreement. The Management Fee will be payable until all portfolio investments are distributed or until the General Partner's relationship with the Partnership is terminated for other reasons (as described in the applicable Partnership Agreement). Installments of the Management Fee payable for any period other than a full Management Fee period are adjusted on *pro rata* basis according to the actual number of days in such period.

Unless otherwise approved by the applicable Partnership's advisory board, the Management Fee will be reduced by an offset credit equal to a specified percentage of the Partnership's share of (i) directors' fees paid by portfolio companies to partners or employees of the General Partner or certain of its affiliates; (ii) any net transaction fees, financial consulting fees or advisory fees paid to the applicable General Partner or certain of its affiliates with respect to any Partnership investment; and (iii) any net break-up fees with respect to Partnership transactions not completed that are paid to the applicable General Partner or certain of its affiliates (any such fees that such General Partner or another Water Street entity or person are permitted to retain are herein referred to as "**Supplemental Fees**"). To the extent that such an offset credit would reduce the Management Fee for a given Management Fee period below zero, the credit will be carried forward for future application against payable Management Fees. To the extent any such excess credit remains unapplied upon dissolution of a Partnership, each partner of such Partnership will receive its share of such unapplied excess, unless such partner elects not to receive its share. To the extent that any other Private Investment Fund or any other entity or individual co-invests alongside a Partnership in any portfolio company investment, any Supplemental Fees may, to the extent specified in the applicable Partnership Agreement, be allocated with respect to such Partnership and the co-investors in proportion to the cost of the investment or potential investment in the portfolio company held (or committed to be held) by each. Such co-investors generally do not pay Management Fees or carried interest and to the extent any allocation with respect to Supplemental Fees has been made concerning the Partnership and co-investors, and no Managements Fees are charged to co-investors, the General Partner has no management fees to offset with respect to co-investors and, therefore, may retain the full amount of the Supplemental Fees and the General Partner's Management Fee may be reduced to a lesser extent. The terms of the applicable Partnership Agreements provide the General Partner the ability to charge fees and/or carried interest in its discretion.

4

Water Street works with a network of executives, generally former chief executive officers or other senior healthcare executives, who work in a third-party consulting role with Water Street. These executives, referred to herein as "**Operating Partners**" and "**Executive Advisors**," provide services to portfolio companies and are not employees of Water Street. The Operating Partners and Executive Advisors typically receive compensation from Water Street and/or directly from portfolio companies. In some instances, to the extent cash compensation is paid to the Operating Partners and Executive Advisors directly from portfolio companies over a specified amount, it reduces the amount of such compensation paid to such Operating Partners and Executive Advisors by Water Street. Operating Partners and Executive Advisors also generally receive equity-based compensation from portfolio companies in the form of grants or options for board membership and/or other consulting services. In certain cases, such equity-based compensation will be divided and allocated among a number of portfolio companies to provide ultimate payments that will occur over time and, if such structure is used, portfolio company equity-based compensation may include payments from portfolio companies where the Operating Partners and Executive Advisors have no direct involvement. No compensation paid by portfolio companies to (or with respect to) Operating Partners and Executive Advisors, whether paid directly to Operating Partners and Executive Advisors or through reimbursements to Water Street, will reduce or offset Management Fees payable to the Advisers. Operating Partners and Executive Advisors may also be offered co-investment opportunities in portfolio companies. Such co-investment opportunities are typically on terms more favorable than investments in such portfolio companies made by the Partnerships. The compensation and co-investment arrangements for Operating Partners and Executive Advisors could create an incentive for Water Street to arrange for retention of Operating Partners and Executive Advisors by portfolio companies.

Water Street also maintains certain operations executives as full-time employees, referred to herein as "**Employee Operating Partners**," who do not receive any compensation from portfolio companies or the Partnerships. However, Employee Operating Partners may have received equity-based compensation from portfolio companies or the Partnerships prior to full-time employment with Water Street and may retain such equity-based compensation. As of the date of this Brochure, the Employee Operating Partners include: Jim Connelly and Kevin Swan. Only Mr. Swan has retained equity-based compensation received prior to his employment by Water Street.

Water Street also has a "**Corporate Resources Group**" that is comprised of functional specialists who are Water Street employees with experience in executing key strategic initiatives. The Corporate Resources Group is designed to supplement and/or provide expertise in particular areas for portfolio companies. Expenses of the Corporate Resources Group, including all compensation, benefits, overhead and travel costs, are passed through to portfolio companies and are either paid directly by Water Street and then reimbursed by portfolio companies or are paid directly by portfolio companies. Under the terms of the applicable Partnership Agreements, expenses of the Corporate Resources Group, whether initially incurred by Water Street directly and reimbursed by portfolio companies, or paid directly by portfolio companies, do not offset Management Fees payable to the Advisers by the respective Partnerships. Members of the Corporate Resources Group also may be offered co-investment opportunities in portfolio companies. Such co-investment opportunities are typically on terms more favorable than

5

investments in such portfolio companies made by the Partnerships.  The compensation and co-investment arrangements for Corporate Resources Group members could create an incentive for Water Street to arrange for the retention of Corporate Resources Group members.

The compensation paid to and co-investments held by the Operating Partners, Executive Advisors and members of the Corporate Resources Group are presented annually to the the Partnerships respective advisory boards and are generally made available to the limited partners of the Partnerships unless the General Partner determines that the release of such information to a limited partner could put Water Street at a competitive disadvantage.

As permitted under the Partnership Agreement for each Partnership, the applicable General Partner may waive or agree to reduce the Management Fee.  Certain waived portions of the Management Fee are treated by the applicable Partnership Agreement(s) as a deemed capital contribution by the relevant General Partner, which is effectively invested in the relevant Partnership on such General Partner's behalf, and operate to reduce the amount of capital such General Partner would otherwise be required to contribute to the Partnership.  The limited partners of the Partnership may be required to make a *pro rata* contribution according to their respective Commitments to fund any contribution that would otherwise be required of the General Partner in connection with any such waiver or reduction as described above and, as a result, the exercise of such waiver may result in an acceleration (or delay) of investor capital contributions.  Waived or reduced Management Fees are applied prior to the Management Fee offsets described above, and the amount of such waived or reduced Management Fees has the potential to be significant. Due to waived or reduced Management Fees by a General Partner and/or timing of receipt of compensation subject to offsets (as described above), it is possible that Management Fee offsets will be delayed.

**Carried Interest**

The General Partner of each Partnership will receive a carried interest with respect to the respective Partnership(s) it advises equal to 20% of all realized profits in excess of an 8% compound preferred return subject to a General Partner catch-up provision, as more fully described in the applicable Partnership Agreement.  The carried interest distributed to a General Partner is subject to a potential giveback at specified points during the life of a Partnership if such General Partner has received excess cumulative distributions.

It is expected that any similar future Private Investment Funds will have a similar fee structure.

**Other Information**

The Advisers may exempt certain investors in the Partnerships from payment of all or a portion of the Management Fee and/or carried interest. Any such exemption from fees and/or carried interest may be made by a direct exemption, a rebate by the Advisers and/or their affiliates, or through other Private Investment Funds which co-invest with a Partnership.

The Partnerships generally invest on a long-term basis.  Accordingly, investment advisory and other fees are expected to be paid, except as otherwise described in the Partnership

Agreement, over the term of the applicable Partnership, and investors generally are not permitted to withdraw or redeem interests in the Partnership.

Principals or other current or former employees of Water Street may receive a portion of the Management Fee, carried interest or other compensation received by the General Partners or their affiliates.

In addition to the Management Fee and carried interest payable to the applicable General Partner, each Partnership bears certain expenses. As set forth in more detail in the applicable Memorandum and/or Partnership Agreement, a Partnership bears all Partnership expenses relating to such Partnership's activities, to the extent not paid by portfolio companies, including organizational expenses up to the expense cap specified in the applicable Partnership Agreement, legal, auditing, consulting (excluding fees for consulting services associated with overall strategy that are not performed as part of an investment initiative), travel (including, unless otherwise prohibited by the applicable Partnership Agreement, non-commercial air travel), administration, financing, accounting and custodian fees and expenses; expenses associated with the Partnership's financial statements, tax returns and Schedule K-1s; out of pocket expenses incurred in connection with transactions not consummated ("**Broken-Deal Expenses**"); expenses of any advisory board of limited partners; expenses of meetings with the Partnership's limited partners; insurance; other expenses associated with the acquisition, holding and disposition of its investments, including extraordinary expenses (such as litigation, if any); and any taxes, fees or other governmental charges levied against the Partnership, but not ordinary administrative and overhead expenses of the General Partners incurred in connection with maintaining and operating its offices, including employees' salaries, rent, utilities and other similar expenses specified in the Partnership Agreement. The Partnerships also bear expenses indirectly from the payment by portfolio companies of similar expenses, including Supplemental Fees. As is typical for private equity funds, the Partnerships likely bear additional and greater expenses, directly or indirectly, than many other pooled investment products, such as mutual funds. To the extent brokerage fees are incurred, they will be incurred in accordance with the general practices set forth in "Brokerage Practices."

The General Partners may permit certain investors to co-invest in portfolio companies alongside one or more Partnerships. If a co-invest vehicle is formed, such entity generally will bear expenses related to its formation and operation, many of which are similar in nature to those borne by the Partnerships. In the event that a transaction in which a co-investment was planned, including a transaction for which a co-investment was believed necessary in order to consummate such transaction, ultimately is not consummated, all Broken-Deal Expenses relating to such unconsummated transaction will be borne by the Partnership(s), and not by any prospective co-investors that were to have participated in such transaction. However, to the extent that such co-investors have already invested in a co-investment or other vehicle in connection with such transaction, such vehicle is expected to bear its share of such Broken-Deal Expenses. Notwithstanding the foregoing, Water Street has formed a vehicle through which certain of its employees invest alongside the Partnerships (the "**Co-Invest Fund**"), which does not pay a Management Fee or carried interest and does not pay partnership expenses or bear its share of Broken-Deal Expenses.

In certain circumstances, one Partnership is expected to pay an expense common to multiple Partnerships (including without limitation legal expenses for a transaction in which all such Partnerships participate, or other fees or expenses in connection with services the benefit of which are received by other Partnerships over time), and be reimbursed by the other Partnerships by their share of such expense, without interest. In certain circumstances, Water Street has the ability to advance amounts related to the foregoing and receive reimbursement from the Partnerships to which such expenses relate.

The Partnerships generally utilize Partnership-guaranteed capital call loans to fund new investments prior to calling capital from limited partners for administrative convenience. The Partnerships also occasionally utilize longer term Partnership-guaranteed credit facilities to bridge to future equity or portfolio company stand-alone credit facilities. The calculation of Partnership performance metrics may be favorably influenced by the use of these types of credit facilities.

Additionally, as described above and more fully in the applicable Memorandum, Partnership Agreement, financial statements and/or advisory board minutes (generally circulated to each investor) for each Private Investment Fund, Operating Partners, Executive Advisors and/or members of the Corporate Resources Group may receive fees and other compensation from portfolio companies of such Private Investment Fund in the form of cash and/or equity-based compensation. Such compensation does not reduce or offset Management Fees payable to the Advisers. Operating Partners, Executive Advisors and/or members of the Corporate Resources Group may be permitted to make co-investments alongside a Partnership and, as noted above, typically are not charged a Management Fee or carried interest on such co-investments, nor do they bear their share of any Broken-Deal Expenses with respect to such co-investments. Furthermore, to the extent any Executive Advisors are limited partners of a Partnership, such individuals will typically not be charged carried interest. As noted above, if an Operating Partner or Executive Advisor who is a third-party consultant receives equity-based compensation in a portfolio company and subsequently becomes an employee of Water Street, such person may retain such equity-based compensation received prior to his or her employment by Water Street. The use of Operating Partners, Executive Advisors and the Corporate Resources Group subjects the Advisers to potential conflicts of interest, as described under "Methods of Analysis, Investment Strategies and Risk of Loss — Conflicts of Interest," below.

Water Street and/or its affiliates generally have discretion over whether to charge transaction fees, monitoring fees or other compensation to a portfolio company and, if so, the rate, timing and/or amount of such compensation. The receipt of such fees or other compensation generally will give rise to potential conflicts of interest between the Private Investment Funds, on the one hand, and Water Street and/or its affiliates on the other hand.

### PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

As described under "Fees and Compensation," the General Partners typically receive a carried interest allocation on certain realized profits in the Partnerships. Water Street also advises the Co-Invest Fund, which is not subject to Management Fees or a carried interest. While this practice could present a conflict of interest in allocating investment opportunities and expenses because Water Street has an incentive to favor accounts for which it receives the

highest performance based compensation, Water Street does not believe this arrangement poses a conflict of interest in practice because the Co-Invest Fund co-invests alongside the relevant Partnership at substantially the same time and on substantially the same terms as such Partnership and disposes of such investments in a similar manner.

TYPES OF CLIENTS

The Advisers provide investment advice to Private Investment Funds, including the Partnerships. Private Investment Funds are investment partnerships or other investment entities formed under domestic or foreign laws and operated as exempt investment pools under the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder (the "**Investment Company Act**"). The investors participating in Private Investment Funds may include individuals, banks or thrift institutions, other investment entities, university endowments, sovereign wealth funds, family offices, pension and profit-sharing plans, trusts, estates or charitable organizations or other corporations or business entities and may include, directly or indirectly, principals or other employees of the Advisers and their affiliates and members of their families, Operating Partners, Executive Advisors or other service providers retained by Water Street.

Fund I has a minimum investment of $5 million for third-party investors, while Fund II, Fund II AIV and Fund III have a minimum investment of $10 million for third-party investors, each of which may be waived by the applicable General Partner. Investors in the Partnerships must meet certain suitability and net worth qualifications prior to making an investment. Investors must be (i) "accredited investors" as defined under Regulation D of the Securities Act of 1933, as amended, and (ii) either "qualified purchasers" or "knowledgeable employees" as defined under the Investment Company Act.

METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

**General**

Water Street is a private investment firm focused on making investments in later-stage, middle-market healthcare companies. The Advisers' investment advisory services consist of identifying and evaluating investment opportunities, negotiating investments, managing and monitoring investments and achieving dispositions for investments. Investments are predominantly of non-public companies although investments in public companies are permitted.

The following is a summary of the investment strategies and methods of analysis generally employed by Water Street on behalf of the Partnerships and a summary of certain risks involved with Water Street's investment strategy and an investment in the Partnerships. More detailed descriptions of the Partnerships' investment strategies and methods of analysis and risks are included in the applicable Memorandum and Partnership Agreement for each Partnership. The investment strategies and methods of analysis and risks described in this section also generally apply to the Co-Invest Fund.

The Advisers' investment strategy for the Partnerships focuses on the acquisition of controlling interests in middle-market companies and divisions of global healthcare

9

organizations that the Advisers believe have strong growth prospects to serve as potential platform companies. The Advisers focus on investments that require equity capital of approximately $25 million to $100 million, although the required capital may be greater or less than such amounts.

The Advisers' investment strategy consists of the following phases: (i) sourcing proprietary investment opportunities through a direct calling program and conducting due diligence; (ii) creating customized transaction structures and innovative capital structures for sellers; (iii) growing portfolio companies through strategic combinations; (iv) maintaining active involvement with portfolio companies in an effort to improve operating performance; and (v) exit planning to position a portfolio company for strategic sale.

There can be no assurance that the Advisers will achieve the investment objectives of any of the Partnerships and a loss of investment is possible.

**Investment and Operating Strategy**

*Deal Sourcing and Due Diligence.* The Advisers' deal sourcing program has two components: (i) a sourcing effort focusing on the 200 largest publicly-traded healthcare companies; and (ii) a segment-focused sourcing effort with middle-market companies. The first component serves as a method for the Advisers to propose and discuss creative ways to enhance the operations, market positions and value of certain of the public healthcare company's non-core businesses. The second component focuses on building a dialogue with middle-market companies in pre-selected areas of interest with a goal of partnering with them to seek to grow their businesses. The information gathered through the proactive sourcing program helps the Advisers to: (a) better understand trends and competitive dynamics in a segment by talking to key participants and competitors in that segment; (b) identify businesses that can most likely be combined to create a market leader in the segment of interest; and (c) identify likely strategic buyers of that business once successfully built and developed. Once a potential investment is identified, the Advisers develop an investment thesis and, through a detailed due diligence process, seek to verify such thesis and investigate the major business risks.

*Create Customized Transaction Structures for Sellers.* As part of its strategic dialogue with healthcare companies, the Advisers encourage owners to maintain ongoing ownership stakes in partnership with Water Street as a means of both: (i) providing corporate parents or private-company owners with the opportunity to benefit from future value creation; and (ii) differentiating the Advisers' discussion and proposed transaction from an outright sale. The Advisers expect to frequently structure their acquisitions as leveraged recapitalizations, allowing owners to achieve partial liquidity, while continuing to have meaningful equity stakes and remain involved in the governance of their companies. This structure is preferred for a larger corporation or entrepreneur that is looking for liquidity but also desires a financial partner to enhance the company's growth opportunities and the ability to participate in value creation.

*Grow Portfolio Companies Through Strategic Acquisitions.* The Advisers seek to build market-leading companies focused on adding value to end customers through broader product and/or service offerings. Post-acquisition, the Advisers encourage and facilitate significant operating investments in the infrastructure of their portfolio companies to better position such

10

companies for future growth and value creation.   Portfolio companies also may receive additional and more comprehensive support through Water Street's Corporate Resources Group (a group comprised of functional specialists who support portfolio companies with executing key strategic initiatives, including executive recruiting, corporate development and communications). Portfolio companies may request the services of the Corporate Resources Group to supplement and/or provide for the portfolio company's expertise in a particular area.   Members of the Corporate Resources Group are employees of Water Street working substantially on portfolio companies' internal projects. As described above and as permitted under the Limited Partnership Agreement for the applicable Private Investment Fund, expenses of the Corporate Resources Group, including compensation, benefits, overhead and travel costs, are paid by portfolio companies without offsetting fees that are paid to the Advisers.   The Advisers also seek to improve the competitive position and financial performance of portfolio companies through transformational strategic acquisitions.   The Advisers focus on acquisitions that they believe will: (i) offer customers improved product offerings and/or greater geographic coverage; (ii) leverage production and purchasing power to improve gross margins; (iii) leverage distribution strength into profitable and proprietary licensing or distribution relationships; (iv) consolidate selling and marketing efforts to reduce costs, improve margins and improve customer coverage; and/or (v) enhance investments in research and development.

*Maintain Active Involvement in Portfolio Companies*.   Post-closing, the Advisers will establish a detailed governance program that includes a regular calendar of organization planning, strategic planning, corporate development, executive compensation and operations analysis.   Additionally, the Advisers seek to implement an authorities matrix that explicitly outlines approval authorities for management and ensures that the board of directors of a company (the "**Board**") gets appropriately involved in decisions of significance for each company.   The Advisers will also develop, together with management, a reporting package that is focused on operating metrics that the Advisers believe are critical in monitoring the progress of the company.   In most companies, an Employee Operating Partner, other operating executive from Water Street or an Operating Partner or Executive Advisor generally serves as a lead director, working closely with company management on operating and strategic priorities.   In addition to its personnel, including the Employee Operating Partners, Water Street also seeks to supplement its knowledge, experience and contacts with a network of executives that serve as Operating Partners or Executive Advisors.   Operating Partners and Executive Advisors are experienced industry executives, generally former Chief Executive Officers, who work in a consulting role that is exclusive to Water Street, while Employee Operting Partners are full-time employees of Water Street.   Operating Partners, Executive Advisors and Employee Operating Partners may serve as members of the Board or, in special cases, as operating executives of portfolio companies. .  The compensation of Operating Partners, Executive Advisors and Employee Operating Partners is described above under "Fees and Compensation — Management Fee."   Water Street also may make resources available to portfolio companies through senior advisers, who serve a similar purpose as Operating Partners and Executive Advisors, but who are not exclusive to Partnerships' portfolio companies.

*Exit Strategy*.   The Advisers seek to develop companies with the objective of building businesses that will become compelling and dynamic acquisition candidates for a strategic buyer. The Advisers seek to develop portfolio companies into market leaders that have the financial scale to be meaningful to a strategic buyer and that are run with the discipline and reporting

standards of a public company. The Advisers believe that keeping management focused on the standards required for an independent public company improves the strategic decisions made in the development of the company and best positions the business for sale to a strategic buyer. Although the Advisers will analyze whether a portfolio company is appropriate for public offering, the Advisers' primary exit strategy is a cash sale to a strategic buyer.

**Risks of Investment**

A Partnership and its investors bear the risk of loss that the Advisers' investment strategy entails. The risks involved with the Advisers' investment strategy and an investment in a Partnership are detailed in such Partnership's Memorandum. In general, these risks include, but are not limited to:

*Business Risks*. The Partnership's investment portfolio is expected to consist primarily of securities issued by privately held companies, and operating results in a specified period will be difficult to predict. Such investments involve a high degree of business and financial risk that can result in substantial losses.

*Investment in Junior Securities*. The securities in which the Partnership will invest may be among the most junior in a portfolio company's capital structure, and thus subject to the greatest risk of loss. Generally, there will be no collateral to protect the Partnership's investment once made.

*Concentration of Investments*. The Partnership will participate in a limited number of investments and intends to make most of its investments in one industry or one industry segment. As a result, the Partnership's investment portfolio could become highly concentrated, and the performance of a few holdings or of a particular industry may substantially affect its aggregate return. Furthermore, to the extent that the capital raised is less than the targeted amount, the Partnership may invest in fewer portfolio companies and thus be less diversified.

*Lack of Sufficient Investment Opportunities*. The business of identifying, structuring and completing private equity transactions is highly competitive and involves a high degree of uncertainty. It is possible that the Partnership will never be fully invested if enough sufficiently attractive investments are not identified. However, the limited partners will be required to bear the Management Fee during the investment period based on the aggregate amount of all Commitments to the Partnership and other expenses as set forth in the Partnership Agreement.

*Illiquidity; Lack of Current Distributions*. An investment in the Partnership should be viewed as an illiquid investment. It is uncertain as to when profits, if any, will be realized. Losses on unsuccessful investments may be realized before gains on successful investments are realized. The return of capital and the realization of gains, if any, generally will occur only upon the partial or complete disposition of an investment. While an investment may be sold at any time, it is generally expected that this will not occur for a number of years after the initial investment. Before such time, there may be no current return on the investment. Furthermore, the expenses of operating the Partnership (including any Management Fee payable to the General Partner) may exceed its income, thereby requiring that the difference be paid from the Partnership's capital, including unfunded Commitments.

*Leveraged Investments.*  The Partnership may make use of leverage by having a portfolio company incur debt to finance a portion of its investment in such portfolio company, including in respect of companies not rated by credit agencies.  Leverage generally magnifies both the Partnership's opportunities for gain and its risk of loss from a particular investment.  The cost and availability of leverage is highly dependent on the state of the broader credit markets (and such credit markets may be impacted by regulatory restrictions and guidelines), which state is difficult to accurately forecast, and at times it may be difficult to obtain or maintain the desired degree of leverage.  The use of leverage also imposes restrictive financial and operating covenants on a company, in addition to the burden of debt service, and may impair its ability to operate its business as desired and/or finance future operations and capital needs.  The leveraged capital structure of portfolio companies will increase the exposure of the Partnership's investments to any deterioration in a company's condition or industry, competitive pressures, an adverse economic environment or rising interest rates and could accelerate and magnify declines in the value of the Partnership's investments in the leveraged portfolio companies in a down market.  In the event any portfolio company cannot generate adequate cash flow to meet its debt service, the Partnership may suffer a partial or total loss of capital invested in the portfolio company, which could adversely affect the returns of the Partnership.  Furthermore, should the credit markets be limited or costly at the time the Partnership determines that it is desirable to sell all or a part of a portfolio company, the Partnership may not achieve an exit multiple or enterprise valuation consistent with its forecasts.  Moreover, the companies in which the Partnership will invest generally will not be rated by a credit rating agency.

*Restricted Nature of Investment Positions.*  Generally, there will be no readily available market for Partnership investments, and hence, most of the Partnership's investments will be difficult to value.  Certain investments may be distributed in kind to the partners of the Partnership and it may be difficult to liquidate the securities received at a price or within a time period that is determined to be ideal by such partners.  After a distribution of securities is made to the partners of the Partnership, many partners may decide to liquidate such securities within a short period of time, which could have an adverse impact on the price of such securities.  The price at which such securities may be sold by such partners may be lower than the value of such securities determined pursuant to the Partnership Agreement, including the value used to determine the amount of carried interest available to the General Partner with respect to such investment.

*Reliance on Portfolio Company Management.*  Although the General Partner will monitor the performance of each Partnership investment, it will primarily be the responsibility of each portfolio company's management team to operate such portfolio company on a day-to-day basis.  Although the Partnership generally intends to invest in companies with strong management or recruit strong management to such companies, there can be no assurance that the management of such companies will be able or willing to successfully operate a company in accordance with the Partnership's objectives.

*Projections.*  Projected operating results of a company in which the Partnership invests normally will be based primarily on financial projections prepared by such company's management, with adjustments to such projections made by the General Partner in its discretion.  In all cases, projections are only estimates of future results that are based upon information received from the company and third parties and assumptions made at the time the projections

13

are developed. There can be no assurance that the results set forth in the projections will be attained, and actual results may be significantly different from the projections. Also, general economic factors, which are not predictable, can have a material effect on the reliability of projections.

*Need for Follow-On Investments.* Following its initial investment in a given portfolio company, the Partnership may decide to provide additional funds to such portfolio company or may have the opportunity to increase its investment in a successful portfolio company (whether for opportunistic reasons, to fund the needs of the business, or as an equity cure under applicable debt documents or for other reasons). There is no assurance that the Partnership will make follow-on investments or that the Partnership will have sufficient funds to make all or any of such investments. Any decision by the Partnership not to make follow-on investments or its inability to make such investments may have a substantial negative effect on a portfolio company in need of such an investment (including an event of default under applicable debt documents in the event an equity cure cannot be made). Additionally, such failure to make such investments may result in a lost opportunity for the Partnership to increase its participation in a successful portfolio company or the dilution of the Partnership's ownership in a portfolio company if a third party invests in such portfolio company.

*Non-U.S. Investments.* The Partnership may invest in portfolio companies that are organized or headquartered and/or have substantial sales or operations outside of the United States, its territories and possessions. Such investments may be subject to certain additional risk due to, among other things, potentially unsettled points of applicable governing law, the risks associated with fluctuating currency exchange rates, capital repatriation regulations (as such regulations may be given effect during the term of the Partnership), the application of complex U.S. and non-U.S. tax rules to cross-border investments, possible imposition of non-U.S. taxes on the Partnership and/or the limited partners with respect to the Partnership's income, and possible non-U.S. tax return filing requirements for the Partnership and/or the limited partners.

Additional risks of non-U.S. investments include: (a) economic dislocations in the host country; (b) less publicly available information; (c) less well-developed and/or more restrictive laws, regulations, regulatory institutions and judicial systems; (d) greater difficulty of enforcing legal rights in a non-U.S. jurisdiction; (e) civil disturbances; (f) government instability; and (g) nationalization and expropriation of private assets. Moreover, non-U.S. companies may not be subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those that apply to U.S. companies.

*Director Liability.* The Partnership will often seek to obtain the right to appoint one or more representatives to the board of directors (or similar governing body) of the companies in which it invests. Serving on the board of directors (or similar governing body) of a portfolio company exposes the Partnership's representatives, and ultimately the Partnership, to potential liability. Not all portfolio companies may obtain insurance with respect to such liability, and the insurance that portfolio companies do obtain may be insufficient to adequately protect officers and directors from such liability. In addition, involvement in litigation can be time consuming for such persons and can divert the attention of such persons from the Partnership's investment activities.

14

*Uncertain Economic, Social and Political Environment.*  Consumer, corporate and financial confidence may be adversely affected by current or future tensions around the world, fear of terrorist activity and/or military conflicts, localized or global financial crises or other sources of political, social or economic unrest.  Such erosion of confidence may lead to or extend a localized or global economic downturn.  A climate of uncertainty may reduce the availability of potential investment opportunities, and may increase the difficulty of modeling market conditions, potentially reducing the accuracy of financial projections.  In addition, limited availability of credit for consumers, homeowners and businesses, including credit used to acquire businesses, in an uncertain environment or economic downturn may have an adverse effect on the economy generally and on the ability of the Partnership and its portfolio companies to execute their respective strategies and to receive an attractive multiple of earnings on the disposition of businesses.  This may slow the rate of future investments by the Partnership and result in longer holding periods for investments.  Furthermore, such uncertainty or general economic downturn may have an adverse effect upon the Partnership's portfolio companies.

*Market Conditions.*  The capital markets have experienced great volatility and financial turmoil.  Moreover, governmental measures undertaken in response to such turmoil (whether regulatory or financial in nature) may have a negative effect on market conditions.  General fluctuations in the market prices of securities and economic conditions generally may reduce the availability of attractive investment opportunities for the Partnership and may affect the Partnership's ability to make investments.  Instability in the securities markets and economic conditions generally (including a slow-down in economic growth and/or changes in interest rates or foreign exchange rates) may also increase the risks inherent in the Partnership's investments and could have a negative impact on the performance and/or valuation of the portfolio companies.  The Partnership's performance can be affected by deterioration in the capital markets and by market events, such as the onset of the credit crisis in the summer of 2007 or the downgrading of the credit rating of the United States in 2011, which, among other things, can impact the public market comparable earnings multiples used to value privately held portfolio companies and investors' risk-free rate of return.  Movements in foreign exchange rates may adversely affect the value of investments in portfolio companies and the Partnership's performance.  Volatility and illiquidity in the financial sector may have an adverse effect on the ability of the Partnership to sell and/or partially dispose of its portfolio company investments.  Such adverse effects may include the requirement of the Partnership to pay break-up, termination or other fees and expenses in the event the Partnership is not able to close a transaction (whether due to the lenders' unwillingness to provide previously committed financing or otherwise) and/or the inability of the Partnership to dispose of investments at prices that the General Partner believes reflect the fair value of such investments.  The impact of market and other economic events may also affect the Partnership's ability to raise funding to support its investment objective.

*Deterioration of Credit Markets May Affect Ability to Finance and Consummate Investments.*  The recent deterioration of the global credit markets has made it more difficult for investment funds such as the Partnership to obtain favorable financing for investments.  A widening of credit spreads, coupled with the deterioration of the sub-prime and global debt markets and a rise in interest rates, has dramatically reduced investor demand for high yield debt and senior bank debt, which in turn has led some investment banks and other lenders to be unwilling to finance new private equity investments or to only offer committed financing for

15

these investments on unattractive terms. The Partnership's ability to generate attractive investment returns may be adversely affected to the extent the Partnership is unable to obtain favorable financing terms for its investments. Moreover, to the extent that such marketplace events are not temporary and continue, they may have an adverse impact on the availability of credit to businesses generally and could lead to an overall weakening of the U.S. and global economies. Such marketplace events also may restrict the ability of the Partnership to realize its investments at favorable times or for favorable prices.

*Healthcare Regulation, Reimbursement and Reform.* Various segments of the healthcare industry are (or may become) (i) highly regulated at both the state and federal levels in the United States and internationally, (ii) subject to frequent regulatory change and (iii) dependent upon various government or private insurance reimbursement programs. While the Partnership intends to make investments in companies that comply with relevant laws and regulations, certain aspects of their operations may not have been subject to judicial or regulatory interpretation. An adverse review or determination by any one of such authorities, or an adverse change in the regulatory requirements or reimbursement programs, could have a material adverse effect on the operations of the companies in which the Partnership invests. Recent legislative changes have had, and will likely continue to have, a significant impact on the healthcare industry. In addition, various legislative proposals related to the healthcare industry are introduced from time to time at the United States federal and state level, and any such proposals, if adopted, could have a significant impact on the healthcare industry. The U.S. healthcare industry continues to undergo significant changes designed to increase access to medical care, improve safety and contain costs. Generally, Medicare and Medicaid reimbursement levels have declined; the use of managed care has increased; distributors, manufacturers, healthcare providers and pharmacy chains have consolidated; and large purchasing groups are more prevalent.

In March 2010, the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (collectively the "**Affordable Care Act**") were enacted. Among other things, the Affordable Care Act seeks to expand health insurance coverage to approximately 32 million uninsured Americans. Many of the significant changes in the Affordable Care Act did not take effect until 2014, including a requirement that most Americans carry health insurance. While expansion of access to health insurance may increase the demand for various healthcare products and services, other provisions of the Affordable Care Act could affect the Partnership and its investments adversely. The Affordable Care Act contains many provisions designed to generate the revenues necessary to fund the coverage expansions and to reduce costs of Medicare and Medicaid. The Partnership's portfolio companies may be subject to certain taxes as a result of the Affordable Care Act. Additionally, the Affordable Care Act changed the federal upper payment limit for Medicaid reimbursement to no less than 175 percent of the average weighted manufacturer's price from 250 percent of the lowest average manufacturer's price for generic pharmaceuticals. The Partnership and its investments could be adversely affected by, among other things, changes in the delivery or pricing of or reimbursement for pharmaceuticals, medical devices or healthcare services.

Congress may withhold the funding necessary to implement provisions of the Affordable Care Act, or may attempt to replace the legislation with amended provisions or repeal it altogether. Due to its complexity, the impact of the Affordable Care Act remains difficult to

16

predict and is not yet fully known. The Affordable Care Act could negatively impact the Partnership and its portfolio companies or could alternatively create new or expand existing opportunities for investment.

*Healthcare Research and Innovation.* The healthcare industry spends heavily on research and development. Research findings (*e.g.*, regarding side effects or comparative benefits of one or more particular treatments, services or products) and technological innovation (together with patent expirations) may make any particular treatment, service or product less attractive if previously unknown or underappreciated risks are revealed, or if a more effective, less costly or less risky solution is or becomes available. Any such development could have a material adverse effect on the companies in which the Partnership invests.

*Hedging Arrangements; Related Regulations.* The General Partner may (but is not obligated to) endeavor to manage the Partnership's or any portfolio company's currency exposures, interest rate exposures or other exposures, using hedging techniques where available and appropriate. The Partnership may incur costs related to such hedging arrangements, which may be undertaken in exchange-traded or over-the-counter ("**OTC**") contexts, including futures, forwards, swaps, options and other instruments. There can be no assurance that adequate hedging arrangements will be available on an economically viable basis or that such hedging arrangements will achieve the desired effect, and in some cases hedging arrangements may result in losses greater than if hedging had not been used. In some cases, particularly in OTC contexts, hedging arrangements will subject the Partnership to the risk of a counterparty's inability or refusal to perform under a hedging contract, or the potential loss of assets held by a counterparty, custodian or intermediary in connection with such hedging. OTC contracts may expose the Partnership to additional liquidity risks if such contracts cannot be adequately settled. Certain hedging arrangements may create for the General Partner and/or one of its affiliates an obligation to register with the U.S. Commodity Futures Trading Commission (the "**CFTC**") or other regulator or comply with an applicable exemption. Losses may result to the extent that the CFTC or other regulator imposes position limits or other regulatory requirements on such hedging arrangements, including under circumstances where the ability of a Partnership or a portfolio company to hedge its exposures becomes limited by such requirements.

*Unfunded Pension Liabilities of Portfolio Companies.* Recent court decisions have found that, where an investment fund owns 80% or more (or under certain circumstances less than 80%) of a portfolio company, such fund (and any other 80%-owned portfolio companies of such fund) might be found liable for certain pension liabilities of such a portfolio company to the extent the portfolio company is unable to satisfy such liabilities. Although Water Street intends to manage each Partnership's investments to minimize any such exposure, a Partnership may, from time to time, invest in a portfolio company that has unfunded pension fund liabilities, including structuring the investment in a manner where such Partnership may own an 80% or greater interest in such a portfolio company. If such Partnership (or other 80%-owned portfolio companies of such Partnership) were deemed to be liable for such pension liabilities, this could have a material adverse effect on the operations of the Partnership and the companies in which such Partnership invests. This discussion is based on current court decisions, statute and regulations regarding control group liability under the Employee Retirement Income Security Act of 1974, as amended, as in effect as of the date of this Brochure, which may change in the future as the case law and guidance develops.

17

*Valuation of Investments.* Generally, the General Partner will determine the value of all of the Partnership's investments for which market quotations are available based on publicly available quotations. However, market quotations will not be available for virtually all of the Partnership's investments because, among other things, the securities of portfolio companies held by the Partnership generally will be illiquid and not quoted on any exchange. There can be no assurance that the valuation decision of the General Partner with respect to an investment will represent the value realized by the Partnership on the eventual disposition of such investment or that would, in fact, be realized upon an immediate disposition of such investment on the date of its valuation.

*Cybersecurity Risks.* Recent events have illustrated the ongoing cybersecurity risks to which operating companies are subject. To the extent that a portfolio company is subject to cyber-attack or other unauthorized access is gained to a portfolio company's systems, such portfolio company may be subject to substantial losses in the form of stolen, lost or corrupted (i) customer data or payment information; (ii) customer or portfolio company financial information; (iii) portfolio company software, contact lists or other databases; (iv) portfolio company proprietary information or trade secrets; or (v) other items. In certain events, a portfolio company's failure or deemed failure to address and mitigate cybersecurity risks may be the subject of civil litigation or regulatory or other action. Any of such circumstances could subject a portfolio company, or the Partnership, to substantial losses. In addition, in the event that such a cyber-attack or other unauthorized access is directed at Water Street or one of its service providers holding its financial or investor data, Water Street, its affiliates or the Partnerships may also be at risk of loss.

**Conflicts of Interest**

Water Street and its related entities engage in a broad range of advisory and non-advisory activities. Water Street will devote such time, personnel and internal resources as are necessary to conduct the business affairs of the Partnerships in an appropriate manner, as required by the relevant Partnership Agreement, although the Partnerships and their respective investments will place varying levels of demand on these over time. In the ordinary course of the Advisers conducting their activities, the interests of a Partnership may conflict with the interests of the Advisers, one or more other Partnerships or Private Investment Funds, portfolio companies or their respective affiliates. Certain of these conflicts of interest are discussed herein. As a general matter, the Advisers will determine all matters relating to structuring transactions and Partnership operations using their best judgment considering all factors they deem relevant, but in their sole discretion, subject in certain cases to the required approvals by the advisory committees of the participating Partnerships.

During the investment period of a given Partnership, all appropriate investment opportunities that meet the investment criteria of the Partnership will be pursued by the Advisers through such Partnership, subject to certain limited exceptions set forth in the applicable Partnership Agreement. Without limitation, the Advisers' principals currently, and may in the future, manage several investment vehicles and other investments similar to a given Partnership and those investments in which such Partnership invests. The Advisers' principals and the Advisers' investment staff will continue to manage and monitor such investment vehicles and such investments until their expiration or realization, as applicable. Such other investments that

18

the Advisers' principals may control or manage may potentially compete with companies acquired by a given Partnership. Following the investment period of a Partnership, the Advisers' principals may and likely will focus their investment activities on other opportunities and areas unrelated to such Partnership's investments, possibly including successor funds. In addition, the Advisers' principals may spend a portion of their business time and attention pursuing investment opportunities that do not fall within the investment objectives of a Partnership for other investment vehicles and other than on behalf of such Partnership. The Advisers believe that the significant investment of the Advisers' principals in a given Partnership, as well as the Advisers' principals' interest in the carried interest, operate to align, to some extent, the interest of the Advisers' principals with the interest of the limited partners of such Partnership, although the Advisers' principals have economic interests in such other investment vehicles and investments, as well, and may receive management fees and carried interest relating to such other investment vehicles and investments.

From time to time, the Advisers will be presented with investment opportunities that would be suitable not only for a given Partnership, but also for other Private Investment Funds and other investment vehicles operated by advisory affiliates of the Management Company. In determining which investment vehicles should participate in such investment opportunities and the amount of such participation, the Advisers and their affiliates are subject to conflicts of interest among the investors in such investment vehicles. The Advisers attempt to resolve such conflicts of interest in light of their obligations to investors in the applicable Partnership, Private Investment Funds and other investment vehicles managed by the Advisers, and attempt to allocate investment opportunities among a Partnership, other Private Investment Funds and such investment vehicles in a fair and equitable manner. Where necessary, the Advisers consult and receive consent to conflicts from an advisory committee consisting of limited partners of the applicable Partnership and such other investment vehicles.

The Advisers must first determine which Partnership(s) will, or are required to, participate in the relevant investment opportunity. The Advisers generally assess whether an investment opportunity is appropriate for a particular Partnership based on the applicable Partnership Agreement, investment objectives, strategies, life-cycle and structure. For example, a newly organized Partnership generally will seek to purchase a disproportionate amount of investments until it is substantially invested.

Following such determination of allocation among Partnerships, the Advisers will determine if the amount of an investment opportunity in which a Partnership will invest exceeds the amount that would be appropriate for such Partnership and any such excess may be offered to one or more potential co-investors, as determined by the Partnership Agreements, side letter arrangements and the Advisers' policies and procedures regarding investment allocations and co-investments. The Advisers' procedures permit them to take into consideration a variety of factors in making such determinations, including but not limited to: expertise of the prospective co-investor in the industry to which the investment opportunity relates; perceived ability to quickly execute on transactions; tax, regulatory and/or securities law considerations (*e.g.*, qualified purchaser or qualified institutional buyer status); and other appropriate factors..

Co-investment opportunities may, and typically will, be offered to some and not to other Partnership investors. When and to the extent that employees and related persons of Water

19