Street and its affiliates make capital investments in or alongside certain Partnerships, the Advisers and their affiliates are subject to conflicting interests in connection with such investments. There can be no assurance that any Partnership's return from a transaction would be equal to and not less than another Partnership or Private Investment Fund participating in the same transaction or that it would have been as favorable as it would have been had such conflict not existed.

The Advisers' allocation of investment opportunities among the persons and in the manner discussed herein may not, and often will not, result in proportional allocations among such persons, and such allocations may be more or less advantageous to some such persons relative to others. While the Advisers will allocate investment opportunities in a manner that they believe in good faith to be fair and equitable to their clients under the circumstances over time and considering relevant factors, there can be no assurance that a Private Investment Fund's actual allocation of an investment opportunity, if any, or the terms on which that allocation is made, will be as favorable as they would be if the conflicts of interest to which the Advisers may be subject, discussed herein, did not exist.

Conflicts may arise when a Partnership makes investments in conjunction with an investment being made by another Partnership or other Private Investment Fund, or if it were to invest in the securities of a company in which another Private Investment Fund has already made an investment.  A Partnership may not, for example, invest through the same investment vehicles, have the same access to credit or employ the same hedging or investment strategies as other Private Investment Funds.  This may result in differences in price, terms, leverage and associated costs. Further, there can be no assurance that the relevant Partnership and the other Private Investment Fund(s) or vehicle(s) with which it co-invests will exit such investment at the same time or on the same terms. There can be no assurance that the return on one Private Investment Fund's investments will be the same as the returns obtained by other Private Investment Funds participating in a given transaction. Given the nature of the relevant conflicts there can be no assurance that any such conflict can be resolved in a manner that is beneficial to both Private Investment Funds. In that regard, actions may be taken for one or more Private Investment Funds that adversely affect other Private Investment Funds.

Subject to any relevant restrictions or other limitations contained in the Partnership Agreements, the Advisers will allocate fees and expenses in a manner that they believe in good faith to be fair and equitable to their clients under the circumstances and considering such factors as they deem relevant, but in their sole discretion. In exercising such discretion, the Advisers may be faced with a variety of potential conflicts of interest.

As a general matter, except with respect to the Co-Invest Fund as described in "Fees and Compensation," Partnership expenses typically will be allocated among all relevant Partnerships or co-invest vehicles eligible to reimburse expenses of that kind. In all such cases, subject to applicable legal, contractual or similar restrictions, expense allocation decisions will generally be made by the Advisers or their affiliates using their best judgment, considering such factors as they deem relevant, but in their sole discretion. The allocations of such expenses may not be proportional, and any such determinations involve inherent matters of discretion, *e.g.*, in determining whether to allocate *pro rata* based on number of Partnerships or co-invest vehicles receiving related benefits or proportionally in accordance with asset size. The Partnerships have

different expense reimbursement terms, including with respect to Management Fee offsets, which may result in the Partnerships bearing different levels of expenses with respect to the same investment.

Because the General Partners' carried interest is based on a percentage of certain net profits, it may create an incentive for the Advisers to cause the Partnerships to make riskier or more speculative investments than would otherwise be the case. Also, because there is a fixed investment period after which capital from investors in a Partnership may only be drawn down in limited circumstances and because the Management Fee is, at certain times during the life of a Partnership, based upon capital invested by such Partnership, this fee structure may create an incentive to deploy capital when the the General Partner of such Partnership may not otherwise have done so. Since the General Partners are permitted to retain certain Supplemental Fees (as described under "Fees and Compensation") in connection with Partnership investments, the Advisers could have a conflict of interest in connection with approving transactions and setting such compensation. The Advisers also could have a conflict of interest in allocating investment opportunities and related fees and expenses to the Partnerships and co-investors.

The Management Company may cause its affiliates, including a Partnership, to purchase different classes of debt and/or equity of the same borrower or issuer. These and other investments may be deemed to create conflicts of interest, particularly because the Advisers' principals and/or other employees of the Management Company may take certain actions for affiliates with respect to one class of debt or equity that may be adverse to other affiliates who hold other classes of debt or equity of the same borrower or issuer. In such cases, the Advisers' principals will seek to act in a manner they believe in good faith to be fair to clients under the circumstances.

As a result of the Private Investment Funds' controlling interests in portfolio companies, Water Street and/or its affiliates typically have the right to appoint board members to such portfolio companies, or to influence their appointment, and to determine or influence a determination of their compensation. From time to time, portfolio company board members (including current or former Water Street personnel or persons serving at their request) approve compensation and/or other amounts payable to Water Street and/or its affiliates. Unless such amounts are subject to the Partnership Agreements' offset provisions, they will be in addition to any Management Fee or carried interest paid by a Partnership to its respective General Partner.

Additionally, a portfolio company typically will reimburse the Advisers or service providers retained at the Advisers' discretion for expenses (including without limitation travel expenses) incurred by the Advisers or such service providers in connection with the performance of services for such portfolio company. This subjects the Advisers and their affiliates to conflicts of interest because the Partnerships generally do not have an interest or share in these reimbursements, and the amount of such reimbursements over time is expected to be substantial. The Advisers determine the amount of these reimbursements for such services in their own discretion, subject to Water Street's internal reimbursement policies and practices.

The Advisers generally exercise discretion to recommend to a Partnership or to a portfolio company thereof that it contract for services with (i) the Advisers or a related person of the Advisers (which may include a portfolio company of such Partnership), (ii) an entity with

21

which Water Street or its affiliates or current or former members of their personnel has a relationship or from which Water Street or its affiliates or their personnel otherwise derive financial or other benefit or (iii) certain limited partners or their affiliates. For example, the Advisers may be presented with opportunities to receive financing and/or other services in connection with a Fund's investments from certain limited partners or their affiliates that are engaged in lending or related business. This subjects the Advisers to conflicts of interest, because although the Advisers select service providers that they believes are aligned with their operational strategies and will enhance portfolio company performance and, relatedly, returns of the relevant Partnership, the Advisers may have an incentive to recommend the related or other person (including a limited partner) because of their financial or other business interest. There is a possibility that the Advisers, because of such belief or for other reasons (including whether the use of such persons could establish, recognize, strengthen and/or cultivate relationships that have the potential to provide longer-term benefits to the relevant Partnerships or Water Street), may favor such retention or continuation even if a better price and/or quality of service could be obtained from another person. Whether or not the Advisers have a relationship or receive financial or other benefit from recommending a particular service provider, there can be no assurance that no other service provider is more qualified to provide the applicable services or could provide such services at lesser cost.

Water Street and/or its affiliates may also, from time to time, employ personnel with pre-existing ownership interests in portfolio companies owned by the Private Investment Funds or other investment vehicles advised by Water Street and/or its affiliates; conversely, former personnel or executives of Water Street and/or its affiliates may serve in significant management roles at portfolio companies or service providers recommended by Water Street and/or its affiliates. Similarly, Water Street, its affiliates and/or personnel maintain relationships with (or may invest in) financial institutions, service providers and other market participants, including managers of private funds, banks and brokers. Certain of these persons or entities will invest (or will be affiliated with an investor) in, engage in transactions with and/or provide services (including services at reduced rates) to, Water Street and/or its affiliates, and/or the Partnerships or other investment vehicles they advise. Water Street and/or its affiliates may have a conflict of interest with a Partnership in recommending the retention or continuation of a third-party service provider to such Partnership or a portfolio company if such recommendation, for example, is motivated by a belief that the service provider or its affiliate(s) will continue to invest in one or more Partnerships, will provide Water Street and/or its affiliates with information about markets and industries in which Water Street and/or its affiliates operates (or are contemplating operations) or will provide other services that are beneficial to Water Street and/or its affiliates. Water Street and/or its affiliates may have a conflict of interest in making such recommendations, in that Water Street and/or its affiliates has an incentive to maintain goodwill between it and the existing and prospective portfolio companies for a Partnership, while the products or services recommended may not necessarily be the best available to the portfolio companies held by a Partnership.

Water Street, its affiliates, and equityholders, officers, principals and employees of Water Street and its affiliates may buy or sell securities or other instruments that the Advisers have recommended to a Partnership. The investment policies, fee arrangements and other circumstances of these investments generally vary from those of any Partnership. Employees and related persons of Water Street have, and are expected to continute to have, capital investments

22

in or alongside certain Partnerships, or in prospective portfolio companies directly or indirectly, and therefore may have additional conflicting interests in connection with those investments.

Because certain expenses are paid for by a Partnership and/or its portfolio companies or, if incurred by the Advisers, are reimbursed by a Partnership and/or its portfolio companies, the Advisers will not necessarily seek out the lowest cost options when incurring (or causing a Partnership or its portfolio companies to incur) such expenses.

In addition, as described above, portfolio companies (and, to a lesser extent, the Private Investment Funds) may from time to time pay certain fees to certain consultants (including consultants introduced or arranged by Water Street and/or its affiliates that may regularly provide services to one or more portfolio companies, such as Operating Partners and Executive Advisors, senior advisers and members of the Corporate Resources Group), and such fees will not offset the Management Fee as described herein. Such consultants may make use of Water Street's resources or otherwise be associated with (and in the case of members of the Coporate Resources Group be employed by) Water Street and/or its affiliates. Such compensation is expected to include cash fees and equity-based compensation. Although the use of such consultants and the allocation of compensation paid to them by Water Street, its affiliates and/or the portfolio companies subjects Water Street to potential conflicts of interest, Water Street believes that such potential conflicts may be reduced by the anticipated cost savings to portfolio companies (which is expected to be to the benefit of the applicable Private Investment Fund(s)) that will result if the cost of such consultant(s) is lower than market rates for the services provided and/or if the services of such consultant(s) align with Water Street's model for the applicable portfolio company and improve such portfolio company's performance. Although Water Street seeks to retain such consultants with a view to reducing costs to portfolio companies (and, ultimately, the Private Investment Funds) and/or improving portfolio company performance, a number of factors may result in limited or no cost savings from such retention. Water Street also seeks to reduce potential conflicts of interest resulting from such arrangements by structuring compensation packages for such persons in a manner that Water Street believes will align such persons' interests with those of the Private Investment Funds' limited partners, and seeks to retain consultants which it believes provide a level of service at a value generally consistent with other relevant market alternatives. However, there can be no assurance that no other consultant is more qualified to provide the applicable services or could provide such services at a lesser cost.

An Adviser may enter into side letter arrangements with certain investors in a given Partnership providing such investors with different or preferential rights or terms, including but not limited to different fee structures, information rights, co-investment rights, and liquidity or transfer rights.

Water Street has instituted a program under which portfolio companies owned by the Partnerships are given the option to participate in purchasing, vendor or similar arrangements with Water Street, its affiliates and other portfolio companies. Program participants expect to receive discounts negotiated with various vendors and service providers on a groupwide basis. Water Street and its affiliates also participate in the program in exchange for an allocable portion of such costs, and receive similar benefits and discounts as the portfolio companies participating therein. No such amounts will result in additional offsets to the Management Fee. Water Street

23

believes the potential for conflicts relating to such arrangements is mitigated by the anticipated cost savings to portfolio companies (which is expected to be to the benefit of the applicable Partnership(s)) that will result if the negotiated discounts rates for goods and services are discounted relative to those widely available in the market.

Any of these situations subjects Water Street and/or its affiliates to potential conflicts of interest. Water Street and its affiliates attempt to resolve such conflicts of interest in light of their obligations to investors in the Partnerships and the obligations owed by Water Street's advisory affiliates to investors in investment vehicles managed by them, and attempt to allocate investment opportunities among a Partnership, other Private Investment Funds and such investment vehicles in a fair and equitable manner. To the extent that an investment or relationship raises particular conflicts of interest, Water Street and/or its affiliates will review the circumstances of such investment or relationship with a view to addressing and reducing the potential for conflict. Where necessary, Water Street and/or its affiliates consult and receive consent to conflicts from an advisory committee consisting of limited partners of the relevant Partnership and such other investment vehicles.

### DISCIPLINARY INFORMATION

The Management Company and its management persons have not been subject to any material legal or disciplinary events required to be discussed in this Brochure.

### OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

The Management Company serves as the general partner of each of the General Partners, each of which is registered with the SEC under the Advisers Act pursuant to the Management Company's registration in accordance with SEC guidance. The Management Company and the General Partners operate as a single investment advisory business and the General Partners serve as general partners of private investment funds and other pooled vehicles or of other affiliated investment advisers and generally share common owners, officers, partners, employees, consultants or persons occupying similar positions.

### CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

The Advisers have adopted the Water Street Code of Ethics and Securities Trading Policy and Procedures (the "**Code**"), which sets forth standards of conduct that are expected of the Advisers' principals and employees and addresses conflicts that arise from personal trading. The Code requires certain of the Advisers' personnel to:

- report their personal securities transactions;

- pre-clear any proposed purchase of an initial public offering or a limited offering; and

- comply with policies and procedures reasonably designed to prevent the misuse of, or trading upon, material non-public information.

24

A copy of the Code will be provided to any investor or prospective investor upon request to Jeff Holway, the Water Street Chief Compliance Officer, at (312) 506-2900. Personal securities transactions by employees who manage client accounts are required to be conducted in a manner that prioritizes the client's interests in client-eligible investments.

The Advisers and their affiliated persons may come into possession, from time to time, of material nonpublic or other confidential information about companies which, if disclosed, might affect an investor's decision to buy, sell or hold a security. Under applicable law, the Advisers and their affiliated persons would be prohibited from improperly disclosing or using such information for their personal benefit or for the benefit of any person, regardless of whether such person is a client of the Advisers. Accordingly, should the Advisers or any of their affiliated persons come into possession of material nonpublic or other confidential information with respect to any company, the Advisers generally would be prohibited from communicating such information to clients, and the Advisers will have no responsibility or liability for failing to disclose such information to clients as a result of following their policies and procedures designed to comply with applicable law. Similar restrictions may be applicable as a result of Water Street personnel serving as directors of public companies and may restrict trading on behalf of clients, including the Partnerships.

Principals, Operating Partners, Executive Advisors and employees of the Advisers and their affiliates may directly or indirectly own an interest in Private Investment Funds or certain co-investment vehicles. To the extent that co-investment vehicles exist, such vehicles may invest in one or more of the same portfolio companies as a Partnership. Operating Partners, Executive Advisors and Employee Operating Partners could also own direct interests in portfolio companies.

Co-investment opportunities may also be presented to certain affiliates of Water Street, as well as third-party investors and other persons, and such co-investments may be effected through co-investment vehicles or directly in a particular portfolio company. The Partnerships and other Private Investment Funds may invest together with other investment vehicles advised by an affiliated adviser of Water Street in the manner set forth in the applicable Partnership Agreement. In addition, certain Operating Partners, Executive Advisors, other consultants, employees of Water Street that are not partners of the General Partners and members of the Corporate Resources Group may be offered the opportunity to co-invest in each portfolio company investment of the Partnerships. The Advisers will determine allocation of investment opportunities in a manner that they believe is fair and equitable to their clients consistent with the Advisers' fiduciary obligations and Water Street's Investment Allocations/Co-Investment Policy. In the case of co-investments, the Advisers may grant certain third-party investors the opportunity to evaluate specified amounts of prospective co-investments in a Private Investment Fund's portfolio companies or otherwise to have priority in co-investment opportunities. Co-investors described above may, but, typically do not pay management fees or carried interest.

The Advisers and their affiliates, principals and employees may carry on investment activities for their own accounts and for family members, friends or others who do not invest in the Partnerships, and may give advice and recommend securities to other accounts or certain vehicles which may differ from advice given to, or securities recommended or bought for, any Partnership, even though their investment objectives may be the same or similar. The operative

25

documents and investment programs of certain Private Investment Funds may restrict, limit or prohibit, in whole or subject to certain procedural requirements, investments of certain other vehicles in issuers held by such Private Investment Funds or may give priority with respect to investments to such Private Investment Funds. Some of these restrictions could be waived by investors (or their representatives) in such Private Investment Funds.

From time to time, the General Partners may borrow funds on behalf of the Partnerships or Private Investment Funds and contribute such borrowed amounts to the Partnerships (or relevant Private Investment Fund, as applicable) as a special capital contribution for investment, to be returned to the General Partner at a later date. Interest in connection with such borrowing is borne by the Partnerships (or the relevant Private Investment Fund, as applicable) as a Partnership expense, consistent with the applicable Partnership Agreement (or other governing document) and the expense policy described under "Fees and Compensation." In borrowing on behalf of the Partnerships or any Private Investment Fund, the General Partners are subject to conflicts of interest between repaying their obligations and retaining such borrowed amounts for the benefit of the Partnerships or such Private Investment Fund(s), as applicable. The General Partners will effect such borrowings in a manner that they believe to be fair and equitable to the Partnerships or Private Investment Fund(s), as applicable, and consistent with the General Partners' obligations to the Partnerships and the applicable Partnership Agreement (or other governing document).

## BROKERAGE PRACTICES

The Advisers focus on securities transactions of private companies and generally purchase and sell such companies through privately-negotiated transactions in which the services of a broker-dealer may be retained. However, the Advisers may also distribute securities to investors in a Private Investment Fund or sell such securities, including through using a broker-dealer, if a public trading market exists. Although the Advisers do not intend to regularly engage in public securities transactions, to the extent they do so, they follow the brokerage practices described below.

If the Advisers sell publicly traded securities for a Private Investment Fund, they are responsible for directing orders to broker-dealers to effect securities transactions for accounts managed by the Advisers. In such event, the Advisers will seek to select brokers on the basis of best price and execution capability. In selecting a broker to execute client transactions, the Advisers may consider a variety of factors, including: (i) execution capabilities with respect to the relevant type of order; (ii) commissions charged; (iii) the reputation of the firm being considered; and (iv) responsiveness to requests for trade data and other financial information.

The Advisers have no duty or obligation to seek in advance competitive bidding for the most favorable commission rate applicable to any particular client transaction or to select any broker on the basis of its purported or "posted" commission rate, but will endeavor to be aware of the current level of the charges of eligible brokers and to reduce the expenses incurred for effecting client transactions to the extent consistent with the interests of such clients. Although the Advisers generally seek competitive commission rates, they may not necessarily pay the lowest commission or commission equivalent. Transactions may involve specialized services on

26

the part of the broker involved and thereby entail higher commissions or their equivalents than would be the case with other transactions requiring more routine services.

Consistent with the Advisers seeking to obtain best execution, brokerage commissions on client transactions may be directed to brokers in recognition of research furnished by them, although the Advisers generally do not make use of such services at the current time and have not made use of such services since their inception.

The Advisers do not anticipate engaging in significant public securities transactions; however, to the extent that the Advisers engage in any such transactions, orders for purchase or sale of securities placed first will be executed first, and within a reasonable amount of time of order receipt.    To the extent that orders for Private Investment Funds are completed independently, the Advisers may also purchase or sell the same securities or instruments for several Private Investment Funds simultaneously.  From time to time, the Advisers may, but are not obligated to, purchase or sell securities for several client accounts at approximately the same time.  Such orders may be combined or "batched" to facilitate obtaining best execution and/or to reduce brokerage commissions or other costs.  Batched transactions are executed in a manner intended to ensure that no participating Private Investment Fund of the Advisers is favored over any other Private Investment Fund.  When an aggregated order is filled in its entirety, each participating Private Investment Fund generally will receive the average price obtained on all such purchases or sales made during such trading day.  To the extent such orders are not batched, they may have the effect of increasing brokerage commissions or other costs.

When an aggregate order is partially filled, the securities purchased or sold will normally be allocated on a *pro rata* basis to each Private Investment Fund participating in such buy or sell order in accordance with the amount of securities originally requested for such Private Investment Funds.

Each Private Investment Fund generally will receive the average price obtained on all such purchases or sales made during such trading day.  Exceptions to *pro rata* allocations are permissible provided they are fair and equitable to Private Investment Funds over time.

REVIEW OF ACCOUNTS

The investments made by the Private Investment Funds are generally private, illiquid and long-term in nature.  Accordingly, the review process is not directed toward a short-term decision to dispose of securities.  However, the Advisers closely monitor companies in which the Private Investment Funds invest, and the Water Street Chief Compliance Officer periodically checks to confirm that each Private Investment Fund is maintained in accordance with its stated objectives.

The Partnerships will provide to their limited partners (i) GAAP audited financial statements annually, (ii) unaudited financial statements for the first three quarters of each fiscal year, (iii) annual tax information necessary for each limited partner's tax returns, and (iv) descriptive investment information for each portfolio company periodically.

### CLIENT REFERRALS AND OTHER COMPENSATION

The Advisers and/or their affiliates may provide certain business or consulting services to companies in the Partnerships' respective portfolios and may receive compensation from these companies in connection with such services. As described in the applicable Partnership Agreement, this compensation may, in many cases, offset a portion of the Management Fee paid by such Partnership. However, in other cases (*e.g.*, reimbursements for out of pocket expenses directly related to a portfolio company or with the Partnership's advisory board consent), these fees may be in addition to the Management Fee. See "Fees and Compensation."

From time to time, the Advisers may enter into solicitation arrangements pursuant to which they compensate third parties for referrals that result in a potential investor becoming a limited partner in an applicable Partnership or other Private Investment Fund. Any fees payable to any such placement agents are borne by the Advisers indirectly through an offset against the Management Fee, although related expenses incurred pursuant to the relevant placement agent or similar agreement, including but not limited to placement agent travel, meal and entertainment expenses, typically are borne by the relevant Partnership(s).

### CUSTODY

The Advisers maintain custody of the Partnerships' assets held in the Partnerships' names with the following qualified custodians: Merrill Lynch, Pierce, Fenner & Smith Inc., located at 101 California Street, Suite 1300, San Francisco, CA 94111 and BMO Harris Bank, located at 111 West Monroe St., 9th Floor East, Chicago, IL 60603.

### INVESTMENT DISCRETION

The Advisers have discretionary authority to manage investments on behalf of each Partnership. As a general policy, the Advisers do not allow limited partners to place limitations on this authority. Pursuant to the terms of the Partnership Agreement, however, an Adviser may enter into "side letter" arrangements with certain limited partners whereby the terms applicable to such limited partner's investment in a Partnership may be altered or varied, including, in some cases, the right to opt-out of certain investments for legal, tax, regulatory or other similar reasons. The Advisers assume this discretionary authority pursuant to the terms of the Partnership Agreement and powers of attorney executed by the limited partners of each Partnership.

### VOTING CLIENT SECURITIES

The Advisers have adopted the Water Street Proxy Voting Policies and Procedures (the "**Proxy Policy**") to address how they will vote proxies, as applicable, for the Partnerships' portfolio investments. The Proxy Policy seeks to ensure that the Advisers vote proxies (or similar instruments) in the best interest of the Partnerships, including where there may be material conflicts of interest in voting proxies. The Advisers generally believe their interests are aligned with those of the Partnerships' investors, for example, through the principals' beneficial ownership interests in the Partnerships and therefore will not seek investor approval or direction when voting proxies. In the event that there is or may be a conflict of interest in voting proxies,

the Proxy Policy provides that the Advisers may address the conflict using several alternatives, including by seeking the approval or concurrence of a Partnership's advisory board on the proposed proxy vote or through other alternatives set forth in the Proxy Policy. The Advisers do not consider service on portfolio company boards by Water Street personnel or the Advisers' receipt of management or other fees from portfolio companies to create a material conflict of interest in voting proxies with respect to such companies. In addition, the Proxy Policy sets forth certain specific proxy voting guidelines followed by the Advisers when voting proxies on behalf of the Partnerships. Investors or prospective investors should contact Jeff Holway, the Water Street Chief Compliance Officer, at (312) 506-2900, if they would like a copy of the Advisers' complete Proxy Policy or information regarding how the Advisers voted proxies for particular portfolio companies. Such information will be provided to such persons at no charge.

## FINANCIAL INFORMATION

The Management Company does not require prepayment of management fees more than six months in advance or have any other events requiring disclosure under this item of the Brochure.

# EXHIBIT 8



Welcome, Michael | My Alerts | | Sign Up For Emails | | Log out |

Help / Contact Us: 1-888-667-3325 / customerservice@thedeal.com

| Search articles with key words or company names |

HOME | SEARCH | INTELLIGENCE | ACTIVISM | M&A | OUT OF COURT | BANKRUPTCY | PRIVATE EQUITY | MIDDLE MARKET | SECTORS | EVENTS

## Middle Market

Share   Reprint   Save to My Articles

## Wipro makes big bet with acquisition of HealthPlan Services

By Sarah Pringle Updated 04:15 PM, Feb-11-2016 ET



Hoping to reignite its top line growth, India's **Wipro Ltd.** (WIT) has made a big bet on the U.S. healthcare insurance market by making its second-largest acquisition ever.

The Bangalore, India-based information technology company announced Thursday, Feb. 11 that is has reached a $460 million all-cash deal for **HealthPlan Services**, which is being sold by Chicago private equity firm **Water Street Healthcare Partners**.

The transaction is expected to close in the next 60 to 90 days.

Founded in 1970, HealthPlan Services provides business processing services to the insurance and managed care industries. The Tampa, Fla.-based company offers exchange connectivity, administration, distribution and technology services to insurers in the individual, group and ancillary markets. The company connects its payer clients to more than 40 public exchanges and more than 150 private exchanges in the U.S.

With three offices in **Florida** and two in Ohio, HealthPlan Services employs more than 2,000.

HealthPlan Services generated $223 million in revenue during 2015, implying Wipro paid about 2.1 times HealthPlan Services' revenue.

The company's top line was an improvement over 2014's $188 million and 2013's $113 million.

Wipro expects the acquisition will be dilutive to its fiscal year 2017 Ebit margins by 50 basis points to 80 basis points,

Wipro makes big bet with acquisition of HealthPlan Services - Deal Pipeline                    Page 2 of 2

but the company anticipates cost synergies in the future as a result of cross-selling activity and expanded market share.

While HealthPlan Services may serve as "a potential trigger for improving the company's lackluster top-line growth rates," according to Sterne Agee CRT's Moshe Katri, the analyst also acknowledged in a Thursday research note that Wipro historically has overpaid when it makes acquisitions, pointing to the disconnect between the hefty valuations it has paid compared to the targets' historical/projected growth expectation.

Katri described the company's previous M&A efforts as "'promising' acquisitions commanding very high price tags and lacking on executing effective integration plans."

The analyst also described Thursday's transaction as a replica of Cognizant Technology Solution Corp.'s $2.7 billion purchase of TriZetto Corp. from Apax Partners in September 2014.

For Wipro, HealthPlan Services represents its largest acquisition since shelling out $600 million for Leonia, N.J., data center provider Infocrossing Inc. in August 2007.

But the company has since remained acquisitive, most recently announcing a pair of transactions in December.

Wipro said on Dec. 22 that it would pay $130 million for Viteos Group, a Somerset, N.J.-based provider of business process services to global investment banks. A few weeks earlier, on Dec. 2, it revealed a $77.87 million deal for cellent AG, the IT consulting and software services business of Stuttgart, Germany-based Landesbank Baden Wuerttemberg.

For Water Street, the sale comes more than seven years after buying a majority stake in HealthPlan Holdings Inc. from Sun Capital Partners Inc. Terms of the October 2008 transaction weren't disclosed, but the healthcare-focused financial sponsor said at the time that it had committed $75 million in equity financing to expand its capabilities.

HealthPlan Services is one of two operating divisions that make up Water Street's HealthPlan Holdings. The other division, Zenith American Solutions, will continue to operate under Water Street's ownership. Zenith was formed in 2011 via the merger of Zenith Administrators and American Benefit Plan Administrators, and today serves as the nation's largest Taft-Hartley third-party administrator.

Water Street spokeswoman Kelly Zillow declined to provide the firm's return on its HealthPlan Services' investment, but noted that HealthPlan Services received significant inbound interest from multiple organizations.

She explained that Water Street was able to grow the company because of the Patient Protection and Affordable Care Act.

Shares of Wipro, listed on the New York Stock Exchange, slid 2 2% Thursday to finish at $10.99, assigning the company a market capitalization of about $27 billion.

UBS AG provided financial advice to Water Street and HealthPlan Services, while Kirkland & Ellis LLP served as counsel.

Share    Reprint    Save to My Articles

Privacy    |    Terms and Conditions    |    My Account    |    Contact Us

@Copyright 2016, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

# EXHIBIT 9

| | |
|---|---|
| **From:** | Reinthaler, Richard W. <RReinthaler@winston.com> |
| **Sent:** | Friday, June 16, 2017 2:02 PM |
| **To:** | Brian Timmons |
| **Cc:** | Woolner, Rolf S.; Dylan Proctor |
| **Subject:** | RE: Zenith |

Brian:

Responding to your email of Tuesday, once again, respectfully, I think you have your facts wrong. Our understanding is that Water Street is evaluating whether to proceed with a sale of Zenith American Solutions this year and matters remain at a very early stage: no decision has yet been made, the process is just getting under way, and no sale transaction is imminent. As we advised you in November 2015, we do not believe the Trust has any right or legal basis pre-judgment on which to interfere with any sale process or distribution of sale proceeds in the event of a sale of a portfolio company having nothing to do with the subject matter of the litigation. Our views on that subject have not changed.

Happy to talk if you'd like.

Regards,

Dick


**Richard Reinthaler**
Winston & Strawn LLP
D: +1 (212) 294-4631
M: +1 (914) 217-8689
winston.com

WINSTON
&STRAWN
LLP

**From:** Brian Timmons [mailto:briantimmons@quinnemanuel.com]
**Sent:** Tuesday, June 13, 2017 1:56 PM
**To:** Reinthaler, Richard W. <RReinthaler@winston.com>
**Cc:** Woolner, Rolf S. <RWoolner@winston.com>; Dylan Proctor <dylanproctor@quinnemanuel.com>
**Subject:** Zenith

Dick,

It has come to our attention that Water Street is currently marketing for sale Zenith American Solutions, Inc., one of the last remaining assets in its investment fund portfolio, and that Water Street intends to distribute any proceeds from this sale to its LP's soon after the sale occurs.

Based upon the information available to us, we believe that these actions will impair Water Street's ability to satisfy a potential judgment in this case, resulting in irreparable harm to the Trust.

1

Because the Trust has an equitable interest in requiring Water Street to preserve its assets, the Trust may have no choice but to file a motion for a preliminary injunction seeking to freeze the proceeds of any sale, pending the resolution of the Trust's claims against Water Street.

If our information is incorrect or you believe a motion for preliminary injunction would otherwise be unnecessary, we invite you to explain why and to provide us with any evidence supporting your contentions.  Given the urgency, I would appreciate it if you can get back to us by Friday, June 16 with your response.

Best regards,

BRIAN TIMMONS | PARTNER
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3221
Main Phone: (213) 443-3000
Main Fax:  (213) 443-3100
E-mail:  briantimmons@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.