## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*, | ) | Case No. 13-12965(KG) |
| | ) | |
| Debtors. | ) | |
| PAH LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 15-51238(KG) |
| | ) | |
| WATER STREET HEALTHCARE | ) | |
| PARTNERS, L.P., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **Re: D.I. 557 & 562** |

## OPINION

## INTRODUCTION

The Court is addressing cross-motions for partial summary judgment filed by the plaintiff, PAH Litigation Trust (the "Litigation Trust"), and the defendants in the adversary proceeding, Water Street Healthcare Partners, L.P. and related entities ("Water Street") and Wind Point Partners IV, L.P. and related entities ("Wind Point") (collectively, the "Defendants"). The Litigation Trust and Defendants filed the cross-motions because while the Litigation Trust and Defendants were in mediation, the mediator recognized that the parties' contrary and disparate positions on the potential damages stymied their

settlement discussions.  The parties asked the Court for a fast decision on the cross-motions so their settlement discussions might continue.  The Court agreed.[1]

The issue presented is a complex one and not of the nature that would normally be quickly decided, but the Court will honor its promise to the parties.  The issue is this: assuming (but not deciding) that the Court finds for the Litigation Trust on liability, what are the potential damages?  The Litigation Trust says that it is entitled to receive the full measure of its damages under its claim for actual fraudulent transfer, or $248.6 million, and at least $228.7 million under its claim for constructive fraudulent transfer.  Defendants argue that the Litigation Trust cannot recover what they view as a windfall, a recovery in excess of unpaid claims which was received from the later sale of the reorganized Debtors.  With liability assumed, what makes the decision difficult is weighing what may be a windfall and the absence of mitigation, against Defendants possibly walking away with hundreds of millions of dollars obtained by actual or constructive fraudulent transfers.  The Court will address the difficult issues in a somewhat abbreviated fashion with the time constraints imposed.

---

[1] The Court initially promised the decision on the cross-motions by October 20, 2017 (after hearing oral argument on September 27, 2017).  However, in another case the Court had to address a motion for summary judgment before trial was to be held on October 16-20, 2017.  These obligations made a decision by October 20, 2017, a near impossibility.

# FACTS[2]

A.    Pre-Bankruptcy

In 2007, Water Street and Wind Point acquired Physiotherapy Holdings, Inc. and affiliates ("Physiotherapy" or "Debtors"), one of the largest providers of outpatient physical therapy services in the United States. Declaration of J. Cory Falgowski, Esq., dated August 18, 2017 ("Falgowski Declaration") ¶ 7. D.I. 560.  On or about February 22, 2012, Court Square Capital Partners II, L.P. ("Court Square"), Physiotherapy Merger Sub and Defendants entered into an agreement and merger plan (the "Merger Agreement") contemplating a leveraged buyout ("LBO") transaction with Physiotherapy emerging as the surviving entity.  Falgowski Declaration ¶ 9-10.  Court Square financed its acquisition through equity and debt, including (i) a $100 million term loan (the "Term Loan") secured by Physiotherapy's assets; (ii) $210 million in 11.875% senior unsecured notes due in 2019 (the "Senior Notes"); (iii) an equity investment by Court Square of approximately $313.3 million; (iv) a management equity rollover in the amount of approximately $3.9 million; and (v) a minority third party investment. Falgowski Declaration ¶ 11.  As a result of the LBO, Physiotherapy transferred $248.6 million of the proceeds to Defendants in exchange for their interests in the company. Def. Opening Br., page 6.

---

[2] This Opinion provides a brief summary of the factual and procedural background.  A more extensive discussion of such disputed facts and procedure is provided in the Court's Opinion on Defendants Motion to Dismiss, dated June 20, 2016. *PAH Litigation Trust v. Water Street Healthcare Partners, L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016).  The facts are not particularly germane to the Opinion, since what is presently before the Court is a legal question.

B.     The Debtors' Bankruptcy

On November 12, 2013, Physiotherapy filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re Physiotherapy Holdings, Inc., et al.*, No. 13-12965-KG, D.I. 1 (Bankr. D. Del.).   The Debtors, unable to pay approximately $350 million they owed, determined that they needed bankruptcy relief to "deliver [their] capital structure" and obtain "operating liquidity" required to continue their business. Disclosure Statement, D.I. 19 at 9 (Nov. 12, 2013). Following "extensive, good-faith negotiations" with creditors and shareholders (*id.*), the Debtors submitted a proposed joint prepackaged plan of reorganization (the "Plan"). *See* Plan, D.I. 18 (Nov. 12, 2013). The Plan significantly reduced the Company's existing debt, provided the Debtors with long-term financing, and established the Litigation Trust to pursue causes of action relating to Defendants' sale of Physiotherapy to Court Square in April 2012. D.I. 19 at 9.

The Debtors lacked sufficient funds to pay unsecured creditors (the "Noteholders"), and those interests (the "Senior Notes Claims") were therefore impaired under the Plan. D.I. 18 at 17-18. At the time, the Debtors owed the Noteholders $237,721,715, which included principal and unpaid accrued interest. Declaration of Farbod Moridani ("Moridani Decl.") ¶¶ 2, 10 & Ex. 1. The Plan provided that the "Senior Notes Claims shall be Allowed in the aggregate principal amount of $210,000,000." D.I. 18 at 17. The Senior Notes Claims could not be satisfied.  The Plan proposed to distribute to each Noteholder who chose to participate in the Plan, "in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Senior Notes Claims," (*id.*) (i) a pro rata share of new common stock issued by the reorganized Debtor (the "Equity

4

Interest"), and (ii) a pro rata share of 50% of Litigation Trust recoveries (the "Litigation Interest"). D.I. 18 at 28.  Almost all of the Noteholders (accounting for $209.4 million of the $210 million face value of the Notes) opted into the Plan. *See* Declaration of M. McGahan in Supp. of Chapter 11 Pets. & First Day Pleading, D.I. 16 ¶ 60 (Nov. 12, 2013). The Plan allocated the remaining 50% interest in Litigation Trust recoveries to Court Square. D.I. 18 at 28.

The Plan also placed a value on the Equity Interest in the reorganized Debtors which the Noteholders received. The Debtors' investment banker, Rothschild Inc., performed a valuation of the Debtors that approximated their post-confirmation going concern enterprise value at $240 million.  D.I. 19, Ex. J at 1.  After accounting for existing debts, the Debtors' post-confirmation implied equity value was between $76 million and $116 million, with a midpoint of $96 million. *Id.*  In the Disclosure Statement the Debtors valued the Equity Interest received by the Noteholders at 40.3% of the value of the Allowed Senior Notes Claims, or $84.63 million (40.3% of $210 million).  D.I. 19 at 38.

As previously stated, the Plan also created the Litigation Trust. D.I. 18 at 27-29. Pursuant to the Plan, the claims of the Debtors, Court Square, and the Noteholders (collectively, the "Contributing Claimants") were transferred to the Litigation Trust, including any avoidance claims. *Id.* at 27.  The Litigation Trust was designated an estate representative authorized to retain and pursue all such causes of action. *Id.* at 28.  The Disclosure Statement identified Water Street and Wind Point as potential targets of causes of action transferred to the Litigation Trust. *See* D.I. 19 at Ex. C.

All interested parties—including Defendants—had notice and the opportunity to object to the Plan. The Defendants acted on that opportunity, and on December 12, 2013, objected to the Plan. D.I. 128 at 2 (Dec. 12, 2013). This objection was only on the grounds that the Plan unfairly impaired their rights of indemnity against the Debtors and contained overly broad releases and exculpations that prevented Defendants from pursuing claims against third parties. *Id.* Defendants did not object to many terms of the Plan and Disclosure Statement including the formation of the Litigation Trust, the assignment of the Contributing Claimants' causes of action to the Litigation Trust, the distribution of new common stock in Physiotherapy to Noteholders, the determination that the equity distributed to Noteholders satisfied only 40.3% of their claims, the Noteholders' entitlement under the Plan to both the Equity Interest and 50% of Litigation Trust recoveries, Court Square's entitlement to the other 50% of Litigation Trust recoveries, or the Litigation Trust's standing to pursue the claims assigned to it for the benefit of both the Noteholders and Court Square.

On December 23, 2013, the Court approved the Plan and Disclosure Statement. *See* Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 197 (Dec. 23, 2013) (the "Confirmation Order"), including that "[t]he valuation set forth in the Disclosure Statement was prepared by the Debtors' investment banker, Rothschild Inc., in accordance with standard and customary valuation principles and practices, and is a fair and reasonable estimate of the value of the Debtors' businesses as a going concern." *Id.* at 27.

C.    <u>The Adversary Proceeding</u>

The Litigation Trust filed this adversary proceeding on September 1, 2015, seeking to recover the funds that Defendants allegedly took from the Debtors in connection with Physiotherapy's LBO. Complaint, Adv. D.I. 1. The Litigation Trust's complaint (the "Complaint") purports extensive accounting manipulations that led to the alleged fraudulent sale of Physiotherapy. The "manipulations" consisted primarily of the Debtors' abandonment of the historical look-back revenue recognition method in favor of a new methodology called the "rate bridge," which allowed Physiotherapy to record revenue without verifying that the amount recorded was consistent with past experience or was actually collected. *Id.* ¶¶ 40-42.

In the pre-bankruptcy sale, Court Square had agreed to pay $510 million for Physiotherapy based on fraudulent financial statements and other misrepresentations, Compl. ¶ 86, which was roughly double Physiotherapy's enterprise value. *Id.* ¶ 96. The sale was structured as a LBO financed by an equity investment by Court Square and over $300 million in debt, $210 million of which was issued to the Noteholders in the form of senior unsecured notes (the "Notes"). *Id.* ¶¶ 81-82, 87; Moridani Decl. ¶ 3, Ex. 2. The Litigation Trust argues the Offering Memorandum drastically overstated the Debtors' net revenues and EBITDA.

The transaction closed on April 30, 2012. Upon closing, the Debtors incurred hundreds of millions of dollars in debt and distributed $248.6 million to Defendants, leaving Debtors insolvent. Compl. ¶¶ 88, 96. On May 1, 2013, the Debtors failed to make a $12,468,750 interest payment due under the Notes, thereby defaulting. *Id.* ¶ 105;

Moridani Decl. ¶ 4, Ex. 3 at 9763. They also missed the next payment due, in the same amount, on November 1, 2013. Moridani Decl. ¶ 2, Ex. 1. The Debtors then filed for bankruptcy on November 12, 2013. D.I. 1.

In the adversary proceeding, Defendants moved to dismiss the Litigation Trust's Complaint. The Court resolved that motion on June 20, 2016, granting it in part but sustaining the Litigation Trust's claims for actual fraudulent transfer under 11 U.S.C. § 548 of the Bankruptcy Code and constructive fraudulent transfer under the Pennsylvania Uniform Fraudulent Transfer Account ("PUFTA"). D.I. 250. On May 25, 2017, the Litigation Trust moved for leave to amend its Complaint, including to seek punitive damages under the PUFTA claim. That motion is pending.[3]

D.    The Subsequent Sale of Physiotherapy

In March 2016, Select Medical Corporation ("Select Medical") acquired the reorganized Debtors, in which the Noteholders held their Equity Interest. Moridani Decl. ¶ 5, Ex. 4. Select Medical paid $421 million in cash. The Noteholders who sold their equity to Select Medical in March 2016 received a total of $282,282,590.11 through this transaction. *Id.* ¶ 6, Ex. 5. It is the Noteholders' receipt of this amount that Defendants argue forecloses recovery by the Litigation Trust. The amount is significantly higher than the Noteholders' Equity Interest under the Plan, reflecting improvements in Physiotherapy's performance created under the Noteholders' ownership. But the

---

[3]    The parties have briefed and argued the motion to amend but because of the urgent nature of the cross-motions, the Court has deferred a decision on the motion to amend. The Court will issue an opinion at its earliest convenience.

Litigation Trust argues that this amount is significantly lower than the value of the debt which the Noteholders agreed to release under the terms of the Plan, in exchange for the Equity Interest and Litigation Interest.  *See* Moridani Decl. ¶¶ 8-9.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal  Rule of  Bankruptcy  Procedure  7056,  provides  that  "[a]  party  may  move  for  summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56.  The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where, as here, there are cross-motions for summary judgment, the Court must ensure that the nonmoving party on each theory has the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion.  *Mitsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Here, the Court is assuming (without deciding) that the Litigation Trust has successfully proven all of the accounting manipulations and financial misrepresentations alleged in the Complaint; that the Debtors transferred $248.6 million to Defendants "with actual intent to hinder, delay, or defraud" creditors; and that Defendants knew about and actively  concealed  the  fraud  from  Court  Square  and  the  Noteholders.  *See* 11 U.S.C. § 548(a)(1)(A). The Court also assumes that, at the time of the transfers to Defendants, the Debtors (i) were insolvent; (ii) had unreasonably small assets in relation to the transfers

to Defendants; (iii) intended to incur debts beyond their ability to pay as they became due; and (iv) received less than reasonably equivalent value in exchange for the transfers. *See* 12 Pa. C.S.A. §§ 5104(a)(2), 5105.  For the purposes of this Opinion only, the Court is assuming there are no material facts regarding liability.

## DECISION

### A.  The Litigation Trust's Position

The Litigation Trust forcefully argues that it is entitled to recover the full amount of the fraudulent transfers regardless of the sale to Select Medical.   The Litigation Trust points out that Section 548 of the Bankruptcy Code empowers it to "avoid" a fraudulent transfer.   Further, Section 550 provides that the avoidance of a transfer under Sections 544, 545, 547, 548, 549, 553(b) or 724(a) permits that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property. . . ."  The property "transferred" and the "value" of the property transferred are the same, the $248.6 million which Defendants took from the Debtors.

There are cases which have addressed the issue and held that Section 550 damages are not capped to permit creditors to receive only the amount of their claims.  *See, e.g., In re JTS Corp.*, 617 F. 3d 1102, 1115-16 (9th Cir. 2010); *Clinton v. Acequia, Inc.* (*In re Acequia, Inc.*), 34 F. 3d 800, 809-11 (9th Cir. 1994); *In re Tronox Inc.*, 464 B.R. 606, 614 (Bankr. S.D.N.Y. 2012); and *Stalnaker v. DLC, Ltd.*, 376 F. 3d 819, 823 (8th Cir. 2004).  These cases, and

others,[4] hold that Section 550 does not limit a recovery to the amount of creditor claims. The Litigation Trust discussed the *Tronox* decision at length.

In *Tronox*, a defendant argued in a case brought under Section 548 that Section 550(a) imposes a cap – an absolute cap – in the amount of the claims of the creditors who would benefit from the recovery. *See generally* 464 B.R. 606. According to the defendant, more recovery would create a windfall that did not benefit the estate. *Id.* at 611. The court rejected the defendant's argument and stated that:

> In other words, the "for the benefit of the estate" clause in § 550 sets a minimum floor for recovery in an avoidance action – at least some benefit to the estate – but does not impose any ceiling on the maximum benefits that can be obtained once that floor is met.

*Id.* at 614. Congress did not use the phrase "to the extent" of the benefit to the estate.

In *Acequia*, the defendant urged the court to limit recovery under Section 550(a) to "an amount sufficient to satisfy all unsecured claims" to prevent a windfall to the estate. 34 F. 3d at 810. The court responded that "the [estate] has a greater equitable claim to the transferred funds than does [the defendant wrongdoer]" and did not cap the recovery. *Id.* at 812.

*Tronox* and *Acequia*, as well as a number of other cases, stand for the proposition that Section 550's "for the benefit of the estate" clause is not limiting, i.e., it does not limit the amount of recovery. The crux of the Litigation Trust's argument is therefore that its

---

[4] *See, e.g., Lim v. Miller Parking Co., 526 B.R. 202, 214-15* (Bankr. E.D. Mich. 2015); *Kipperman v. Onex Corp.*, 411 B.R. 805, 876-78 (N.D. Ga. 2009); *MC Asset Recovery, LLC v. Southern Co.*, 2006 WL 5112612 at * 5, n. 11 (N.D. Ga. Dec. 11, 2006).

recovery from Defendants is not capped.  If the Litigation Trust's recovery provides "some benefit to the estate," the amount recoverable is not capped.

Then there is the Plan on which, according to the Litigation Trust, "the Noteholders took a gamble."  They accepted equity in bankrupt Debtors which helped the Debtors emerge from bankruptcy without massive debts.  The Noteholders took a risk and are entitled to the benefits of their risk-taking.  Their sacrifice and management's efforts increased the value of Physiotherapy.  In contrast, Defendants did nothing to increase Physiotherapy's value.  Yet, if the Litigation Trust is correct, Defendants would benefit despite making no contribution to the increase in value.  Thus, Defendants would escape the Noteholders' litigation claims and thereby enjoy asset appreciation, while allegedly defrauded creditors would bear the burden of asset depreciation.  *See, e.g.*, *MC Asset Recovery*, 2006 WL 5112612 * 6-7 (N.D. Ga. Dec. 11, 2006) (noting appreciation of creditors' equity did not diminish the value of their avoidance claims); *In re Euler*, 251 B.R. 740, 747 (Bankr. M.D. Fla. 2000) (emphasis added) (highlighting that the increase or decrease in asset value is a risk or benefit of ownership and not a windfall).

At bottom, the Noteholders argue that they accepted the risk of depreciation of their Equity Interest.  Therefore, they should benefit from the appreciation of equity.

The Noteholders also argue that there will be no windfall if the Court accepts their argument.  The Plan provided for the Noteholders to receive the Equity Interest and the Litigation Trust interest.  If the Noteholders had not agreed to release their claims on the Notes, the Notes would have continued to accrue interest, which would have made the

unpaid principal and interest worth well over $300 million. Thus, the Noteholders would not receive a windfall from the litigation.

## B.     Defendants' Position

Defendants argue first that the fraudulent transfer laws are remedial, not punitive, in nature. The intent of the law is to restore creditors to their positions immediately prior to the fraudulent transfers. *See, e.g.*, *In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) (stating fraudulent transfer laws are not punitive, they are remedial); *Tronox*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010); *Miller v. Dow* (*In re Lexington Oil & Gas Ltd.*), 423 B.R. 353, 376 (Bankr. E.D. Okla. 2010) (noting an award of punitive damages is not included in Section 550 of the Bankruptcy Code). Defendants therefore complain that the Litigation Trust seeks to recover all $248.6 million paid to Defendants which far exceeds the Noteholders' and Court Square's actual losses.

Second, Defendants argue that when fraudulent transfer law was codified through the Bankruptcy Code it did not unleash an unlimited avoidance power. *See Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000) (finding no reason to analyze state interests differently because of a bankruptcy proceeding).

Third, Section 550 requires a plaintiff to prove that any recoveries are "for the benefit of the estate." *See Wellman v. Wellman*, 933 F. 2d 215, 217-18 (4th Cir. 1991) (observing courts unanimously hold that the estate must benefit from the recovery of transferred property). However, the "benefit" means a benefit to a debtors' creditors. *See, e.g.*, *Kennedy Inn Assocs. v. Perab Realty Corp.* (*In re Kennedy Inn Assocs.*), 221 B.R. 704,

715 (Bankr. S.D.N.Y. 1998) and *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.* (*In re P.A. Bergner & Co.*), 140 F. 3d 1111, 1118 (7th Cir. 1998).

Fourth, a court must focus on what the bankruptcy estate lost, and not what the transferee gained. *Gill v. Maddalena* (*In re Maddalena*) 176 B.R. 551, 556-57 (Bankr. C.D. Cal. 1995).

Fifth, recovery may not be greater than the value of unpaid creditor claims, and should only be awarded to cover harm to a creditor. The recovery must benefit a creditor. *Murphy v. Town of Harrison* (*In re Murphy*), 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005).

Sixth, Section 550 provides for partial avoidance because creditors are entitled to recover only what is necessary to satisfy their claim. *See Slone v. Lassiter* (*In re Grove-Merritt*), 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("A fraudulent transfer should be avoided only to the extent creditors were harmed."); *see also In re Murphy*, 331 B.R. at 114:

> The bankruptcy objective of the avoidance powers in Sections 544 and 548 is to protect creditors generally from prejudice resulting from transfers of the debtor's property for less than fair consideration, resulting in diminution of the debtor's estate available to pay creditors. That objective can and must be reconciled with state law and public interest by limiting the measure of avoidance damages under Sections 548 and 550 to the amount necessary to make creditors of the debtor's estate whole.

The foregoing is designed to prevent a windfall.

Seventh, creditors are entitled to collect only what is owed and no more. *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. Withum Smith Brown, P.C.*, 692 F. 3d 283, 295-96 (3d Cir. 2012).

Eighth, under either PUFTA or Delaware Uniform Fraudulent Transfer Acts ("DUFTA"), creditor recoveries are limited to the lesser of the value of the asset

transferred or the amount necessary to satisfy the creditor's claim.  Uniform Fraudulent

Transfer Act ("UFTA"), § 8(b); DUFTA § 1308(b); PUFTA, § 5108(b).[5]  The UFTA therefore

does not allow an award of punitive damages.  By their terms, Sections 548(a) and 550 of

the Bankruptcy Code provide only for compensatory damages not punitive damages.

Here, the only creditors who have not been compensated in whole are those Noteholders

who sold their common stock before Select Medical purchased the reorganized Debtors.

The Defendants also argue that *Tronox* and *Acequia* are distinguishable.  In *Tronox*,

the court also ruled that:

> On the other hand, [the debtor] overstates its case when it implies that there
> is no cap on plaintiff's potential recovery other than the value of the
> property fraudulently transferred.  Bankruptcy Code § 550 has several
> provisions that explicitly limit a plaintiff's recovery. . . .

464 B.R. at 617-18.  The *Tronox* court denied summary judgment, holding that trial was

necessary to determine what, if anything, would reduce damages. *Id.* at 618

The Defendants distinguish *Tronox* from the present case on several grounds:

1.      Unlike *Tronox*, the value of the property transferred is known and

        undisputed.  It is $248.6 million in cash.

2.      The Noteholders are the only unpaid creditors and have an allowed

        claim for a liquidated amount of $210 million.

---

[5]  The parties dispute whether PUFTA or DUFTA applies.  However, DUFTA and PUFTA
are nearly identical and both follow UFTA on points relevant to the dispute which the Opinion
addresses. *Compare* 6 Del. C §§ 1307(a)(1) and 1308(b), 12 Pa. Const. Stat. §§ 5107(a) and 5108(b),
*with* UFTA, §§ 7(a)(1) and 8(b).

3.    The sale to Select Medical resulted in payment to the Noteholders in
      excess of their allowed claims.

4.    The Litigation Trust has already settled claims for $22 million.

5.    The only creditors who remain unpaid are Noteholders who sold
      their stock before the sale to Select Medical.   Their maximum
      recovery is approximately $21 million.  Defendants' Reply Brief at 7-8.

### C.    Determination

<u>The Recovery is Not Capped</u>

The decision on the cross-motions is not as apparent as it may seem.  On the one
hand, there are numerous decisions, all outside of the Circuit in which the Court sits,
holding that there is no cap on fraudulent transfer claim damages.  On the other hand,
there is in bankruptcy law the general rule that creditors are not entitled to receive more
than their unpaid claims.  Windfalls and punitive damages are not bankruptcy concepts.

The Court's decision on the issue presented appears to be unanswered by the
Third Circuit Court of Appeals.  Further, the difference between the Litigation Trust's
position and Defendants' position well exceeds $200 million.  On balance, the Court is
satisfied that the Litigation Trust must be awarded summary judgment on the scope of
damages – not on the amount, which remains at issue, but on the concept.  Numerous
cases stand for the proposition that a recovery under Section 550(a) is not capped by the
amount of the creditor claims.  *Stalnaker v. DLC, Ltd.*, 376 F. 3d 819 (8th Cir. 2004); *In re
Leonard*, 125 F. 3d 543, 545 (7th Cir. 1997); *Tronox*, 464 B.R. at 613-14; and *MC Asset
Recovery, LLC,* 2006 WL 5112612 at *6-7.  All of these cases and others to which the Court

refers above reject a cap on fraudulent transfer recoveries under circumstances like what is now before the Court.  In *MC Asset Recovery*, the district court reviewed the cases and stated that "all have found that a trustee who brings an action to avoid or recover a fraudulent transfer may avoid or recover in its entirety, even when the value of the transfer exceeds the value of all allowed claims of unsecured creditors." 2006 WL 5112612 at * 5.  Were the Court to rule otherwise, it would mean that if Defendants are in fact liable for the fraudulent transfer, they would keep most if not all of the transferred money.  The Court cannot countenance such an inequitable result if liability exists.  *See, e.g.,* Adam J. Levitan, *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 Am. Bankr. L.J. 1, 1 n. 1 (collecting cases that proclaim "the bankruptcy court is a court of equity.")

The Litigation Trust also points out in its Reply Brief (at page 9) that the Court's interpretation of Section 550 is in accord with the Supreme Court's decision in *Moore v. Bay*, 284 U.S. 4 (1931).  There the Supreme Court held that a bankruptcy trustee could avoid a fraudulent transfer in its entirety, for the benefit of the estate, and that recovery was not limited to the amount of the unsatisfied creditor's claim.  *Id.* at 4-5.  According to *In re DLC, Ltd.*, 295 B.R. 593, 606 (B.A.P. 8th Cir. 2003), *Moore v. Bay* is codified by Section 550.  A trustee may thus avoid a transfer beyond the extent necessary to satisfy a creditor's claim.  The Trustee may avoid the entire transfer for the "benefit of the estate." *MC Asset Recovery*, 2006 WL 5112612 at *4.  Furthermore, and contrary to Defendants' position, "for the benefit of the estate" does not mean for the benefit of creditors.  "Estate" means "all legal or equitable interests of the debtor in property as of the commencement

17

of the case." *Tronox*, 464 B.R. at 613 (quoting 11 U.S.C. § 541). The estate is more than the interest of creditors. *Mellon Bank, N.A. v. Dick Corp.*, 351 F. 3d 290, 293 (7th Cir. 2003) (emphasis omitted) ("Section 550(a) speaks of the benefit to the estate – which in bankruptcy parlance denotes the set of all potentially interested parties – rather than to any particular class of creditors."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 972 (Bankr. D. Del. 1994) ("Section 550(a) requires a benefit to the 'estate,' not to creditors. 'Estate' is a broader term than 'creditors.'") In fact, the Plan provides that Court Square is entitled to one-half of recoveries by the Litigation Trust. D.I. 197-1 at 3, 27, 28.

Cases which Defendants cite and rely upon are inapposite. For instance, *In re Murphy*, 331 B.R. at 107, involved property which a town foreclosed on. A trustee sought to avoid the transfer. *Id.* at 113. In the "extremely unusual" situation the bankruptcy court refused to set aside the transfer which would negate an enforceable state court judgment. *Id.* at 121-26.[6]

*Adelphi Recovery Trust v. Bank of Am.*, N.A. 390 B.R. 80 (S.D.N.Y. 2008), is another case Defendants heavily rely on. There, the court dismissed fraudulent transfer claims because any recoveries would have been paid to different creditors of a different debtor with no interest in the funds. *Id.* at 97.

In another case that Defendants cite, *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 176 (S.D. Tex. 2009), the court set aside the transfer in its entirety. The court

---

[6] In *Tronox* the court found that "*Murphy* is factually distinguishable because there is no analogous state public policy at issue here." 464 B.R. at 617.

thereby refused the defendants' request that recovery be limited to what was necessary to make creditors whole.  *Id.*

The Court is fully satisfied that any recovery by the Litigation Trust will benefit the Estate.  The Noteholders are entitled to one-half of the Litigation Trust recoveries and Court Square, whose equity was eliminated and who is not a creditor, the other one-half.

## Appreciation of Noteholders' Equity

The cases make it clear that the appreciation of equity from the Select Medical sale is irrelevant.  The Court does not determine whether a party which received stock received too much or too little value when weighed against a claim.  *Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D. Ga. 2009); *see also MC Asset*, 2006 WL 5112612 at *6-7, n. 12 (noting appreciation of equity does not diminish value of claim); *In re Euler*, 251 B.R. 740, 747 (Bankr. M.D. Fla. 2000) (providing that an increase in value is a benefit of owning the stock just as decrease in value is a risk).

It also cannot be assumed that the Noteholders will receive a windfall if successful in the litigation.  Had there been no bankruptcy, the Noteholders would have received with interest $470,332,509 at maturity or over $380 million today. Moridani Decl. ¶¶ 8-9. Although the Noteholders in the Plan agreed to an allowed claim of $210 million and waived interest, the Court does not see a windfall from recovery in the fraudulent transfer action.

## PUFTA Recovery

The parties agree that under PUFTA, the Litigation Trust's recovery is the lesser of "the value of the asset transferred . . . or the amount necessary to satisfy the creditor's

claim." 12 Pa. C.S.A. § 5107(b). The question, therefore, is what the Noteholders received – actually received. The Court looks to the Disclosure Statement which provides that the Equity Interest which the Noteholders received satisfied 40.3% of the Senior Note Claims. The satisfaction of the claims of the Noteholders will occur only when (or if) the Litigation Trust recovers $250.8 million ($125.4 million x 2), or $228.7 million above the $22.05 million the Trust received in settlement.[7]

The Litigation Trust argues that "Defendants assert that the Plan is not binding on them . . . ." Litigation Trust's Brief in Opposition, p. 26. The Court does not think Defendants are making such an argument, which, in any event, would be wrong. Defendants do, however, argue that the "Litigation Trust and the Noteholders are similarly estopped from arguing that there was less than a 46% recovery for Noteholders." Defendants' Opening Brief, p. 10, n. 7. The Plan and the 40.3% valuation of the Equity Interest are indeed binding. Defendants both objected to the Plan and made claims on the Debtors' estate. *See In re Arctic Glacier Int'l, Inc.*, 2016 WL 3920855, *14 (Bankr. D. Del. July 13, 2016), *aff'd*, 2017 WL 2573957 (D. Del. June 14, 2017) ("A confirmed plan is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.") The Court again finds that the Equity Interest satisfied 40.3% of the

---

[7] The $228.7 million figure arises from the creditors' original claim in the amount of $210 million, of which the Noteholders took a 40.3% equity interest, leaving their new value at $84.63 million, or a $125.37 million deficit. Considering the Noteholders carry a 50% litigation interest, to make the whole $125.37 million would need to be doubled, making it $250.74 million. The Litigation Trust has recovered $22.05 million thus far. Thus, subtracting that $22.05 million from $250.74 million results in final recovery of $228.7 million.

Senior Note Claims.  Were the Plan not controlling, and it is, the Noteholders would have been entitled to far more in principal and interest.

### CONCLUSION

The Court therefore holds that the recovery of the Litigation Trust is not capped by the amounts received in the sale to Select Medical.  Amounts received in excess of the sale consideration will not be a windfall.  An Order consistent with the Opinion will issue.


Dated:  November 1, 2017

KEVIN GROSS, U.S.B.J.